```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA .    Case No. 2:18-cr-00249-6 and 9
                         .
          Plaintiff,     .
                         .    U.S. Courthouse
      v.                 .    601 Market Street
                         .    Philadelphia, PA 19106
AMIR BOYER AND           .
DENNIS HARMON,           .
                         .
          Defendants.    .    May 30, 2019
. . . . . . . . . . . . .     9:50 a.m.

              TRANSCRIPT OF SUPPRESSION HEARING
            BEFORE HONORABLE MICHAEL M. BAYLSON
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff           EVERETT R. WITHERELL, ESQ.
United States of        TIMOTHY MULLIGAN STENGEL, ESQ.
America:                U.S. ATTORNEY'S OFFICE
                        615 Chestnut Street, Suite 1250
                        Philadelphia, PA 19106


For Defendant           ANN C. FLANNERY, ESQ.
Dennis Harmon:          Ann C. Flannery Law Office
                        1835 Market Street
                        Philadelphia, PA 19103


For Defendant           LUTHER E. WEAVER, III, ESQ.
Amir Boyer:             Weaver & Associates, P.C.
                        123 S. Broad Street, Suite 2102
                        Philadelphia, PA 19109


Audio Operator:         L. BUENZLE, ESR

TRANSCRIBED BY:         Eileen Dhondt, CET-807
                        Aequum Legal Transcription Services
                        6934 East Almeria Road
                        Scottsdale, AZ 85257


            Proceedings recorded by electronic sound
        recording, transcript produced by transcription service.
```

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

INDEX

THE COURT                                              PAGE:

WITNESSES:

For the Government:

*JUSTIN FALCONE*
     Direct Examination by Mr. Stengel          8
     Cross-Examination by Ms. Flannery          33
     Cross-Examination by Mr. Weaver            48

*CHARLES RILLERA*
     Direct Examination by Mr. Witherell        57
     Cross-Examination by Ms. Flannery          93
     Redirect Examination by Mr. Witherell      130

*Brian Peters*
     Direct Examination by Mr. Witherell        135
     Cross-Examination by Ms. Flannery          145
     Cross-Examination by Mr. Weaver            157
     Redirect Examination by Mr. Witherell      164

*JOSEPH CENTENO*
     Questions by the Court                     166
     Direct Examination by Mr. Witherell        167
     Cross-Examination by Ms. Flannery          168

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

EXHIBITS:

| FOR THE GOVERNMENT: | MARKED | ADMITTED |
|---|---|---|
| Exhibit 1-A | -- | 170 |
| Exhibit 1-B | -- | 170 |
| Exhibit 4 | -- | 170 |
| Exhibit 225 | -- | 170 |
| Exhibit 341 | -- | 170 |
| Exhibit 342 | -- | 170 |
| Exhibit 343 | -- | 170 |
| Exhibit 348 | -- | 170 |

| FOR DEFENDANT HARMON: | | |
|---|---|---|
| Exhibit 2 | -- | 134 |
| Exhibit 10 | -- | 97 |
| Exhibit 17 | -- | 98 |
| Exhibit 20 | -- | 131 |
| Exhibit 66 | -- | 170 |
| Exhibit 69 | 41 | 41 |

| FOR DEFENDANT BOYER: | | |
|---|---|---|
| Exhibit 001 | -- | 169 |
| Exhibit 002 | -- | 169 |
| Exhibit 004 | -- | 169 |

<pre>
 1                         PROCEEDINGS

 2        (Call to Order of the Court)

 3        (Proceedings commence at 9:50 a.m.)

 4             THE COURT:  It's okay.  We're already in open court.

 5   Be seated.  Be seated.

 6             MR. WITHERELL:  Your Honor, with your permission, can

 7   I grab my colleague?  With your permission, may I grab my

 8   colleague?  I believe --

 9             THE COURT:  Sure.

10             MR. WITHERELL:  Thank you.

11        (Pause)

12             MS. FLANNERY:  Your Honor, the Government wasn't here

13   when I made my estimate of the hearing time.  I don't want to be

14   responsible if I undershot it.

15             THE COURT:  Well, the question is, approximately how

16   many witnesses do you plan to call, Mr. Witherell and

17   Mr. Stengel?

18             MR. WITHERELL:  Your Honor, we have, I think, six

19   witnesses total here.  I do not believe that they're all going

20   to be necessary.  I believe that our direct will -- of the

21   witnesses will be over an hour.

22             MS. FLANNERY:  Well, then my estimate is probably

23   short.

24             THE COURT:  All right.  Well, and we -- we're

25   probably -- if we can't finish by our usual lunch break at 12:15
</pre>

3

 1  or 12:30, we'll just have to continue this afternoon.

 2              MS. FLANNERY:  Might I ask who the --

 3              THE COURT:  Yeah.  Everybody pull the microphone

 4  closer to you, please.

 5              MS. FLANNERY:  We were given notice of five witnesses.

 6  I just wanted to inquire as to who the sixth available witness

 7  is.

 8              MR. WITHERELL:  Your Honor, the sixth witness pertains

 9  to Mr. Luther.  Part of his motion, which I don't know if the

10  Court is planning on hearing today, deals with the search of the

11  Sydenham residence in 2018 --

12              THE COURT:  Oh.

13              MR. WITHERELL:  -- not 2017.  I've spoken to

14  Mr. Weaver, who has indicated that the argument is more on the

15  facial sufficiency of the warrant.  So I don't believe we need

16  to call any witness.

17              THE COURT:  Okay.

18              MR. WITHERELL:  I do have the affiant, which is --

19              THE COURT:  Okay.

20              MR. WITHERELL:  -- the FBI agent.

21              THE COURT:  All right.  Look, let's get through the

22  witnesses on North Sydenham Street, and then we'll see where we

23  are.

24              MR. WITHERELL:  Just to be clear, Judge, they're both

25  at the same address.  They're just at different times.

1          THE COURT:  Oh, okay.

2          MR. WITHERELL:  One's in --

3          THE COURT:  So same address?  All right.  Okay.

4          MR. WITHERELL:  One's in 2017.  One's in 2018.

5          THE COURT:  I got you.  Okay.  Thank you.  All right.

6  Thanks for clarifying that.  All right.  Well, we're here for

7  the suppression hearing in United States versus Boyer and

8  Harmon.  These are two defendants in the indictment at

9  18-CR-249.  And I've had a prior suppression hearing in this

10 case on another defendant and another search, and this one has

11 been scheduled because both Mr. -- counsel for Mr. Boyer and

12 Mr. Harmon have both filed separate motions to suppress evidence

13 that was seized by the Government in this same search.  So we're

14 ready to begin.

15          Mr. Witherell, you want to call your first witness?

16          MR. WITHERELL:  Sure.

17          MR. STENGEL:  I think I'm up to bat.

18          THE COURT:  Mr. Stengel.  Yeah.

19          MR. STENGEL:  Yeah.  I think I'm up to bat first, Your

20 Honor.  The Government calls Detective Justin Falcone to the

21 stand.

22          THE COURT:  All right.  Is he outside?  Somebody needs

23 to get the witness.

24     (Pause)

25          MR. STENGEL:  I apologize for walking in a couple

5

 1    minutes late, Your Honor.

 2              THE COURT:  That's okay.

 3              MR. STENGEL:  It's nice to see you.

 4              MS. FLANNERY:  And if we could move the podium a bit

 5    to the right, please?

 6              MR. STENGEL:  Sure.  Where do you need me?

 7              THE COURT:  Okay.  By the way, one -- before you

 8    start --

 9              MR. STENGEL:  Is that okay?

10              THE COURT:  -- as some of you know from having been

11    here early, I have a civil case in which the trial is starting

12    on next Monday.  And counsel are picking a jury next door in 3B,

13    and the panel is on its way up.  And when the panel is ready,

14    I'm going to take a recess here and go into 3B for about ten

15    minutes just to explain to the jury panel what's happening, and

16    then I'll come back, and we'll resume.  Okay?  So that's

17    the -- that'll be the first recess --

18              MR. STENGEL:  Sure.  Let's play that by ear.

19              THE COURT:  -- and I'll keep it short.  All right.  Go

20    ahead.  All right.  Swear the witness, please.

21              THE CLERK:  Please raise your right hand.

22         (JUSTIN FALCONE, Witness, is Sworn)

23              THE CLERK:  Please state your full name.  Spell your

24    last name for the record.

25              THE WITNESS:  Detective Justin Falcone, F-A-L-C-O-N-E.

6

1    I'm currently assigned to the ATF Task Force, Philadelphia

2    Division, detailed from Northwest Detective Division.

3                    THE COURT:  Okay.  Have a seat.  Keep your voice up.

4                    THE WITNESS:  Good morning, Your Honor.

5                    THE COURT:  Good morning.

6                    Go ahead, Mr. Stengel.

7                                DIRECT EXAMINATION

8    BY MR. STENGEL:

9    Q    Good morning, Detective Falcone.  How are you?

10   A    Good morning.  I'm well.  How are you?

11   Q    All right.  So you just answered my first question, but you

12   work for the Philadelphia Police Department, correct?

13   A    Yes, that's correct.

14   Q    And what is your job with the Philadelphia Police

15   Department?

16   A    I'm a detective.

17   Q    With what division?

18   A    Northwest Detective Division.

19   Q    And how long had you been a detective in the Northwest

20   Division?

21   A    Four-and-a-half years.

22   Q    Prior to that, what was your job?

23   A    I was a police officer.

24   Q    As a detective in Northwest Division, what are some of your

25   duties?

1   A      We handle every crime from fraud up to non-fatal shootings.

2   The only crimes we cannot handle are homicides and sexual

3   offenses.

4   Q      Who handles homicide investigations?

5   A      Homicide division.

6   Q      Were you working on September 11, 2017, as a detective?

7   A      Yes, I was.

8   Q      And what hours were you working?

9   A      4 p.m. to 12 a.m.

10  Q      Did you on that day respond to the report of a shooting?

11  A      I did.

12  Q      And do you recall where that shooting was?

13  A      It was the -- yes.  It was the 2700 block of North 22nd

14  Street.

15  Q      What are the cross-streets at that block of 22nd Street?

16  A      22nd and Lehigh Avenue.

17  Q      And how is it that you knew there was a shooting on the

18  2700 block of 22nd Street that day?

19  A      Somebody from the patrol division had called Northwest and

20  alerted us to it.  At that point, we responded to the scene.

21  Q      And why is it that they call you and alert you as to that

22  shooting?

23  A      At that time, it was a non-fatal shooting.  The victim was

24  not yet deceased.

25  Q      Do you know -- pardon me -- approximately when that

8

1  shooting occurred?

2  A    It was approximately 5:40 p.m.

3  Q    And do you recall approximately what time you responded to

4  the scene?

5  A    Approximately 6:35, 6:40 p.m.

6  Q    When you responded to the scene, were you alone?

7  A    No.  I was with Detective Sweeney.

8  Q    Is Detective Sweeney your partner?

9  A    He -- I worked with him at the time, some cases, yes.

10 Q    But you don't generally operate with partners, correct?

11 A    We do not.  No.

12 Q    Now, when you responded to that scene, what information did

13 you have?

14 A    Just that there was a report of gun shots.  A male victim

15 was located on the scene on 22nd Street, and he was transported

16 to Temple University Hospital in extremely critical condition.

17 Q    So at that time, he was not deceased, correct?

18 A    He was in extremely critical condition, not yet deceased.

19 No.

20 Q    Did he ultimately die?

21 A    Yes, he did.

22 Q    When you got to the scene, describe for the Court, please,

23 what you saw.

24 A    It was -- it was early September, so it was still daylight.

25 It was a chaotic scene.  There was, I would say, hundreds of

1   people between Lehigh Avenue and Somerset on both sides of the

2   street.  It was a lot of people outside.

3   Q    And did you see anything that at that time, as a detective,

4   you viewed as having evidentiary value?

5   A    Yeah.  There were multiple cameras on -- along the Save A

6   Lot store located on 22nd Street?

7   Q    Any ballistic evidence?

8   A    There were multiple shell casings on the street -- in the

9   street and on the sidewalk on North 22nd Street as well.

10  Q    Now, you mentioned that you saw multiple cameras.  Where

11  were those cameras?

12  A    They were on the side of the Save A Lot store located on

13  22nd Street.  The cameras that I saw were pointing down towards

14  the scene.

15  Q    And so fair to say that the shooting occurred in close

16  proximity to the Save A Lot, correct?

17  A    Yeah.  There was a motorcycle scooter that was crashed onto

18  the sidewalk and had pooled blood right by it.  And I assumed

19  that that's where the shooting had taken place, because there

20  was multiple FCCs right in that general area as well.

21  Q    Okay.  And the cameras that you observed on the Save A Lot,

22  did you have an opportunity to determine whether they were

23  operational?

24  A    Yeah.  I proceeded to go inside the store to check

25  the -- you know, if they were operational, and I was told by the

1  security -- I was met by the security guard who told me they

2  were not.

3  Q    And did you have any further discussions with that security

4  guard?

5  A    Yes.  As I approached him, the security guard had told me

6  that he -- he heard the shooting, that he observed a black male

7  from around the side of the store walk -- or hurriedly walk to a

8  white SUV and exit the area on Lehigh Avenue towards Broad

9  Street.  He then gave me a piece of paper with a PA tag written

10  on it that the witness told me another older black gentleman

11  that was a patron of the store had said -- had given to him and

12  said that was the tag of the vehicle.

13  Q    And did you have an opportunity to interview the person who

14  provided that plate to the security guard?

15  A    I attempted to locate him.  He was lost amongst the

16  confusion.

17  Q    Now, once you got that information from the security guard,

18  what did you do with it?

19  A    I immediately broadcast the Pennsylvania tag over the

20  police radio and asked the Northwest Division to also broadcast

21  it over J-Band, which is our citywide band.

22  Q    And did you wait to conclude your interview to do that?

23  A    Did I -- I'm sorry?

24  Q    When you were speaking with the security guard, did you

25  finish speaking with him before you broadcast that over radio,

1    or did you just broadcast it over the radio?

2    A    Once he handed me that tag, I stopped him there, and I said

3    just give me one second, and I turned on the radio and I

4    broadcast it then.

5    Q    I'd like to play for you what's been marked as Government

6    Exhibit 225.

7         (Counsel confer)

8              THE COURT:  All right.  Okay.  Is the jury ready?

9              UNIDENTIFIED SPEAKER:  Yes.

10             THE COURT:  All right.  I'm going to take a recess --

11             MR. STENGEL:  Sure.

12             THE COURT:  -- at this time.

13             MR. STENGEL:  Okay.  Sure.

14             THE COURT:  Okay?

15             MR. STENGEL:  That's good.

16             THE COURT:  So I'll be back in five to ten minutes.

17   Okay?

18             MR. STENGEL:  Standing by.  Thanks.

19             THE COURT:  All right.

20             THE CLERK:  Rise.

21        (Recess at 10:02 a.m. until 10:10 a.m.)

22             THE COURT:  All right.  We are ready.  Where's the

23   witness?

24             UNIDENTIFIED SPEAKER:  We'll go get him, Your Honor.

25        (Pause)

1          THE WITNESS:  Can I sit, Your Honor?

2          THE COURT:  Yes.

3          Okay.  Let's continue --

4          MR. STENGEL:  Sure.  Thank you, Your Honor.

5          THE COURT:  -- with direct examination.

6                    DIRECT EXAMINATION CONTINUED

7     BY MR. STENGEL:

8     Q    Detective Falcone, before we took a brief break, we had

9     talked with you -- you mentioned that a -- that an individual

10    had provided some information to a security guard, and then you

11    had spoken to that security guard, correct?

12    A    That's correct.

13    Q    And what information did that individual give to the

14    security guard?

15    A    He gave a PA registration tag that was on a white Jeep

16    Cherokee.

17    Q    And what was the import of that white Jeep?

18    A    That was the vehicle that was -- that he saw the shooter

19    get into and drive away.

20    Q    Okay.  Now, you mentioned then that you stopped your

21    interview and that you provided that information over police

22    radio, correct?

23    A    That's correct.

24    Q    I'd like to play for you what has been marked as Government

25    Exhibit 2-25.

1        (Counsel confer)

2        (Video played from 10:11 a.m. to 10:12 a.m.)

3   BY MR. STENGEL:

4   Q    Detective Falcone, recognize that voice?

5   A    Yeah.  That's me.

6   Q    That's you.  And that was the radio call you made after

7   receiving the information from the security guard, correct?

8   A    That's correct.

9   Q    And just for the benefit of all here, just describe what

10  you just said.

11  A    I put a -- the tag that was given to me was JYD-0749 -- or

12  I believe -- and I put that out over the air in phonetic

13  alphabet.

14  Q    And now did you -- and you also mentioned, as you did

15  previously, that the -- that tag was on a vehicle that a witness

16  saw the shooter get into, correct?

17  A    Yes.  The unknown witness told the --

18        MS. FLANNERY:  May -- I couldn't hear him with

19  the -- could I have the question repeated, please, the --

20        MR. STENGEL:  Sure.  Sure.

21  BY MR. STENGEL:

22  Q        It's that that was -- the tag on that vehicle

23  was -- who got into that vehicle?

24  A    According to the witness, the shooter of -- from 22nd

25  Street got into that vehicle and fled the scene.

14

1    Q    Now, did you, through your own investigation, obtain any

2    other information about any possible suspects?

3    A    When I formally interviewed the security guard, he

4    mentioned the black male in the white t-shirt that got into the

5    white SUV.  And he also mentioned another black male in a red

6    t-shirt, but he stated that that male was across the street on

7    the other side of 22nd Street, and he didn't believe he was

8    involved.

9    Q    Okay.  But to be clear, you broadcast that information over

10   radio.  Then you went back and concluded an interview with the

11   security guard, correct?

12   A    Yeah.  At the time I broadcast that, I did not formally

13   interview --

14   Q    Okay.

15   A    -- the witness yet.  No.

16   Q    And then you did -- and you obtained that information about

17   possible suspects, correct?

18   A    Yes, that's correct.

19   Q    And did you obtain any information through your

20   investigation about any other possible suspects?

21   A    I did not.

22   Q    And did you obtain any information about any other possible

23   getaway vehicles?

24   A    I did not.

25   Q    When you went over police radio to convey the information

15

1  that you received from the security guard, did you believe that

2  was the first time any flash information about a getaway car had

3  gone over police radio?

4  A    Yes, I did, because the -- when I -- the eyewitness had

5  handed me the slip, I asked him if he had told anybody else

6  about this information yet, and he said he hadn't.  So, to me,

7  it was the freshest and most reliable information we had at that

8  point.  I didn't know any other --

9  Q    Now, after you -- did you stay at the scene the entire

10 evening?

11 A    I did not.  I left more than one -- more than one occasion.

12 Q    And approximately, if you recall, what time did you leave?

13 A    Maybe about approximately 7:20 to take the

14 eyewitness -- the vehicle that I broadcast over the radio was

15 located by 39th District officers on the 3200 block of North

16 Sydenham Street.  I took the eyewitness there approximately 7:20

17 to show it to him and see if that was the vehicle he saw exiting

18 the Save A Lot parking lot after the shooting.

19 Q    Now, at 7:20 when you took him there, were you aware as to

20 whether the victim had died?

21 A    I don't recall at that point if he had or hadn't died yet.

22 I don't know.

23 Q    And at whose --

24 A    I don't believe so.

25 Q    At whose request, if anyone's, did you take that witness to

```
1   the 3200 block of Sydenham Street?

2   A    Yeah.  Come to think of it, now that I -- it was -- by that

3   point, the male had been deceased, and Detective Peters was the

4   assigned investigator at that point.  At that point, I had

5   spoken to him, and he had asked me to do so.

6   Q    And Detective Peters works from what division?

7   A    He's in the Homicide Division.  Once the male died, it

8   became his investigation.  It was no longer mine.

9   Q    Prior to that, though, it was your investigation, correct?

10  A    Yes, that's correct.

11  Q    Now, and you went to the 3200 block of Sydenham Street

12  because that white SUV with the PA tag you broadcast had been

13  located, correct?

14  A    Yes, sir.

15  Q    And approximately how far is that from the scene of the

16  shooting?

17  A    It's in the same police district.  It's about a five-minute

18  ride, maybe less.

19  Q    And you took the witness to identify the Jeep, correct?

20  A    I did.

21  Q    And then where did you take him?

22  A    After that, I took him back to the Save A Lot location

23  where he worked.

24  Q    And then what did you do after that?

25  A    At that point, I -- Detective Peters had been on scene or
```

1  other homicide personnel, at that -- you kind of debrief them as

2  far as how -- what information you have, pass along any notes

3  you have to them.  And that's what I did.  And I was talking to

4  Detective Peters for a while, and, at that point, after my job

5  was concluded, he asked me to transport myself and Detective

6  Sweeney to the Homicide Division to be formally interviewed by

7  one of their personnel.

8  Q    Did you go directly to the Homicide Division?

9  A    No.  Once I left the Save A Lot location, I decided that I

10  would stop by the 3200 block of Sydenham Street to let the

11  officers know who I work with that they were in for a long

12  evening and to prepare to be there for a while because homicide

13  was preparing search warrants for the house and the vehicle on

14  the block.

15  Q    So why is it that they were in for a long evening?

16  A    The process takes a little while, and Homicide Division

17  doesn't do anything quickly.

18  Q    And what do they -- what do those officers have to do while

19  homicide is doing what homicide does?

20  A    They have to secure the vehicle, make sure nobody enters

21  it, touches it, and they have to secure the house at 3234 North

22  Sydenham, nobody in or out.

23  Q    Why 3234 North Sydenham Street?

24  A    The tag was -- the tag on the white Jeep Grand Cherokee was

25  registered to 3234 North Sydenham Street.  That's how the

1  officers found it.  That's the block they -- that they -- they

2  were directed to that block by the address on the registration,

3  and that's where they found the Jeep.

4  Q    And when you got back to 3234 North Sydenham

5  Street -- excuse me -- who did you see there?

6  A    Officer Rillera and his partner, Officer Nelson, I believe.

7  Q    And did you speak with them?

8  A    Yes.  At that point, I hadn't spoken to any officers on

9  that scene yet, so I -- I know Officer Rillera from working in

10 the same division, and I just informed him what was going on.

11 And I wanted to ask him a few questions about what had -- what

12 happened when he arrived on scene there.  We were --

13 Q    Could you just briefly describe for the Court that

14 conversation?

15 A    At that point, the male had been deceased, and Officer

16 Rillera had known that, but I had asked him, you know,

17 when -- what he saw when he pulled onto the block and what had

18 happened. And I knew from police radio that one male was taken

19 into custody, and I was asking him how that came about.  And

20 Officer Rillera said that the male that they had detained and

21 transported to homicide for questioning had come inside and

22 outside of 3234 North Sydenham Street.

23 Q    Okay.  I'd like to -- on September 11, 2017, were you aware

24 that federal law enforcement had a pole camera outside of that

25 block?

```
1    A    I was not.

2    Q    Are you aware now?

3    A    I am now.

4    Q    And have you had an opportunity to review some of that

5    footage?

6    A    Yes.

7    Q    And does the footage that you review (sic) fairly and

8    accurately reflect the scene at North Sydenham Street that

9    night?

10   A    Yes.

11   Q    I'd like to play for you what's been marked as Government

12   Exhibit 1-B.

13          (Counsel confer)

14             MR. STENGEL:  Your Honor, I'd proffer to the

15   Court -- we have a witness here who can testify to this if

16   necessary, but that you'll see a timestamp on the FBI pole cam.

17   The timestamp is 22 -- approximately 22 minutes slow as to the

18   actual time.  So when the timestamp says 19:28:36 seconds, it's

19   really about 7:50 p.m.

20             THE COURT:  Okay.  Is that --

21             MS. FLANNERY:  I would concur on --

22             THE COURT:  Is that stipulated --

23             MS. FLANNERY:  -- that, Your Honor, but I would

24   ask -- as we go through the pole camera, all the identifying

25   information on the pole camera is at the bottom in military
```

```
1    time.  And I agree with the AUSA that it's 22 minutes slow, but
2    I think it would be helpful when we're looking at the pole
3    camera to refer to the times that the pole camera shows, if that
4    makes sense.
5              MR. STENGEL:  I fully --
6              THE COURT:  Sure.  But you -- there's -- it's
7    stipulated that the camera is 22 minutes slow?  Is that agreed?
8              MS. FLANNERY:  That's agreed.
9              THE COURT:  Mr. Weaver, you agree?
10             MR. WEAVER:  Yes, Your Honor.
11             THE COURT:  All right.
12             MS. FLANNERY:  And --
13             THE COURT:  All right.
14             MS. FLANNERY:  And my suggestion -- and I believe
15   Mr. Stengel agrees -- that when we reference the pole camera
16   footage, we use the number that's at the bottom of the screen.
17             THE COURT:  Yeah.  That makes sense.  Thank you.
18             MS. FLANNERY:  And we'll all know --
19             THE COURT:  Yeah.
20             MS. FLANNERY:  -- in the end that that's 22 minutes
21   behind.
22             THE COURT:  Okay.  Thank you.  All right.  What's the
23   exhibit number?
24             MR. STENGEL:  This exhibit is 1-B, Your Honor.  It's
25   an approximately 12-minute clip from the pole camera from
```

1    about --

2                    THE COURT:  All right.

3                    MR. STENGEL:  -- the time where Detective Falcone --

4                    THE COURT:  You want to play the whole thing now?

5                    MR. STENGEL:  No, I'm not.  I'm going --

6                    THE COURT:  Okay.  Go ahead.

7                    MR. STENGEL:  -- to mercifully skip through it.

8                    THE COURT:  All right.  Go ahead.

9                    MR. STENGEL:  Thank you.  Special Agent Becker

10   (phonetic), if we could just play -- don't hit play yet.  I'm

11   just going to note for the record that the timestamp here is

12   19:28:36 seconds.  We're going to play this for approximately 45

13   seconds.  So Special Agent Becker, if you could please play it?

14                    THE COURT:  All right.  Go ahead.

15        (Video played from 10:22 a.m. to 10:23 a.m.)

16   BY MR. STENGEL:

17   Q    Detective Falcone, you can see it on your screen, correct?

18   A    I can.  Yes.

19   Q    And what did we just see?

20   A    That's myself and Detective Sweeney arriving on 3200 block

21   of Sydenham Street.

22   Q    I saw two guys get out of that car that pulled up.  Which

23   one of them is you?

24   A    I'm the driver of the vehicle.

25   Q    You're dressed a little like you are today, right?  Looks

1  like a white shirt, dark tie, and a blazer?

2  A     Yeah.  With a blue jacket and tan pants.

3           MR. STENGEL:  Sure.  Now, Special Agent Becker, if you

4  could please play for the next about minute and 15 seconds to

5  the two-minute mark?  Thank you.

6           (Video played from 10:23 a.m. to 10:24 a.m.)

7  BY MR. STENGEL:

8  Q     So, Detective Falcone, what is it that we just saw?

9  A     So I exited the vehicle, and I just take a closer look at

10  the white Jeep Grand Cherokee that's parked up the street.  I

11  began -- I talked to Officer Rillera and Officer Nelson just

12  about the recap of the timeline of events and how

13  it -- how -- what had taken place since they arrived on location

14  there.  As we go over to this area here and look on the ground,

15  that's -- I believe that's when Officer Rillera had told me that

16  the keys to the Jeep Grand Cherokee were thrown on the ground by

17  that tire, and I think he said -- there was some dirt kicked on

18  it.

19  Q     Let me just stop you right there, because you pointed to

20  the screen.  Just so our record is clear, right now the camera

21  is stopped at 19:30 and 36 seconds.  And there's a group of

22  people standing sort of in front of the police car, and there's

23  another car in front of the police car, correct?

24  A     Yes.

25  Q     And you just mentioned, is that around the area where you

1  believe they found the keys?

2  A    Yes, I believe so.

3  Q    Okay.  Now, continue.  What else did you guys discuss?

4  A    Officer Rillera relayed to me that there was -- as he

5  pulled onto the block, there was a -- there was five or six

6  black -- young black males that were on location when they

7  pulled up.  As they exited the vehicle and began to approach the

8  Jeep -- the white Jeep, that they -- the males walked off.

9  Officer Rillera began to also tell me that they took one guy

10  into custody, and I asked him about -- he explained to me that

11  the man was in -- inside and outside of the property on Sydenham

12  Street.

13         At that point -- at some point in the next minute or

14  so, I asked Officer Rillera if anybody else was inside that

15  house, and he said that he didn't know.  And I asked him, well,

16  when you cleared the house, was there anybody else inside, did

17  you see any other evidence of somebody inside.  And he said,

18  well, we never did clear the house.

19  Q    And now, why would it be important that they cleared the

20  house?

21  A    Well, I mean, it was a non-fatal shooting investigation.

22  At this point, it had turned into a homicide.  We had nobody as

23  far as suspected shooters in custody.  We had no weapons

24  recovered.  And it's (sic) reason to believe that the possible

25  offender could still be inside that property.

```
 1   Q     Now, you had mentioned that there were several males

 2   outside of the property, or at least Rillera mentioned to you

 3   that there were several males outside of the property when they

 4   arrived, and they dispersed.  At this point, did you have any

 5   possible descriptions of the shooter?

 6   A     I just had what the security guard had given me: 5'8",

 7   5'9", black male with dark complexion, wearing a white t-shirt,

 8   approximately 180 pounds --

 9   Q     Did --

10   A     -- which isn't very descript at all.

11   Q     Did Officer Rillera tell you whether any of the males that

12   dispersed matched the description of any possible shooter?

13   A     Officer -- he wasn't very sure about any of their

14   description.  He just knew the -- there was males in there, and

15   they dispersed pretty quickly when he approached the Jeep.

16   Q     So when you found out that the house had not been cleared,

17   what did you do?

18   A     I decided to clear the house with Detective Sweeney and the

19   two officers that were there.

20         MR. STENGEL:  I'd like to now play for the next about

21   25 seconds, Special Agent Becker, that this will be starting at

22   the timestamp of about 19:30 and 36 seconds until about 19:31.

23         (Video played from 10:27 a.m. to 10:28 a.m.)

24   BY MR. STENGEL:

25   Q     All right.  So what is it that we just saw, Detective
```

1  Falcone?

2  A    At that point, we decided that we were going to clear the

3  property. I go back to the car to turn off -- I still have the

4  vehicle running.  I go back to turn the keys off and lock it and

5  get my flashlight.

6  Q    So we see you in the middle of the street, but you

7  eventually went in to help clear the house, correct?

8  A    I did.  Officer Sweeney and the two officers, I believe,

9  went in directly.

10 Q    Okay.  Now, is it -- I'd like to --

11           MR. STENGEL:  Special Agent Becker, if you could

12 please fast forward to the -- 7:05 in the video clip?  This will

13 be at a timestamp of approximately 19:35 and 41 seconds.  It's

14 going to play for about 30 seconds.

15      (Counsel confer)

16      (Video played from 10:29 a.m. to 10:29 a.m.)

17 BY MR. STENGEL:

18 Q    So what is it that we just saw, Detective Falcone?

19 A    This is myself and the police officers exiting the property

20 after we had cleared it.

21 Q    And is it fair to say that you were in clearing that

22 property for approximately five minutes?

23 A    Approximately, yes.

24 Q    Approximately?

25 A    Correct.

1   Q    And just so we're clear here, what does it mean to clear a

2   house?

3   A    In this regard, we were going inside to make sure there

4   were no occupants inside the house.  That's all.

5   Q    And in this case, is that what you did?

6   A    That's exactly what we did.

7   Q    And what did you do to ensure there were no occupants

8   inside the house?

9   A    You go -- I searched -- I searched the basement and the

10  first floor.  The police officers and, I believe, Detective

11  Sweeney went upstairs.  But we search any place that a body

12  could be hidden.

13  Q    And did you find anybody?

14  A    There was nobody else inside the property, no.

15  Q    Did you -- what did you see when you walked in, however?

16  A    As I entered the property, I could -- I was -- immediately

17  smelled a strong smell of marijuana.  There was two big bags of

18  marijuana inside the living room to the left of the front door

19  as I entered.  I also observed a heat-sealing machine

20  that's -- through my experience as a narcotics officer, is used

21  to package narcotics.

22  Q    Okay.  And did you search anywhere other than the first

23  floor?

24  A    The basement.

25  Q    And did you search anywhere other than the basement and the

1   first floor?

2   A    I did not.

3   Q    Did other officers search the second floor?

4   A    Yes.  The officers -- the -- Detective Sweeney and I did

5   the first floor and the officers went upstairs.  Detective

6   Sweeney eventually made his way upstairs.  I did not.

7   Q    And did any of the individuals who went upstairs tell you

8   what they saw?

9   A    Yeah.  They mentioned that they saw -- they -- there was

10  cell phones, a money counter, narcotics paraphernalia, I believe

11  ammunition.

12  Q    I'd like to show you what's been marked as Government

13  Exhibit 341.

14       (Counsel confer)

15  BY MR. STENGEL:

16  Q    Detective Falcone, did you -- when you walked in that

17  house, you were in there for approximately five minutes, did you

18  take any photographs?

19  A    I did not.

20  Q    Did you touch anything?

21  A    Just doors and, you know, drawer -- anywhere a body could

22  be hidden, just to move things around, handles maybe just to

23  look.

24  Q    Did you remove anything from the scene?

25  A    I absolutely did not.

1    Q    Did you add anything to the scene?

2    A    No.

3    Q    Do you see the photo in front of you?

4    A    I do.

5    Q    Do you recognize that?

6    A    Yes.  It's the front of 3234 North Sydenham Street.

7    Q    And, again, you did not take this photograph, though,

8    correct?

9    A    I did not.

10    Q    Does it fairly and accurately depict the front of that

11    property on the evening you cleared the house?

12    A    Yes, it does.

13    Q    I'd like to show you what's been marked as Government

14    Exhibit 342.  Do you recognize that?

15    A    Yes.  This is the living room area as soon as you enter the

16    property through that front door.

17    Q    And this fairly and accurately depicts that living room on

18    the night you cleared it?

19    A    Yes.

20    Q    I'd like to show you what's been marked as Government

21    Exhibit 343.  And what do we see here?

22    A    There's two bags of bulk marijuana and the heat-sealing

23    machine that I had saw.

24    Q    If you could describe for the Court, please, where the bulk

25    bags of marijuana are?

1   A    There's one on the chair directly in the center of the

2   photograph, and there's one on the table there, a smaller bag

3   next to the heat-sealing device.

4   Q    And the heat sealer is sort of in the middle of that white

5   curtain, correct?

6   A    Yes, that's correct.

7   Q    At the bottom of the curtain?

8   A    Yes.

9   Q    Show you just one more, what's been marked as Government

10  Exhibit 348.  What's this appear to be to you?

11  A    This is the kitchen area.

12  Q    And did you find anything in the kitchen?

13  A    No.

14  Q    It's fair to say when you arrived, you assumed the house

15  had been cleared?

16  A    Yes.  As I talked to Officer Rillera and we were recapping

17  the series of events, when he told me that they had not cleared

18  the house, I was kind of -- I was shocked at that point, and I

19  decided that we should go inside and make sure that the offender

20  wasn't in there for our safety.

21  Q    And why would your safety be in jeopardy if the offender

22  was in there?

23  A    At that point, we had a homicide and no weapon recovered,

24  no offender in custody, and if that male or female had been

25  inside the house, eventually they could decide that they were

1  trapped and decide that they had no other choice but to shoot

2  and try to escape and flee.

3  Q    When you were doing clearing the house, were you leaving?

4  A    Yes.

5  Q    Was everybody?

6  A    No.  The officers were -- the -- they still had a duty to

7  secure the front and back of that property for a search warrant.

8  Q    And that -- you describe that as holding the house for the

9  search warrant?

10  A    Yes.

11  Q    And why is it that you hold a house for a search warrant?

12  A    To make sure that there's no evidence -- no evidence

13  disappears from the house or anything is not put inside the

14  house.  There's nobody to go inside or outside other than police

15  personnel.

16  Q    So you knew a search warrant for this house was going to be

17  executed before you cleared it, correct?

18  A    It was already being held.  Yes, Your Honor, I believe it

19  was.

20  Q    And do you know whether a search warrant was executed for

21  this property?

22  A    Yes, it was.

23  Q    Did you participate in the search?

24  A    I did not.

25           MR. STENGEL:  Just one moment, please, Your Honor.

1         (Pause)

2    BY MR. STENGEL:

3    Q    After you cleared the house -- you just mentioned

4    there -- did you leave the scene?

5    A    Yes.

6    Q    Where did you go?

7    A    At that point, my plan was to -- I was on my way to

8    homicide when I stopped by Sydenham Street.  After the house was

9    cleared, and I relayed to the officers what was going on, I then

10   was on my way to homicide.

11   Q    And did you go directly to homicide?

12   A    No.  After I -- after leaving the scene, I contacted

13   Detective Peters and let him know that we did clear the house,

14   that it hadn't been cleared yet by the patrol.  And I also let

15   him know that I observed two bags of marijuana and paraphernalia

16   inside the house.  And he took down that information, and he

17   asked me at that point if I could swing back by the scene and

18   grab the security guard and take him with me since I was going

19   there as well.

20   Q    And did you?

21   A    I did.

22           MR. STENGEL:  I think no further questions, Your

23   Honor.

24           THE COURT:  All right.  Cross-exam?

25                    CROSS-EXAMINATION

1   BY MS. FLANNERY:

2   Q    Good morning, Detective Falcone.  I'm Ann Flannery.  I'm

3   the --

4   A    Good morning, ma'am.

5   Q    -- attorney for Dennis Harmon.  Detective Falcone, you

6   described the scene of the murder as fairly chaotic?

7   A    Yes, ma'am.

8   Q    You're an experienced police officer, right?

9   A    I tend to believe so, I guess.  I don't --

10  Q    All right.  So it wouldn't surprise you if there were

11  people calling in to the radio -- calling in to 911 with

12  descriptions of what happened, would it?

13  A    Absolutely.  It would not surprise me at all.  No.

14  Q    And it wouldn't surprise you if there were radio broadcasts

15  describing any description of the shooter or of the getaway

16  vehicle that anyone calling in had seen, correct?

17  A    That would not surprise me either, no.

18  Q    But you did not monitor those phone calls --

19  A    I did not.

20  Q    -- those radio broadcasts?

21  A    No.

22  Q    You didn't hear the radio broadcast shortly after the

23  shooting saying that the getaway driver was in a burgundy Jeep?

24  A    I don't recall the exact time I turned the radio on, but

25  we're -- we don't -- we don't listen -- we don't monitor radio

1    in the detective division.  We wait for the patrol to call us

2    and alert us to the shooting incident.  Sometimes it takes up to

3    a half an hour to 45 minutes.

4    Q    So you didn't hear the broadcast a little bit later that

5    North Central and the 39th were reporting that the getaway

6    driver was in a blue sedan -- that the getaway -- the shooter

7    was in a blue sedan?  You didn't hear that broadcast?

8    A    I did not, no.  I don't monitor the radio.

9    Q    And you didn't hear the broadcast that the shooter was in a

10   dark gray sweat suit?

11   A    I did not, no.

12   Q    Now, you have the capability to call in to the person who

13   is manning the 911 calls and the radio broadcasts, do you not?

14   A    Yes, we do.  Eventually, yes.

15   Q    In fact, that's what you did when you called in your report

16   on the white vehicle, right?

17   A    When I contacted radio?

18   Q    Yes.

19   A    See, my role as the investigator at that time is not

20   monitor radio.  If I have something pertinent to relay to other

21   officers, that's what I do, and that's what I did.  Before or

22   after, I did not monitor -- maybe a little after, but definitely

23   not before that.

24   Q    Well, that was a pretty important broadcast that you sent

25   out, was it not, that you caused to be sent out saying that the

1  shooter was in a white Jeep?

2  A    Yes.

3  Q    But you didn't actually talk to anyone who saw the shooter?

4  A    I talked to the witness at the Save A Lot.

5  Q    And the witness at the Save A Lot did not see the shooting,

6  did he?

7  A    He did not see the shooting.  He saw a black male ten

8  seconds after the shooting go directly to a white Jeep.

9  Q    And that the description that the guard gave you was that

10 the gentleman was in a white t-shirt, walking into the parking

11 lot and getting in a white Jeep, correct?

12 A    Yes, that's correct.

13 Q    And that's all that that gentleman saw?

14 A    I believe so, yes.

15 Q    And the Save A Lot -- so it didn't occur to you to check

16 with the 911 people, with the radio broadcast people to see if

17 the getaway shooter had been described as wearing a white

18 t-shirt?

19 A    In the course of these investigations, there's hundreds of

20 people on the street, so at my -- at this point, I believe that

21 I have the most reliable and accurate information because it's

22 given directly to me from somebody who is an armed security

23 guard.  And the reason that the witness gave him the tag was

24 because he probably believed he was a cop.  I can't say that for

25 sure, but I assume that's the case.

1  Q    But, sir, you're getting the information from someone who

2  didn't see the shooter, right?  He didn't see the shooting?

3  A    No, he did not see the shooting.  He saw a black male come

4  from around the corner where the shooting happened, ten seconds

5  afterward.

6  Q    And you didn't think it was important to check before you

7  broadcast that information about the white Jeep to see if that

8  matched any other descriptions of the shooter from people who

9  actually saw the shooting?

10  A    That's all follow-up investigation, and that is absolutely

11  important.  But at the time when I broadcast it, we were in a

12  time-sensitive situation, and my main goal was to get that out

13  as quickly as possible.

14  Q    So you didn't check to see what the SEPTA video showed or

15  what others had learned from the SEPTA bus that was on the

16  scene?

17  A    The SEPTA bus wasn't on the scene, I don't believe.  I

18  believe the -- they had got that video later.  This is all

19  follow-up stuff, ma'am.  It's all very important, but it is

20  absolutely follow-up.

21  Q    Well, it's not follow-up if the broadcast about the gray

22  suit -- sweat suit was before your broadcast, is it?

23  A    I don't really understand what you mean by that.

24  Q    If there was a broadcast about a gray sweat -- the shooter

25  being in a gray sweat shoot (sic) --

1   A    Uh-huh.

2   Q    -- sweat suit -- before you put your information out,

3   that's not subsequent follow-up, is it?  That's information that

4   you could or should have had at the time you sent out your radio

5   broadcast?

6   A    I could have had it had I called police radio and waited

7   maybe 30 minutes for them to go through the tapes.  But at that

8   point, like I said, my main goal was to get out the most

9   accurate information I had and believed to be accurate as

10  quickly as I could.

11  Q    Now, the Save A Lot store is at -- its side is on 22nd.  Is

12  that correct?

13  A    Yeah.  The front of the property faces Lehigh Avenue,

14  correct.  The side is -- where the shooting happened was on 22nd

15  Street.

16          MS. FLANNERY:  Your Honor, may I go to the --

17          THE COURT:  Yeah.  Sure.

18          MS. FLANNERY:  -- ELMO?

19          THE COURT:  Yes.

20          MS. FLANNERY:  Do I need to do something to --

21          THE COURT:  You have to turn it on.  There you go.

22      (Counsel confer)

23          THE COURT:  Janice is not here, who knows how to work

24  the --

25      (Counsel confer)

1          THE COURT:  Well, it's showing your hand, so it's

2    working.  Just you need to get the --

3          MS. FLANNERY:  Okay.

4          THE COURT:  Do you want to show it to -- you want to

5    take it, or do you want to show it to the witness?

6          THE WITNESS:  I can see it, Your Honor, here on the

7    screen.

8          MS. FLANNERY:  I believe it's on everybody's screen.

9          THE WITNESS:  I can see it.

10         THE COURT:  Okay.  Go ahead.

11   BY MS. FLANNERY:

12   Q    So, Detective, I apologize (indiscernible).

13   A    That's all right.  No problem.

14   Q    But the box in the corner, can we say that that represents

15   the Save A Lot store?

16   A    Yes, ma'am.  That's correct.

17   Q    And so the street running alongside it, is that 22nd

18   Street?

19   A    Yes.  That's the 2700 block of North 22nd Street.

20   Q    27?

21   A    Second.  2700 North 22nd.

22   Q    (Indiscernible).  Okay.  And the motorcycle that the murder

23   victim was riding was found somewhere along the side here; is

24   that correct?

25   A    Yes, that's correct.

1    Q    Is this about where --

2    A    Yeah, about -- that's about right, yes.

3    Q    And the shooting was actually further down the block,

4    correct?

5    A    I believe it may have started there.  There were shell

6    casings throughout the street and down by the motorcycle scooter

7    as well.

8    Q    The parking lot for the Save A Lot, the front of the Save A

9    Lot is down on this side of the Save A Lot; is that correct?

10   A    That is correct.

11   Q    All right.  I'm going to put (indiscernible).  And the

12   parking lot is in front of the front door, correct?

13   A    Yes.

14   Q    So the witness you spoke to, the security guard, was in the

15   front of the Save A Lot store when he heard the shots, correct?

16   A    Correct.  Yes.

17   Q    So he physically couldn't see who the shooter was?

18   A    He did not know who the shooter was.  He did not say that.

19        MR. STENGEL:  Objection, Your Honor.  I --

20        THE COURT:  Overruled.

21   BY MS. FLANNERY:

22   Q    And the information he gave you is that the person who gave

23   him the tag number for the white Jeep that was in the parking

24   lot was a customer in the store, right?

25   A    Yes.

1  Q    And you never talked to that individual, did you?

2  A    I tried, but I was unable to find him.

3  Q    So it's a fact that you never spoke to anyone who

4  identified the white Jeep, who had seen the shooter?

5  A    No.

6           MR. STENGEL:  Your Honor, before we move on, are we

7  going to mark that as an exhibit?

8           MS. FLANNERY:  Oh, I'm sorry.  I certainly will.

9  Thank you.

10          THE COURT:  Sure.  Any time.

11          MR. STENGEL:  And I have no objection to the use of --

12          THE COURT:  All right.  Just give it a number.  That's

13  fine.

14          MS. FLANNERY:  We'll give it DH for Dennis

15  Harmon -- I'm marking all of mine Supp, S-U-P-P --

16          THE COURT:  Okay.

17          MS. FLANNERY:  -- for the suppression hearing.  And

18  it'll be 69.

19      (Defendant Harmon Exhibit 69 marked and admitted)

20          MR. STENGEL:  Okay.  And the Government has no

21  objection to the use of the diagram.  Just, obviously, it's not

22  to scale.

23          THE COURT:  Okay.

24          MS. FLANNERY:  I wouldn't disagree with that, Your

25  Honor.  All right.  So that is moved in.

1   BY MS. FLANNERY:

2   Q    I'm a little confused about when you took the security

3   guard to Sydenham Street.  By the way, what did the security

4   guard look like?

5   A    What did he look like?

6   Q    What did he look like?

7                MR. STENGEL:  Objection, Your Honor.  Relevance.

8                THE COURT:  Overruled.

9                THE WITNESS:  He was a bigger black guy with a beard.

10  He was taller than me, heavier than me, had full beard.

11  BY MS. FLANNERY:

12  Q    And when did you take him to the scene?

13  A    Sometime after our interview and after the man had deceased

14  and Detective Peters asked me to do so.  It was still daylight

15  out, dusk.  I don't know the exact time.  I believe it was

16  around 7:20.  I don't -- I couldn't be -- I don't know for

17  certain.  I didn't mark it.

18  Q    Was that before or after you did your sweep?

19  A    It's before.

20  Q    And did he -- did you go in a marked car, an unmarked car?

21  A    The same vehicle that I was on video in, the same unmarked

22  police vehicle.

23  Q    So the video we watched where you came, you spoke to

24  Officer Riera (sic) and then you -- is it Riera or Rillera?

25  A    Rillera.

```
1   Q      -- Rillera -- and you went inside the house --

2   A      Uh-huh.

3   Q      -- was that after you had brought the individual?

4   A      Yes.  When I cleared the house, I had already been by there

5   with the witness, and he identified the Jeep.  Yes.

6   Q      Where were the other police cars when you got there?

7   A      The first time?

8   Q      The first time?

9   A      I don't recall.

10  Q      And what did the witness do?  Did you have the witness get

11  out of the car?

12  A      I did not.  I just -- I drove up to the spot where the car

13  was, and I asked him if that looked like the vehicle he saw

14  leave, and he said, yes, that's the one.

15  Q      He didn't get out of the car?

16  A      He did not.

17  Q      He didn't look at the license plate?

18  A      He didn't know the license plate.

19  Q      He didn't look at the wheels to see if they --

20  A      He mentioned the wheels, yes.

21  Q      Okay.  So when was your conversation with Detective Peters?

22  A      I spoke to Detective Peters probably ten times that night.

23  I don't --

24  Q      Here's what I'm trying to put in order.  Maybe you can help

25  me out.  You go -- you bring the witness by.
```

1  A    Uh-huh.

2  Q    You do a protective sweep.  You talk to Detective Peters,

and he asks you to bring the witness by Sydenham.  What was the

order of those?

5  A    So after I interviewed the witness, I take the witness to

Sydenham Street.  We drive by the car.  We do not even get out

of the vehicle, and we drive -- after he identifies it to me as

the vehicle he saw leaving the Save A Lot, I take him back to

work.

10 Q    Did you -- did the car stop?  Did you stop the car so he

could identify it, or was it a drive-by?

12 A    No.  I would slow down, probably stop for a second or two,

and then kept moving.

14 Q    Well, I'm asking you what you remember.  Do you remember

stopping?

16 A    Yes, I remember stopping.  Yeah.

17 Q    And what color car was it --

18 A    A white Jeep.

19 Q    -- were you in?  No.  What color car were you in?

20 A    Oh.  It's a -- I think it's gray, gray Chevy or Toyota.  I

don't --

22 Q    Was anybody with you when you took the witness?

23 A    Detective Sweeney was with me.

24 Q    And did -- do you have any interaction with Officer Rillera

or Nelson at that point in time?

1  A    No, not the first time.

2  Q    And when you arrived at Sydenham and you had your

3  conversation with Officer Rillera, did he tell you that they

4  hadn't swept the house because they didn't have personnel?

5  A    I don't recall why he said.  I just -- he just said he

6  hadn't.  I don't recall.  I don't believe he said that, no.

7  Q    So you cleared the house at approximately 7:50?

8  A    Approximately.

9  Q    Is that right, yes?

10  A    Yes.

11  Q    The shooting had been at 5:40, correct?

12  A    Yes.

13  Q    Are you aware of any information that the shooter had gone

14  to that house?

15  A    The only information I had was that the getaway vehicle

16  went to that house, so I did not know where the shooter had

17  gone.

18  Q    And the only information that the getaway vehicle went to

19  the house was based on the individual who didn't see the

20  shooter?

21  A    That was relayed to him through somebody who did see him

22  get into -- the shooting actor get into the vehicle.

23  Q    You didn't speak to that person who gave the hearsay, so

24  you don't know, correct, whether or not he witnessed the actual

25  shooting?

44

1    A    I only know what the eyewitness told me.  Yes.

2    Q    Did Officer Rillera tell you that he had obtained a

3    description of what the shooter was wearing and that none of the

4    males outside the house met that description?

5    A    I don't recall what -- he didn't say -- he didn't have a

6    good description on any of the males that were outside the

7    house.

8    Q    He wasn't concerned about them --

9    A    I mean --

10   Q    -- at the time?

11   A    -- you're concerned about anybody doing the job of a police

12   officer in Philadelphia that could be involved in a shooting,

13   but I -- not overly concerned, no.

14   Q    So you, Detective Sweeney, Officer Rillera, and Officer

15   Nelson all went in the house for the sweep?

16   A    Yes.  Correct.

17   Q    And that's what we saw?

18   A    Yes.

19   Q    And the -- to get to the front door, you walk up steps, and

20   then you go into the house, correct?

21   A    Yes.

22   Q    And it was dark by the time you entered the house?

23   A    It was dark, yes.

24   Q    So if anyone entered the house -- and we saw at the end of

25   that video clip when you came out of the house were -- there

1  were flashlights.  Were you using iPhone flashlights inside?

2  A    Originally, I believe, I had an iPhone flashlight.  And

3  when I went back to my vehicle to turn off and lock it, I

4  grabbed my flashlight.  So I had a regular flashlight.

5  Q    But what we saw -- I won't play it again.  But do you

6  recall seeing, when you came out of the house, there were

7  flashlights?

8  A    Yeah.  Yeah.

9  Q    We could see your flashlights before we could see you?

10 A    Yeah.  Yes.

11 Q    After you cleared the house, your understanding was that

12 the officers on the scene were to hold the house for

13 the -- pending a search warrant, assuming you got a search

14 warrant?

15 A    The officers were already holding the house for a search

16 warrant when I arrived.  I was just telling them to prepare to

17 be there all night.  Basically, that's why I went there.

18 Q    Because it takes a long time to get a search warrant,

19 correct?  I mean, it --

20 A    It takes time, yeah.  And I basically was telling them if

21 they wanted to call their supervisor now to arrange for relief

22 when their tour ended at 12:00, they might want to do that now

23 and give him the heads-up.

24 Q    And what's your understanding of holding a house where

25 there's no search warrant?

1    A    My understanding of holding a house is that nobody is to

2    exit or enter the house.

3    Q    Including police, correct?

4    A    Including police, after it's cleared.

5            MS. FLANNERY:  May I have a moment, Your Honor?

6            THE COURT:  Sure.

7        (Counsel confer)

8            MS. FLANNERY:  May I have one moment?

9            THE COURT:  Sure.

10       (Counsel confer)

11           MS. FLANNERY:  Thank you, Your Honor.  Nothing

12   further --

13           THE COURT:  Mr. Weaver?

14           MS. FLANNERY:  -- at this time.

15           MR. WEAVER:  Your Honor.

16       (Counsel confer)

17                         CROSS-EXAMINATION

18   BY MR. WEAVER:

19   Q    Good morning, Detective Falcone.

20   A    Good morning, sir.

21   Q    My name is Luther Weaver, and I represent Amir Boyer, one

22   of the defendants in this case.  I want to be very, very clear

23   on a couple of facts, and I'll try not to repeat some of the

24   information that Ms. Flannery covered.

25   A    Okay.

1    Q     It's your testimony that at the time you arrived at the

2    property -- Sydenham Street property, the officers had already

3    decided to get a search warrant; is that correct?

4    A     Yes, that's correct.

5    Q     Who told you that?

6    A     It is -- that -- it was held by patrol officers.  The

7    patrol sergeants had automatically -- as soon as that vehicle

8    came back to that spot, that was held as well as the house that

9    the man came out of.  That was already being held for a search

10   warrant.

11   Q     What patrol officers?  Do you know the name of the one that

12   told you that?

13   A     I don't know.  I know it was just -- it would have been a

14   supervisor, so a sergeant or a lieutenant.

15   Q     So until you got there, they decided that they wanted to

16   run the facts before a judicial officer and obtain a legal

17   search warrant before they entered the property?

18   A     Yes, that's correct.

19   Q     All right.  But things changed when you arrived on the

20   premises.  You're the one that said you need to go into the

21   property without a search warrant?

22   A     Only for officer safety.  That's all.  No reason other --

23   Q     You're the one that made the decision and directed them

24   that the property should be searched before the warrant arrives,

25   correct?

1   A     The property was not searched.  It was cleared for bodies

2   only.  That's it.

3   Q     So you're saying that when --

4         THE COURT:  Well, yeah, but are you the one that made

5   the decision --

6         THE WITNESS:  It was -- yes.  Yes, Your Honor.  It was

7   me.

8   BY MR. WEAVER:

9   Q     All right.  So you're saying that when you went into the

10  property, and you went on the first floor, the basement,

11  basically, whoever went into the property -- and the names are

12  on record -- went through the entire property, correct?

13  A     Yes.  Any place that anybody could hide, yes.

14  Q     All right.  And you're saying, therefore, that the property

15  was not searched?

16  A     It --

17        THE COURT:  Well, wait, wait, wait, wait.  I don't

18  want to get into semantics, Mr. Weaver.  He explained what

19  happened.  You're welcome to cross-examine him about what he

20  did.  All right?  Whether it's a search or not is a legal

21  conclusion, in my view.

22  BY MR. WEAVER:

23  Q     When you and the other officers went through the property

24  and you observed certain things that are reported, did you take

25  any notes as to what you saw?

49

1  A    I just -- not notes, no.  Just with my mind.

2  Q    You didn't take any notes?

3  A    No.

4  Q    Did you -- do you notice whether any of the other officers

5  took any notes?

6  A    I did not notice what they did up -- I wasn't upstairs with

7  the other officers.  I was on the first floor.  I never went

8  upstairs.

9  Q    All right.  When you exited the property at some point, did

10  you report to other officers what you had seen inside the

11  property?

12  A    When I -- after I left the scene, on my way to homicide, I

13  did contact Detective Peters and let him know what I saw.

14  Q    All right.  Do you know if the other officers who went

15  through the property -- walked through the property or cleared

16  it, I think was the term you used, whether or not they reported

17  what they had seen when they were inside the property?

18  A    Reported it to whom?

19  Q    I don't know.  Do you know if they reported it to anyone?

20  A    I heard them talking about what they -- it wasn't

21  officially reported to anybody.  I heard them say what they had

22  saw upstairs in plain view like money counter and --

23  Q    Now, since --

24  A    -- narcotics packaging.

25  Q    -- since when you arrived on the property a search warrant

1   had already been requested, it was already in the process, do

2   you know what the purpose of that search warrant was for?

3   A    For the offender of the homicide --

4   Q    And do you know if --

5   A    -- and any evidence involving the homicide that occurred.

6   Q    I'm sorry.  Go ahead.

7   A    For any offenders, firearms, anything of evidentiary value

8   regarding that homicide.

9   Q    So the warrant that had already been -- that was already

10  being sought at the time you arrived on the property was limited

11  to seeking a homicide suspect?

12  A    It --

13         THE COURT:  Well, wait, wait, wait.  Are you

14  familiar -- you're going to -- are you going to have another

15  witness testify about the search warrant?

16         MR. WITHERELL:  Yes, I do, Judge.

17         THE COURT:  All right.  Do you -- were you involved at

18  all in typing the search warrant or preparing it in any way?

19         THE WITNESS:  No, Your Honor, I was not.

20         THE COURT:  All right.  I think this goes beyond his

21  direct.

22         MR. WEAVER:  All right.  Very good, Your Honor.

23         THE COURT:  What's your next question?

24         MR. WEAVER:  All right.

25  BY MR. WEAVER:

1   Q    Now, you've described the scene where the shooting took

2   place as somewhat hectic.  When you arrived on Sydenham Street,

3   was that scene hectic at the time you arrived in any manner?

4   A    Sydenham Street was not.

5   Q    All right.  And at the time you arrived, how many officers

6   were in place?

7   A    I believe the -- just the two.

8   Q    All right.  And had you received any information during the

9   investigation that the person who supposedly was involved in the

10  shooting, the shooter, had entered the premises that you had to

11  clear?

12  A    Could you repeat that?

13  Q    Yes.  Had you received any information that the shooter had

14  actually entered the premises that you cleared?

15  A    I did not have that information, no.

16  Q    Did you receive any information that the weapon that was

17  used in the assault and the shooting was inside the premises on

18  Sydenham Street?

19  A    I did not have any information of that, no, but that's the

20  reason for the search that we would have done.

21  Q    The black males who were on the street at the time the

22  officers arrived, it was reported to you that they walked away,

23  correct?

24  A    Yes.

25  Q    Was it reported to you that any of them were arrested at

1    all as a suspect?

2    A    That night or -- no.

3    Q    That night at --

4    A    No.

5    Q    -- the time you were there?

6    A    No.

7    Q    All right.  Now, there was an individual who was reported

8    to you to have exited the house and also went back into the

9    house.  Can you describe what you were told about that?

10   A    I believe, from my memory, Officer Rillera had said that

11   Mr. Harmon had come out of the property, went back inside, and

12   come back out, I believe, and was kind of -- that's when they

13   stopped him for investigation.

14   Q    All right.  So while there were -- police were on the

15   scene, he was permitted to exit the property, return to the

16   property, and exit the property again?

17   A    I believe that's correct.  I believe --

18   Q    All right.

19   A    -- that's how Rillera had relayed it to me.  I couldn't say

20   for sure.

21   Q    All right.

22   A    I wasn't there.

23   Q    And while the house was under the control of the

24   police -- I'm not talking about the clearing of it, but while it

25   was under the control of the police, that would include both the

1   front, rear of the property; would that be correct?

2   A    Yes, sir.  That's typically the way it's done, but it's

3   not --

4   Q    And so --

5   A    -- not always the case.

6   Q    I'm sorry.  So while it was under the control of the

7   police, no one could exit the property, and no one could enter

8   the property?

9   A    Beside police personnel, correct.

10  Q    Yes.

11  A    Yes.

12  Q    All right.  Thank you.  Now, the -- when you interviewed

13  the security guard from Save A Lot, he indicated to you

14  that -- the first thing he indicated to you was that there was a

15  black male wearing a red shirt who was across the street from

16  the market; is that correct?

17  A    He did mention that, yes.  He also mentioned he didn't

18  believe he was involved later.

19  Q    That was at a later time.  But initially, he mentioned the

20  red -- the red shirt person was the first person that he

21  mentioned to you as possibly being involved in the shooting;

22  wouldn't that be correct?

23  A    It wasn't later.  It was at the exact same time I asked the

24  question.  He described him, and he described the other male.

25  But it wasn't like hours later.  In that -- during -- as he was

1   using his mind to remember, he said that that male was across

2   the street, and, come to think of it, he didn't think he was

3   involved.  But I just put down exactly how he said it.

4   Q     But the guard, of course, didn't see the shooting, so he

5   didn't know exactly --

6   A     He didn't know, no.

7   Q     -- who was involved, correct?

8   A     No.  He was just going off his instincts and what he saw.

9           MR. WEAVER:  Okay.  That's all I have, Your Honor.

10           THE COURT:  Any redirect?

11       (Counsel confer)

12           MR. STENGEL:  No redirect, Your Honor.

13           THE COURT:  All right.  Thank you --

14           THE WITNESS:  Thank you, Your Honor.

15           THE COURT:  -- Detective.

16           All right.  Next witness, please?

17           MR. WITHERELL:  We'll call Officer Rillera to the

18   stand, Your Honor.

19       (Pause)

20           THE CLERK:  Please raise your right hand.

21       (CHARLES RILLERA, Witness, is Sworn)

22           THE CLERK:  Can you state your full name?  Spell your

23   last name for the record.

24           THE WITNESS:  Police Officer Charles Rillera,

25   R-I-L-L-E-R-A.  Philadelphia Police Department, 39th District,

1  six years.

2          THE COURT:  All right.  Thank you.  Have a seat and

3  keep your voice up.  Thank you.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Thank you.

6          MR. WITHERELL:  May I inquire, Your Honor?

7          THE COURT:  Yes.

8                      DIRECT EXAMINATION

9  BY MR. WITHERELL:

10  Q    Good morning, Mr. -- Officer Rillera.  How are you today?

11  A    Good morning.  Fine.

12  Q    Officer Rillera, would you please tell the Court who you

13  work for?

14  A    I work for the Philadelphia Police Department.

15  Q    And how long have you worked for the Philadelphia Police

16  Department?

17  A    Approximately six years.

18  Q    I want to draw your attention to September 11, 2017.  Do

19  you recall if you were working on that date?

20  A    Yes, I was.

21  Q    Do you remember what your tour of duty was?

22  A    Yes.  I was 3:00 to 11:00 p.m., a fully marked vehicle, in

23  full uniform.

24  Q    Okay.  So when we say marked, we're talking a police car

25  that says police on it?

1  A    That's correct.

2  Q    Okay.  And were you working alone or with a partner?

3  A    I was working with a partner.  His name is Ralph Nelson.  I

4  believe his badge number is 7087.

5  Q    I want to draw your attention to approximately 5:40 p.m. on

6  that date, September 11, 2017.  Did you receive a radio call for

7  a shooting that took place at 2762 North 22nd Street?

8  A    That is correct.

9  Q    Okay.  And the nature of your radio call was what?

10 A    The nature of the call was a person with a gun, priority

11 one, person shot on the highway.  I responded lights and sirens

12 to that location.

13 Q    Did you arrive there at approximately 5:43 p.m.?

14 A    Approximately, yes.

15 Q    Were you one of the first officers to arrive?

16 A    Yes, I was.  I was the second officer from my district to

17 arrive.

18 Q    Could you please -- when you first got to the scene, tell

19 the Court what you observed.

20 A    The scene was rather large.  It was very chaotic.  There

21 was a lot of movement going around.  There was pedestrian and

22 vehicle traffic based on the location.  It's right next to a

23 business sector where there's a grocery store, a GameStop, and

24 there's a parking lot that has an exit for -- exit/entryway for

25 cars that are coming and going.  There's also public sidewalks

1  where people are moving.  And we have a lot of residential homes

2  on the west side of the 2700 block of 22nd Street, which we have

3  multiple people out on the street, on their porches, and walking

4  along the sidewalk.

5  Q    In relating to the shooting when you first arrived, what

6  did you see?

7  A    When I first arrived, there was a scooter on the sidewalk

8  on the east side of the 2700 block of 22nd Street on its side.

9  There was a blood trail that led in a northwest direction toward

10  the corner of 22nd and Cambria -- or Somerset.  And there was

11  multiple FCCs.

12  Q    What's an FCC?

13  A    It's a fire cartridge.  It's a spent casing.

14  Q    Bullets?  Spent bullets?

15  A    Yes.

16  Q    Okay.

17  A    Spent --

18  Q    When you first arrived around 5:43, what were your primary

19  responsibilities as one of the first officers on the scene?

20  A    Well, as the first officer on the scene, my duty is to

21  secure and preserve the crime scene.  The first thing we do is

22  secure the crime scene by establishing our boundaries based on

23  the layout of the physical evidence, Your Honor.  Me and my

24  partner both took police tape and decided where we were going to

25  place the tape across to not allow pedestrian or vehicle

1   traffic, which was dictated by our supervisor who was also at

2   the scene, Sergeant McLaughlin (phonetic).

3   Q    Did you have any other responsibilities besides initially

4   clearing the area and looking for physical evidence?

5   A    Yes.  As far as paperwork goes, we start a crime scene log

6   as well as looking for physical evidence and possible witness

7   statements, any surveillance that could be located in the

8   immediate area.

9   Q    Let's talk first about surveillance.  Did you notice any

10  surveillance video that needed your investigation?

11  A    Well, there were cameras on the side of the grocery store,

12  on the east side of the 22nd Street.  I did speak with a

13  security guard who stated that the business recently changed

14  names and the cameras were inoperable, so there was no footage

15  to recover from that specific store.

16  Q    You said part of your responsibilities, speak to witnesses.

17  Did you speak to any witnesses when you arrived on that scene,

18  the 22nd Street shooting scene?

19  A    I spoke to approximately 10 to 15 people that were out on

20  location, whether they were residents on the street, people in

21  the parking lot, asking them if they did witness anything that

22  happened prior to my arrival, to which I didn't get any credible

23  statements that made me feel like I needed to notify a

24  supervisor to have that person make a statement.

25  Q    Did anybody provide any information concerning the

1  description of the shooter or a getaway car to those 10 to 15

2  people that you spoke to?

3  A    No, they did not.

4  Q    Okay.  How long are you maintaining that scene on 22nd

5  Street?

6  A    Approximately 45 minutes to an hour, somewhere in between

7  there.

8  Q    So let's take your attention to about 6:40 p.m.  Does there

9  come a time when you resume patrol?

10 A    Yes.  Because I'm in a patrol vehicle, and my primary

11 responsibilities are service calls.  We have a foot beat

12 initiative, which is officers in our district that do not have

13 vehicles; they're on foot for community relations and quality of

14 life assistance.  They came to relieve me so that I could remain

15 back on the street on patrol to do 911 service calls or further

16 investigation.

17 Q    And when you -- at some point, I'm guessing you entered

18 your car?

19 A    Yes.

20 Q    Did you receive any information upon entering your vehicle

21 concerning a getaway car or the shooting that just occurred on

22 22nd Street?

23 A    Yes, I did.

24 Q    Tell the Court how you received that information.

25 A    We have a job description, our MDT, which stands for mobile

1    data terminal, and it basically lists all the details of the job

2    and any specific information, whether it be flash information on

3    someone that's a possible suspect or a vehicle, at which time I

4    read the information on the job.

5    Q    And what was the information that was provided to you?

6    A    There was a description of a white SUV with a PA

7    registration of JYD-0709.

8    Q    And about -- in relation to that vehicle, what was said to

9    have -- that vehicle had been a part of?

10   A    Possibly connected to the shooting that occurred that I was

11   holding at the time, fled the location at a high rate of speed.

12   Q    Okay.  And did you run that -- the plate that was provided

13   through the Bureau of Motor Vehicles?

14   A    I did.  I did a BMV search to see where the registered

15   owner's address was going to come back to, to further

16   investigate the possibility of that vehicle being involved.

17   Q    And what did you -- what came back?

18   A    It came back registered to an Abdul West (phonetic) of 3234

19   North Sydenham Street.

20   Q    And how far is that location from the location of 22nd

21   Street that you were just at?

22   A    Distance-wise, I would say about a mile and a half.  It

23   took me approximately three to five minutes to drive there.

24   Q    And did you arrive at that location at approximately

25   6:46 p.m.?

1   A    Yes, I did.

2   Q    Could you please tell the Court, as you pull onto that

3   block, what do you see?

4   A    As I pull onto the block initially, I see a white SUV on my

5   left-hand side, which would have been the east side of Sydenham

6   Street.  That tag did not match the information that I had, so I

7   continued down the street where I observed multiple persons on

8   the west side of the street out on the sidewalk and in the porch

9   area.  I continued past them to where I seen a white SUV.  It

10  was a Jeep, and it had a tag of JYD-0709, at which point I

11  stopped my vehicle to further investigate.

12  Q    This is approximately 6:46 p.m.  So you get out of your

13  vehicle.  Officer Nelson's still with you?

14  A    That's correct.

15  Q    Could you tell the Court what happens at this point?

16  A    Okay.  So at this point, I look over to the vehicle to make

17  sure that there's no one inside the vehicle or directly outside

18  of the vehicle, seeming as though there might be a threat still

19  inside the vehicle that could be a danger to myself and others.

20  I do not initially see anyone near the vehicle or inside, but

21  there is heavy tint on the vehicle.  It's difficult to see.

22  There is the crowd that's in front of 3234 North Sydenham

23  Street, and they're dispersing at that time northbound.  I come

24  over police radio, and I request if there is any additional

25  information, specifically flash information, on the possible

1   shooter from the shooting on 22nd Street that I might be able to

2   address that might be leaving that location.

3   Q    And did you receive flash in that regard?

4   A    I did.  The last information they gave me was the shooter

5   was going to be in an all gray track suit.

6   Q    I'm now going to play for you 226.

7        (Video played from 11:14 a.m. to 11:15 a.m.)

8            MR. WITHERELL:  There's a lot of people talking.

9        (Video played from 11:15 a.m. to 11:15 a.m.)

10           MR. WITHERELL:  I'm sorry, Judge.

11       (Video played from 11:15 a.m. to 11:16 a.m.)

12  BY MR. WITHERELL:

13  Q    A lot of people are talking on that radio communication.

14  Initially, is that your voice who comes over saying that you

15  had -- seen the vehicle at that location at Sydenham Street?

16  A    That is correct.

17  Q    All right.  What is the rest of that communication about?

18  A    The rest of the communication is requesting if there's any

19  additional flash or new flash.  Since I'm out of my vehicle and

20  this is a constantly, rapidly-evolving situation, there can be

21  information that's added to this job in seconds, Your Honor.  So

22  when I'm outside of my vehicle, and I don't have access to my

23  mobile data terminal, my computer screen, someone could have

24  updated additional information.  So I'm verifying as I'm looking

25  at all the males that are walking down northbound on 3200

1  Sydenham that none of them are matching the actual flash that

2  could have been updated while I was away from my vehicle.

3  That's what I was requesting from police radio for a description

4  if there was anything new.

5  Q     Okay.  Now, at this point when you're present at Sydenham

6  Street, do you know that there's FBI pole camera that's in

7  place?

8  A     No, I do not.

9  Q     Have you come to learn that?

10  A     Yes, I have.

11  Q     I'm going to go through portions of that pole camera

12  momentarily, but first I just want to talk in general terms

13  about what occurred while you're at Sydenham Street.  You had

14  just mentioned to the Court that you got out of your car,

15  observed the vehicle to be unoccupied, and that a group of

16  males, I believe you said, walked off?

17  A     Yes.

18  Q     Tell us what happens at that point.

19  A     After the males walk off, I request for the flash to see if

20  anybody should be stopped, at which time I would have stayed

21  with the vehicle, but I would have relayed that information to

22  backup officers coming to my location.  I then stayed on

23  location with the vehicle.  I went back to the vehicle to verify

24  through the tint that there was no one laying in the back seat.

25  I then went back to my patrol car to verify the actual numerical

1  address of the registered owner which came back to 3234, because

2  initially I was just headed to the 3200 block of Sydenham to

3  look for the vehicle.  That's what my primary concern was, to

4  locate the vehicle, and then if I did, then I try to locate any

5  other kind of evidence, whether it be persons of interest or

6  physical evidence on location.

7  Q    So as you confirm that the vehicle was registered to that

8  Sydenham residence, where did you go?

9  A    I stayed in front of the residence, and I looked in the

10  immediate area of the residence for any kind of physical

11  evidence that I might find.

12  Q    Physical evidence such as what?

13  A    Well, since there was a large group of males that are out

14  front there, I'm looking for anything: possible murder weapon,

15  possible keys to a vehicle, anything that I can find that might

16  be related to this vehicle or the crime that had occurred on

17  22nd Street.

18  Q    And did you notice anything not directly in front of that

19  Sydenham address but right to its right on stairs, I'm going to

20  call them?

21  A    Yes.  On the front steps, there was a bag.  I thought it

22  was a little bit odd that when everybody walked away there was

23  personal items that were left behind.  Inside the bag was a pair

24  of sneakers, athletic shoes, that were brand new, still in the

25  box with the receipt still in the bag.  There was also a pizza

1    box with pizza that was still hot.  The oil was still in liquid

2    form on the top of the pizza, and the box was still warm to the

3    touch, which I thought was a little bit odd considering that

4    someone had just left newly acquired items and food on the step

5    like that.

6    Q    At this point, had a suspect in the shooting that occurred

7    at 22nd Street been arrested or identified?

8    A    No.

9    Q    Had a weapon been recovered?

10   A    No.

11   Q    Did you have any idea if any individuals were inside of

12   that Sydenham residence?

13   A    No.

14   Q    At some point, did other officers arrive on scene?

15   A    Yes.  I believe it was RPC 3931, and that would have been

16   Officers Teri (phonetic) and Officers Giacomelli.  They

17   responded to back us up because they had heard that we found the

18   vehicle that could possibly be the shooter's vehicle, and they

19   arrived at 3200 Sydenham.

20   Q    When they arrived, did there come a time when someone

21   exited that Sydenham residence?

22   A    Yes.  The defendant, wearing the blue, Dennis Harmon,

23   exited 3234.  I was -- at the time when he exited, I was facing

24   the RPC that was parked out front.  I did not see him exit the

25   residence, but one of the other officers in the vehicle asked

1    where he had come from.  We then observed him walk across the

2    street to the corner of Sydenham and Hilton Street, at which

3    point in time he turned around.  And I told the officers, if he

4    comes back to the residence, we're going to stop and inquire

5    about what his business is there.  He returns to the porch area

6    of 3234 North Sydenham, and that's when myself, Officer Nelson,

7    Officer Teri, and Officer Giacomelli go to talk to Mr. Harmon.

8    Q    I believe you did advise -- I want to be clear.  Could you

9    please -- Mr. Harmon, do you see him in the courtroom here

10   today?

11   A    Yes, I do.

12   Q    Could you please point to him and identify an article of

13   clothing he's wearing?

14   A    Yes.  He's wearing a blue shirt.

15          MR. WITHERELL:  Your Honor, may the record reflect

16   that -- identified Defendant Harmon?

17          THE COURT:  All right.  Identifying defendant,

18   Mr. Harmon.

19   BY MR. WITHERELL:

20   Q    When you go to speak to Mr. Harmon, where is he located?

21   A    He's located on the porch at that time.

22   Q    Tell us about your interaction with Mr. Harmon.

23   A    I asked Mr. Harmon -- I greet Mr. Harmon formally, and I

24   ask him what his business is there, if he lives there, to which

25   he responds, yes, he does live there.  And then he tells me that

```
 1   he -- and then he tells me that he was squatting in the house

 2   and that --

 3            THE COURT:  All right.  Wait just one second.

 4        (Court confers)

 5            THE COURT:  How much longer will your direct be?

 6            MR. WITHERELL:  Some time, Judge.  I'm going to have

 7   to go through some portions of the video.

 8            THE COURT:  All right.  Okay.

 9            MR. WITHERELL:  I'll try to make it as short as

10   possible.

11            THE COURT:  We're going to have to take about a

12   ten-minute recess --

13            MR. WITHERELL:  Okay.

14            THE COURT:  -- at this point.  I've got to deal with

15   the jury selection next door.  It'll just take a break.  And

16   we'll go until 12:20.  Okay?

17            MR. WITHERELL:  Okay.

18            THE COURT:  So I intend to be back in ten minutes.

19            MR. WITHERELL:  Okay.

20            THE COURT:  All right.  Thank you.

21            THE DEPUTY:  All rise.

22            THE COURT:  No all rise.  Just (indiscernible

23   *11:23:43).

24            MR. WITHERELL:  Okay.  Then we'll stay still.

25        (Recess at 11:23 a.m. until 11:32 a.m.)
```

1            THE COURT:  All right.  Want to get Mr. Witherell's --

2       (Pause)

3            THE COURT:  Okay.  We're going to continue until 12

4   noon.  Then I've got to go next door for just five minutes

5   again, and then I'll be back until 12:20.

6            MR. WITHERELL:  Okay, Judge.

7            THE COURT:  All right.  Go ahead.

8            All right.  Have a seat.

9            All right.  Continue.

10                      DIRECT EXAMINATION CONTINUED

11   BY MR. WITHERELL:

12   Q    I think we were talking about your initial contact with

13   Harmon.  You said you introduced yourself.  And I'm sorry if you

14   already said this.  Could you tell us about what that

15   conversation was about?

16   A    The conversation was basically me asking him what his

17   business was there, if he lived there, which he responded that

18   he did, and he told me that he had been squatting there at the

19   house.  And squatting is a term that is used in the Philadelphia

20   area for an illegal residency.  Like, basically, you find a

21   vacant property, and you make it your home without paying rent

22   or having any kind of lease agreement.

23   Q    Does Harmon provide you with any identification?

24   A    Yes, he does.

25   Q    Is that at your request?

1    A    Yes, it is.

2    Q    And what do you do with the identification?

3    A    I walk over to the closest RPC, and I do a NCIC, PCIC, BMV

4    check, which is basically me running him through databases to

5    make sure that he doesn't have any wants, warrants, or that his

6    actual identification is legitimate.

7    Q    Okay.  And did you find anything?

8    A    No.

9    Q    Was there anything about the identification that gave you

10   pause or was significant to you?

11   A    It was significant, because he informed me that he was the

12   only individual that lived at the address, and I had been -- my

13   business at the address was for a registered owner of a vehicle

14   that was possibly involved in a shooting that came back to that

15   address.

16   Q    Mr. Harmon stays on that porch for quite some time?

17   A    Yes.

18   Q    I'm going to jump ahead, and we're going to go through this

19   with the video.  But it's approximately 7:37 that he's actually

20   transported to homicide; is that correct?

21   A    Approximately, yes.

22   Q    All right.  I'm going to get to that in a second.  But

23   during that time when he's on the porch and you're speaking to

24   him, does anybody ask him about the car that's registered to

25   that address that was just used in a shooting?

1  A    Yes.  Officer Teri.

2  Q    What was his response?

3  A    He asked him if he was the owner of the vehicle.  Do these

4  cars belong to you, I believe, were the words that he asked him.

5  And he said no.

6  Q    And did that give -- was that significant to you in any

7  way?

8  A    Yeah, for what I said earlier, that the registered owner

9  comes back to that address.  He's stating that he's the only

10 one, no other persons live at that house, and that the vehicles

11 are parked directly in front of that house, and his name is not

12 Abdul West.

13 Q    During that time -- so from when you initially see Harmon

14 to 7:37 when he's actually transported to the homicide squad,

15 where does Harmon stay?

16 A    Harmon is on the porch for the majority of the time.

17 Q    Is he handcuffed?

18 A    No, he's not.

19 Q    Is he under arrest?

20 A    No, he's not.

21 Q    Why is he staying on the porch?  Did you direct him to do

22 so?

23 A    We asked him to stay on the porch, because we have an

24 investigation.  He is a person of interest at that point.  Based

25 on a totality of the facts that we have before us, he was a

1   person of interest to us.

2                MS. FLANNERY:  Your Honor?

3                THE COURT:  Yes.

4                MS. FLANNERY:  This segment of questioning goes to a

5   different suppression motion that I have --

6                THE COURT:  All right.

7                MS. FLANNERY:  -- which is scheduled for June 12th.

8                THE COURT:  Right.  Yeah.  How do you want to handle

9   that?

10               MR. WITHERELL:  Judge, I don't plan on going much

11  farther into this.  I believe that --

12               THE COURT:  All right.  Well, you can just -- he can

13  answer a couple questions about it.

14               MR. WITHERELL:  Yeah.  I don't --

15               THE COURT:  All right.  Just to put it in context.

16  Okay.

17               MR. WITHERELL:  It just -- it's also part and parcel

18  of why the Sydenham address becomes important, but I don't

19  plan --

20               THE COURT:  Right.

21               MR. WITHERELL:  -- on going any further.

22               THE COURT:  Okay.  Go ahead.

23               MR. WITHERELL:  Okay.

24  BY MR. WITHERELL:

25  Q    While he's at -- while Harmon's on that porch, does there

1   come a time when you and other officers continue to search the

2   area?

3   A    Yes.

4   Q    Does anybody find anything?

5   A    Yes.

6   Q    Tell us about that.

7   A    Officer Teri finds a set of vehicle keys that belong to the

8   Jeep in question with the PA tag JYD-0709.

9   Q    And do you know where he found it?

10   A    He did tell me that he found them -- found the keys by the

11   rear tire of a Chevrolet that was also registered to Abdul West,

12   same address on Sydenham.

13   Q    And at some point, are you notified that the individual who

14   was shot at 22nd Street had been pronounced dead?

15   A    Yes.

16   Q    Did anybody tell you or any officers in your presence that

17   detectives wish to speak to Defendant Harmon?

18   A    Yes.  We had multiple officers on location: myself, Officer

19   Nelson, Officer Giacomelli, and Officer Teri.  We were all

20   making notifications to different people and different places.

21   It came to my attention that homicide unit wanted to speak with

22   Mr. Harmon by Officer Teri telling me that they were going to

23   transport him to homicide.

24   Q    And I'm not going to go into it deep, but Mr. Harmon, did

25   you tell him that they -- that detectives wanted to speak to

1  him?

2  A     I did not personally, no.

3  Q     Did someone in your presence say that?

4  A     Yes.

5  Q     Who was that?

6  A     Officer Teri.

7  Q     And did Mr. Harmon go -- accompany officers to the homicide

8  squad?

9  A     Yes, he did.

10  Q     Okay.  Was he ever handcuffed when going in?

11  A     No, he was not.

12  Q     Okay.  After Mr. Harmon leaves the scene, you remain at the

13  scene, correct?

14  A     That is correct.

15  Q     What do you -- what is your purpose of being here this

16  entire time?

17  A     I am holding the scene.  And by scene, I mean the vehicles

18  that are on location as well as the residence.

19  Q     At this time, do you know if a search warrant's going to be

20  applied for or anything along those lines?

21  A     Not at that time, no.

22  Q     Okay.  But you're holding it in case it is?

23  A     Yes.

24  Q     I want to now draw your attention to approximately -- you

25  know what?  Let's go to the pole cam for a little bit.

1    MR. WITHERELL:  Judge, if you wouldn't mind, I'm

2  just -- I'm going to try to do it the best I can to skip through

3  it.  I have a segment that's about 50 minutes.  I do not plan on

4  playing the entire thing.

5    THE COURT:  Okay.

6    MR. WITHERELL:  But I'm going to do it from the seat,

7  if that's okay with you.

8    THE COURT:  Yeah.  Sure.

9    (Counsel confer)

10 BY MR. WITHERELL:

11 Q   Just so the record's clear, the timestamp on the video is

12 18:24 and 20 seconds.  We've already stipulated that's 22

13 minutes slow.  Is that your understanding?

14 A   That is correct.

15 Q   Okay.  Could you just for the Court situate us?  Where are

16 we?  What are we looking at here?

17 A   So this pole camera is facing south on the 3200 block of

18 North Sydenham Street.  This is the scene that I arrived to,

19 initially looking for the vehicle, with the gentlemen on the

20 right side, which would be the west side of the street, out in

21 front of the residence and in the street and on the sidewalk.

22 Q   I'm going to play the video in a second.  You can tell us

23 what happened.  But just so the Court is aware, the Jeep that

24 we're speaking about with that PA tag that you had mentioned

25 several times --

1    A    Yes.

2    Q    -- could you just let the Court know where that is?

3    A    So if you look at the right side of the screen, there's

4    going to be a dark blue Chevy -- I believe it's a

5    Malibu -- followed by a white Lexus.  And then behind that is

6    going to be the white Jeep with the tag JYD-0709.  The plate was

7    obscured from view while driving southbound until -- you'll see

8    me basically become parallel with the vehicle so that I could

9    identify the tag.

10            MR. WITHERELL:  Your Honor, at this point, I'm going

11   to begin to play the video.

12        (Video played from 11:41 a.m. to 11:42 a.m.)

13   BY MR. WITHERELL:

14   Q    I just stopped it now with the imbedded timestamp of

15   8:25:29.  Could you just tell us what we saw, what you did to

16   lead us up to this point?

17   A    At this point, upon exiting the vehicle -- which I'm

18   operating, my partner is riding passenger -- we do a quick

19   glance into the vehicle to see if it's occupied.  We don't see

20   any persons, but like I said earlier, Your Honor, there is a

21   heavy tint on the vehicle.  It is very difficult to completely

22   clear it.  Since we do have the vehicle, my next reaction is to

23   see if there's a possible shooter on the block still that might

24   have been matching flash from the job previously.  That's when

25   you heard the radio tape earlier of me requesting any additional

1    or updated flash information to be given to me for a possible

2    stop.  Now, I would not probably be doing that stop.  I would

3    relay that information over police radio to have responding

4    backup officers conduct that stop, because my primary concern

5    right now is going to be that vehicle and the house, security

6    and preservation of any evidence that might be at that location.

7    Q    And just to be clear, on the immediate left, there's this

8    white SUV.  Is that the SUV that you spoke about when you first

9    rolled up, looking at license plate?

10   A    That's correct.  The first letter was a J, but it was not

11   matching.

12   Q    And later on, it's this one up on the right that actually

13   matched the description that was provided to you through that

14   MDT?

15   A    That is correct.  Right where your cursor was, that is the

16   white Jeep SUV.

17   Q    All right.  And this is the group of males that you spoke

18   about in previous testimony?

19   A    Yes.  And there were others that already had disbursed.

20   Reviewing this tape now, I see that there was a male inside the

21   vehicle that exited that I just now have seen and other

22   individuals that have walked off before I even approached them.

23        (Video played from 11:44 a.m. to 11:45 a.m.)

24   BY MR. WITHERELL:

25   Q    Stopped at 18:26:22.  Would you just tell the Court what

1    has occurred at this point?

2    A    At this point, there's a vehicle left running unattended

3    with the windows down.  So it's just another thing that

4    is -- strikes me as being odd to have someone have their vehicle

5    there running with the windows down and unoccupied.  So I go to

6    look inside the vehicle to verify if there's anyone in the back

7    seat.  The back windows, I believe, were up at the time.

8    Q    The males that have -- were originally on the right side of

9    the screen, do -- at this point in the video, at 18:26:22, do

10   you know where they were?

11   A    Yes.  They walked northbound and dispersed, and they went

12   both east and west from that location, which I believe I gave

13   over radio before I walked over to this vehicle.

14        (Video played from 11:46 a.m. to 11:49 a.m.)

15   BY MR. WITHERELL:

16   Q    I'm now playing it at 18:27:56.  At this point, you had

17   looked into the Jeep in question and made sure it was clear?

18   A    Yes, I believe so.  I'm going back to my vehicle now to

19   verify the address of the registered owner and verify the name

20   again.

21   Q    At this point, you appear to be having an interaction with

22   an individual on the left who's wearing a red shirt.  Do you see

23   that?

24   A    Yes, I do.

25   Q    At that day, September 11, 2017, did you know who that

1  person was?

2  A    No, I did not at that day.

3  Q    Do you see that person in the courtroom here today?

4  A    Yes, I do, seated to the right of counsel, my left, Amir

5  Boyer.

6          MR. WITHERELL:  Your Honor, may the record reflect

7  he's identified Defendant Boyer?

8          THE COURT:  Yes.

9  BY MR. WITHERELL:

10  Q    Officer, that was the car you said had been left running?

11  A    Yes.

12  Q    Could you please tell us about this interaction you're

13  having with Mr. Boyer at this time?

14  A    It was just a mere encounter.  I basically asked him if

15  that was his vehicle.  He responded, yes, he was securing the

16  vehicle, rolling the windows up, locking the doors.  He informed

17  me he was a Lyft driver waiting for a fare or something to that

18  sort.  Our conversation was extremely brief at that time, and I

19  didn't have any reason to investigate further.  He walked away.

20  I walked away.

21  Q    Okay.  It's 18:29 in the video.  Can you please tell us

22  what you're doing at this point?

23  A    Well, right now, the -- the area is pretty secure with us

24  out there.  We're looking for evidence.  It strikes me as odd

25  that there's a bag containing sneakers that were just bought

1  still with the receipt in the bag.  And like I said previously,

2  there was a half-eaten pizza that was still warm.  I'm looking

3  around the area for any possible weapons that could have been

4  used or keys to any vehicles, anything of that sort.

5  Q    I'm just going to let it play for one more minute.

6          MS. FLANNERY:  Your Honor, may I inquire?  These are

7  law clerks in the jury box?

8          THE COURT:  Yes.

9          MS. FLANNERY:  Do they have access to the screen?

10         THE COURT:  No.  So do you want them to leave?

11         MS. FLANNERY:  No, I --

12         THE COURT:  They're --

13         MS. FLANNERY:  I thought they should -- if we turn

14  on --

15         THE COURT:  They're interns.

16         MS. FLANNERY:  -- if they --

17         THE COURT:  Well, exactly --

18         MS. FLANNERY:  -- if we turned on the screen, they

19  could see it.

20         THE COURT:  Is this --

21         MS. FLANNERY:  Well, I guess they can see over here.

22         THE COURT:  Well, this -- we're in a public courtroom.

23         MS. FLANNERY:  No, I'm not concerned about it.  I just

24  didn't want them to be excluded from the information being put

25  forward.

1          MR. WITHERELL:  I don't think it was an objection,

2   Your Honor.  I think she was trying to include them more.

3          THE COURT:  Yeah.  They're -- well, we're in a public

4   courtroom.  I don't think that pertains to a public courtroom.

5          MS. FLANNERY:  I'm not -- you're misunderstanding my

6   point, Your Honor.

7          THE COURT:  Yeah.

8          MS. FLANNERY:  I was trying to be inclusive and say --

9          THE COURT:  Yeah.  Absolutely.

10         MS. FLANNERY:  -- if they're sitting here --

11         THE COURT:  Everybody --

12         MS. FLANNERY:  -- it's fine with us --

13         THE COURT:  Anybody sitting in the courtroom is

14   entitled to this information.

15         MS. FLANNERY:  And I'm saying if it would be helpful

16   to them, we could turn the jury monitors on too.  That's my only

17   point.

18         THE COURT:  Okay.

19         MS. FLANNERY:  Sorry to interrupt.

20         THE COURT:  All right.  Let's continue.

21         MR. WITHERELL:  Okay.

22      (Video played from 11:50 a.m. to 11:50 a.m.)

23   BY MR. WITHERELL:

24   Q   I'm at 18:29:53 in the video.  Can you please tell the

25   Court what you're doing at this point?

1  A    I'm just looking at what the contents of the bag that were

2  left there.  At this point, it's abandoned property.  I'm

3  looking to see what the nature is, if it has any relation to

4  possible suspect, possible scene.  And I'm also concluding to

5  myself that there's something odd being as though there's

6  recently purchased merchandise that was just left abandoned on

7  someone's porch.

8  Q    Well, and this is the shoes and the pizza you spoke about,

9  right?

10  A    Yes, it is.

11        MR. WITHERELL:  Okay.  I'm going to move ahead a

12  little bit.

13  BY MR. WITHERELL:

14  Q    You mentioned in your previous testimony that at some

15  point, other officers arrive on scene; is that correct?

16  A    That is correct.

17  Q    And who were those officers?

18  A    Officers Giacomelli and Officers Teri.  Their call sign is

19  3931, but they're in our PC 3915.

20  Q    And that would be the vehicle that's seen in the direct

21  middle of the video at 18:32:48, correct?

22  A    That is correct.

23        MR. WITHERELL:  I'm going to play it at this point.

24        (Video played from 11:51 a.m. to 11:52 a.m.)

25  BY MR. WITHERELL:

1   Q     See the individual on the right who just left the Sydenham

2   residence?

3   A     Yes.

4   Q     Who's that individual?

5   A     That individual is Mr. Harmon.

6   Q     Did you see him at that point?

7   A     I seen him in my peripheral when he was stepping off of the

8   sidewalk.  I did not see him exit the residence, but he was

9   brought to my attention from Officer Teri or Giacomelli.  I

10  don't recall.  It was one of them.  They said, where'd he come

11  from?  And I said, I don't know where he came from, but he came

12  from the direction of the house.  So that's when we started

13  observing his movement.

14        (Video played from 11:52 a.m. to 11:52 a.m.)

15  BY MR. WITHERELL:

16  Q     18:33:53.  On the left side of the screen, do you see an

17  individual?

18  A     Yes.

19  Q     Who's that individual?

20  A     That's Mr. Harmon returning.

21  Q     I stopped at 18:34:33.  Is this that interaction you had

22  with Mr. Harmon you spoke about previously on direct?

23  A     Yes.

24  Q     Can you tell us about what was being said at this time?

25  A     He basically gave me his name, his ID, and told me that he

1  had been squatting there at the residence.  He told me he was

2  trying to work out some kind of payment plan with the owners of

3  the house.

4  Q    Mr. Harmon is located on that porch in front of the

5  residence.  Is he told to stay there?

6  A    He's not told to stay there, per say, but he is not free to

7  leave.  I do have his identification card.  I told him that

8  right now he's a person of interest, and we're conducting an

9  investigation, and if he would just hang out on the porch area

10 here while we conduct our investigation.

11         THE COURT:  Well, is this testimony going to be

12 relevant on the motion to suppress the statement that we --

13         MR. WITHERELL:  It is, Judge.  I'm not going to go

14 in --

15         THE COURT:  -- have listed for another date?  What?

16         MR. WITHERELL:  It is, Judge, but I --

17         THE COURT:  All right.  We'll just incorporate it in

18 that record, I presume.

19         MS. FLANNERY:  Well, I'm not prepared to address that

20 motion today, Your Honor.  I'll have many questions for the

21 officer with respect to that.

22         THE COURT:  Okay.  Fine.  Well, you can hold off your

23 cross-examination.

24         MS. FLANNERY:  Thank you.

25         THE COURT:  Okay.  Go ahead.

1        MR. WITHERELL:  I'll try to -- I'll try not to broach

2  that subject, Judge.

3        THE COURT:  Well, we're -- today we're limited to the

4  search of the -- search and seizure of the premises on North

5  Sydenham Street.  All right.  Go ahead.

6        I'm just wondering whether all this testimony about

7  Mr. Harmon back and forth is relevant to the search warrant.

8        MR. WITHERELL:  Judge, I'll try to move ahead.

9        THE COURT:  Good idea.  Thank you.

10  BY MR. WITHERELL:

11  Q    Now, throughout this encounter with Mr. Harmon, he stays on

12  the porch, but you guys don't stay in front of that location the

13  entire time, correct?

14  A    No.  We don't guard him, so to say.

15        (Video played from 11:55 a.m. to 11:55 a.m.

16  BY MR. WITHERELL:

17  Q    I'm playing the portion at 18:38:15.  It's you and several

18  officers.  You guys are searching the area?

19  A    Correct.

20  Q    At some point during this, is this when Officer Teri

21  informs you about the keys?

22  A    Yes.

23  Q    Okay.  Tell us what else Teri told you.

24  A    Officer Teri tells me that the keys were on the ground with

25  dirt on top of them as if somebody tried to kick dirt on top of

1    them to hide them, to conceal the keys.

2         (Video played from 11:55 a.m. to 11:57 a.m.)

3    BY MR. WITHERELL:

4    Q    I'm now at 18:39:35.

5         MR. WITHERELL:  And, Your Honor, I'm almost done.

6    BY MR. WITHERELL:

7    Q    I see an individual with a red shirt.  Is that the same

8    individual you identified earlier?

9    A    Yes, that's correct.  Amir Boyer.

10   Q    Can you tell us about the conversation you've having with

11   Mr. Boyer at this point?

12   A    Mr. Boyer at this point is inferring about what's going on

13   as far as the property and Mr. Harmon on the porch.  Mr. Boyer

14   informed me that his parents used to own the property.  We

15   exchanged a couple of minor questions that I do not recall.

16   Just a mere encounter.  I told him when the investigation is

17   finished, he can talk to Mr. Harmon and get all the answers, but

18   I can't give him answers to the questions that he was asking

19   based on the fact that it's a ongoing investigation.  And I also

20   informed him that he was going to have to leave the area.

21   Q    You mentioned something that I want to talk about.  Did

22   Mr. Boyer say he lived there?

23   A    No, he did not say he lived there.  He said his family had

24   owned the property.

25   Q    In the past?

1    A    Yes.

2    Q    Did he indicate at all if that was a premise (sic passim)

3    he was staying at or was living at?

4    A    No.

5         (Video played from 11:57 a.m. to 11:58 a.m.)

6    BY MR. WITHERELL:

7    Q    Do you know Mr. Boyer's saying at this point, 18:40:53?

8    A    At this point, he's just acting as a street lawyer and

9    giving him unsolicited legal advice as to what Mr. Harmon can

10   say or can't say in the street court of law that we're holding.

11   Q    Let me --

12   A    He was asked to leave again, which he remained at the rear

13   of the vehicle, shouting instructions to Mr. Harmon.  Officer

14   Giacomelli, I believe, says that's enough, you have to leave

15   now, you're impeding our investigation, it's now causing a

16   scene, which Mr. Boyer was compliant and did leave the area

17   after that.

18        (Counsel confer)

19   BY MR. WITHERELL:

20   Q    At some point, approximately 7:37, Mr. Harmon is taken to

21   the homicide squad.  Do you remain at the scene?

22   A    I do.

23   Q    And who do you remain at the scene with?

24   A    I remain at the scene with Officer Nelson.

25   Q    At approximately 7:50 p.m., do plainclothes detectives come

1  to your location?

2  A     Yes, they do.

3  Q     Who are those detectives?

4  A     Detective Falcone and Detective Sweeney with Northwest

5  Detectives.

6  Q     Okay.  And do you have a conversation with them when they

7  arrived?

8  A     Yes.

9  Q     Okay.  Tell us about that conversation.

10  A     Well, they said that they were holding the house for a

11  search warrant, and they inquired if I had cleared the house

12  yet.

13  Q     And when they asked you about clearing the house, what was

14  your response?

15  A     My response was, no, we didn't clear the house yet because

16  of the situation that we had out there as far as personnel goes,

17  as far as the investigation rapidly escalating to where it was,

18  because the man wasn't -- was pronounced while we were on the

19  scene.

20  Q     Now, did -- I just want to be clear.  When you talked to

21  Detective Falcone and Sweeney, do you just say, no, we didn't

22  clear the house, or do you give that explanation about why?

23  A     I might have said that we didn't have personnel, and we

24  also didn't -- the male wasn't pronounced.  So, initially, we're

25  investigating aggravated assault, and then it escalates even

1   further when the male is pronounced.

2   Q    But at some point, a decision is made between you four that

3   that house has to be cleared, correct?

4   A    That's correct.

5   Q    Okay.  And you four enter the premise; is that correct?

6   A    That is correct.

7   Q    All right.  Tell us, where do you go?

8   A    Upon entering the front door, which is open, we go into the

9   living room.  Now, I'm clearing this house.  I'm looking for

10  people, possible shooter.  Based on the evidence that's

11  outside -- you have the pizza box, and you have the shoes.  So

12  somebody abruptly left the area.  Whether they went into the

13  house or up the street, I do not know.  So I'm basically looking

14  for a person and a person only.  Specifically, I'm also trying

15  to inquire about the registered owners of the vehicle and their

16  possible involvement with the shooting.

17  Q    Okay.

18  A    When we go through the house, in plain view in the first

19  floor, in the front room, there is a few bags of marijuana.  I

20  did not weigh it.  I would only approximate that one of the bags

21  was possibly a pound in a heat-sealed bag in plain view on a

22  wooden chair.  There was another bag, approximate weight of an

23  ounce, and that was in a plastic bag tied in a knot.

24      Upon further clearing of the house, up in the

25  bedrooms, strong odor of marijuana.  There was small amounts of

1  marijuana packaged for sale in small little plastic jars in

2  plain view in a laundry bag.  In a front bedroom, second floor,

3  there was a money counter.  There was also a safe in the front

4  bedroom.  And that's pretty --

5  Q    When you're clearing this house --

6  A    Yes.

7  Q    -- are you searching these items that you're seeing, or are

8  you just going, looking for people?

9  A    No.  I'm looking for people.  The only reason I see these

10 things, they're in plain sight.  I'm not -- the only places that

11 I'm looking are places that a human being can be.  So I am

12 opening doors to the bathroom, checking behind doors.  I'm

13 looking in closets.  I'm moving some clothes around to make sure

14 that there's no one hiding.  But I'm not searching, looking for

15 anything except for a possible person in hiding.

16 Q    And was anybody found --

17 A    No, there was not.

18 Q    Do you know how long you and the detectives and Officer

19 Nelson were in that house for?

20 A    I would approximate five minutes.

21      THE COURT:  Wait.  Just a minute.

22      (Court confers)

23      THE COURT:  Just everybody stay in place.  We're just

24 going to go off the record in this case, and we'll swear in the

25 jury, and we'll resume.

1    Why don't you have a seat, Mr. Witherell, just so the jury

2  is --

3         MR. WITHERELL:  Oh, yes, Your Honor.  I apologize.

4    (Recess from 12:02 p.m. to 12:04 p.m.)

5         THE COURT:  -- is your direct, but can you finish it

6  by 12:20 so --

7         MR. WITHERELL:  I can finish it -- oh, yeah.  I can

8  finish in five minutes, Judge.

9         THE COURT:  All right.  Let's go.

10              DIRECT EXAMINATION CONTINUED

11  BY MR. WITHERELL:

12  Q    The house was cleared.  Officer -- Detectives Falcone and

13  Sweeney, they left?

14  A    Yes.

15  Q    You stayed at the premise?

16  A    Yes, I did.

17  Q    And what was your purpose to stay there?

18  A    To hold and maintain security and preservation of the

19  residence and the vehicles.

20  Q    Okay.  Are you aware as you sit here today that a search

21  warrant was executed on that residence?

22  A    Yes.

23  Q    Were you present for the search of that residence?

24  A    No, I was not.

25         MR. WITHERELL:  Okay.  I have no further questions,

1    Judge.

2                   THE COURT:  Okay.  All right.  Let's start the

3    cross-examination.  So we'll go for -- until 12:20.  Thank you.

4                              CROSS-EXAMINATION

5    BY MS. FLANNERY:

6    Q    Good afternoon, Officer Rillera.  I'm Ann Flannery.  I

7    represent Mr. Harmon.

8    A    Good afternoon, ma'am.

9    Q    You're assigned to the 39th District; is that right?

10   A    That is correct.

11   Q    And what's your role?  Are --

12   A    I am a patrol officer.

13   Q    So that means you're responding to radio calls or other

14   requests for you to go to a particular place?

15   A    That is correct.

16   Q    And you're -- so it's a bit reactive?

17   A    Sometimes it's reactive.

18   Q    And so you have a radio in your car; is that right?

19   A    We do not have radios in our vehicles anymore.  They're

20   handheld radios throughout the department now.

21   Q    Okay.  So you have a radio --

22   A    Correct.  I have a personal radio.

23   Q    And you don't even have to be in your car to be able to

24   listen to the radio?

25   A    That is correct.

1  Q    And you also have the mobile data terminal in your car?

2  You were explaining that.

3  A    Yes.

4  Q    So does that mean that --

5  A    Fancy name for a computer.

6  Q    If you miss something on the radio, you can look and see it

7  scrolling on the terminal?

8  A    That is correct.

9  Q    Fair to say there were a lot of calls and broadcasts about

10 this murder?

11 A    Yes.

12 Q    And it took place around -- the shooting took place around

13 5:39 p.m.; is that correct?

14 A    Approximate, yes.

15         MS. FLANNERY:  All right.  So let's -- if I could play

16 what I've marked as DH Supp 10, which is call number eight.

17         And, Your Honor, I have -- for everyone's convenience,

18 I printed out my notes of the calls that I intend to play.

19         THE COURT:  Okay.

20         MS. FLANNERY:  Bless you.  I wouldn't say they go to

21 the -- they rise to the level of transcripts, but --

22         THE COURT:  Sure.  Okay.

23         MS. FLANNERY:  -- in case they're helpful.

24         THE COURT:  I'll be happy to look at it.  Thank you.

25         MS. FLANNERY:  And that these are marked as DH-33.

1          MR. WITHERELL:  Thank you.

2          MR. STENGEL:  Thank you.

3          MR. WEAVER:  Thank you.

4          MS. FLANNERY:  If I could ask Mr. Walters to play

5    what's marked as DH-10.  And this --

6          (Audio played from 12:08 p.m. to 12:08 p.m.)

7          MS. FLANNERY:  Okay.  You can stop it there.

8          MR. WITHERELL:  Your Honor, I just want to point one

9    thing out.  I just want to see if this is clear.  I don't

10   believe that what was played was an actual radio call, something

11   that would be broadcasted over radio.  That was a 911 call.  I

12   do not believe this officer would have been privy to hear -- I

13   just want to make --

14         THE COURT:  Well, she can ask him, or you can ask him

15   on redirect.  Overruled.

16         MR. WITHERELL:  I just want to make sure --

17         THE COURT:  Overruled.  Go ahead.

18   BY MS. FLANNERY:

19   Q    To follow up on Mr. Witherell's point, was that a call

20   in -- did that sound to you like a call into the 911 call?

21         MR. WITHERELL:  Objection.

22   BY MS. FLANNERY:

23   Q    Well, what do you think that was?

24         THE COURT:  If you know.

25   BY MS. FLANNERY:

```
1   Q     If you know?

2   A     I do not know, but I would assume that that is a 911 call,

3   and that's a dispatcher on the other end, which does not go over

4   or is it ever broadcast over police radio.

5   Q     But if the dispatch then gets that information --

6   A     Yes.

7   Q     -- they convey it out to you on the radio?

8               THE COURT:  They can if they want to.

9               THE WITNESS:  They have the ability to.  Yes, they

10  can.

11  BY MS. FLANNERY:

12  Q     Were you aware that there was a report of a burgundy Jeep

13  being the getaway vehicle?

14  A     I was aware of a burgundy Jeep.  I was aware of multiple

15  different descriptions of flash on suspected shooters that

16  conflicted.  So, normally -- if you listen to the timestamp on

17  that call, that's right when it happened.  It's very hectic.  We

18  get a lot of different information from people trying to process

19  what exactly they're seeing.  Even when I individually

20  investigate and ask for people if they have anything, two people

21  standing right next to each other can tell me totally different

22  stories.  So, normally, it's after a matter of time and

23  deduction to where we actually -- excuse me -- have better flash

24  or better information on vehicles, vehicle colors, vehicle tags,

25  what people are wearing.  Because at first, it's a rush of
```

1   information coming from different sources.  And a lot of 911

2   calls, some people can actually give false information to throw

3   us off.

4   Q    You were right there on the scene fairly shortly

5   thereafter; is that correct?

6   A    That is correct.

7   Q    And you were aware that there had been a report that the

8   doer had fled in a burgundy Jeep; is that correct?

9   A    I did hear that information.

10  Q    Did you also hear a little later that there was flash for

11  the doer fleeing in a blue sedan with a female passenger?  Do

12  you recall that flash?

13  A    I do not recall that.

14          MS. FLANNERY:  Let's first play -- and I move into

15  evidence, Your Honor -- I may be a little out of order, but

16  since it's a suppression hearing, I'll move into the DH-10 that

17  I just played.

18          THE COURT:  What do you want to play?

19          MS. FLANNERY:  I wanted to move into evidence the call

20  that I just played, DH-10.

21          THE COURT:  Yeah.  Okay.  Admitted.

22     (Defendant Harmon Exhibit 10 admitted)

23          MS. FLANNERY:  And I'd like to play DH-17.

24     (Audio played from 12:12 p.m. to 12:12 p.m.)

25  BY MS. FLANNERY:

1    Q      This is the -- a radio as opposed --

2    A      Yes.

3    Q      -- to a call, correct?

4    A      Yes.

5           (Audio played from 12:12 p.m. to 12:13 p.m.)

6           MS. FLANNERY:  All right.  We can stop right there.

7    BY MS. FLANNERY:

8    Q     So as opposed to the first track that I played, that was a

9    radio call that would have gone over the radio to you?

10   A      That call right there was one of our dispatchers.  Her name

11   is Nicole (phonetic).  She is -- she follows my shift.  So that

12   is a radio transmission over police radio.  She is relaying

13   information that she received to us to be on the lookout for.

14   And it's always going to be possible.  It's possible suspected

15   shooter in this car or that car.

16          MS. FLANNERY:  I move in DH-17.

17          THE COURT:  It's admitted.

18      (Defendant Harmon Exhibit 17 admitted)

19          MS. FLANNERY:  Now let's play DH-20.

20      (Audio played from 12:13 p.m. to 12:16 p.m.)

21          MS. FLANNERY:  Okay.  You can stop that.

22   BY MS. FLANNERY:

23   Q     So, sir, that was a radio call as opposed to a call in to

24   911; is that correct?

25   A     That was a radio transmission over police radio.  Correct,

97

1    ma'am.

2                  THE COURT:  All right.  We're going to stop now.

3    Okay.  About how much longer is your cross?  I'm not attempting

4    to limit you, but just --

5                  MS. FLANNERY:  It --

6                  THE COURT:  -- give me an idea.

7                  MS. FLANNERY:  It's a good bit.  At least an hour.

8                  THE COURT:  All right.  Okay.  I'm not sure -- you

9    know, we're talking here -- the issue here is the suppression of

10   any evidence seized from the North Sydenham Street; is that

11   correct?

12                 MS. FLANNERY:  That's correct, Your Honor.

13                 THE COURT:  All right.  I'm not sure why all these

14   radio calls about the shooter and what car they're in is

15   relevant, to be honest with you.

16                 MS. FLANNERY:  It's relevant to the omissions that are

17   in the search warrant, Your Honor, in the search warrant

18   affidavit.  The --

19                 THE COURT:  All right.  Is that in -- can I see that

20   exhibit, Mr. Witherell?

21                 MR. WITHERELL:  The search warrant, Judge?

22                 THE COURT:  Yeah.

23                 MR. WITHERELL:  Absolutely.

24                 THE COURT:  It may have been attached to all the

25   papers here, but --

1          MR. WITHERELL:  I believe it was, Judge, but just give

2   me one second --

3          THE COURT:  All right.  Can I look at it, please?

4          MS. FLANNERY:  I have it marked as DH-1.

5          THE COURT:  All right.  Can you just hand up a copy

6   for a minute?

7          MR. WITHERELL:  Uh-huh.  Can I --

8          THE COURT:  Mr. Witherell, how many more witnesses do

9   you have?

10       (Counsel confer)

11         THE COURT:  And what are they going to testify about?

12       (Counsel confer)

13         MR. WITHERELL:  Your Honor, after Officer Rillera,

14   there's Detective Brian Peters.  He's the lead homicide

15   detective.

16         THE COURT:  What's he going to say?

17         MR. WITHERELL:  He's going to say that he received a

18   call around 7:30 -- 7:24.  He was informed about the murder, had

19   contact with Detective Falcone, told him that -- was --

20         THE COURT:  Well, who drafted the search warrant?

21         MR. WITHERELL:  That is Detective Centeno.  All that

22   information that Detective Centeno gets is from Brian Peters,

23   and that's why the Government was planning on --

24         THE COURT:  From who?  Brian?

25         MR. WITHERELL:  Peters.  Detective Brian Peters.  And

1  that's why we were planning on calling him.  And the thrust of

2  the argument made by defense attorneys in their motion --

3           THE COURT:  Well, wait.  Wait just a minute.  Wait.

4  Just what is the testimony?  You said you're going to call

5  Detective Peters.

6           MR. WITHERELL:  Correct.

7           THE COURT:  And he's the one who gave most of the

8  information in the search warrant; is that right?

9           MR. WITHERELL:  Correct.

10          THE COURT:  All right.  And how long is his direct

11  likely to be?

12          MR. WITHERELL:  Twenty minutes.

13          THE COURT:  How long?

14          MR. WITHERELL:  Twenty minutes, Judge.

15          THE COURT:  All right.

16          MR. WITHERELL:  If that.

17          THE COURT:  Okay.  Now -- okay.  Fine.  All right.

18  Okay.  I have a better understanding.  All right.  I

19  don't -- okay.  You know -- all right.  And I don't want to

20  comment on this at all at the moment, but I'll think about it

21  over the lunch recess.  Can I keep this?

22          MS. FLANNERY:  You may, Your Honor.

23          THE COURT:  All right.

24          MS. FLANNERY:  If I may respectfully say that this

25  evidence is extremely important to my client, and I think the

1   details of what went on that day when they're all added up and

2   put in -- to perspective are going to be very significant as to

3   the legality of the search.

4           THE COURT:  Well, I can see that it's important to

5   your client and the overall case.  I don't have any dispute

6   about that.  But this is a suppression hearing, and the fact

7   that the search warrant talks about the white Jeep and doesn't

8   talk about these other vehicles is -- may be relevant, but it's

9   been established.  So I'm not sure why more details about it are

10  necessary, to be honest with you.  But I'm not ruling.  I'm not

11  going to prevent you from cross-examining the officer, because

12  the direct was lengthy, more lengthy than it had to be, in my

13  opinion.

14          Okay.  I'll see you at 2:00.  Thank you very much.

15          MS. FLANNERY:  Thank you, Your Honor.

16          MR. WITHERELL:  Thank you, Your Honor.

17          THE COURT:  But I'd like you to think about shortening

18  this, because we've had two officers on the scene.  The search

19  warrant says what it says.  And I would rather the direct be

20  kind of circumspect and specific and then give defense counsel a

21  chance to cross-examine on what they think is relevant.  Okay?

22  All right.

23          MS. FLANNERY:  Your Honor --

24          THE COURT:  Yeah?

25          MS. FLANNERY:  -- this probably goes without saying

```
 1   since this is a professional witness, but I would ask that he be
 2   instructed not to speak to the Government about his testimony.
 3             THE COURT:  Yeah.  You're under cross-examination,
 4   Officer, so don't talk to the Government counsel or any other
 5   police witnesses about this case.  Okay?
 6             THE WITNESS:  Yes, sir.
 7             THE COURT:  All right.  Thank you.
 8             All right.  See you at 2:00.
 9             MR. WITHERELL:  Thank you, Your Honor.
10             THE COURT:  And I'll be -- I'm -- we'll be back here
11   at 1:45 on the civil case.  Thank you.
12        (Recess from 12:20 p.m. to 1:58 p.m.)
13             MR. WITHERELL:  Should we bring the witness back in,
14   Your Honor?
15             THE COURT:  Oh, yeah.  Yes.  Please.
16        (Pause)
17             MS. FLANNERY:  If I can just get a moment, Your Honor?
18   I whisked my things away.  I've got to find them again.
19             THE COURT:  Okay.  Let me just say -- well, before we
20   start with the continued cross-examination, as I see --
21        (Audio skip from 1:59 p.m. to 1:59 p.m.)
22             THE COURT:  -- first is whether the police were acting
23   legally or illegally when they went into the house, as the first
24   witness said, to clear the house.  And it was clear that that
25   took place --
```

1          MS. FLANNERY:  Your Honor, the witness is here with

2   the --

3          THE COURT:  I understand.  I'm not saying anything

4   that affects his testimony.  And that is a legal issue.  The

5   second issue has to do with the sufficiency of the search

6   warrant, which I now have in front of me.  And I think that both

7   sides have extended examination beyond what is reasonable to

8   determine the legality of the search warrant, but it's

9   background, and it's happened.  So I'm -- I'll allow

10  Ms. Flannery and Mr. Weaver to continue their cross-examination,

11  but I'd like the Government to sort of curtail any future

12  witnesses as to what focuses on these two legal issues.  All

13  right.  Thank you.

14         MS. FLANNERY:  And, Your Honor, if I may?  Omission is

15  a part of our argument too with --

16         THE COURT:  Well --

17         MS. FLANNERY:  -- respect to the --

18         THE COURT:  -- it is clear that the search warrant

19  only talks about a white Jeep.  Okay?  But --

20         MS. FLANNERY:  That's not all, Your Honor.

21         THE COURT:  Yeah.  What?

22         MS. FLANNERY:  There's more.

23         THE COURT:  Well, but -- yeah, but we don't need

24  extended discussion about how many radio calls there were about

25  a blue car.

1          MS. FLANNERY:  Understood, Your Honor.

2          THE COURT:  There were radio calls about a blue car,

3    but we don't need it played out for ten minutes at a time.

4    Okay.  Have a seat.

5          MS. FLANNERY:  All right.  Here we go.

6          THE COURT:  All right.  Continue.

7                    CROSS-EXAMINATION CONTINUED

8    BY MS. FLANNERY:

9    Q    Officer, you went to Sydenham shortly after -- as soon as

10   you heard the broadcast, you looked -- about the white Jeep, you

11   looked up the address; is that how it happened?

12   A    Yes.  I did a BMV check on the license, the PA

13   registration, and BMV produces a registered owner along with a

14   address of that registered owner.

15   Q    And then did you promptly go to that street?

16   A    Yes, immediately.

17   Q    And you were the first to arrive at Sydenham Street; is

18   that correct?

19   A    Yes, it is.

20   Q    You mention in your direct testimony that the information

21   you had was that the white SUV left at a high rate of speed.

22   Was that your testimony?

23   A    I believe it was, yes.

24   Q    Where did you get that information?

25   A    I believe that was on the MDT.

1    Q    Did you hear the flash information when we played it

2    earlier in court today?  I can't remember whether you were here.

3    A    Yes, I did hear.

4    Q    And that had nothing in it about the SUV leaving at a high

5    rate of speed, did it?

6    A    No.

7    Q    So you arrive, you see a number of males outside the house,

8    and you call into police radio to let them know that you're

9    there and to ask what the information was on what the shooter

10   was wearing, correct?

11   A    Well, I put myself on location and tell them that I have

12   the suspected vehicle in my presence, first and foremost.  I

13   radio my location so additional backup units know where I'm at.

14   And then I ask for any additional flash or updated flash on the

15   suspected shooters that might have changed since I had driven

16   over to that location within the last five minutes.

17   Q    And what they told you was it was someone in a gray

18   sweatshirt -- gray sweat suit?

19   A    All gray sweats, possible hoodie, I believe it was.

20   Q    And that was consistent with the flash earlier?

21   A    There was inconsistent flash with that earlier of males

22   wearing all dark clothing too, I recall.

23   Q    Not necessarily inconsistent, dark and gray, but one -- one

24   described it as dark, and one described it as gray, correct?

25   A    Well, depending on the tone of gray, correct.

1  Q    All right.  And we heard earlier the radio call that you

2  made.  Was Officer Nelson on that call too?  Was that the other

3  voice we heard?

4  A    I do not believe he was on the radio very much.  He was a

5  newer officer, and I was kind of showing him the ropes for the

6  day.

7  Q    And correct me if I'm wrong, but you advised the dispatch

8  person that there was no one matching the shooter description at

9  that location, right?

10  A    Yeah, that's correct.

11  Q    There is someone saying that the location was under

12  control.  Do you remember that?

13  A    I do not recall, but I wouldn't doubt that I might have

14  said everything is under control.  It's possible.

15  Q    Everyone seemed -- everything seemed under control to you

16  at that location at that time, correct?

17  A    Well, as far as an immediate threat, there -- everything

18  was under control in my eyes at that time.

19  Q    And you didn't express any concern in that phone call about

20  the shooter perhaps being in the house, did you?

21  A    No, I did not.

22  Q    And you don't ask for backup in that call, did you?

23  A    No.  I believe I did not ask for backup, but other

24  responding units answered up and said that they were coming.  So

25  I didn't request them.  They said they were coming, so there was

1   no need to.

2   Q    Okay.  And in that call, no one advises you of any reason

3   to think the shooter's in the house, correct?

4   A    In the radio transmission?

5   Q    Correct.

6   A    No.  Radio operators are not police officers.  They're not

7   going to advise me at all, my duties.

8   Q    Well, at that point in time, had anybody advised you of any

9   reason to think the shooter was in the house?

10  A    Nobody advised me, because I was the senior officer out

11  there, so I was making the decisions based on my own --

12  Q    Okay.

13  A    -- observations.

14  Q    Someone on the radio advises you to watch the car.  Do you

15  recall that?

16  A    Yes.  To hold the location.  Correct.  That's my immediate

17  supervisor who was working the street.  His name is Sergeant

18  McLaughlin.

19  Q    And you understood that to mean what?

20  A    That means that I stay on location, and my duties are to

21  secure the property or the vehicle, preserve any kind of

22  physical evidence, observe and report.

23  Q    So you -- and you're basing your decisions on what you know

24  and what you observe and your experience as a police officer --

25  A    That is correct.

1  Q    -- fair to say?

2  A    Fair to say.

3  Q    And at that point in time, you didn't see any reason to do

4  a sweep inside the house; is that correct?

5  A    At that particular moment, no.

6  Q    Then the males who were gathered outside on the sidewalk,

7  they left, as we saw in the videotape, correct?

8  A    That is correct.

9  Q    And at that point in time, you didn't see a reason to do a

10 sweep of the house?

11 A    At that particular moment, no.

12 Q    And you went around, as we saw, and you -- and as you

13 described, and you looked for evidence; is that right?

14 A    Yes.

15 Q    And I don't want to belabor the tape, but often during that

16 tape, the portions that we saw, you often had your back to the

17 house; did you not?

18 A    That is correct.

19 Q    As did Officer Nelson, correct?

20 A    Sure.

21 Q    And you saw a bag of personal items.  You described them as

22 new sneakers and a box of half-eaten pizza?

23 A    Correct.

24 Q    And those were actually on the steps of the adjoining

25 house; is that correct?

1  A    That is correct.

2  Q    And those were there when you arrived, right?

3  A    Yes.

4  Q    And they were left behind when the males walked off?

5  A    Correct.

6  Q    So seeing that bag -- and you investigated the bag,

7  correct?

8  A    Correct.

9  Q    Whatever you saw in the bag and whatever you felt in terms

10  of the temperature of the pizza, that didn't cause you to decide

11  you needed to sweep the house, did it?

12  A    Not that particular fact, no.  It was more of a totality of

13  all the circumstances that happened in a rapid progression.

14  Q    Well, it was over an hour before you entered the house for

15  the sweep, correct?

16  A    Correct.

17  Q    And during that time, there were no radio broadcasts saying

18  that the shooter had gone to 3234 Sydenham, were there?

19  A    No, there were not.

20  Q    Did anyone at the location tell you that somebody was

21  inside?

22  A    No, they did not.

23  Q    Did you hear any noises coming from the house to suggest

24  that someone was inside?

25  A    No, I did not.

1  Q    Did you hear any evidence being destroyed inside the house?

2  A    No, I did not.

3  Q    And before you did the sweep, Officers Teri and --

4  A    Giacomelli.

5  Q    -- Giacomelli --

6  A    Yes, ma'am.

7  Q    -- they came to the location, correct?

8  A    Yes, ma'am.

9  Q    And they stayed for approximately how long?  I mean, we can

10 figure it out, but -- I won't hold you to it.

11 A    I would say approximately 30 to 40 minutes.

12 Q    They didn't ask you to do a sweep of the house or suggest

13 that you do a sweep of the house, did they?

14 A    Not immediately when they came, no.

15 Q    And, in fact, another officer arrived around pole camera

16 time 6:42, so close to 7:00?

17 A    I believe you're referring to -- I don't have the video.  I

18 believe you're referring to a supervisor.  Was he wearing a

19 white shirt?

20 Q    Yes.  Maybe I can help you out with that.

21            MS. FLANNERY:  If we could go to 18:42, Mr. Walters.

22            THE COURT:  All right.  What's the question?

23            MS. FLANNERY:  I asked him if a third additional

24 officer arrived, and I believe this -- there.

25      (Video played from 2:08 p.m. to 2:09 p.m.)

1   BY MS. FLANNERY:

2   Q    Do you see in the bottom of that screen an additional car

3   arriving --

4   A    Yes.

5   Q    -- Officer?

6   A    Yes, I do.

7   Q    And perhaps we'll see who gets out.  Who is that?

8   A    That is Sergeant Gariano.  He's also a supervisor on the

9   street of the 39th District.

10              MS. FLANNERY:  Okay.  You can stop the video.  Thank

11  you.

12  BY MS. FLANNERY:

13  Q    So at this point, you're there.  Officer Nelson's there.

14  Officer Teri's there.  Officer Giacomello (sic passim) is there.

15  And Sergeant Giariano (sic)?

16  A    Gariano.

17  Q    Gariano.

18  A    Yes, ma'am.

19  Q    I apologize.  So there's five of you there --

20  A    Yes.

21  Q    -- correct?  And no one suggests that a sweep is necessary,

22  correct?

23  A    Not at that moment, no.

24  Q    All right.  The sergeant drives off before the other two

25  officers do, correct?

1    A     Yes.

2    Q     And then Detective Falcone and Sweeney arrive at 7:28 pole

3    camera time, right?

4    A     Approximately.  Yes, ma'am.

5    Q     And you told Detective Falcone that you hadn't done a sweep

6    because you didn't have personnel to watch the vehicles and

7    cover the house; is that correct?

8    A     Yes.

9    Q     Well, that wasn't true, was it?

10   A     Well, it is true, in my opinion, ma'am.

11   Q     There were five officers there, right?

12   A     Well, it depends on what time you're talking about.  At

13   that time, I don't believe that the male was pronounced, so we

14   were investigating aggravated assault.

15   Q     The male was pronounced dead before Detective Falcone

16   came --

17   A     Well --

18   Q     -- was he not?

19   A     Yes, but I don't --

20         THE COURT:  Well, the issue is, did he know that.

21         THE WITNESS:  I did not know that.

22   BY MS. FLANNERY:

23   Q     You learned at 7:15 that the male had been pronounced dead,

24   correct?

25   A     I'm not sure about that.  I learned after I seen Mr. Harmon

1    was being transported to homicide, that I assumed.  Nobody

2    specifically told me the man was pronounced.  But homicide's not

3    going to interview someone unless there's a pronouncement by

4    medical staff.

5    Q    So using your knowledge as a police officer, you knew that

6    at the time Dennis Harmon was transported to homicide at

7    homicide's request, that we -- that you were dealing with a

8    homicide, correct?

9    A    Yes, that's what I deduced.

10   Q    And Dennis Harmon left at --

11              MS. FLANNERY:  If I could have a moment, Your Honor.

12        (Pause)

13   BY MS. FLANNERY:

14   Q    He left while Teri and Giacomello were still there,

15   correct?

16   A    Giacomelli and Teri transported Mr. Harmon down to

17   homicide.

18   Q    And they left --

19              MS. FLANNERY:  If we could have 19:15.

20        (Video played from 2:12 p.m. to 12:13 p.m.)

21   BY MS. FLANNERY:

22   Q    This is when they left with Mr. Harmon, correct?

23   A    Yes, that's correct.

24   Q    And that's you bringing the car around that had been in

25   front of them, right?

A    That is correct.  I circled the street to put the RPC in front of the property.

Q    All right.  So at this point in time, you know that it's a homicide?

A    Yes.

Q    And you know that before Teri and Giacomello left --

A    Yes.

Q    -- correct?  So another 20 minutes or so passed by before Detective Falcone and Sweeny arrived, correct?

A    Fair to say.  Yes.

Q    And why was it important to have personnel -- when you told Detective Falcone that you hadn't done the sweep because you didn't have personnel to watch the vehicles and cover the house, as I said, you did have five officers there, correct?

          THE COURT:  Well, you've already asked him.  You've already asked him about that.

          MS. FLANNERY:  All right.

BY MS. FLANNERY:

Q    When you did go do the protective sweep, no one stayed outside and watched the house -- the cars, did they?

A    I'm not sure.  I'm not sure if Officer Nelson even entered the house or if he stayed on the porch.  I don't recall.

Q    Now, are you aware that Detective Falcone reported that he brought a witness to identify the white Jeep?

A    Not at the time, no.

1   Q    Did you see Detective Falcone bring a witness to identify

2  the white Jeep?

3  A    No, I did not.

4           MS. FLANNERY:  If we could see 18:24?

5           THE COURT:  No.  No, we're not going to -- you're

6  not -- no.  Please forward -- no.  You don't need to show him.

7  He doesn't need to see a video to cross-examine him,

8  respectfully.

9  BY MS. FLANNERY:

10  Q    When you arrived, you --

11           THE COURT:  Ask the question.  He doesn't have to look

12  at the video.

13  BY MS. FLANNERY:

14  Q    When you arrived, you parked in the street, correct?

15  A    When I first arrived?

16  Q    Yes.

17  A    Yes, ma'am.

18  Q    And that car stayed there in the street, blocking the

19  street, until you moved it when we saw a few minutes ago when

20  the sergeant left, correct?  Or -- no.  When --

21  A    When Giacomelli was going to transport Mr. Harmon, what I

22  did is I pulled around the block so that they could transport to

23  homicide.  And I relocated my vehicle directly in front of the

24  residence that we were holding.

25  Q    All right.  So until that time -- from the time you first

1   arrived shortly after the flash information until the time when

2   you pulled your car around to allow Detective -- Officer Teri to

3   leave, the street was blocked, correct?

4   A    Yes.

5   Q    So no one --

6            MS. FLANNERY:  Your Honor, if I could just pull up

7   18:32?

8            THE COURT:  No.  We're not going to look at a video.

9   You can ask him the question.  He doesn't have to see the video

10  again.  He's already seen the video.

11           MS. FLANNERY:  I think it's important to look at where

12  the --

13           THE COURT:  That's my ruling.  Ask the question.

14  BY MS. FLANNERY:

15  Q    The Jeep was in the corner, correct?

16           THE COURT:  This is a very peripheral point, but

17  you're welcome to cross-examine him.  Go ahead.

18  BY MS. FLANNERY:

19  Q    The Jeep was in the -- at the corner of the street,

20  correct?

21  A    Yes.

22  Q    So you had to drive past 3234 Sydenham and around the

23  corner to pass the Jeep, correct?

24  A    I pulled around the corner.  It wasn't necessary, but --

25  Q    I'm saying, anyone who wanted to see the Jeep would have to

1   drive down the street and turn the corner --

2   A    If they were trying to verify the license plate, yes, they

3   would have to at least become parallel with the Jeep, because it

4   was parked in a manner that obscured the license plate, because

5   there was a white Lexus SUV that was directly in front of the

6   Jeep parked on the street.

7   Q    And your car and then added to that, Officer's Teri

8   car -- Teri's car blocked the street so that no one could drive

9   down the street and see the license plate or see the Jeep up

10  close?

11  A    If they were to go down Sydenham, yes, I believe the street

12  would have been blocked completely --

13            THE COURT:  Okay.  Ms. Flannery, I got to tell you --

14            THE WITNESS:  -- but there's another street there.

15            THE COURT:  I can understand how you're interested in

16  this from the point of view of defending your client at trial.

17  This is not relevant on the suppression motion.  That's my

18  ruling.

19            MS. FLANNERY:  Your Honor --

20            THE COURT:  Ask your next question.

21            MS. FLANNERY:  Your Honor, with all due respect, the

22  search warrant affidavit states that Detective Falcone brought a

23  witness by who identified the Jeep.

24            THE COURT:  It says that.  And he -- but he's not

25  aware of that.  He doesn't recall that.

1            MS. FLANNERY:  No.  But what I'm establishing, Your

2      Honor, is that it could not have happened.

3            THE COURT:  You can argue that.  That what -- next

4      question.

5      BY MS. FLANNERY:

6      Q     From the time that you -- that you moved your car so the

7      street was unblocked until the time that Sweeney

8      and -- Detective Sweeney and Falcone arrived, no one drove down

9      the street, did they?

10     A     Not that I observed.

11     Q     Are you familiar with the term "active shooter," sir?

12     A     Yes, I am.

13     Q     And that's a term that's often used in mass shootings,

14     unfortunately, when a shooter is in a location and is continuing

15     to shoot; is that correct?

16     A     Yes, it is.

17     Q     That's a term that's not applicable to this situation, is

18     it?

19            MR. WITHERELL:  Objection, Judge.

20            THE COURT:  Well, if you know, without -- if you can

21     answer that from your knowledge without speculating.

22            THE WITNESS:  Your Honor, I wouldn't deem an active

23     shooter situation unless I knew that there was a shooter

24     barricaded who was actively shooting inside of a school, a movie

25     theater.  So I would not say that the term "active shooter"

1   applies to Sydenham Street.  No.

2   BY MS. FLANNERY:

3   Q    And that term, to your knowledge, was not used in any of

4   the radio broadcasts or flash information?

5   A    Not that I'm aware of, no.

6   Q    Your sweep concluded at what the pole camera data said was

7   19:38.  So that's 7:38 p.m. plus 22, so it's roughly around

8   8 p.m.; is that accurate?

9   A    Approximately.  Yes, ma'am.

10   Q    The search warrant was not obtained until 11:59 p.m.; is

11   that correct?

12   A    I'm assuming so.

13   Q    There were -- did you stay until the search warrant was

14   obtained?

15   A    I was relieved by an oncoming shift.

16   Q    And was that at 11:00 or shortly thereafter?

17   A    It was right around that time, ma'am.  Yes.

18   Q    So you were there for three hours roughly after the sweep?

19   A    Approximately, yes.

20   Q    And subsequent to a sweep, what is your responsibility as

21   an officer there holding the property?

22          THE COURT:  And you can ask him what he did.

23          THE WITNESS:  What I did --

24          THE COURT:  Just a minute.

25          Do you want to phrase the question?  Not in theory.

```
 1   Ask him what --
 2   BY MS. FLANNERY:
 3   Q    What did you do --
 4           THE COURT:  -- he felt at the time was his
 5   responsibility.
 6   BY MS. FLANNERY:
 7   Q    What did you do to hold the property?
 8   A    Security and preservation.
 9   Q    What do you mean by that?
10   A    That means we make sure no one comes in or out.
11   Q    And that includes police officers?
12   A    Not necessarily.
13   Q    Not necessarily?  Why?
14           THE COURT:  No.  He doesn't have to answer that.
15   That's his testimony.
16   BY MS. FLANNERY:
17   Q    So it's your --
18           THE COURT:  That's his testimony.
19   BY MS. FLANNERY:
20   Q    It's your understanding that after you do a protective
21   sweep and before a search warrant is obtained, police officers
22   can enter the property?
23           THE COURT:  No.  That's not --
24           THE WITNESS:  Not enter the --
25           THE COURT:  Just a minute.
```

 1          That is not a proper question.  You can ask him in

 2   this case, to his recollection, did any police officers come in

 3   after he started the --

 4          After you thought you had cleared the house and you

 5   were standing there and watching it, do you recall any other

 6   police officers coming in or going out?

 7          THE WITNESS:  No, I do not.  Detective Peters --

 8          THE COURT:  All right.  Next question.

 9          THE WITNESS:  -- and Detective Brogan (phonetic)

10   arrived on the -- on the scene to assess what was going to be

11   necessary.

12          THE COURT:  Did he go inside, to your recollection?

13          THE WITNESS:  Not to my recollection.

14          THE COURT:  All right.  Next --

15          THE WITNESS:  I believe we were in a doorway --

16          THE COURT:  All right.

17          THE WITNESS:  -- just looking in.

18          THE COURT:  Next question?

19   BY MS. FLANNERY:

20   Q    Was the doorway open?

21   A    Yes.

22   Q    And you didn't go back inside?

23   A    I did go back inside one time.

24   Q    When was that?

25   A    After the protective sweep was performed.  I had to secure

1  the back door.

2  Q    Back door couldn't have been secured from the back?

3  A    No.  It was much easier to secure it the way that we did

4  it.

5  Q    And when did you do that?  How long after the sweep?

6  A    I don't know an exact time frame, but not long after the

7  sweep.  Very shortly after I might have returned back into the

8  property --

9  Q    Who else --

10 A    -- while detectives were still on location, I believe.

11 Q    Who else was there?

12 A    Detective Falcone, Detective Sweeney, myself, and Officer

13 Nelson.

14 Q    Okay.  So it was still during the time --

15 A    Yes.

16 Q    -- when -- so broadly, that was still part of the sweep --

17 A    Yes, but --

18 Q    -- that you did with Detective Falcone --

19 A    Yes, but I did leave -- you asked if I left and went back

20 in.  I did go back in to secure the rear of the property.

21 Q    Thank you.

22         MS. FLANNERY:  Could we go to 20:33, please?

23 BY MS. FLANNERY:

24 Q    Did a Sergeant Busch (phonetic) come to the property?

25 A    I don't know who Sergeant Busch is.

1          MS. FLANNERY:  Well, could we go to 20:33?

2       (Video played from 2:23 p.m. to 2:24 p.m.)

3          THE COURT:  Were you shown this --

4          Was he shown --

5          Have you seen this before today?

6          THE WITNESS:  No, I have not.

7          THE COURT:  All right.  All right.  What's the

8  question?

9  BY MS. FLANNERY:

10  Q    Who's arriving there?

11  A    That's Sergeant Busa, not Busch.

12  Q    Oh, I'm sorry.  Sergeant Busa.  And what is he -- what was

13  your understanding of why he had arrived?

14  A    He is just asking what was going on with the house and what

15  we have.

16  Q    Now, if you'll watch there, is -- he's walking up the

17  steps.  Did he enter the house?

18  A    I don't believe he did.  He might have looked into the

19  front, because the door is open.

20  Q    Did you follow him into the house?

21  A    No, I do not recall --

22  Q    I mean, did you go into the house at that point?

23  A    No.

24  Q    Do you see yourself?  You're walking up the steps?

25  A    Yes.

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

1    Q    And Officer Nelson is walking up the steps?

2    A    Correct.

3    Q    And all three of you are standing -- what are all three of

4    you doing there at the door?

5    A    Probably looking into the residence.

6              MS. FLANNERY:  All right.  I'd like to -- if we can go

7    to --

8    BY MS. FLANNERY:

9    Q    So this is -- all this time, your testimony is you're

10   standing there at the door, looking in?

11   A    Well, not the whole time looking in.  I might have been

12   talking to the sergeant about the job and explaining to him from

13   front to back what happened.

14             MS. FLANNERY:  Okay.  Let's keep this running, because

15   I want to get to 34 --

16             THE COURT:  Okay.  Ms. Flannery, I must tell you, this

17   minute questioning of minute by minute has nothing to do with

18   the legality of the search in this case, in my view.  All right?

19             MS. FLANNERY:  Your Honor, I believe this is evidence

20   that --

21             THE COURT:  All right.  How much more time do you want

22   to cross-examine this witness?  Because, in my view, you have

23   already gotten out of him everything he knows about this that he

24   can recall.

25             MS. FLANNERY:  Your Honor, what I'd like to show is --

```
 1              THE COURT:  How much more time do you want?  You've

 2     been at it for about an hour.

 3              MS. FLANNERY:  Five minutes.  Five to --

 4              THE COURT:  What?

 5              MS. FLANNERY:  Ten minutes.

 6              THE COURT:  Ten minutes.  Okay.  Ten minutes.

 7              MS. FLANNERY:  Ten minutes.

 8              THE COURT:  And then you're done.

 9         (Video played from 2:25 p.m. to 2:25 p.m.)

10     BY MS. FLANNERY:

11     Q    But, Officer, I'd like to direct your attention to the

12     upper right part of the screen when we get to 34:57.  There are

13     windows upstairs in the house, are there not?

14     A    I believe there are.

15     Q    And, in fact, you all were up -- someone, one of you, was

16     upstairs in the house at this time, were you not?

17     A    I don't believe so, ma'am.

18              MS. FLANNERY:  Can we go to 34:57?  20:34:57?  Okay.

19     Wait.  Go back.

20         (Video played from 2:25 p.m. to 2:25 p.m.)

21     BY MS. FLANNERY:

22     Q    Look at the upper right-hand screen.  Do you see --

23              THE COURT:  All right.  I want --

24     BY MS. FLANNERY:

25     Q    -- flashlights --
```

```
 1              THE COURT:  What relevance is it that -- what police

 2    officer was inside?

 3              MS. FLANNERY:  Your Honor, I believe the evidence is

 4    these officers went in and out many times --

 5              THE COURT:  Okay.

 6              MS. FLANNERY:  -- before the search warrant.

 7              THE COURT:  Suppose they did.  What relevance is that?

 8              MS. FLANNERY:  The magistrate was not told that when

 9    the --

10              THE COURT:  That's not --

11              MS. FLANNERY:  -- when the search warrant was issued.

12              THE COURT:  I'm not sure that -- you can argue that

13    that's not -- that that voids the search warrant.  You're

14    welcome to argue that.

15              MS. FLANNERY:  Will the Government stipulate that

16    officers --

17              THE COURT:  I don't --

18              MS. FLANNERY:  -- went in and out --

19              THE COURT:  You can talk to --

20              MS. FLANNERY:  -- several times?

21              THE COURT:  -- to Mr. Witherell about that.  Next

22    question.  These detailed questions about -- I don't see how

23    it's relevant what the magistrate was told from the time that

24    the police officers got to the property until the search warrant

25    was executed.  I really don't.  But go ahead.  It may be
```

1   relevant for guilt or innocence, but it's not relevant to the

2   legality of the search, in my view.  Next question.  But maybe

3   you can show me -- when you brief this, you can make some

4   arguments that may be persuasive.  I'm not ruling on it.

5          MS. FLANNERY:  Well, Your Honor, perhaps what we

6   should do is -- I have -- what I anticipated doing was going

7   through several points at which additional police officers come

8   and apparently go into that house, in and out, many officers,

9   many times, well before the search warrant is issued, which I do

10  not believe is legally proper and -- because they didn't have a

11  warrant.  They had performed the sweep.  And the magistrate is

12  not informed of this when the search warrant is applied for.  So

13  I -- if Your Honor doesn't want me to go through that evidence,

14  I'll proffer it.

15          THE COURT:  Fine.  Proffer it.  All right.

16          MS. FLANNERY:  I can identify the -- I will --

17          THE COURT:  Well, you've just proffered it.

18          MS. FLANNERY:  I'll move into the -- into evidence the

19  entire section of the pole camera from the time Officer Rillera

20  arrives until midnight --

21          THE COURT:  All right.

22          MS. FLANNERY:  -- when the search warrant is obtained.

23  And I would direct the Court's attention to 20:42.  20:46, where

24  it appears that two officers come out of the house.  21:02,

25  where I -- scratch that one.  21:04, when two detectives arrive.

1   21:08, where it appears that they go into the house.  21:15:30,

2   when they come down the steps.  21:47:55, when two more police

3   appear to exit the house.  21:57, when Rillera -- Officer

4   Rillera appears to exit the house.  21:59:45, where two

5   additional police officers appear to come out with their

6   flashlights in front of them.  22:10:45, where another car

7   arrives with an officer in shorts who puts on black gloves.  At

8   22:12:39, it appears that Officer Rillera and the individual

9   with shorts go into the house.  22:15:10, where it appears they

10  come out.  And 22:22:45, when the officer with the shorts goes

11  back in with perhaps Officer Rillera and a plainclothes officer

12  following.

13          THE COURT:  Okay.  I'll accept those as a proffer.

14  All right.

15          MS. FLANNERY:  Okay.

16          THE COURT:  Any other questions?

17          MS. FLANNERY:  Just a moment, Your Honor.  Let me make

18  sure I haven't omitted anything.

19      (Pause)

20          MS. FLANNERY:  Nothing further.

21          THE COURT:  All right.  Thank you.

22          Mr. Weaver?

23          MR. WEAVER:  Your Honor, Ms. Flannery covered any

24  points that I would cover on cross-examination, so I have no

25  questions.

1          THE COURT:  All right.  Thank you.

2          Any redirect?

3          MR. WITHERELL:  Just briefly.

4                    REDIRECT EXAMINATION

5  BY MR. WITHERELL:

6  Q    Ms. Flannery talked about someone pulling up to view the

7  Jeep while your car was present.  You remember her asking about

8  that?

9  A    Yes, I do.

10 Q    You don't know what direction or how Detective Falcone

11 brought the Save A Lot individual to view that Jeep?

12 A    I do not, but I can tell you that there is a clear line of

13 sight from 15th Street straight down Hilton.  Where you see my

14 car make that turn, Your Honor, that's called Hilton Street.

15 Sydenham turns into it.  That car was parked right on the elbow.

16 So someone driving south on 15th Street can clearly see that

17 vehicle parked right at the elbow.  I'm not saying that's what

18 happened, but there is a clear line of sight there.

19 Q    As you sit here today, are you aware that that Save A Lot

20 security employee gave a statement not only to Detective Falcone

21 at the scene, but also to the homicide squad where he indicated

22 that he identified that vehicle?

23 A    I'm not aware of what that witness said or did.

24         MR. WITHERELL:  Okay.

25         THE COURT:  All right.

1           MR. WITHERELL:  That's it.

2           THE COURT:  All right.  Thank you.

3           MR. WITHERELL:  Thank you, Judge.

4           THE WITNESS:  Thank you, Your Honor.

5           THE COURT:  All right.  Now --

6           MR. WEAVER:  Your Honor, could I have a moment with

7    counsel?

8           THE COURT:  Yes.

9           Just hold on one second.

10       (Counsel confer)

11          MS. FLANNERY:  Mr. Weaver advises that he doesn't

12   think I moved the third phone call that I played in.  I would

13   ask that that be moved in.  I can identify all the ones that I

14   played as DH-10, DH-17, DH-20.

15          MR. WEAVER:  Yeah.  I think it's 20 that was not

16   moved.

17          MS. FLANNERY:  So I'd move those into evidence.

18          THE COURT:  All right.  Thank you.

19       (Defendant Harmon Exhibit 20 admitted)

20          THE COURT:  All right.  Mr. Witherell, who is --

21          All right.  Thank you, Officer.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  All right.  Now, before your next witness

24   comes, tell me who the witness is and an offer of proof.

25          MR. WITHERELL:  Okay.

1          THE COURT:  Okay.  Pull the microphone closer, please.

2          MR. WITHERELL:  Judge, I have two more witnesses.  My

3   next plan was to call Detective Centeno.  He is the affiant on

4   the warrant.  His testimony would be that he was provided

5   information from Detective Brian Peters concerning the search of

6   the residence --

7          THE COURT:  Okay.

8          MR. WITHERELL:  -- that all information in the warrant

9   that you've seen, Judge, was provided by Detective Peters.

10         THE COURT:  All right.

11         MR. WITHERELL:  He will testify that he then offered

12  that to a district -- an assistant district attorney who

13  approved the warrant.  And then after it was approved by an

14  assistant district attorney, it was approved by a magistrate at

15  approximately 11:49 p.m. on September --

16         THE COURT:  Okay.

17         MR. WITHERELL:  -- 11, 2017.

18         THE COURT:  All right.  And who's the next witness

19  after that?

20         MR. WITHERELL:  Detective Brian Peters.

21         THE COURT:  Okay.  And what's he going to say?

22         MR. WITHERELL:  He is the lead homicide investigator.

23  He would testify that he received a call at approximately 7:24

24  p.m. on September 11, 2017, that he was informed of the murder

25  of Sherman Williams, that he had been pronounced dead at Temple

1    Hospital at approximately 7:15 p.m.  He would also testify that

2    while prior -- before leaving the homicide --

3             THE COURT:  Well, get up to the search warrant.

4             MR. WITHERELL:  He would testify that he directed

5    Falcone to hold the scene, that he talked to numerous witnesses

6    at the scene of the shooting.  No one gave any additional flash.

7    That the only flash that they had pertinent was the Jeep.  That

8    he was then informed by Falcone and others about the

9    circumstances that you've heard about, Judge.

10            THE COURT:  All right.  It's the Government's position

11   that the -- what is contained in the search warrant is the only

12   information that was given to the magistrate as far as --

13            MR. WITHERELL:  Yes, Your Honor.

14            THE COURT:  Okay.  You're not relying on any

15   information given to the magistrate other than what appears in

16   the search warrant?

17            MR. WITHERELL:  None whatsoever, Judge.

18            THE COURT:  Okay.  All right.  Thank you.  All right.

19   Bring in -- is that how you want to call them, Centeno first?

20            MR. WITHERELL:  I can call them in any order you want,

21   Judge.

22            THE COURT:  Well, I think it'd be better to have

23   Peters first to -- since he's the one who was the lead

24   investigator.

25            MR. WITHERELL:  No problem, Your Honor.  Yep.

1   Absolutely, Judge.

2          THE COURT:  All right.

3      (Counsel confer)

4          MS. FLANNERY:  Your Honor, while the witness is coming

5   in, I made reference when I was doing the proffer that I would

6   introduce the entire pole camera video.

7          THE COURT:  Yeah.

8          MS. FLANNERY:  I have identified particular things

9   that I think would be of interest to the Court by its

10  date -- timestamp, and I will mark -- I believe we've marked the

11  entire segment --

12         THE COURT:  Come on up.

13         MS. FLANNERY:  -- from beginning to end as DH-2.

14         THE COURT:  DH-2?

15         MS. FLANNERY:  DH-2.  And I'll move that into

16  evidence.

17         THE COURT:  Okay.

18     (Defendant Harmon Exhibit 2 admitted)

19         MS. FLANNERY:  Is that correct?

20         MR. WEAVER:  That's correct.

21         MS. FLANNERY:  Thank you.

22     (Counsel confer)

23         THE CLERK:  Please raise your right hand.

24     (BRIAN PETERS, Witness, is Sworn)

25         THE CLERK:  Please state your full name and spell your

1  name for the record.

2          THE WITNESS:  Detective Brian Peters, P-E-T-E-R-S.

3          THE CLERK:  Thank you.

4          THE WITNESS:  Badge Number 851, assigned to the

5  Philadelphia Homicide Unit.

6          THE COURT:  All right.  Thank you.  Have a seat.  Keep

7  your voice up, please.

8          MR. WITHERELL:  May I inquire, Judge?

9          THE COURT:  Yes.

10         MR. WITHERELL:  Okay.

11                        DIRECT EXAMINATION

12  BY MR. WITHERELL:

13  Q    Detective, please tell us, who do you work for, how long

14  you've been doing it.

15  A    I am currently employed by the Philadelphia Police

16  Department.  I'm a 28-year veteran.  I've been assigned to the

17  Homicide Unit for the past 12 years.

18  Q    And suffice it to say, as a member of the Homicide Unit,

19  you investigate homicides that occur within Philadelphia County;

20  is that correct?

21  A    That's correct.

22  Q    I want to draw your attention to September 11, 2017.  Do

23  you recall if you were working that day?

24  A    I was.

25  Q    Do you remember what your tour of duty was?

1   A    My tour of duty is 4 to 12.

2   Q    So it's 4 --

3   A    4 p.m. to 12 a.m.

4   Q    I want to draw your attention to approximately 7:24 p.m.

5   Did you get notified of a homicide, meaning that Sherman -- a

6   person by the name of Sherman Williams was pronounced dead from

7   a fatal shooting, and he was pronounced dead at 7:15 p.m. at

8   Temple Hospital by a Dr. Pathak, P-A-T-H-A-K?

9   A    Yes.

10  Q    Okay.  How were you notified of that?

11  A    By police radio.

12  Q    What does that mean?

13  A    What the -- the protocol is that officers at the scene

14  respond to the scene, they gather preliminary information, and

15  they forward it to police radio. Police radio has to make

16  us -- has to give us the notification because it has to be

17  documented in their recordings.  This way, there's a chronology

18  of the time coming in from police radio.  From that point on, we

19  go into our own protocol of how to handle the assignment.

20  Q    Is this the first notification you have about the shooting

21  of Sherman Williams?

22  A    Yes.

23  Q    Okay.  And you become the lead detective in this particular

24  case?

25  A    Correct.

1    Q    Okay.   Where are you when you receive this notification?

2    A    I'm inside the Homicide Unit.

3    Q    Okay.   So I'm drawing your attention to just

4    minutes -- 7:30 p.m.   You get any other information while still

5    at the Homicide Unit concerning the murder of Sherman Williams,

6    particularly about any getaway vehicles?

7    A    Yes.

8    Q    Tell us about that.

9    A    We received information from -- it was Sergeant McLaughlin,

10   that there was a vehicle that had been seen leaving the scene.

11   There was a witness that provided information to detectives who

12   had also responded from Northwest Division.   This witness was

13   interviewed and provided a detail of what he had saw, what had

14   occurred.

15   Q    And I don't want to say the name of it, but that was the

16   witness that you came to know from the Save A Lot; is that

17   correct?

18   A    That's correct.

19   Q    The security guard?

20   A    Yes.

21   Q    Who was ultimately -- initially interviewed by Detective

22   Falcone?

23   A    Yes.

24        MR. WITHERELL:   I'm sorry, Judge.   Give me one second.

25        (Counsel confer)

BY MR. WITHERELL:

Q    While you're still at the Homicide, so -- Squad, so, you know, 7:30 to 7:40, did you receive any other information concerning that white Jeep with that tag, JYD-0709?

A    Yeah.  I received information that the vehicle was registered to Sydenham Street, 3234 Sydenham Street, and that officers had broken off from this -- the original scene at 22nd Street and had gone to Sydenham Street where they observed the vehicle parked.

Q    And so your information, even before you left the Homicide Unit, was that they had found this vehicle in front of that Sydenham residence?

A    Yes.

Q    Did you receive anything else concerning that vehicle by way of a 911 call?

A    No.  There was some other information, but there was flash information of that Jeep.  Essentially, once I spoke to the witness and he was provided a tag number and then it also came back, it was just like several things of corroboration as to what -- as to the involvement of that white Jeep.

Q    My question wasn't very clear.  I'm sorry.  Do you receive any information concerning whether or not that Jeep was reported stolen?

A    Yes.  During the protocol, making notifications, we did receive information that somebody had reported that car stolen.

1  Initially, I think it was like 7:12, and then it -- the radio

2  was updated at 7:37, somewhere around that time.

3  Q    And the individual who was reporting it stolen, they

4  reported it stolen from that Sydenham residence?

5  A    Yes.

6  Q    Indicating it was no longer in front of that residence?

7  A    Correct.

8  Q    You had information that officers were actually in front of

9  that residence with that there?

10  A    And the car was there.

11  Q    Okay.  At approximately -- at some point after you make

12  your notifications, do you go to the 22nd Street shooting scene

13  of Sherman Williams?

14  A    I do.

15  Q    Okay.  When you get there, is that approximately 8:23 p.m.?

16  A    Correct.

17  Q    Do you have an opportunity either by way of phone or by

18  speaking in person with Detective Falcone?

19  A    Yes.

20  Q    What does he tell you in regards to what he's learned?

21  A    Okay.  He -- I contacted Falcone right away, because I knew

22  that Falcone and Sweeney had been dispatched from Northwest

23  Detectives to the scene prior to the male dying.  Once the

24  decedent was pronounced, then we would take over the

25  investigation.  In the meantime, I contacted Falcone to get a

1  preliminary assessment of what was transpiring, what happened,

2  what was at the scene.  Falcone updated me as to the white

3  truck, his -- his initial interview of the male from the Save A

4  Lot, and that -- the fact that the car was on scene at Sydenham

5  Street, and it was identified by the witness.

6  Q   At that point, had you made any determination of whether or

7  not that scene should be held for a search warrant?

8  A   The scene was held.  Yeah.

9  Q   And that determination to be held for a search warrant,

10 that's prior to when you later learned that they had cleared the

11 property; is that correct?

12 A   Correct.

13 Q   Okay.  So 8:23, you rely -- you head to the 22nd Street

14 shooting scene; is that correct?

15 A   Yes.

16 Q   Describe the scene as you first see it.

17 A   22nd Street is a two-way street, parking on one side.  It's

18 a northbound/southbound street.  On the eastern side is a very

19 large shopping center.  They -- the scene was -- pretty much

20 extended almost the entire block.  It encompassed -- there was

21 multiple shell casings recovered from the crime scene.  There

22 was a crashed motorcycle.  And, like I said, there was

23 commercial property there.

24 Q   Okay.  When you get to the scene, what are your duties and

25 responsibilities?

1    A    My first thing is to speak to the supervisors on the scene,

2    the patrol supervisors.  Then my responsibilities are to

3    coordinate with the crime scene unit as to what's going to be

4    recovered and anything that we specifically need afterwards.

5    And then I -- either myself will write the crime scene up or

6    the -- whoever I'm with.  And at that time, it was Detective

7    Griffin.  Detective Griffin was going to write the crime scene

8    up, which means that he would take notes as to where things were

9    located.  And I, in turn, went and knocked on people's doors.

10   Q    Prior to that, at any point did -- when you spoke to

11   Detective Falcone either over the phone or in person when you

12   arrived at the scene, did he inform you that they had cleared

13   the residence on Sydenham Street and what they saw inside?

14   A    Yes.

15   Q    Okay.  And they had indicated that they saw drugs,

16   ammunition.  Anything else?

17   A    Yes.

18   Q    Okay.  You said you then spoke to witnesses.  From 9:10 to

19   approximately 10 -- I want to get this right -- 9:10 to 10:15,

20   you're doing neighborhood surveys; is that correct?

21   A    Correct.

22   Q    Tell the Judge what a neighborhood survey is.

23   A    They are when I just go and I knock on doors.  I talk to

24   the people who live in the private residences.  Maybe somebody

25   might be sitting out on a porch, or someone might be standing at

1   a bus stop.  I basically just go up and knock and talk to

2   people, everybody I see.

3   Q    How many people would you say you attempted to speak with

4   from 9:15 to 10:10, I believe -- 9:10 to 10:15?

5   A    I spoke to over 20 people.

6   Q    Okay.  Did anybody provide any information concerning any

7   description of the shooter or a possible getaway vehicle?

8   A    The only information I had, which was the verified

9   information from the Save A Lot witness.

10  Q    That was the witness Detective Falcone spoke to?

11  A    Yes.

12  Q    He was the only individual who provided any description of

13  the vehicle?

14         THE COURT:  Okay.  He's established that.  Next

15  question.

16         MR. WITHERELL:  Okay.

17  BY MR. WITHERELL:

18  Q    At some point, you go to the Sydenham residence?

19  A    Yes.

20  Q    And what is your purpose of going there?

21  A    To assist that crime -- that's going to be a secondary

22  scene.  That's a crime scene.  So while I'm at 22nd Street, I'm

23  getting information from Falcone and from the uniform sergeant

24  who's coordinating with the uniform patrol officers who were

25  there at the scene.  I learned that there was narcotics found

1    inside the house.  I also learned that there was people -- when

2    they -- when the officers initially responded to that house,

3    there was a group of males outside and that those males had

4    broken off and walked down towards Westmoreland.  And then from

5    where the males were standing, that there was keys recovered,

6    and those keys belonged to the white Jeep.  They were like left

7    at the curb line.  I also knew that there was somebody from

8    Sydenham Street that was transported down to homicide.

9              MR. WITHERELL:  Okay.  Judge, I'm handing -- if I may

10   approach the witness?

11             THE COURT:  Yes.

12   BY MR. WITHERELL:

13   Q    I'm handing you what's been marked as Government Exhibit 4.

14   It is the search -- the homicide search warrant.

15        (Counsel confer)

16   BY MR. WITHERELL:

17   Q    At some point the evening of September 11, 2017, you

18   attempt to get a search warrant for the Sydenham residence; is

19   that correct?

20   A    Correct.

21   Q    Do you write the warrant?

22   A    No.

23   Q    Who do you call?

24   A    Detective Centeno.

25   Q    Okay.  Did Detective Centeno come to the 22nd Street scene

1    that night?

2    A    No.

3    Q    Did he come to the Sydenham residence that night?

4    A    No.

5    Q    The information that is contained in Government Exhibit 4,

6    who provided that to Detective Centeno?

7    A    Myself and Detective Falcone and Sweeney.

8    Q    Okay.  But who's talking to Detective Centeno?

9    A    I am.

10   Q    So anything about Falcone or Sweeney or any other officers

11   you spoke to, that's all coming through you?

12   A    Yes.

13   Q    Have you had an opportunity to review Government Exhibit 4?

14   A    Yes.

15   Q    Okay.  To the best of your knowledge and ability, is that

16   completely accurate?

17   A    Yes.

18           MR. WITHERELL:  Okay.  And, Your Honor, that is my

19   last exhibit that I plan on moving in.  I'm going to move in all

20   the exhibits that me and --

21           THE COURT:  Yeah.

22           MR. WITHERELL:  -- Mr. Stengel had referenced at this

23   time.  I can give you a list if you need to be --

24           THE COURT:  All right.  We can do that later.

25           MR. WITHERELL:  Okay.

1    BY MR. WITHERELL:

2    Q    At some point, the warrant was signed and executed?

3    A    Correct.

4    Q    Are you there for the search of the property?

5    A    No.

6            MR. WITHERELL:  Okay.  Thank you very much.  Nothing

7    further.

8            THE COURT:  Okay.  Cross-examine?

9                          CROSS-EXAMINATION

10   BY MS. FLANNERY:

11   Q    Good afternoon, Detective Peters.  I'm Ann Flannery.  I

12   represent Mr. Harmon.

13   A    Good afternoon, Ms. Flannery.

14   Q    So you became sort of information central --

15   A    Correct.

16   Q    -- of this investigation?

17   A    It's actually the best way of looking at it.

18   Q    So it was your responsibility to pull together the various

19   pieces of information that all the different segments of the

20   police department were gathering; is that correct?

21   A    That's fair to say.

22   Q    Now, one person that you spoke to was Sergeant McLaughlin,

23   who reported on a vehicle seen leaving the scene, correct?

24   A    Well, Sergeant McLaughlin was one of the persons that

25   provided me the information that that car was stolen.  Case

1   specifically as to who saw it coming from the scene, that

2   information was relayed from initially police radio.  And it may

3   have came from Sergeant McLaughlin at the scene, but the

4   conversation that I notated with Sergeant McLaughlin was that

5   that car was reported stolen.

6   Q     So your information about the car came from flash

7   information on the radio broadcast?

8   A     No.  No.  It came from -- what was relayed to me was that

9   this Jeep that a witness had seen -- now, the information came

10  from Falcone that there was a Jeep that was leaving the scene

11  and that Jeep -- there was a tag related to a witness who

12  provided the tag.  The tag came back to Sydenham Street.

13  Q     Well, let's break that down a little bit.  You're saying

14  the scene --

15  A     Well --

16  Q     -- but the -- were you told that the car left the Save A

17  Lot parking lot?

18  A     You mean was I told that night the car left the Save A Lot?

19  Yes, absolutely.

20  Q     As opposed to 22nd Street where the shooting took place,

21  correct?

22  A     Ms. Flannery, to be fair, so I have this correct, I

23  received information that that car was involved in a shooting,

24  that the person who was responsible for shooting fled in that

25  car.

```
1    Q    Okay.  But let me -- if I may --

2              THE COURT:  Yeah.  Are we -- what car are we talking

3    about?

4              THE WITNESS:  The white Jeep.  I'm sorry, Your Honor.

5    The white --

6              THE COURT:  When you say the white Jeep --

7              THE WITNESS:  Yeah, the white Jeep.

8              THE COURT:  -- was that different than a white SUV?

9              THE WITNESS:  The white SUV was, in turn, the white

10   Jeep.

11             THE COURT:  So they're synonymous?

12             THE WITNESS:  Yes.

13             THE COURT:  Somebody described it as a Jeep, and --

14             THE WITNESS:  Somebody said SUV.

15             THE COURT:  -- but it turned out to be an SUV?

16             THE WITNESS:  Well, it -- the Jeep -- yeah.  It was a

17   Jeep Cherokee, so it was an SUV-style --

18             THE COURT:  Okay.

19             THE WITNESS:  -- Jeep Cherokee.

20             THE COURT:  All right.  So but --

21             MS. FLANNERY:  So --

22             THE COURT:  -- we're talking about one car, whether

23   it's called a Jeep --

24             THE WITNESS:  One car.

25             THE COURT:  -- or a SUV?  All right.  Next question.
```

1   BY MS. FLANNERY:

2   Q    Who told you that it was, "involved in the shooting"?

3   A    That information came from Falcone and also came from, when

4   I arrived at the scene, I was also again told that by the patrol

5   officers on the scene, the patrol supervisors on the scene.  I

6   received it from multiple people that night.

7   Q    Did they tell you that the witness who told them about the

8   white Jeep did not see the shooting?

9   A    I was told that the -- I actually spoke to the witness

10  myself that night, so the information that he was -- had

11  specifically to the tag was that that tag was provided to him

12  from somebody who also witnessed the shooting.  That person

13  witnessed the shooting, and that person gave him the tag saying

14  that the shooter went away in that car.

15  Q    You didn't speak to that person, correct?

16  A    No.

17  Q    And your understanding was he was a customer at the Save A

18  Lot, correct?

19  A    Correct.

20  Q    And your understanding -- I'm sure you're intimately

21  familiar with the scene.  If you're in the front of the Save A

22  Lot, you could not have physically seen where the gunshots were

23  coming from on 22nd Street, correct?

24                 MR. WITHERELL:  Objection.

25                 THE COURT:  Overruled.  Can you answer that?  If you

 1 │ know.

 2 │         THE WITNESS:  I don't know.  It's not a question

 3 │ really for me.  I know what was relayed to me, but what

 4 │ Mr. -- what the witness from the Save A Lot described to me was

 5 │ not being a witness to the shooting itself.  It was hearing the

 6 │ gunshots and the moments after, what he observes in the parking

 7 │ lot.

 8 │ BY MS. FLANNERY:

 9 │ Q    That's an important distinction, isn't it, between being a

10 │ witness to the shooting and being a witness to a car leaving a

11 │ parking lot?

12 │         MR. WITHERELL:  Objection.

13 │         THE COURT:  Well, it is what it is.  I mean, they're

14 │ two different things, right?

15 │         THE WITNESS:  It is what it is.  It's apples to

16 │ oranges, counselor.

17 │ BY MS. FLANNERY:

18 │ Q    Did you -- were you told that the -- I believe you were

19 │ told by the Save A Lot guard that the individual he saw getting

20 │ in the white Jeep was wearing a white t-shirt, correct?

21 │ A    No.  What he saw was a person in a white t-shirt

22 │ from -- leaving where the shooting had occurred.

23 │ Q    And that's the person that got into the white Jeep,

24 │ correct?

25 │ A    I don't believe so.

1          MS. FLANNERY:  May I have a moment, Your Honor?

2          THE COURT:  Sure.

3       (Counsel confer)

4          MS. FLANNERY:  All right.  If I may, Your Honor?  I'm

5  approaching the witness with DH -- well, we can put DH-66 up on

6  the screen, right?

7  BY MS. FLANNERY:

8  Q    Detective, do you recognize this document?

9  A    Yes.

10 Q    What is it?

11 A    This is the 483 that was prepared at homicide of the

12 witness from the Save A Lot.

13 Q    So this is the report of the interview that we were just

14 discussing; is that correct?

15 A    Yes.

16 Q    All right.  Could you turn to --

17         MS. FLANNERY:  I move the admission of DH-66, Your

18 Honor.

19         MR. WITHERELL:  I think we just lost all power.

20      (Counsel confer)

21         THE COURT: All right.  Well, I can look at it.  It's

22 not coming in right now.

23         MR. WITHERELL:  Judge, I --

24         MS. FLANNERY:  Do you need a hard copy, Your Honor?

25         THE COURT:  No, that's all right.  I can look over his

1   shoulder.  Go ahead.

2           MS. FLANNERY:  I have an extra hard copy.

3           THE COURT:  All right.

4           MR. WITHERELL:  Judge, I have no objection to this

5   coming in.  I would -- for the sake of continuity, there is a

6   interview done by Detective Falcone prior to this.  I would ask

7   they both go into evidence at this point.

8           THE COURT:  All right.  When was --

9           MS. FLANNERY:  I believe that what I marked contains

10  both.

11          THE COURT:  Well --

12          MR. WITHERELL:  Okay.

13          THE COURT:  -- when was this statement taken, you

14  know?

15          THE WITNESS:  The night of September 11th.

16          THE COURT:  What time?

17          THE WITNESS:  Somewhere after 9:00.

18          THE COURT:  All right.  Was this prior to your giving

19  the information on the search warrant to Detective Cenet (sic

20  passim) or after, if you know?

21          THE WITNESS:  It's after, I believe.

22          THE COURT:  What?

23          THE WITNESS:  I do believe it's after.  It's --

24          THE COURT:  All right.  Well, then this information

25  was not part --

```
 1              THE WITNESS:  I'm sorry.  This --

 2              THE COURT:  -- of the information --

 3              THE WITNESS:  I'm sorry.  The --

 4              THE COURT:  -- you gave him for the search warrant; is

 5    that right?

 6              THE WITNESS:  Correct.  Yeah.

 7              THE COURT:  All right.  Then I don't know why it's

 8    relevant.

 9              MR. WITHERELL:  No.  Judge, I believe that --

10              THE COURT:  What?

11              MR. WITHERELL:  -- that occurs at approximately 9:40.

12    The search warrant isn't gathered until after that.  That is

13    prior to the search warrant.

14              MS. FLANNERY:  The search warrant is at 11:59, Your

15    Honor.

16              MR. WITHERELL:  Yeah.

17              THE COURT:  That's when it was approved.  But did you

18    have this information when you gave Detective Cenet --

19              THE WITNESS:  I did not read this until I came back

20    from all the crime scenes, so I --

21              THE COURT:  When you came back from where?

22              THE WITNESS:  The crime scenes.  When I was -- after I

23    went to Sydenham Street and --

24              THE COURT:  All right.  So you didn't know --

25              THE WITNESS:  -- toured it.
```

1            THE COURT:  -- anything about this --

2            THE WITNESS:  No.

3            THE COURT:  -- when you gave Detective Cenet the

4    information for the search warrant?

5            THE WITNESS:  No.

6            THE COURT:  Is that correct?

7            THE WITNESS:  Correct.

8            THE COURT:  All right.

9            THE WITNESS:  What I had --

10           THE COURT:  I don't know why it's relevant.

11           MS. FLANNERY:  Your Honor, because it's before the

12   search warrant is issued, and it's information in the hands of

13   the Homicide Unit.

14           THE COURT:  But he didn't -- he's the one provided all

15   the information, and he didn't know whatever was contained in

16   this.  I didn't read it, but I don't know why it's relevant.

17   BY MS. FLANNERY:

18   Q    You say you --

19           MS. FLANNERY:  May I try to tie it up, Your Honor?

20           THE COURT:  Yes.

21   BY MS. FLANNERY:

22   Q    What I'm trying to understand is your statement that

23   the -- your recollection was that the witness, the Save A Lot

24   guard, did not say he saw white -- a man in a white t-shirt --

25           THE COURT:  Okay.

1  BY MS. FLANNERY:

2  Q    -- get into the vehicle?

3         THE COURT:  Okay.  Ms. Flannery, are -- once again,

4  the affidavit says what it says here.  Okay?  It has -- what

5  this witness told the police is not relevant.  What is -- it's

6  what is in the affidavit, whether that's sufficient to find a

7  search warrant, not whether the police left out something that

8  they should have put in.

9         MS. FLANNERY:  If --

10        THE COURT:  That's my position.

11        MS. FLANNERY:  If the information, though, with all

12  due respect, Your Honor, omits information that would make

13  what's in the search warrant not correct or misleading, I would

14  respectfully suggest that that's important.

15        THE COURT:  I don't think so.  Okay?  But you can

16  argue that in your brief.  Next question.

17  BY MS. FLANNERY:

18  Q    To make the record clear, what I've just given you, this

19  Number 66, it does say DH-66, was available to the Homicide Unit

20  before the search warrant was obtained, correct?

21  A    Yes.

22        THE COURT:  If you know.

23        THE WITNESS:  No.  I mean, Detective Lee (phonetic),

24  he was brought in --

25        THE COURT:  This was taken -- this statement was taken

1    by another homicide detective down at homicide headquarters in

2    the roundhouse --

3              THE WITNESS:  Correct.

4              THE COURT:  -- is that correct?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Okay.  You were at the scene of the crime?

7              THE WITNESS:  Yes.

8              THE COURT:  You gave the information to your colleague

9    who was the affiant, Detective Centana (sic passim), right?

10             THE WITNESS:  Yes.

11             THE COURT:  Based on what you knew at the scene?

12             THE WITNESS:  Correct.

13             THE COURT:  You didn't know anything -- at that time,

14   when you gave the information to Detective Centana, you didn't

15   know anything that was in this, right?

16             THE WITNESS:  No, I did not read that.

17             THE COURT:  All right.  I'll sustain -- do you object

18   to this?

19             MR. WITHERELL:  Yes, Judge.

20             THE COURT:  All right.  It's sustained.  That's my

21   ruling.  If I'm wrong, I'll be corrected.  I'll reopen the

22   record.  I'll be reversed on appeal.  That's my ruling.

23   BY MS. FLANNERY:

24   Q    It's your job to make sure that the information for the

25   search warrant is accurate and as complete as possible at that

1  time, correct?

2          THE COURT:  No.  As complete as reasonable.  The word

3  in the Fourth Amendment is "reasonable."

4          THE WITNESS:  I -- like I said, I have a lot going on

5  when I'm out there at the scene.  I'm giving as much information

6  as I can to Detective Centeno in regards to him obtaining a

7  search warrant for that property on Sydenham Street.

8  BY MS. FLANNERY:

9  Q    And you weren't aware that both Detective Falcone's

10  write-up of that civilian interview and your homicide

11  colleague's write-up of that interview both described the

12  witness as saying that he saw an individual in a white t-shirt

13  get in the white Jeep?

14  A    No.  When I gave the information relevant to the search

15  warrant, that was the information that was on the search

16  warrant, and it encompassed all different things.  But what I

17  told Centeno about the search warrant was my personal

18  observations at Sydenham Street and the fact that all the other

19  things that happened prior to -- we're still trying to sort

20  everything out.  There's a -- like I said, I wish it was that

21  simple, but it's not.  There's just so much going on.  It's like

22  a funnel, and you're trying to get to the bottom of it.

23  Q    And it was Officer -- was he detective, officer -- Centeno

24  had no responsibility, no obligation to check with anyone

25  besides you?

1  A    Yes.  I'm at the scene giving him the information.  There

2  would be no need for somebody else to be standing over my

3  shoulder or calling him outside of me.

4  Q    Did you go back and check the radio broadcast to see what

5  the reports were on what the doer was wearing?

6  A    Later on.  Not that night, no.

7  Q    You didn't think it was important to find out what those

8  broadcasts were --

9              THE COURT:  All right.  That's --

10             MR. WITHERELL:  Objection.

11 BY MS. FLANNERY:

12 Q    -- well before you got involved?

13             THE COURT:  No.  Don't answer that.  That's

14 argumentative.  Next question.

15             MS. FLANNERY:  May I have a moment, Your Honor?

16     (Counsel confer)

17             MS. FLANNERY:  I have nothing further, Your Honor.

18             THE COURT:  All right.  Mr. Weaver?

19             MR. WEAVER:  All right.

20                        CROSS-EXAMINATION

21 BY MR. WEAVER:

22 Q    Good afternoon, Detective Peters.

23 A    Good afternoon, Mr. Weaver.

24 Q    I represent Defendant Aman (sic) Boyer.  One of the things

25 that I believe you testified you did know was that you had

1  received a report -- or the police had received a report that

2  this white Jeep had been stolen -- had been reported stolen

3  before you provided the information on the search warrant; is

4  that correct?

5  A    Correct.

6  Q    And if the white Jeep had been stolen, that means that the

7  police may be looking for a perpetrator other than the owner of

8  the vehicle; would that be a fair statement?

9  A    At that point, I didn't know who the perpetrator was.

10  Q    Now, my question is that if in fact it was determined that

11  the vehicle had been stolen, and you're looking for a murder

12  suspect, then you may be looking for a person other than the

13  registered owner of the vehicle?

14  A    I don't really understand that question, because the car is

15  reported stolen, yet it was in front of the police at the

16  residence that it was supposed to have been stolen from.

17  Q    And did you indicate in the information that you provided

18  to Officer Centeno that the car had been reported stolen in

19  addition to the other information you provided?

20  A    I don't -- I'm not aware if I specifically told him about

21  the car had been reported stolen.

22  Q    Could you take a look at Government Exhibit 4 and tell me

23  if it's in the affidavit that was prepared?

24          THE COURT:  It's not here.

25  BY MR. WEAVER:

1   Q    Page 2.

2            THE COURT:  Not here.  It doesn't say anything about

3   stolen.

4            MR. WEAVER:  Not there.

5   BY MR. WEAVER:

6   Q    Now, I note in the --

7            THE COURT:  But, you know, even if it's stolen, the

8   registered -- the -- if -- the license plate is what leads to

9   the address; is that right?

10            THE WITNESS:  That's correct, sir.

11            THE COURT:  All right.  So the car could be stolen ten

12   times, but if it's registered to some person, that's where you

13   would look --

14            THE WITNESS:  Correct.

15            THE COURT:  -- for the owner of the car, not

16   necessarily the driver, right?

17            THE WITNESS:  Correct.

18            THE COURT:  All right.  Next --

19   BY MR. WEAVER:

20   Q    But the fact that the -- that there was a report to the

21   police that the car had been stolen, that information never got

22   to the judicial magistrate who issued a warrant, correct?

23            THE COURT:  That's right.

24            THE WITNESS:  That's correct.

25            MR. WEAVER:  All right.

```
 1   BY MR. WEAVER:

 2   Q    Now, in the warrant, if you look at Government Exhibit 4,

 3   there's a section entitled, "Violation of," and it says murder

 4   PCC2502.  You've seen these warrants before, correct?

 5   A    Yes, sir.

 6   Q    What's the purpose of telling the magistrate -- giving them

 7   that information?

 8   A    What's the purpose?

 9   Q    Yes.  It says, "Murder PCC2502."

10           THE COURT:  Well, wait.  The space -- above the space,

11   it says --

12           THE WITNESS:  No --

13           THE COURT:  -- "Violation of."

14           MR. WEAVER:  Yeah.

15   BY MR. WEAVER:

16   Q    What's the purpose of --

17           THE COURT:  That's -- well, wait, wait, wait, wait,

18   wait.  The question is  incomplete.  There's printed in the form

19   the words, "Violation of (describe conduct or specify statute)."

20   Is that correct?

21           THE WITNESS:  That's correct, Your Honor.

22           THE COURT:  All right.

23   BY MR. WEAVER:

24   Q    Well, what that means is that you're telling the magistrate

25   that you're obtaining evidence of a homicide; is that correct?
```

1   A    That's correct.

2   Q    Now, in the section where you list the items to be searched

3   for, you indicate marijuana, correct?

4   A    Yes.

5   Q    And how would that lead to an investigation involving a

6   murder?

7          THE COURT:  All right.  You don't have -- that's

8   not -- it's not relevant on a search -- on a suppression motion.

9   Next question.

10         MR. WEAVER:  All right.  Let me rephrase the question,

11   Your Honor.

12   BY MR. WEAVER:

13   Q    Listed here is money counter, cash, narcotics, marijuana,

14   and other types of narcotics, ammunition, any and all guns.

15   Isn't it correct that that's the --

16         THE COURT:  Keep going.  Any and all guns, handguns,

17   firearms --

18         MR. WEAVER:  Firearms.

19         THE COURT:  -- proof of residence -

20         MR. WEAVER:  Residence.

21         THE COURT:  -- and any other items of evidentiary

22   value.

23         MR. WEAVER:  Any other items of evidentiary value.

24   BY MR. WEAVER:

25   Q    Is it -- am I correct that the narcotics, drugs, ammunition

1   that's listed here is listed here because that's information

2   that was found by the officers when they conducted a warrantless

3   search of the property?

4            THE COURT:  No.  Just the -- no.  No.  They -- I'm not

5   going to allow you to use the term "search" in that question.

6   All right?  They did not -- you can argue it's a search.  Maybe

7   you have some law it was a search.  But they testified it was to

8   secure the house, okay, to clear it, as they said.  All right?

9   Now --

10            MR. WEAVER:  I can rephrase the question, Your Honor.

11            THE COURT:  Okay.  Yeah.  Rephrase the question.

12            MR. WEAVER:  All right.

13            MR. WEAVER:  Surely.

14   BY MR. WEAVER:

15   Q    Those items are listed there, that we just read, because

16   that's what the officers -- had already seen when they went into

17   the residence to clear the property?

18   A    Yeah.  Those items were observed by the officers who

19   cleared the property in plain view.  I don't think it would be

20   prudent for Detective Centeno to leave those things out when he

21   was instructed, hey, listen, there's a money counter, there's

22   guns, there's narcotics.  And for the -- you know, the fact that

23   at this time the decedent had drugs on them, you know, and

24   it -- in a -- in an amount that would have been indicative that

25   maybe he was a drug dealer as well.  So this could have been a

1    drug-related shooting.  So just to incorporate those things

2    would not be out of the scope of the search warrant whatsoever.

3    Q    I understand.  But they are listed -- in this particular

4    warrant, you provided this information to Officer Centeno

5    because this is what was discovered during the sweep of the

6    house?

7    A    This is what was observed during the sweep of the house.

8    Q    Now, did you ever receive any information while you were

9    doing your investigation -- I understand you weren't first on

10   the scene, et cetera, you received information from other

11   people -- that there were any radio calls that -- the first call

12   was of a burgundy vehicle fleeing the scene and that the shooter

13   had fled in that vehicle?  Did anyone ever give you that

14   information?

15   A    Not that night.

16   Q    Did anyone ever give you any information about a blue

17   Impala with a man and a woman leaving the scene that was

18   suspected to be the murder suspects?

19   A    Not that night.

20        MR. WEAVER:  All right.  I have nothing further,

21   Judge.

22        THE COURT:  All right.  Any redirect?

23        MR. WITHERELL:  Briefly.

24     (Counsel confer)

25                    REDIRECT EXAMINATION

1   BY MR. WITHERELL:

2   Q     You told Detective Centeno that Detective Falcone and

3   Sweeney did a sweep and saw stuff in the property?

4   A     Well, they cleared the property, yeah.  Sweep, clear.  I

5   don't want to mix words.

6   Q     And you told him that because that was the information that

7   was supplied to you?

8   A     Yes.

9   Q     Okay.  You indicated that the warrant indicates that

10  Detective Falcone and Detective Sweeney transported a witness to

11  the 3200 block of Sydenham, and the witness positively

12  identified the vehicle as being the same vehicle that had left

13  the scene of a shooting right after the shooting?

14  A     Yes.

15  Q     That's the information provided to Detective Falcone?

16  A     Yes.

17  Q     And that's why you gave that to Centeno?

18  A     Correct.

19            MR. WITHERELL:  Yeah.  I have nothing further, Judge.

20            THE COURT:  All right.  Thank you.

21            MS. FLANNERY:  Your Honor --

22            THE COURT:  Yes?

23            MS. FLANNERY:  -- before this witness leaves, I was

24  just looking at the Government's papers, and they do bring up

25  inevitable -- the inevitable discovery doctrine.  So if they're

```
 1  going to rely on that, then I would ask to be permitted to ask a
 2  couple of questions about information that was learned after
 3  that --
 4            THE COURT:  Not today.  Thank you.  They
 5  (indiscernible).
 6            All right.  Thank you.
 7            THE WITNESS:  Thank you, Your Honor.
 8            THE COURT:  All right.  Have Detective Centeno -- this
 9  is going to be very quick, because I have some other --
10            MR. WITHERELL:  Okay.
11            THE COURT:  -- proceedings I have to get to.
12            THE WITNESS:  May I step down?
13            THE COURT:  Go ahead.  Yes, please.
14            THE WITNESS:  Thank you.
15            THE COURT:  Well, I'm going to allow this witness to
16  stay in the courtroom while Detective Centeno testifies.
17            MR. WITHERELL:  This witness?
18            THE COURT:  Yes.  He's the lead homicide investigator.
19            MR. WITHERELL:  I appreciate it, Judge.
20            THE COURT:  I'm just going to ask -- so Centeno -- I'm
21  just going to try to infer to what I've heard, expedite the
22  conclusion of this evidentiary hearing.
23       (Pause)
24            THE CLERK:  Please raise your right hand.
25       JOSEPH CENTENO, Witness, is Sworn
```

1          THE CLERK:  Please state your full name.  Spell your

2    last name for the record.

3          THE WITNESS:  Detective Joseph Centeno, C-E-N-T-E-N-O.

4    Badge 916, currently assigned to Homicide Division.

5                    QUESTIONS BY THE COURT

6          THE COURT:  Okay.  Detective, have a seat.  I'm going

7    to show you this exhibit we just marked as, I think, Exhibit 4.

8    This is a search warrant that relates to the case that's now

9    here in federal court in which there's been a suppression

10   motion.  Okay?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Are you the affiant on this?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.  Do you see it there?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Okay.  You know, I presume, Detective

17   Peters, who's seated in the front row?

18         THE WITNESS:  Correct.

19         THE COURT:  Okay.  Now, did you -- did the

20   information -- your -- that you got to -- for that search

21   warrant, did that come from Detective Peters?

22         THE WITNESS:  Yes, it did.

23         THE COURT:  All right.  Did you have any other source

24   for the information in the search warrant other than Detective

25   Peters?

```
 1              THE WITNESS:  No.  No, sir.

 2              THE COURT:  Okay.  You didn't talk to anybody else?

 3              THE WITNESS:  No, sir.

 4              THE COURT:  All right.  Okay.

 5              Do you have any questions?

 6              MR. WITHERELL:  Just two, Judge?

 7              THE COURT:  What?

 8                       DIRECT EXAMINATION

 9   BY MR. WITHERELL:

10   Q    Prior to showing it to the magistrate, was it approved by

11   an assistant district attorney?

12   A    Yes, sir.

13   Q    What was the assistant district attorney's name?

14   A    Brian Zarallo.

15   Q    Who is he?

16   A    He is the chief of homicide at that time.

17              THE COURT:  Okay.

18   BY MR. WITHERELL:

19   Q    And --

20              THE COURT:  (Indiscernible *3:10:51)

21   BY MR. WITHERELL:

22   Q    -- when was it signed by the magistrate?

23   A    It was signed by Magistrate Bernard, Francis Bernard.

24              THE COURT:  All right.  Cross-examine?

25                       CROSS-EXAMINATION
```

1   BY MS. FLANNERY:

2   Q    Is this the district attorney who was relying solely on

3   what you told him, correct?

4   A    Correct.

5              MS. FLANNERY:  Nothing further.

6              THE COURT:  Mr. Weaver?

7              MR. WEAVER:  No questions, Your Honor.

8              THE COURT:  Okay.  Thank you very much.

9              All right.  That concludes the testimony, right?

10  Unless the defendants want to offer testimony?

11             MR. WEAVER:  Your Honor, I am -- I talked to the

12  Government.  I have a couple of stipulations that'll just take a

13  couple of minutes.

14             THE COURT:  Go ahead.

15             MR. WEAVER:  First of all, when the search occurred on

16  September 11, 2017, some mail was discovered and seized that was

17  in the name of my client, Amir Boyer.

18             MR. WITHERELL:  That's correct, Your Honor.  So

19  stipulated.

20             THE COURT:  Okay.

21             MR. WEAVER:  Also, Your Honor, I'm moving into

22  evidence certain documents which I will read what they are and

23  read the numbers.  AB Supp 001, this is the Government's omnibus

24  motion for pretrial detention.  This is on the standing issue.

25  Secondly, AB Supp 002, this is the Government's response and

1  opposition to the defendant's appeal of the pretrial detention

2  order.  And finally, the Government's search warrant in this

3  case, AB Supp 004.  These are all Mr. Boyer's exhibits.  No

4  testimony is required on the Government's search warrants,

5  although it isn't challenged by our supplemental memorandum.

6          THE COURT:  Thank you.

7      (Defendant Boyer Exhibit 001, 002, and 004 admitted)

8          MR. WEAVER:  With that, Defendant Boyer would rest.

9          THE COURT:  All right.  Ms. Flannery, any testimony?

10         MS. FLANNERY:  May I have a moment with Mr. -- to

11  confer with Mr. Witherell?

12         MR. WITHERELL:  Uh-huh.

13      (Counsel confer)

14         MS. FLANNERY:  I will need to -- I previously

15  attempted to introduce DH-66, Your Honor --

16         THE COURT:  Yes.

17         MS. FLANNERY:  -- which were two interviews of the

18  Save A Lot security guard, one by a homicide detective who

19  hasn't appeared in court today.  The second part was by

20  Detective Falcone.  Mr. Witherell has agreed to stipulate that

21  the second part, the interview by Detective Falcone, could be,

22  with Your Honor's permission, moved into evidence.

23         MR. WITHERELL:  Your Honor, I actually will stipulate

24  to both.  You've heard the testimony about what Officer Peters

25  knows.  You know that that was the interview that took place.  I

 1   have no problem with them both coming into evidence.

 2        (Defendant Harmon Exhibit 66 admitted)

 3              THE COURT:  Okay.  All right.  Anything else?

 4              MS. FLANNERY:  Nothing from me.

 5              MR. WITHERELL:  Judge, the Government has introduced,

 6   just so the record's clear, 1-A, which is the first portion of

 7   the pole camera with Rillera; 1-B, which is with -- pole camera

 8   with Detective Falcone; 225, 341, 342, 343, 348, and 4.  We move

 9   those into evidence.  I don't believe there's an objection to

10   it.

11              MR. WEAVER:  No objection.

12        (Government's Exhibits 1-A, 1-B, 4, 225, 341, 342, 343, 348

13   admitted)

14              MR. WITHERELL:  Judge, I want to bring up one thing.

15   I have no problem with what Mr. Weaver has asked to be admitted.

16   There are some motions handled by the Government, and I believe

17   he's entering those on the issue of standing.  I just want the

18   Court to be clear that the Government's omnibus motion for

19   pretrial detention and response to defendant's appeal, I believe

20   those only were in reference to the search of Mr. Boyer at his

21   residence at the Sydenham residence, but only in 2018.

22              THE COURT:  All right.  All right.  Well, we didn't

23   get to that today.

24              MR. WITHERELL:  No, we didn't.

25              THE COURT:  All right.  So we'll have to schedule

1    another hearing for that.

2              MR. WITHERELL:  Okay.

3              THE COURT:  I don't --

4              MS. FLANNERY:  Your Honor, I do have one more exhibit

5    I neglected to move in.  If there's any authentication needed

6    for it, Detective Peters, I think, could provide it.  DH-67,

7    which is his statement.

8         (Counsel confer)

9              THE COURT:  All right.  Look, let -- you -- I'm happy

10   to hear you some other time about this if you're -- it's not in

11   agreement.  I want to do a briefing schedule.  So when does the

12   Government -- well, it's the defendants' motion, so you can open

13   and have a reply brief.  When do defense counsel want to file a

14   brief?

15             MS. FLANNERY:  I would need to know -- I would ask for

16   a transcript, Your Honor.  And I don't know how quickly --

17             THE COURT:  Well, you can order it and the usual

18   rules.  You know, you can have it tomorrow if you need it -- if

19   you want it badly and can pay for it.  Or what's --

20             MS. FLANNERY:  Well, I'm not -- I'm CJA, Your Honor --

21             THE COURT:  No.

22             MS. FLANNERY:  -- so it's up to Your Honor.

23             THE COURT:  I'm being facetious.  You know, if you get

24   it in two weeks, could you file a brief in three weeks?  I mean,

25   I assume you can start working on this without a transcript.

1              MS. FLANNERY:  I'm actually on vacation next week.

2              THE COURT:  Okay.  Just give me a date.

3              MS. FLANNERY:  So if I could have two weeks --

4              THE COURT:  Sure.  Just give me a date.

5              MS. FLANNERY:  -- after that?  Whatever --

6              THE COURT:  No.  You pick a date that's good for you.

7     June 21st, June 28th?

8              MS. FLANNERY:  I don't have a calendar in front of me.

9              THE COURT:  Well, they're both Fridays.

10             MS. FLANNERY:  Thank you.

11             THE COURT:  I'd like to get your briefs in by June

12    28th.  That gives you a month.  That gives you four weeks from

13    today.

14             MS. FLANNERY:  That would be fine, Your Honor.

15             THE COURT:  All right.  All right.  So same for you,

16    Mr. Weaver, right?

17             MR. WEAVER:  Yes, Your Honor.

18             THE COURT:  All right.

19             MR. WEAVER:  June 28th.

20             THE COURT:  So is 14 days enough for the Government to

21    respond?

22             MR. WITHERELL:  It is, Your Honor.

23             THE COURT:  All right.  So your brief will be due July

24    12th.  And I'll give defense counsel one week for a response.

25    It'll be due July 19th.  Sorry.  July 12th and then July 19th.

1    Yeah.  Okay.

2             MR. WEAVER:  Your Honor, do we have to do anything

3    more to order the transcript, or are we actually doing it now?

4             THE COURT:  Yeah.  No.  You got to go down to the

5    clerk's office and order it.

6             MR. WEAVER:  Very good.

7             THE COURT:  Yeah.  Yeah.  Please do that.

8             Okay.  Thank you very much.  Court's adjourned.

9             MR. WITHERELL:  Thank you, Your Honor.

10            THE COURT:  And then give this back to Ms. Flannery.

11   Thank you, Lynn.

12        (Proceedings concluded at 3:17 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I, EILEEN DHONDT, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


EILEEN DHONDT, CET 807
Aequum Legal Transcription


Dated:  June 12, 2019