UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | . |
| | . |
| Complainant, | . Case No. 2:18-CR-00249-MMB-9 |
| | . |
| | . 601 Market Street |
| vs. | . Philadelphia, Pennsylvania 19106 |
| | . June 12, 2019 |
| DENNIS HARMON, | . |
| | . |
| Defendant. | . |

. . . . . . . . . . . . . .

TRANSCRIPT OF HEARING ON MOTIONS TO SUPPRESS
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      Everett R. Witherell, Esq.
                         Timothy Mulligan Stengel, Esq.
                         Assistant U.S. Attorney
                         OFFICE OF THE U.S. ATTORNEY
                         615 Chestnut Street, Suite 1250
                         Philadelphia, Pennsylvania 19106

For the Defendant:       ANN CAMPBELL FLANNERY, ESQ.
                         1835 Market Street, Suite 2700
                         Philadelphia, Pennsylvania 19103

Audio Operator:          Electronically Recorded
                         by Janice Lutz, Deputy Clerk

Transcription Company:   Advanced Transcription
                         1600 Market Street
                         Suite 1700
                         Philadelphia, Pennsylvania 19103
                         (855)204-8184

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE GOVERNMENT | | | | |
| BRIAN PETERS | 10 | 32 | 66 | 68 |
| By The Court | 31 | | | |

| EXHIBIT | | IDENT. | EVID. |
|---|---|---|---|
| Government's 1 | Video Recording | | 69 |
| Government's 2 | Miranda Card | | 69 |
| Government's 3 | Summary Sheet | | 69 |
| Search Warrant | | | 75 |
| Attachment | | | 75 |
| Affidavit | | | 75 |
| Defendant's DH-70 | Witness Interview Form | | 48 |

```
 1              (Proceedings commence at 10:15 a.m.)
 2                   THE COURT:  Good morning.
 3                   MR. WITHERELL:  Good morning, Your Honor.
 4                   MS. FLANNERY:  Good morning, Your Honor.
 5                   THE COURT:  Okay.  Please be seated.
 6              All right.  Okay.  My understanding today is that
 7    we are here with two motions filed by Defendant Dennis Harmon
 8    and his attorney, Ann Flannery, both of whom are here:  One
 9    is a motion to suppress Dennis Harmon's statements, and the
10    second is a motion to suppress cell phone evidence.  Is that
11    correct?
12              And for the Government, we once again have Mr.
13    Stengel and Mr. Witherell.
14                   MR. STENGEL:  Good morning, Your Honor.
15                   THE COURT:  Is that counsel's understanding of what
16    we're proceeding on today?
17                   MR. WITHERELL:  That is my understanding.
18                   THE COURT:  Ms. Flannery, is that correct?
19                   MS. FLANNERY:  Yes, Your Honor.
20                   THE COURT:  Okay.  Now the first thing that I just
21    would like to raise is whether the evidence -- the testimony
22    taken when -- last week or the week before, on the other --
23    another motion filed by Mr. Harmon to suppress the evidence
24    seized at 29 -- let me make sure I get the right address --
25    excuse me, 3234 North Sydenham Street, on September 11, 2017,
```

4

1    whether the record of what took place in that hearing should

2    also be included in the record on these two motions.

3              That is, we had a lot of testimony from police

4    officers about what happened, about the shooting and then the

5    car and the -- and then the fact that the police entered the

6    building at 3234 North Sydenham Street originally without a

7    warrant, and then got a warrant and came back in, and whether

8    that testimony should be included in the record for these two

9    motions.

10             Does that Government have a position on that?

11             MR. WITHERELL:  I think they should, Judge, just to

12   streamline the process.  I don't believe we have to dive back

13   into the background and the investigations of Sherman

14   Williams.

15             THE COURT:  Yeah.  Ms. Flannery, any -- what's your

16   view on that?

17             MS. FLANNERY:  I agree, Your Honor.  Some of it is

18   -- some of it won't be relevant to these motions, but some of

19   it will.  And the witness who is not here today, who will be

20   coming back, as I understand it, on June 24th, testified at

21   that earlier hearing.  So I certainly don't need to go back

22   through things that were already testified to that might be

23   relevant.

24             THE COURT:  Okay.  Well, I mean, I agree that not

25   everything that was testified to at that hearing is

1    necessarily relevant on these two motions.  But I don't think

2    I can pick and choose what portions of the evidence should be

3    part of the record and what should not.  So I think, in

4    fairness to both sides, I will say -- I will consider that

5    testimony to be part of this record.

6              Now, whether -- what it's admissible for and what's

7    relevant is something that we can debate down the line.  But

8    we'll proceed today recognizing that the testimony taken at

9    that hearing may be referred to by both counsel in the

10   proceedings on these two motions.  Okay?

11             MS. FLANNERY:  Thank you, Your Honor.  And could

12   that also include -- I think it should also include the

13   exhibits --

14             THE COURT:  Of course.

15             MS. FLANNERY:  -- that were introduced.

16             THE COURT:  And the exhibits that were taken.

17             All right.  Now one last thing.  On scheduling,

18   there was one police officer who the Government wanted to

19   call today, but was not available for a health reason.  And I

20   said that we would go ahead today with the rest of the

21   evidence, but we could call that officer and keep the record

22   open for his testimony on June 24th.  So we don't have to

23   discuss that now.

24             But when we -- at the end of the day, Mr. Witherell

25   -- and you let me know whether you think you need his

```
 1    testimony on June 24th or not.  Okay?  What's the name of

 2    that officer; how do you spell his name again?

 3                 MR. WITHERELL:  It's Officer Rillera, R-i-l-l-e-r-

 4    a.

 5                 THE COURT:  It was --

 6                 MR. WITHERELL:  He testified at the last hearing.

 7                 THE COURT:  R-i?

 8                 MR. WITHERELL:  L-l-e-r-a.

 9                 THE COURT:  Okay.  Rillera.  Yeah, okay.

10                 Is the Government ready to proceed with your first

11    witness?

12                 MR. WITHERELL:  Yes, Your Honor, we are.

13                 THE COURT:  All right.  Please call -- how many

14    witnesses do you have today?

15                 MR. WITHERELL:  Your Honor, I have one witness as

16    to the statements that Ms. Flannery seeks to suppress.  I

17    also have the agent, who's the affiant on the warrant.

18    That's part of Ms. Flannery's motion to suppress cell phone

19    evidence.

20                 THE COURT:  Yes.

21                 MR. WITHERELL:  I don't believe she's raised --

22    she's met the burden for that witness and needs to take the

23    stand, and if we're -- we can deal with that after, I

24    believe, this detective testifies.

25                 THE COURT:  All right.  Who's the witness on the
```

1    statement?

2              MR. WITHERELL:  It's Detective Brian Peters.

3              THE COURT:  Oh, right.  He testified before, too.

4              MR. WITHERELL:  He did, Your Honor.

5              THE COURT:  Yeah.  Okay.  All right.  Are you ready

6    to proceed?

7              MR. WITHERELL:  I am.

8              THE COURT:  All right.  Let's call him in.

9         (Witness summoned)

10   BRIAN PETERS, WITNESS FOR THE GOVERNMENT, SWORN

11             THE CLERK:  Please state your full name for the

12   record.

13             THE WITNESS:  Detective Brian Peters, P-e-t-e-r-s,

14   Badge Number 851, assigned to the Homicide Unit.

15             THE COURT:  Okay.  All right.  Good morning.

16             THE WITNESS:  Good morning, Your Honor.

17             THE COURT:  Have a seat and keep your voice up,

18   please.

19             THE WITNESS:  Thank you.

20             MR. WITHERELL:  Your Honor, I apologize.  I

21   probably should have brought this up before the witness takes

22   the stand.  I don't think he needs to leave for it.  But the

23   anticipated testimony concerns a videotaped statement, taken

24   at the Homicide Unit, of the defendant.  The statement itself

25   is the Q and A between the Detective and Mr. Harmon, it is

1    approximately 50 minutes.  But the --

2              THE COURT:  Six zero.

3              MR. WITHERELL:  Excuse me?

4              THE COURT:  Six zero minutes?

5              MR. WITHERELL:  Fifty minutes, approximately.

6              THE COURT:  Fifty, five zero.

7              MR. WITHERELL:  Approximately.

8              THE COURT:  Yeah, all right.

9              MR. WITHERELL:  The entirety of Mr. Harmon inside

10   that room is about 15 hours.  The vast majority, he's in

11   there by himself, sleeping.

12             I have spoken to Ms. Flannery about what portions

13   she wants played.  I think we had both agreed that, with the

14   Court's permission, we would introduce a copy of the entirety

15   as Government Exhibit 1 for the Court, should we need to

16   address it in our motion papers.  So I'd move that in as

17   Government Exhibit 1.

18             THE COURT:  Okay.

19             MR. WITHERELL:  The only portion that I believe Ms.

20   Flannery has requested that it be played, as opposed to the

21   sum and substance given through the testimony, would be the

22   very beginning, when Miranda rights are actually read.  But

23   that's how I anticipate proceeding, unless the Court wishes

24   to see the entirety of it.

25             THE COURT:  Well, Ms. Flannery, what's your

 1   position?

 2          MS. FLANNERY:  I concur that the entirety of the

 3   tape should be entered into evidence, so that we can refer to

 4   it.  It is 15 hours, 14 minutes, and 40 seconds long.  The

 5   reading of the Miranda rights and the discussion immediately

 6   around it is relevant to my motion.  So I would concur with

 7   Mr. Witherell that it -- I believe it would be helpful to the

 8   Court to see that portion before we talk about what happened

 9   that night.  Alternatively, we can direct Your Honor to that

10   portion, but it's not long.

11          THE COURT:  Okay.  Well, then let's proceed with

12   that, initially, and then we'll see where we are.  Okay?

13          MR. WITHERELL:  So I'm going to conduct my direct,

14   and then, at some portion, I'll play that portion --

15          THE COURT:  Yeah.

16          MR. WITHERELL:  -- of that.  Okay.

17          THE COURT:  Yes.  Now, of course, Detective Peters

18   testified at the prior hearing, so you don't have to repeat

19   what was brought out at that hearing.

20          MR. WITHERELL:  I was just about --

21          THE COURT:  But if you -- but if you want to

22   summarize something or ask him to summarize something, just

23   for -- you know, for making sure the record of this hearing

24   makes sense to somebody that's reading it, you go ahead.

25          MR. WITHERELL:  Thank you.

1                         DIRECT EXAMINATION

2    BY MR. WITHERELL:

3    Q     Good morning, Detective.  How are you?

4    A     Good morning.  I'm fine, thank you.

5    Q     Detective, you were outside when we were all discussing

6    the parameters of this hearing, so I just want to catch you

7    up.  You had testified previously in this courtroom around --

8    about circumstances surrounding this case, correct?

9    A     Yes.

10   Q     And you did not know this prior to getting in here, but

11   we're going to incorporate that testimony as part of this

12   hearing, so I'm not going to dive in depth into your

13   investigation into the murder of Sherman Williams in the

14   early evening of July 11th, 2017.

15   A     September 11th.

16   Q     Thank you.  September 11th.  My apologies.

17         So allow me just to recap, so we know where we are.  You

18   became involved into the murder of Sherman Williams on

19   September 11th, 2017.

20   A     Correct.

21   Q     As a result of that, you were at several scenes,

22   including 22nd and Lehigh.  Is that correct?

23   A     Correct.

24   Q     As well as the Sydenham residence on 3234 North Sydenham

25   Street, correct?

1    A      Correct.

2    Q      Okay.  As a result of you being the lead investigator in

3    that case, you became aware about a Jeep that had been

4    reported to have left the shooting scene and go to that

5    location, 3234 Sydenham Street.

6    A      Correct.

7    Q      You had become aware that detectives and officers had

8    conducted a protective sweep of that residence and had seen

9    marijuana, ammunition, money, and narcotics --

10            MS. FLANNERY:  Your Honor, I believe the prior

11   record speaks for itself.

12            THE COURT:  Yeah.  Sustained.

13            MS. FLANNERY:  And some of this --

14            THE COURT:  Sustained.  We --

15            MS. FLANNERY:  -- is inconsistent --

16            THE COURT:  Yep.

17            MS. FLANNERY:  -- with my recollection.

18            THE COURT:  We have -- sustained.

19   BY MR. WITHERELL:

20   Q      And during the evening of September 11th, 2017, did you

21   become aware that an individual by the name of Dennis Harmon

22   had been brought to the homicide unit in regards to the

23   shooting of Sherman Williams?

24   A      Yes.

25   Q      How did you become aware of that?

1    A     I was informed by patrol supervisors that somebody was

2    outside the house, and that person was transported down to

3    Homicide.

4    Q     And did there come a time that evening when you spoke to

5    Dennis Harmon?

6    A     Yes.

7    Q     Approximately what time did you first come into contact

8    with Dennis Harmon on the evening of September 11, 2017?

9    A     At sometime after eleven o'clock.

10   Q     And --

11             THE COURT:  After eleven o'clock?

12             THE WITNESS:  Yeah, eleven o'clock p.m.  I'm sorry,

13   Your Honor.

14   BY MR. WITHERELL:

15   Q     And where did you come in contact with that individual?

16   A     Mr. Harmon was already at the Homicide Unit when I came

17   in.

18   Q     Now do you see Mr. Harmon in the courtroom here today?

19   A     Yes, he's sitting to -- next to --

20             THE COURT:  Indicating --

21   A     -- Ms. Flannery.

22             THE COURT:  -- the Defendant Dennis Harmon.  Okay.

23   Q     Inside the Homicide Unit, where exactly was he?

24   A     Specifically, he was in C Room when I came in.

25   Q     Was Mr. Harmon under arrest when he met him?

Peters - Direct                    13

1    A    No.

2    Q    I want to specifically talk about some of his personal

3    property.  Do you know where his cell phone was when you

4    first met the defendant?

5    A    His cell phone was in the property bin outside C Room.

6    Q    Just explain to the Judge what means, right outside the

7    C Room?

8    A    Outside each one of the doors, there's a metal bin, it -

9    - almost like an envelope file, and people's property goes in

10   there.

11   Q    Why was Mr. Harmon's cell phone inside that bin?

12   A    The protocol is that you can't have your cell phone

13   inside the rooms, or do we -- we ask everyone to turn them

14   off when they just come in the unit, period.

15   Q    When you met Mr. Harmon, was he -- he was -- was he

16   under arrest for anything?

17   A    No.

18   Q    What was your purpose of speaking to Mr. Harmon?

19   A    I wanted to speak to Mr. Harmon in regards to the

20   homicide.

21   Q    Okay.  And tell us about the initial conversation you

22   had with Mr. Harmon.

23           THE COURT:  Let's have the name of the victim again

24   on the record.

25           THE WITNESS:  The victim's name was Sherman

 1   Williams.

 2   BY MR. WITHERELL:

 3   Q    That homicide room, C Room, is it equipped with

 4   audio/video?

 5   A    Yes.

 6   Q    Okay.  When you first met Mr. Harmon to speak with him,

 7   was the audio/video on?

 8   A    No.

 9   Q    Tell us why.

10   A    When Mr. Williams came in -- or I'm sorry.  When Mr.

11   Harmon came in, he was basically just a witness.  He was just

12   someone who was at the house.  I knew the officer had seen

13   multiple people outside the house, prior to them leaving, and

14   then the -- when the car was recovered.  So I didn't know

15   what -- Mr. Harmon's circumstances, you know, in -- if in any

16   way he was involved in the homicide.  I was just talking to

17   him about the murder.

18   Q    Tell us about that initial conversation you had with Mr.

19   Harmon.

20   A    Well, I sat down and asked Mr. Harmon his relationship

21   to the house, like what's going on with the house, you know,

22   are you there, why is it that you're there.  And then, so --

23              THE COURT:  The house at 3234 --

24              THE WITNESS:  3234 --

25              THE COURT:  -- North Sydenham.

 1            THE WITNESS:  -- North Sydenham.  I'm sorry, Your

 2    Honor.

 3            THE COURT:  Right.

 4            THE WITNESS:  And his answers were vague, they kind

 5    of didn't make sense, and they were evolving, the answers

 6    were evolving.  At some point, Mr. Harmon informs me about

 7    marijuana that's in the house that belongs to him.  The --

 8    initially, it was that he had hidden the marijuana from

 9    himself, but he smokes, but he does sell.  So it's -- as the

10    story evolved, I -- I thought it was wise to just Mirandize

11    Mr. Harmon at this point, in regard to that.  He was

12    completely exclusionary of anything to do with the homicide.

13            MR. WITHERELL:  So --

14            THE COURT:  When you say "exclusionary," what do

15    you mean?

16            THE WITNESS:  I don't want to know nothing about

17    it, I don't know who was there, I don't know anything about

18    who was outside the house, I don't know who owns the cars

19    that are outside the house, I don't know who was outside my

20    house, I may have seen people, but I don't know who they are,

21    yet, they're always here.

22            THE COURT:  When he'd say "my house," did that

23    indicate --

24            THE WITNESS:  He eventually indicates that it's his

25    house.

1          THE COURT:  He owned it?

2          THE WITNESS:  No.

3          THE COURT:  Okay.

4          THE WITNESS:  He was squatting in the house at

5     first.  He knew that a woman had died who owned the house.

6     Then he was squatting in the house.  And then he -- he gave

7     me -- apparently, there's a belief that there's squatters

8     rights and you can just take over a house, and he informed me

9     about that.  But then that changed to he was paying rent and

10    that he sold weed to pay that rent, to supplement his normal

11    job as a construction worker.

12         THE COURT:  All right.  All of this was before you

13    Mirandized him.

14         THE WITNESS:  It was -- it was both, before and

15    after.

16         THE COURT:  Okay.

17         THE WITNESS:  Once he got into the selling the weed

18    and so forth, that's when he was Mirandized.  I ended the

19    conversation at that point.

20         THE COURT:  All right.  When you say "Mirandized,"

21    just so the record is clear, what does that mean?

22         MR. WITHERELL:  Well, let's -- I can talk about

23    that, Judge.

24         THE COURT:  Go ahead.

25    BY MR. WITHERELL:

Peters - Direct                         17

1    Q    When you say you "Mirandized" him, did you do that from

2    the top of your head or do you do that from reading from a

3    card?

4    A    No, I have a card, it's called -- it's a Police 76

5    Miscellaneous 6 card.

6              MR. WITHERELL:   Judge, may I approach with what

7    I've previously marked as Government Exhibit 2?

8              THE COURT:   Yes.

9    BY MR. WITHERELL:

10   Q    I'm showing you what's been marked as Government Exhibit

11   2.   Do you recognize what that is?

12   A    Yes, this is a photocopy of the yellow card.

13   Q    Is this the same card you read to Mr. Harmon on the date

14   we're talking about?

15   A    Yes.

16   Q    And how do you know that?

17   A    Mr. Harmon's initials are here at the bottom and the

18   time.

19   Q    Your reading of the Miranda rights, was this captured on

20   audio/video?

21   A    Yes.   Well, when I -- when I realized that I -- I should

22   just Mirandize him, as the way the conversation was going,

23   protocol is I have to have a learned supervisor, who then has

24   to turn on the audio and visual system inside the -- inside

25   the C Room.

 1              THE COURT:  Well, all right.  About how long had

 2     you been talking to him before you did anything about <u>Miranda</u>

 3     rights?

 4              THE WITNESS:  Not -- it wasn't long, maybe 20 -- 20

 5     minutes to a half-hour.

 6              THE COURT:  Okay.  All right.  Go ahead.

 7     BY MR. WITHERELL:

 8     Q    And I just want to be clear about that.  Let's be clear

 9     about what happened -- what he discussed prior and after

10     <u>Miranda</u>.  Before you gave <u>Miranda</u> warnings, what were your

11     questions to Mr. Harmon?

12     A    My questions -- I didn't -- my questions were everything

13     about the homicide and who was there at the house, who lives

14     in that house, who stays in that house, who frequents that

15     house.  The whole thing about the narcotics wasn't even -- it

16     really didn't even have anything to do -- I didn't -- I

17     wasn't really interested in it, to be honest with you.  It

18     was just the homicide.  I was there for the homicide.  The

19     fact that there was all these drugs in this house that were -

20     - that these guys showed up at after the murder was its own

21     coincidence.

22     Q    When the subject of marijuana came up, is that the time

23     when you read the defendant <u>Miranda</u> warnings?

24     A    Yeah, because it was -- it wasn't like it was like --

25     like a jar of marijuana.  It went from my own personal use

1    to, yeah, I'm selling marijuana.

2    Q    Now, at the time you read <u>Miranda</u> warnings, that was

3    approximately 11:50 p.m.?

4    A    Yes.

5    Q    At that time, you were not aware -- withdrawn.

6         That's approximately the time that a search warrant for

7    Sydenham Street was signed, correct?

8    A    Correct.

9    Q    And you -- at the time when <u>Miranda</u> were initially read

10   to the defendant, you were not aware of any additional drugs

11   that had been found pursuant to that search warrant.  Is that

12   correct?

13   A    No.

14        MR. WITHERELL:  Judge, at this point, I think it's

15   appropriate to play that portion.

16        THE COURT:  All right.  Go ahead.

17      (Participants confer)

18        MR. WITHERELL:  Judge, I'm playing the beginning of

19   what's been marked as Government Exhibit 1, which the Court

20   will have a copy of.  I could skip ahead, but that really

21   doesn't work very well in this system.  It will just be a

22   minute or so.

23        THE COURT:  That's all right.  This shows the time

24   at 11:46 p.m.  Is that --

25        MR. WITHERELL:  That's correct, Judge.

1            THE COURT:  Okay.

2            (Video recording played 10:24:16 to 10:26:00)

3            MR. WITHERELL:  Your Honor, I paused it.  Again,

4    well --

5            THE COURT:  Are you stopping it?

6            MR. WITHERELL:  I am stopping it, Judge.  I can

7    continue to play the entirety of it.

8            THE COURT:  Well, that's up to you and counsel, but

9    I don't need it played anymore right now.

10           MR. WITHERELL:  Okay.

11           THE COURT:  But let me just ask a question.  I'll

12   make sure.  So, Detective, you showed him the car.  Is that

13   right?

14           THE WITNESS:  Yeah.

15           THE COURT:  Did you read him -- did you verbally

16   ask him the questions on the card?

17           THE WITNESS:  Yes.

18           THE COURT:  All right.  I didn't -- that didn't

19   come through.

20           MR. WITHERELL:  Want me to play it again, Your

21   Honor?

22           THE COURT:  Yeah.

23           MR. WITHERELL:  Okay.  I can play that portion

24   again.

25           THE COURT:  Well, can I ask you --

1          MR. WITHERELL:  May I --

2          THE COURT:  -- to turn the volume up, please?

3      (Participants confer)

4          MR. WITHERELL:  See how that works.

5          THE COURT:  Can I look at the exhibit, please?

6  Does that have -- can I look at the exhibit, please?

7          THE WITNESS:  Oh, sure, Your Honor.  I'm sorry.

8          THE COURT:  No the exhibit that -- G-2, that's it.

9      (Video recording played 10:27:21 to 10:28:12)

10         THE COURT:  Okay.  All right.  Thank you.  Thanks.

11         MR. WITHERELL:  Thank you, Your Honor.

12  BY MR. WITHERELL:

13  Q    The card is signed 12:50 [sic], the videotape we just

14  looked at says 11:47 p.m.  That's approximately the right

15  time, 11:50 p.m., when that card is signed?

16  A    Yes.

17  Q    Okay.  After he signs that card, we can see in the video

18  from 11:47 to 12:20 a.m., you speak with a Q and A with Mr.

19  Harmon.  Could you tell us the sum and substance of that

20  conversation?

21  A    We discussed his -- why he's in the house, whose house

22  it is, the relationship to the people outside, and what, if

23  anyone -- who is there that frequents the house and so forth,

24  that I can try and identify as maybe being a participant in

25  the homicide.

```
 1   Q     Tell us about what he tells you?

 2   A     Well, he tells me about the weed in the house.  He tells

 3   me about his -- first, it wasn't his house, that he was

 4   squatting in the house.  Then he was paying rent and he was

 5   supplementing his rent by selling the weed, saying that the

 6   weed was his in the house.  He stayed in the house in the

 7   second floor.  He had talked about -- he didn't know -- he

 8   didn't -- like there's a group of people there at the house

 9   when the police show up and the car is there.  The --

10              MS. FLANNERY:  I would ask that this be question

11   and answer.  I -- this seems far afield.

12              THE COURT:  Well, I think that would be better.  If

13   the witness recalls, you know, if the questions you asked are

14   --

15              MR. WITHERELL:  Judge, the --

16              THE COURT:  Just -- I'll tell you what.  I'll

17   sustain the objection this way:  If you can, try and make

18   this in terms of how you question him and in what order.  Did

19   you make any notes at the time or not?

20              THE WITNESS:  No, I don't take notes.

21              THE COURT:  So you --

22              THE WITNESS:  It's all recorded.

23              THE COURT:  All right.

24              THE WITNESS:  The video is all there.

25              THE COURT:  Okay.  So --
```

Peters - Direct                                    23

1              THE WITNESS:  What --

2              THE COURT:  All right.  And you looked the video

3      recently?

4              THE WITNESS:  I've seen bits and pieces of it, yes.

5              THE COURT:  All right.  So just tell us, from the

6      best of your recollection, how you -- how the discussion

7      went, in terms of what questions you asked, as best you can

8      recall at this time.  Let's proceed this way.

9              THE WITNESS:  The best way I can recall it, Your

10     Honor, is I'm more concerned with the people there, that were

11     at the house, who owns these two cars in front of the house.

12     Who was in that group --

13             THE COURT:  Did --

14             THE WITNESS:  -- and what are those relationships

15     to him.

16             THE COURT:  But at this time, did you have any

17     information that Mr. Harmon may have been the shooter, he

18     killed the -- Mr. Williams, the deceased?

19             THE WITNESS:  No.

20             THE COURT:  All right.  Okay.  So he's still -- in

21     your mind, still a witness, as far as the homicide goes.

22             THE WITNESS:  He -- he's a witness to the homicide

23     because I know that that car goes from the crime scene to

24     that house --

25             THE COURT:  All right.

1          THE WITNESS:  -- and then there's a group of people

2     there.

3          THE COURT:  Did he, at any time, admit knowing who

4     the shooter was?

5          THE WITNESS:  No.

6          THE COURT:  Okay.  All right.  Go -- so go ahead.

7     So, to the best you can recall, go in the sequence of what

8     you asked him and what he said.  But -- all right.  I'm not

9     going to -- I'm not going to make you say, you know, each

10    question separately.  So, in terms of topics, why don't you

11    develop it that way?  Because anybody can look at the video

12    and get the accurate --

13         MR. WITHERELL:  Absolutely, Judge.  And that's why

14    I'm trying to streamline it.

15         THE COURT:  All right.

16    BY MR. WITHERELL:

17    Q    Let's just talk about it and -- these subjects.  What

18    did he tell -- what did Mr. Harmon tell you in sum and

19    substance, about his living situation that night?

20    A    That he was living there, that he was paying rent, he

21    was going to pay rent, and that he was supplementing his

22    income as a construction worker by selling weed to pay his

23    rent.

24    Q    What did Mr. Harmon tell you about squatting at that

25    residence and squatters rights?

```
 1    A     Okay.  It -- Mr. Harmon initially started off with that

 2    he was squatting in the house, that he knew that somebody had

 3    died and the house was available, and that, if he stayed long

 4    enough, his squatters rights, he would actually take over the

 5    house because the City has a program where, if you go and

 6    take care of a house, you can actually just take it over and

 7    live there.

 8    Q     What did Mr. Harmon tell you about the marijuana in the

 9    house?

10    A     He told me the marijuana in the house was his.

11    Q     What did Mr. Harmon tell you, in sum and substance,

12    about an individual by the name of AR Ab?

13    A     He -- he said that --

14              THE COURT:  And how do you spell "Arab"?

15              MR. WITHERELL:  A-R, A-b.

16              THE WITNESS:  Yeah, it's A-R space A-b., AR Ab.

17              MR. WITHERELL:  AR Ab.

18              THE WITNESS:  So he told me that the -- he only

19    knows him by watching videos, and he asked me if I watched

20    him, and I said no.  He seemed surprised that I didn't know

21    who the guy was.

22    BY MR. WITHERELL:

23    Q     Let's -- for the Court's clarity, AR Ab, who is that

24    individual?

25    A     AR Ab is the owner of the house.
```

Peters - Direct                                    26

1    Q      What's his real name?

2    A      Abdul West.

3    Q      That was the same individual whose Jeep was registered

4    to that location?

5    A      The Jeep and the Impala.

6    Q      Did you have an opportunity to ask during this time

7    period, 11:47 p.m. to 12:20 a.m., about individuals outside

8    of the Sydenham residence on September 11th, 2017?

9    A      Yes.

10   Q      Did the defendant indicate that he recognized -- knew

11   anybody there?

12   A      He recognized people from the neighborhood.

13   Q      Did he -- was he able to provide any names or

14   identification of those people?

15   A      No.

16   Q      Did you have an opportunity to show the defendant a

17   photo of Sherman Williams, the decedent?

18   A      Yes.

19   Q      What was your purpose of doing that?

20   A      To see if he knew him at all, to say, hey, listen, I do

21   know that guy, is there some type of relationship between

22   him, the people outside the house, and the decedent?

23   Q      And the sum and substance of what Mr. Harmon told you

24   about knowing who the decedent was?

25   A      He didn't know him at all.

1   Q    Did you have an opportunity to ask Mr. Harmon about the

2   vehicles -- meaning that Chevy Impala you just talked about

3   and that white Jeep that came from the shooting scene -- to

4   ask him about those vehicles?

5   A    Yes.

6   Q    His response to that, in sum and substance?

7   A    He didn't know who the vehicles belonged to, maybe I saw

8   them before, but I don't know who they belong to.

9   Q    This initial conversation you had with him lasted

10  approximately 30 minutes?

11  A    Yes.

12  Q    During the course of this interview, after this 30

13  minutes, does Mr. Harmon ask for water and cigarettes?

14  A    I know he's provided with -- whether he asked for them

15  or I just gave them to him, he's provided with water and

16  cigarettes.

17  Q    Okay.  You provided with water and cigarettes.

18  A    Yes.

19  Q    And I want to draw your attention to about 15 minutes

20  after your initial conversation with him as of 12:35 a.m.

21  Prior --

22            THE COURT:  So this initial conversation was from

23  11:46 to 12:20, correct?

24            THE WITNESS:  Yes.  Yes, Your Honor.

25            THE COURT:  Okay.

Peters - Direct                                    28

1          MR. WITHERELL:  That's correct.

2          THE COURT:  All right.  Go ahead.

3          MR. WITHERELL:  And just so the record is clear,

4    Judge, it's in evidence, but I believe, at 12:24, he provides

5    the water and cigarettes --

6          THE COURT:  Yeah, okay.

7          MR. WITHERELL:  -- I just spoke about.

8    BY MR. WITHERELL:

9    Q    12:35 a.m., prior to going back into the room, as we can

10   see in Government Exhibit 1, do you have an opportunity to

11   see -- to speak to detectives and officers who are at the

12   Sydenham address?

13   A    Yes.

14   Q    Do they let you know, at this point, about additional

15   narcotics that were found pursuant to the search warrant?

16   A    Yes.

17   Q    And now, at this point, you're aware about crack,

18   heroin, and methamphetamine that was found at that address?

19   A    Yes.

20   Q    At 12:35 a.m. to 12:48 a.m. on the video, you have an

21   additional conversation with the defendant.  Do you confront

22   him with that information?

23   A    Yes.

24   Q    Tell us the sum and substance of what he says.

25   A    He says he doesn't know -- I don't know nothing about

1    that, the weed is mine, that's it.

2    Q    After that conversation, you can see in the video at

3    approximately 12:48 a.m., Mr. Harmon is sleeping until

4    approximately 12:47 a.m.  Is that correct?

5    A    Correct.

6    Q    You are not in the room.

7    A    No.

8    Q    At some point around 1 -- 12 -- 2:47 a.m., do you go in

9    with what I'm going to call a "summary sheet"?

10   A    Yes.

11        (Participants confer)

12   Q    I'm showing you what's been marked as Government Exhibit

13   3.  Do you recognize what that is?

14   A    Yes.

15   Q    What is that?

16   A    This is the summary I took of -- of our conversation.

17   Q    When you entered the room in the video --

18             MR. WITHERELL:  Do you need a copy, Ms. Flannery?

19             MS. FLANNERY:  No, that's okay.  Thanks.

20   BY MR. WITHERELL:

21   Q    When you enter the room with that summary sheet, tell us

22   what you do with it.

23   A    I asked Mr. Harmon to read a portion of it aloud, and

24   then I read back the rest of the summary to him, asking him

25   if there's any changes he wants to make.  And he makes a

1    change in here.  And then I ask him to sign it and put the

2    time.

3    Q    And how does he indicate the change he wants to make?

4    A    He crosses out the -- the bottom part, the very last

5    sentence.

6    Q    And what time does this approximately happen?

7    A    2 --

8              THE COURT:  May I see that?

9    A    2:50 a.m.

10          (Pause in proceedings)

11              THE COURT:  Thank you.

12   BY MR. WITHERELL:

13   Q    Detective, would I be correct in stating that this

14   accurately summarizes the conversation you had with the

15   defendant on September 11th, 2017 and the early morning hours

16   of September 12th, 2017?

17   A    Yes.

18   Q    After the summary sheet is signed, how long do you stay

19   at the Homicide Squad?

20   A    I'm probably there until at least 4 of 5 in the morning.

21   Q    At some point, do you leave?

22   A    Yes.

23   Q    What time -- do you know approximately what time do you

24   come back?

25   A    I'm probably back by 10:30, twelve o'clock, somewhere in

1    between there.

2    Q     So now, on September 12th, 2017, in the afternoon, do

3    you have an opportunity to see Mr. Harmon again?

4    A     Yes.

5    Q     And where is he when you see him?

6    A     He's still in C Room.

7    Q     And what is your purpose of seeing him at that point?

8    A     At this point, I know what was recovered in the house,

9    like specifically, and not just generically, like amounts,

10   values, and weights.  And I go back and I talk to Mr. Harmon

11   about those things.  Mr. Harmon doesn't seem to be any more

12   forthcoming.  At that point, I take Mr. Harmon to get

13   processed.

14   Q     Harmon was ultimately arrested for a state narcotics

15   violation.  Is that correct?

16   A     Correct.

17   Q     What happened to Mr. Harmon's cell phone that was

18   outside of that room?

19   A     We retained that cell phone for evidence.

20         MR. WITHERELL:  One second, Your Honor.

21                            EXAMINATION

22   BY THE COURT:

23   Q     Can I ask one question?

24   A     Sure, Your Honor.

25   Q     There was -- I'm not sure you know this, but there --

```
 1    when we had the prior hearing, there was testimony by police
 2    officers that they had discussions with an individual who --
 3    I think that some of them identified him as Mr. Harmon,
 4    outside of 3234 North Sydenham.
 5    A    Yes.
 6    Q    Did you know about any of those conversations while you
 7    were questioning him on September 11th?
 8    A    No.  I just knew that they had brought him in.  I was --
 9    I was dealing with the homicide, and then --
10    Q    Right.
11    A    -- this was secondary.
12    Q    Okay.
13    A    So I knew that they spoke to him, I knew that he said he
14    lived there.  I knew that he had --
15    Q    But you knew that before you were -- before you gave him
16    the Miranda warnings?
17    A    Yes.
18              THE COURT:  Okay.  All right.  Go ahead.
19              MR. WITHERELL:  Your Honor, I do not believe I have
20    any further questions for this witness.
21              THE COURT:  All right.  Cross-examine.
22         (Pause in proceedings)
23                        CROSS-EXAMINATION
24    BY MS. FLANNERY:
25    Q    Good morning, Detective Peters.
```

1   A     Good morning, Your Honor -- or not "Your Honor," I'm

2   sorry.  I apologize.  Good morning, Ms. Flannery.

3   Q     Let's go back to when you first became aware of Dennis

4   Harmon.  That was when he was still at Sydenham.  Is that

5   correct?

6   A     Yes.

7   Q     How did you become aware that he was there at Sydenham?

8   A     I received information from the police officers that

9   were there and the detectives that had gone there, that there

10  was somebody there that was going to be transported from

11  Sydenham to Homicide.  At this point, I'm still at the other

12  scene, handling everything else related to the homicide.

13  Q     Did you know why he was there at Sydenham, why he was --

14  why the police there were interested in him?

15  A     Well, I was interested in him.  He was there at the

16  house.

17  Q     Why were you interested in him?

18  A     Because he was at the house.  From what was told to me,

19  that there was a group of people at the house that had walked

20  away.  I knew that the officers had found the keys that the -

21  - the vehicle used in the homicide was there.

22                THE COURT:  The group walked away from --

23                THE WITNESS:  The house.

24                THE COURT:  -- where the homicide had taken place.

25                THE WITNESS:  And then the keys were recovered

Peters - Cross                          34

 1    there.  So it was just --

 2              THE COURT:  The keys were recovered where?

 3              THE WITNESS:  The keys were recovered where the men

 4    walked away from, which was --

 5              THE COURT:  Where -- the scene of the shooting.

 6              THE WITNESS:  Yes.  Not the scene of the shooting.

 7    After the shooting, the car shows up on Sydenham Street.

 8              THE COURT:  Right.

 9              THE WITNESS:  There's a large group of people

10    outside the house on Sydenham Street.  When the police

11    respond to that secondary scene --

12              THE COURT:  This is the white -- do you have the

13    white Jeep and --

14              THE WITNESS:  Yeah.  When they respond to the

15    secondary scene, those men walk away, and in doing so, they

16    drop the keys into the -- in -- on the ground.  And the

17    officers -- then the men leave.  They -- they watch the

18    officers there.  They're trying to figure out what's going on

19    and then they find the keys to that Jeep.

20    BY MS. FLANNERY:

21    Q    So you knew -- and I believe you testified to this the

22    other day.  While Dennis Harmon was still at Sydenham, you

23    knew of the purported connection between the Jeep and 3234

24    Sydenham.

25    A    I knew that the --

Peters - Cross                          35

1    Q     Is that correct?

2    A     I knew the Jeep was registered to that house.

3    Q     And you were aware of some information -- it may not

4    have been the only information -- but some information that

5    that Jeep was connected to the shooting.

6    A     Yes.

7    Q     Is that correct?

8          So an individual tied to the house, in some way

9    connected to the house where that car was registered, that is

10   a fact that the police would view as incriminating or as

11   connecting him, potentially, to the murder.  Is that correct?

12   A     It was something we had to examine, yes.

13   Q     Did you directly speak to the officers who were there at

14   3234 Sydenham?

15   A     I know, at one point, I went out to 3234 Sydenham.  But

16   I know that there was other officers guarding the scene, and

17   there was other officers that had also responded.  I didn't

18   talk to every --

19   Q     But just so we don't go off on a tangent, let me clarify

20   my question.  While Dennis Harmon was there at Sydenham, did

21   you go to Sydenham?

22   A     No.

23   Q     Did -- while Dennis Harmon was there at Sydenham, did

24   you speak directly to any officers who were there,

25   questioning him?

Peters - Cross                                                    36

1   A    I just said no.  If -- and I -- I kind of find your --

2   Q    Okay.  I just want --

3   A    -- your tangent quite -- that was like kind of

4   insulting, so let me explain this.  I went to the crime scene

5   of a homicide, of which I'm charged with; that's my

6   responsibility.  This whole thing at Sydenham Street was

7   incorporated in because the vehicle from the homicide showed

8   up.

9            THE COURT:  When did you go to the crime scene?

10           THE WITNESS:  Which one?

11           THE COURT:  The one where the shooting had taken

12  place, where it was --

13           THE WITNESS:  I was there about 7:40, I believe it

14  was.

15           THE COURT:  Okay.  7:40 p.m.

16           THE WITNESS:  Yes.

17           THE COURT:  All right.  When was the shooting,

18  according to your recollection?

19           THE WITNESS:  I -- I think it was 5, five o'clock,

20  like after five o'clock.

21           THE COURT:  Okay.  And what's that address again,

22  just for the record?

23           THE WITNESS:  The address was twenty -- was 2800

24  North 22nd Street.

25           THE COURT:  And that's near Lehigh Avenue --

1              THE WITNESS:  Yes.

2              THE COURT:  -- if I recall correctly.

3              THE WITNESS:  It would be just north of Lehigh

4     Avenue --

5              THE COURT:  Yeah, okay.

6              THE WITNESS:  -- by the --

7              THE COURT:  All right.  Okay.  That's where Mr.

8     Williams was shot.

9              THE WITNESS:  That's where he was killed.

10             THE COURT:  Right.  Okay.  And you got there around

11    7:40 p.m.  And how long were you there?

12             THE WITNESS:  I was there for several hours.

13             THE COURT:  Seven hours.

14             THE WITNESS:  Several hours.  I'm sorry.

15             THE COURT:  Several.  All right.  Okay.

16             THE WITNESS:  Yeah.

17             THE COURT:  All right.  And --

18             THE WITNESS:  I know I don't make it to Sydenham

19    until 10:40.

20             THE COURT:  So that you get -- you, personally, get

21    to Sydenham at 10:40.

22             THE WITNESS:  Correct.

23             THE COURT:  And you testified about this last time.

24             THE WITNESS:  Yes.

25             THE COURT:  I just want to make it -- okay.  Go

Peters - Cross                    38

 1   ahead.

 2   BY MS. FLANNERY:

 3   Q     Okay.  First of all --

 4              THE COURT:  And how long did you stay at Sydenham,

 5   just while we're talking about it?

 6              THE WITNESS:  I don't recall how long.

 7              THE COURT:  Approximately.

 8              THE WITNESS:  About as half hour so.

 9              THE COURT:  Like did you -- and you may have said

10   this before.  But did you go inside the house while you were

11   there?

12              THE WITNESS:  No, I went to the inside -- I'm

13   sorry.  I went inside the front door, and that's it.

14              THE COURT:  Okay.

15              THE WITNESS:  When Narcotics came, they went

16   through the house to see what they needed --

17              THE COURT:  Right.

18              THE WITNESS:  -- to gather the evidence.

19              THE COURT:  Okay.  Yeah, and that's what -- you

20   testified about that last time.

21              Go ahead.

22   BY MS. FLANNERY:

23   Q     All right.  And I did not, in any way, mean to be

24   insulting --

25              THE COURT:  No, you were not insulting.

Peters - Cross                                   39

1    Q      -- to you.  I just want to make sure --

2    A      Thank you.

3    Q      -- the record is clear.  And I was trying to make a

4    distinction between the time at Sydenham that Mr. Harmon was

5    there versus the time at Sydenham after Mr. Harmon left --

6               THE COURT:  Yeah.

7    Q      -- this --

8               THE COURT:  And let me --

9    Q      -- that area.

10              THE COURT:  -- just ask one more.  When -- while

11   you were at 3234 North Sydenham, do you recall seeing Mr.

12   Harmon --

13              THE WITNESS:  No.

14              THE COURT:  -- at that time?

15              THE WITNESS:  No.  I had no contact with Harmon --

16   Mr. Harmon until I came back to Homicide later on that night.

17              THE COURT:  Okay.  Go ahead.  Go ahead.

18   BY MS. FLANNERY:

19   Q      At -- and I apologize if I've asked this before, but I

20   think we -- at least I got a little confused.  You were aware

21   of Dennis Harmon, in terms of being an individual at Sydenham

22   that the police were talking to, before he left Sydenham.  Is

23   that correct?

24   A      I knew that there was an individual, who it was, and so

25   forth.  It may be I may have even known his name at that

 1  point, but I didn't know who he was, what his relationship

 2  was at all.  I know that the police brought somebody from

 3  Sydenham to Homicide.

 4  Q    Did you express interest in speaking to that individual?

 5  A    Absolutely.

 6  Q    Did you express interest in speaking to him before he

 7  was brought to the police station?

 8  A    No, there was no time for that.

 9  Q    Are you aware that he arrived -- that he was transported

10  -- is it your understanding that he was transported from

11  Sydenham to the police station in a police car?

12  A    Yes.

13  Q    And he was transported by two officers, correct?

14  A    Yes.

15  Q    Tell us what the outside of the Homicide Unit looks

16  like.  What would Mr. Harmon have seen when he walked into

17  the unit?

18  A    Do you mean --

19  Q    First of all, where -- I guess I should start with:

20  Where is it?

21  A    It's at 8th and Race.

22  Q    And how do you get to the -- when you walk in the front

23  door at 8th and Race, how do you get to the Homicide Unit?

24  A    You come in through a lobby, and then you go through a

25  metal detector, and then you go on an elevator to the first

1     floor.

2     Q     Is there a sign that says "Homicide" when you get

3     inside.

4     A     Once you come inside the door, you have to be buzzed in,

5     and outside that door is the word "Homicide."

6     Q     So anyone walking in that door would know that they're

7     entering the Homicide Unit.

8     A     I would believe so.

9     Q     Do you know where Mr. Harmon was taken once he came into

10    the Homicide Unit?

11    A     Yes, he was taken inside Interview Room C.

12    Q     We saw -- we're seeing it still on the screen.  But I'd

13    ask you to describe in a little more detail what Room C is

14    and how it's set up.

15    A     Okay.  Room C is a generic room.  Because the building

16    is round -- and hence the name "Roundhouse" -- the rooms

17    aren't even.  So the room would be maybe eight-by-twelve.

18    The -- yet it's more narrow in the back here, and then it

19    fans out a little bit wider in the front.

20    Q     All right.  So what we're looking at there, it -- we see

21    the -- what you're referring to as the back of the room,

22    correct?

23    A     Yes.

24    Q     And then the side wall, as we look at it, to the left.

25    Does that wall have any windows in it?

1    A    To -- no.

2    Q    And the wall on which the camera apparently is, does

3    that wall have any windows in it?

4    A    No.  It just has a door.

5    Q    And on the right-hand side, we see a small window, and

6    we've seen in the video a door.

7    A    Yes.

8    Q    Is that correct?

9         And are there any other doors or windows in that wall?

10   A    No.

11   Q    And that window, am I correct in assuming that that's

12   not a window that opens?

13   A    Correct.

14   Q    We saw you enter the room by opening the door.  So that

15   door was shut when you arrived and Mr. Harmon was in the

16   room.  Is that correct?

17   A    Correct.

18   Q    Do you know whether anyone else came into that room

19   between the time he arrived and the time you went in to

20   question him?

21   A    I am not aware, but protocol would be that the

22   supervisor would have -- the supervisor who was inside would

23   have handled him when he came in.

24   Q    What do you mean by "handled"?

25   A    The supervisor would have walked into a room.

Peters - Cross                    43

1    Q    And your understanding is he was left there from the

2    time he arrived until the time that you went in --

3    A    Yes, ma'am.

4    Q    -- to speak to him.

5              MS. FLANNERY:  All right.  If I may, Your Honor, I

6    --

7              THE COURT:  Well, let me -- just so you're all

8    aware here, I spent many hours in that room many years ago,

9    when I was an Assistant DA, and so I'm familiar with -- you

10   know, there's a series of these "interview rooms," as they

11   called them at that time.

12             THE WITNESS:  Yes.

13             THE COURT:  You walk in, and then there's a large

14   space, and then there's a private office for like the

15   commanding officer, the captain or one of the lieutenants.

16   Is that right?

17             THE WITNESS:  Yes.

18             THE COURT:  And then you have the interview rooms

19   along -- they're internal rooms.

20             THE WITNESS:  The cubicles, you mean?

21             THE COURT:  Yeah, the --

22             THE WITNESS:  Yeah.

23             THE COURT:  The room -- like Room C, there are a

24   series of internal rooms.

25             THE WITNESS:  Yes.

 1                THE COURT:  And that -- what looks as a window,

 2      that's a one-way mirror.  Is that right?

 3                THE WITNESS:  That's correct.

 4                THE COURT:  So somebody can look at him from

 5      outside that room --

 6                THE WITNESS:  Yes.

 7                THE COURT:  -- looking in.  Okay.

 8                Go ahead.

 9                MS. FLANNERY:  Thank you, Your Honor.

10                THE COURT:  Okay.

11      BY MS. FLANNERY:

12      Q    Was that door locked when you got there?

13      A    Yes.

14      Q    Do you know whether anyone, prior to your arrival, told

15      Mr. Harmon he was free to leave?

16      A    I'm not aware of that.

17      Q    Did you ever tell Mr. Harmon he was free to leave?

18      A    I did not.

19                MS. FLANNERY:  Your Honor, I may, I think this can

20      come up on the screen.  We've marked it as DH-Sup 70.

21                THE COURT:  Yes.

22                MS. FLANNERY:  But I -- if I may approach the

23      witness --

24                THE COURT:  Please.

25                MS. FLANNERY:  -- I have a hard copy --

1              THE COURT:  Go right ahead.

2              MS. FLANNERY:  -- in case that's easier.

3              THE COURT:  Yes, good idea.

4              MS. FLANNERY:  And I'll hand a copy to the Court,

5      if I may.

6              THE COURT:  Thank you.  Yeah.

7      BY MS. FLANNERY:

8      Q    Detective Peters, do you recognize what this Exhibit DH-

9      70 is?

10     A    Yes.

11     Q    And what is it?

12     A    All right.  This is a small copy of -- there are several

13     -- when -- when -- I'm going to try not to use the police

14     jargon.  When people are brought into the Homicide Unit, when

15     -- a live job -- which means that that's a murder that's

16     ongoing right now, right then and there -- when they come in,

17     there's -- there's several things that the officers try and

18     do to take -- to keep track of witnesses coming in, police

19     officers that are coming in and so forth.  So this is the

20     original sheet, which probably hasn't changed in 50 years, of

21     basically witnesses who are coming, who is going to interview

22     them, and so forth.

23             MS. FLANNERY:  Your Honor, I have -- I've handed

24     both Your Honor and the witness and the Government a black-

25     and-white copy.  I do have a color copy.  It may be helpful

```
 1    for the witness --
 2              THE COURT:  Whatever you --
 3              MS. FLANNERY:  -- to look at that.
 4              THE COURT:  -- want to use.
 5              MS. FLANNERY:  We'll remark this as the original
 6    exhibit for the record.
 7              THE COURT:  Oh, you want this back?
 8              MS. FLANNERY:  Well, it's the same thing, Your
 9    Honor.
10              THE COURT:  Okay.  All right.
11              MS. FLANNERY:  So, I mean, it will be helpful to
12    Your Honor to look at it.  Actually, may I put it on an ELMO?
13    Would that be a difficulty?
14         (Participants confer)
15              THE COURT:  I can see it, that's ...
16         (Pause in proceedings)
17    BY MS. FLANNERY:
18    Q    Now, sir, do you know who completed the form, the top
19    information?
20    A    I don't, but I -- I want to -- I want to say it's
21    Detective Centeno by the handwriting.
22    Q    I'm sorry?
23    A    I want to say it's Detective Centeno by the handwriting.
24    Q    C-e-n-t-e-n-o?
25    A    Yes.
```

1    Q    And who is he?

2    A    He's my partner at the Homicide Unit.

3    Q    There is a time written under "Time," in blue ink, eight

4    o'clock p.m.  Do you see that?

5    A    Yes, ma'am.

6    Q    Who wrote that?

7    A    I'm assuming Detective Centeno, I -- or whoever filled

8    this form out.  And if I can explain this.  So how it would

9    work is we operate on a wheel, so if a murder comes in, the

10   first person at the top of the wheel is assigned that case.

11   The next person assigned it takes over the desk.  So, if I'm

12   up first, I take over the desk.  A murder comes in, I handle

13   it, I go out on the scene and so forth.  The next person is

14   up, takes over the desk.  So the next person up was probably

15   Centeno because we're normally back to back.  We get a murder

16   about once a month.  So you kind of -- the wheel kind of

17   stays the same, and the only time it breaks is when somebody

18   might be on vacation, so -- and then you would miss your turn

19   on the wheel.

20        All right.  So I'm assuming -- the handwriting looks

21   similar to Centeno's, so I'm assuming he followed me up.  I

22   know he didn't go to the scene with me, that it was Griffin.

23   Q    Okay.  The time in is eight o'clock.  So, based on this

24   record, does that mean that Mr. Harmon arrived at Homicide

25   and was logged in at eight o'clock?

1    A    Yes.

2    Q    The interviewer, that's your name there.

3    A    Yes, ma'am.

4    Q    And is that in your handwriting?

5    A    No.

6    Q    Does that mean that no one else interviewed him?

7    A    Yes, that's what it means.

8              THE COURT:  Well, there's a name under it that says

9    "Leahy," L-e-a-h-y.

10             THE WITNESS:  Yeah.  Leahy is the person

11   (indiscernible) this person is redacted.  There's a name and

12   a time for someone who's redacted.

13             THE COURT:  Oh, that's a different individual --

14             THE WITNESS:  Yes.

15             THE COURT:  -- who was questioned.  Okay.

16             MS. FLANNERY:  Your Honor, I move the admission of

17   DH-70.

18             THE COURT:  All right.  Admitted.

19        (Defendant's Exhibit DH-70 received in evidence)

20   BY MS. FLANNERY:

21   Q    So he came in at eight o'clock, was taken to Room C.

22   And if I am following the time frame correctly, you went in

23   sometime between 10 and 10:30 -- no -- 11 and 11:30 --

24   A    Yes, ma'am.

25   Q    -- to speak with him.  So he sat there in C Room with --

1    for two and a half, three hours?

2    A    That's fair to say.

3    Q    He was, to your knowledge, not given any food during

4    that time, correct?

5    A    If he should ask for water, food, if he should ask for -

6    - to use the restroom, he absolutely is given that

7    opportunity.

8    A    He had to knock on the door, in other -- in order to go

9    to the restroom --

10   A    Yes, ma'am.

11   Q    -- correct?

12   A    Because the Homicide Unit only has one waiting room.

13   All right?  So, if there's somebody who's there on that case,

14   you have to take that person -- you have to -- if -- say --

15   say there's like five witnesses, and you have somebody -- no

16   one can see each other.  All right?  Because you don't want

17   anyone -- and especially in today's climate, you don't want

18   anyone to know who's talking to who, who's saying what to

19   who.  So it's very imperative that people are separated.  All

20   right?

21        And the door is locked for a reason.  You can't just

22   come out and walk around and see who's there.  Like, if he

23   was the shooter from 22nd Street and he sees who's there

24   sitting on the bench that might be giving a statement, well,

25   then that person is in danger.  So we do the best to keep

1    everyone separate from each other.

2         So the -- one of the big problems is only having that

3    one waiting room with the two -- there's basically two tiny

4    benches.  The waiting room is about as big as the interview

5    room.  You have to take everybody out, separate them all, put

6    them in different places, and then walk someone to the

7    bathroom.

8         So it -- but if you want to use the bathroom, you're

9    fine.  If you want water, it's fine.  If you want a

10   cigarette, it's fine.  If you want something to eat, it's

11   fine.  There's no -- there's no deprivation of any of those

12   things, at any time.

13   Q    But to your knowledge, Mr. Harmon was never told he was

14   free to leave while he was sitting in Room C.

15   A    No.

16   Q    And he was never given any _Miranda_ warnings by you or

17   your colleagues before the _Miranda_ warning that we saw.

18   A    No, ma'am, not that I'm aware of.

19   Q    When you did go in to speak to him, again, at that point

20   in time, you knew the connection between the house and the

21   car and the murder.

22   A    Well, I knew there was a connection; the entirety of the

23   connection, I didn't know at that point.

24   Q    I appreciate your correction because there is a

25   distinction between being an actual connection and having

1    evidence that there might be, so let me clarify.  And I think

2    you'll agree with this.

3        Is it fair to say that you knew at the time that there

4    was some evidence that there may be a connection between the

5    Jeep and the house and the murder?

6    A    Yes, ma'am.

7    Q    And you were interested in learning anything you could

8    about the house and the car and the people who you understood

9    had been outside the house when the officers arrived.

10    A    Yes, ma'am.

11    Q    So it's fair to say that those are topics that you

12    covered during the pre-videotaped portion of your interview

13    of Mr. Harmon.

14    A    Yes.

15    Q    Did you take notes of that interview?

16    A    No.

17    Q    We watched a couple of times the Mirandization -- if

18    that's a word -- of Mr. Harmon.  And you would agree that you

19    read that rather rapidly, you read the card very rapidly.

20    A    I --

21    Q    Would you agree --

22    A    I wouldn't --

23    Q    -- with that characterization?

24    A    I -- that's fair to say, in going back and looking at

25    it, yes.

1    Q    And you did not pause for the punctuation in the

2    statement.  Is that fair to say?

3    A    If that's how you see it, yes, then that's definitely a

4    -- something you can see.

5    Q    At the conclusion of your reading of the card, you

6    didn't ask Mr. Harmon if he understood what you had just

7    said, did you?

8    A    No, I don't think I did.  I know, when I read the first

9    question, he -- like he nods his head yes.  So I mean, I know

10   that -- I don't believe that Mr. Harmon is not unfamiliar

11   with what I'm reading to him.

12   Q    Why do you say that?

13   A    I don't believe it was Mr. Harmon's first dance.

14   Q    Do you know that for a fact?

15   A    I did that day.

16   Q    Pardon me?

17   A    I did that day.

18   Q    You did what that day?

19   A    I didn't identify that, who he has.

20              THE COURT:  Well, had you made a criminal record

21   check?

22              THE WITNESS:  I just brought up his photograph to

23   see who he was.

24              THE COURT:  Well --

25              THE WITNESS:  The identifiers that he had provided

1    as the photograph -- as the real name, like that's all.

2              THE COURT:  All right.

3              THE WITNESS:  Like did I go into his criminal

4    history and all that stuff --

5              THE COURT:  You --

6              THE WITNESS:  -- and all that?

7              THE COURT:  You did not do that.

8              THE WITNESS:  Nah, I didn't go through that.  I

9    don't have time for that.

10             THE COURT:  Okay.

11   BY MS. FLANNERY:

12   Q    So you didn't have any actual knowledge that he had ever

13   been given his Miranda rights before?

14   A    I did not, ma'am.

15   Q    You didn't ask him, after you read that card, if he

16   wanted to go forward, did you?

17   A    No, because in the -- in the previous conversation, we -

18   - we kind of had an understanding.  We were -- it -- we

19   weren't -- it wasn't -- I think -- I didn't really care about

20   the drugs, the marijuana, at that time.  I was there for a

21   homicide investigation.  And this just kind of took on its

22   own -- its own legs and -- and it became part of the

23   investigation.

24   Q    So Mr. Harmon, your understanding is he knew he was

25   being questioned about a homicide.  That was clear, right?

1   A     Yes.

2   Q     And he knew he was in the Homicide Unit.   That was

3   clear, right?

4   A     Yes.

5   Q     Did you, or, to your knowledge, did anyone else tell him

6   that what he said there in the Homicide Unit could be used

7   against him in a narcotics prosecution?

8              THE COURT:   Well, how --

9              MR. WITHERELL:   Objection.

10              THE COURT:   But how would this witness know that?

11              MS. FLANNERY:   I'll -- that's a --

12              THE COURT:   I mean, according to the testimony, as

13   far as you know, you were the only one who questioned Mr.

14   Harmon before the _Miranda_ warnings.   Is that right?

15              THE WITNESS:   Yes.   And what happens, in the

16   conversation, he brings up the marijuana and it kind of threw

17   me off.

18              THE COURT:   No, I understand.

19              THE WITNESS:   And -- and I say that, I'm like --

20              THE COURT:   Yeah, you don't have to repeat

21   yourself.

22              THE WITNESS:   Yes, Your Honor.

23              THE COURT:   Okay.

24              THE WITNESS:   Sorry.

25              THE COURT:   But that after -- you say, after you

Peters - Cross                          55

```
 1   give him the Miranda warnings, you then talk to him some

 2   more, and then you left.  Now do you have knowledge if any

 3   other detective talked to him while you were out of the

 4   building?

 5           THE WITNESS:  No, no one talked to him.

 6           THE COURT:  I mean, as far as you know, no one else

 7   did.

 8           THE WITNESS:  No.

 9           THE COURT:  And then you talked to him again when

10   you got back around two o'clock, 2 p.m., and you talked --

11           THE WITNESS:  Oh, I'm still there.

12           THE COURT:  What?

13           THE WITNESS:  I was still there at the unit, but --

14           THE COURT:  I thought you left --

15           THE WITNESS:  No, no.

16           THE COURT:  -- for some--

17           THE WITNESS:  No, the detectives are at the scene,

18   I'm still in the Homicide -- I'm dealing with the murder at

19   this point.

20           THE COURT:  So you -- I understand that.  So you

21   stayed in the Homicide Unit the entire early morning hours of

22   the 12th?

23           THE WITNESS:  Yes.

24           THE COURT:  Oh, all right.  I didn't realize that.

25           MR. WITHERELL:  Judge, I think that -- I apologize,
```

1    and I'm not -- don't mean to interrupt.  I think you're

2    saying 2 p.m.  I don't think he understands the question.

3              THE COURT:  Well, all right.  I was under the

4    impression -- and I guess I'm wrong -- that you talked to Mr.

5    Harmon after you gave him <u>Miranda</u> warnings.  You've testified

6    to all that.  And then I got the impression that you left the

7    building.  But that's wrong, you stayed in the building.

8              THE WITNESS:  After we complete the summary and so

9    forth --

10             THE COURT:  Yeah.

11             THE WITNESS:  -- I finish up what's going on with

12   the homicide --

13             THE COURT:  Right.

14             THE WITNESS:  -- prepare what I need to give to --

15             THE COURT:  Yeah.

16             THE WITNESS:  -- my supervisors, I go home, sleep

17   for a little bit, take --

18             THE COURT:  Well, you did leave?  Okay.

19             THE WITNESS:  I -- yes, slept for a little bit,

20   took a shower, and came back.

21             THE COURT:  Okay.  That -- All right.  So that is

22   correct.  All right.  And then, when you came back, Mr.

23   Harmon was still there.

24             THE WITNESS:  He's still there.

25             THE COURT:  Now did you question him some more

Peters - Cross                         57

1   after you came back?

2                THE WITNESS:  I did speak with him briefly about --

3   at this point, I know everything that's recovered in the

4   house and I -- and then it's --

5                THE COURT:  All right.  You've testified about

6   that.

7                THE WITNESS:  Yes.

8                THE COURT:  Okay.  All right.  Thank you.

9                All right.  Go ahead.

10  BY MS. FLANNERY:

11  Q    Did you ever tell Mr. Harmon -- and I'm talking within

12  the con --

13               THE COURT:  Well, no, no.  Wait.  I have one more

14  question.  So, to your knowledge, did any other detective

15  talk to Mr. Harmon before he was processed and charged with

16  the state court violation?

17               THE WITNESS:  No, no one that I'm aware of at all.

18               THE COURT:  As far as you know, you're the only one

19  who talked to him.

20               THE WITNESS:  Correct.

21               THE COURT:  All right.  Go ahead.

22  BY MS. FLANNERY:

23  Q    During either the pre-Miranda interview with him or the

24  interview that was videotaped, did you tell him that the

25  statements that he would be making in that room could be used

Peters - Cross                              58

1    against him in a narcotics prosecution?

2                MR. WITHERELL:  Objection, Your Honor.

3                THE COURT:  Overruled.

4                MR. WITHERELL:  That's not the standard.

5                THE WITNESS:  Yes, ma'am.  That's why, when he went

6    into his dealings with the marijuana, it was my obligation to

7    advise him of his _Miranda_ warnings.  And then, with that, I

8    also put the camera on and had the supervisors put the camera

9    on, so the rest of our conversations, everything was

10   documented, audio and video recorded.

11   BY MS. FLANNERY:

12   Q    Okay.  But my -- so, when you say, yes, you told him it

13   could be used otherwise, what you're referring to is the

14   reading of the _Miranda_ rights that we just saw.

15   A    Yes.

16   Q    Okay.  After the reading of the card and the -- during

17   the videotaping, you elicited some -- the same information

18   that you had gotten from him prior to the Mirandization, in

19   terms of the selling of marijuana, correct?

20   A    Yes.

21   Q    And you also elicited the same thing he had told you

22   before the Mirandization, in terms of where he was staying or

23   living at the time, correct?

24   A    Correct.

25   Q    You also elicited the same information from him after

1    the Mirandization, about the people in the neighborhood that

2    you had elicited prior to the reading of the card, correct?

3    A    No.

4    Q    In what way did that differ?

5    A    Well, I don't think I talked to him about the

6    neighborhood prior to reading him his warnings.  I only spoke

7    to him briefly.  And when he brought up the marijuana and so

8    forth, that's when that conversation ended, he was read his

9    rights, and the camera went on.  I was there to talk him

10   about a murder, like who was there, who was outside, who do

11   you know, that -- and then that went into the marijuana.

12   Q    Okay.  So before --

13   A    And then -- and then, once that graduated to that, then

14   I had to read him his rights.

15   Q    But to be clear, you did -- you were in there, I believe

16   your testimony was, 20 or 30 minutes before we switched to

17   the part that was videoed, correct?

18   A    Correct.

19   Q    And the part that was videoed, the interview, was about

20   the same length in time, wasn't it?

21   A    I would agree.

22   Q    And your focus when you went into interview him, to

23   begin with, was, in part, who was there outside the house,

24   correct?

25   A    Correct.

1    Q    So you would have asked him about that.

2    A    Correct.

3    Q    Your interest was concerning the car, correct?

4    A    Correct.

5    Q    So you would have asked him about the car.

6    A    Yes.

7    Q    Fair to say?

8         (Pause in proceedings)

9    Q    He did, later -- do you recall?  Express surprise that

10   his statements to a homicide detective could be used by the

11   Narcotics Unit.  Do you recall that?

12   A    I do not.

13   Q    At some point, you told him you were going to take him -

14   - or he would be taken over to the Narcotics Unit, correct?

15   A    I don't recall that part.

16   Q    Let me go back a little bit then.  You reentered the

17   room at about 2:47 a.m, to -- with the summary statement,

18   correct?

19   A    Yes.

20   Q    He was then left in that room after you left with the

21   signed statement, correct?

22   A    Correct.

23   Q    He was not given a place to rest, was he?

24   A    He could rest there.

25   Q    He could rest on the floor.  Is that what you mean?

1   A      There was a chair there, as well.  Most people sleep on

2   the table.

3   Q      Are you aware that, at 3:48 a.m., another officer

4   entered the room and told him to get his foot off the chair,

5   which is how he was sleeping?

6   A      No.  But I -- I don't see anything wrong with that,

7   either.  I mean, I know that -- this is unfortunate for us,

8   but that's the chair that I have to sit in when I sit at my

9   desk, as well.  So some detective didn't want somebody's feet

10  on, then the detective didn't want somebody's feet on it.

11  Q      But they didn't give him anything else that he could put

12  his feet up on.

13  A      People sleep in there all the time.  That chair that his

14  feet are on, I've slept in that chair because I've been there

15  for days at a time.

16  Q      The reason he didn't -- the reason he was having to

17  sleep in the room was that he was not free to go home,

18  correct?

19  A      Correct.

20  Q      When was he arrested?

21  A      Narcotics processed his paperwork.  What their times out

22  on that are, I'm not sure of.  But I think, once that search

23  warrant was executed and those things were -- the items were

24  found inside the house, I would assume that, at that point,

25  he's not just a witness.

```
 1              THE COURT:  Well, when you say "arrested," you mean

 2      charged?

 3              MS. FLANNERY:  Let me clarify, Your Honor.

 4      BY MS. FLANNERY:

 5      Q    I think I -- he was in that room, in the C Room, from

 6      the time the video started until the time he was taken out to

 7      go to the Narcotics Unit --

 8              THE COURT:  Well, he was in that room when he got

 9      there at 8 p.m.

10              MS. FLANNERY:  He was in the room at 8 p.m.

11              THE COURT:  And stayed in that room at least until

12      he was processed.  Is that correct?

13              THE WITNESS:  Correct.

14              THE COURT:  And that was --

15      BY MS. FLANNERY:

16      Q    So that was a total of approximately 19 hours, correct?

17      A    Fair to say.

18      Q    So he was not informed that he was charged until

19      sometime after he left the room.  Is that correct?

20      A    It's probably not until I come back and go over the

21      weights and the values with him, and I tell him I'm taking

22      him downstairs and -- to be processed.  He's my

23      responsibility; he's not anybody else's, he's my -- he's --

24      he's in there for me, he's my responsibility.  So, when I

25      come back, I have to take him downstairs.
```

Peters - Cross                                     63

1   Q    You never said the words, though, "you're under arrest,"

2   right?

3   A    I don't believe I did.

4   Q    So he was arrested on the basis of what was found in the

5   house?

6   A    Yes.

7            MS. FLANNERY:  May I have a moment, Your Honor?

8            THE COURT:  Yes.

9   BY MS. FLANNERY:

10  Q    You mentioned a property bin outside the room, in which

11  a cell phone was sitting when you were inside the room with

12  him.  Is that correct?

13  A    Yes.

14  Q    What -- His Honor may know, but I don't.  What does that

15  property bin look like?

16           THE COURT:  I don't necessarily -- I don't remember

17  if they had property bins.  It was a long time ago.

18           THE WITNESS:  It looks like a --

19           THE COURT:  They -- because there were no cell

20  phones then, so I don't know if the person had a wallet, if

21  they would take possession of his wallet, or keys or -- I

22  don't remember any such detail.

23           Go ahead.

24           THE WITNESS:  I -- to describe it easiestly, it

25  looks like -- do you know like the things you put -- to put

1    envelopes in, like -- in like an office setting.  Here's the

2    wall, and then there's like a thing like this.  You would

3    slide an envelope in like this way.  That's what it looks

4    like.  And it's metal.

5    BY MS. FLANNERY:

6    Q    You weren't there when he went into the room.

7    A    I was not.

8    Q    Are you certain that his cell phone was in that bin?

9    A    I'm pretty sure his cell phone was in that bin.

10   Q    Do you know who put the cell phone in that bin?

11   A    I do not.

12   Q    Are you aware that the cell phone was taken from him at

13   Sydenham?

14   A    I believe the officers took his cell phone when they

15   transported him down to Homicide, which would be protocol

16   anyway.

17   Q    Do you know if anything else was in that property bin?

18   A    What was in there?  I don't recall.

19   Q    Do you know what --

20   A    I know his -- something with his shoe -- didn't want to

21   take his shoelaces out of his shoes, so he had to take the

22   shoes off.

23   Q    Did you ever see his identification card?

24   A    I don't think.

25   Q    Do you know where it was that night, when you were

1   talking to him?

2   A    It may have been in the property bin.  I don't remember.

3   Q    You have no knowledge of the identification card.

4   A    Not at this moment.

5   Q    I believe we asked you whether you gave him any rights

6   before the reading that we saw on the videotape.  And just to

7   complete the circle, let me ask you:  Did you give him any

8   further Miranda warnings after that point in time?

9   A    Did I read them twice or once?  Is that what you're

10  saying?

11  Q    That's another way to phrase it.

12  A    I read them that one time, and that was it.

13  Q    So there was no conversation about his rights before you

14  gave him the summary statement to sign.  Is that correct?

15  A    No.

16          THE COURT:  You mean that is correct.

17          THE WITNESS:  Yeah.  That -- I read it the one time

18  --

19          THE COURT:  You read them --

20          THE WITNESS:  -- I didn't --

21          THE COURT:  Your testimony is you read them the

22  rights, as you've testified, he signed the sheet, and that

23  was the only discussion you had with him about Miranda.

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Okay.  I see he signed -- he initialed

1    this, the piece of paper.

2              MS. FLANNERY:  Thank you, Your Honor.  Yeah.  I

3    have nothing further.

4              THE COURT:  All right.  Any redirect?

5              MR. WITHERELL:  Briefly, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MR. WITHERELL:

8    Q    Defense Exhibit 070.

9              MR. WITHERELL:  May I approach, Your Honor?

10             THE COURT:  Yes.

11   BY MR. WITHERELL:

12   Q    You have it in front of you.  I just want to make sure I

13   have that clear.

14        When civilians come in to be interviewed concerning

15   investigations, they are signed in, correct?

16   A    Correct.

17   Q    When Mr. Harmon was signed in at 8 p.m., as outlined in

18   the defense exhibit, he was a civilian being interviewed in

19   connection with a homicide.  Is that correct?

20   A    Yes.

21   Q    In the beginning, when we first see -- and it's already

22   been played -- when you're Mirandizing Mr. Harmon, he asks

23   about going to work.  Is that correct?

24   A    Yes.

25   Q    And when he can go to work, when he can leave, right?

1   A      Correct.

2   Q      And you're talking -- and you're like -- and you

3   continue with the questions that we have -- we saw and are

4   contained in Government Exhibit 1.

5   A      Correct.

6   Q      Indeed, throughout Government Exhibit 1, there comes a

7   time, later on, where Mr. Harmon goes to you and says,

8   Detective, you and I both know I'm not leaving here.

9   A      Correct.

10  Q      And you say to him, Narcotics is going to figure out

11  what they have, and they're going to let you know.

12  A      Correct.

13  Q      And that's after your initial interview with him that

14  ends at approximately 12:20 a.m.

15  A      Correct.

16  Q      Mr. Harmon -- when the narcotics are found -- not the

17  marijuana -- when the narcotics are found at the Sydenham

18  Street address, you inform him of what was found.

19  A      Correct.

20  Q      You didn't have the exact talley, but you knew it was

21  crack, heroin, methamphetamine.

22  A      Correct.

23  Q      Okay.  You knew, at that point, Mr. Harmon was going to

24  be charged with those crimes.

25  A      Correct.

 1    Q     And he wasn't free to leave, but at --

 2    A     No, he wasn't.

 3    Q     But at that time, he had already been Mirandized,

 4    correct?

 5    A     Correct.

 6    Q     And you had already questioned him.

 7    A     Correct.

 8             MR. WITHERELL:  That's all.

 9             THE COURT:  All right.  Any recross?

10                     RECROSS-EXAMINATION

11    BY MS. FLANNERY:

12    Q     He did, at 9:15 a.m., get up, knock on the door, and ask

13    to go home, did he not?

14    A     I am not aware of that.

15             MS. FLANNERY:  Nothing further.

16             THE COURT:  Okay.  All right.  Thank you,

17    Detective.

18             THE WITNESS:  Thank you, Your Honor.  Thank you.

19        (Witness excused)

20             THE COURT:  All right.  Is there any more -- is

21    there going to be any more testimony on the motion to

22    suppress statements?

23             MR. WITHERELL:  Not today, Your -- oh, Your Honor,

24    I would move Government Exhibit 1, 2, and 3 into evidence.

25             THE COURT:  Yeah.  No, they'll be admitted.

 1          (Government Exhibits 1, 2, and 3 received in evidence)

 2               MR. WITHERELL:   Thank you.

 3               THE COURT:   Well, do you still want to call Officer

 4     Rillera?

 5               MR. WITHERELL:   I believe I need to, Judge.   There

 6     were statements made outside of the Sydenham Street address.

 7               THE COURT:   Yes.

 8               MR. WITHERELL:   When I was questioning him about

 9     that at our initial hearing --

10               THE COURT:   Yes, you did.

11               MR. WITHERELL:   -- there was an objection, though.

12               THE COURT:   Yeah, and we delayed that, right.

13               MR. WITHERELL:   Correct.   So I --

14               THE COURT:   So you want --

15               MR. WITHERELL:   -- think I --

16               THE COURT:   You want to cross-examine him?

17               MS. FLANNERY:   Yes, Your Honor.

18               THE COURT:  All right.   Okay.   All right, fine.

19     All right.   So we'll hold the record open on this motion

20     until that hearing, which is scheduled for June 24th.

21               Okay.   All right.   Now we're going to move on to

22     the -- well, does the defense, at this time, have any

23     testimony or evidence you want to offer on the motion to

24     suppress statements?

25               MS. FLANNERY:   No.   I believe everything that I

70

1    wanted to introduce --

2             THE COURT:  All right.  If --

3             MS. FLANNERY:  -- other than some questions of

4    Officer Rillera have been introduced --

5             THE COURT:  For Officer Rillera.

6             MS. FLANNERY:  Rillera.

7             THE COURT:  Yeah.  Well, but Ms. Flannery, if you

8    want to produce any testimony on June 24th, would you please

9    let mister --

10            MR. WITHERELL:  Witherell.

11            THE COURT:  -- and Ms. Lutz know that, so we can

12   allow enough time for it?

13            MS. FLANNERY:  I will, Your Honor.  I don't expect

14   to needs that.

15            THE COURT:  All right.

16            MS. FLANNERY:  I will recheck my notes --

17            THE COURT:  All right.  Okay.

18            MS. FLANNERY:  -- and make sure there's nothing

19   else I need to introduce, but I don't expect to call any

20   other witness.

21            THE COURT:  Okay.  All right.  Okay.  So how long

22   do you think detective -- Officer Rillera's testimony will be

23   on the 24th, the direct?

24            MR. WITHERELL:  Your Honor, since I believe that

25   his previous testimony will be incorporated --

1          THE COURT:  Yes, right.

2          MR. WITHERELL:  I anticipate it being less than a

3    half-hour.

4          THE COURT:  Okay.  So I'm going to allow one hour

5    for that hearing, and we'll start that at -- what do we have

6    it listed for?

7          THE CLERK:  Nine o'clock.

8          THE COURT:  9 a.m.  Okay?  On the 24th.  All right?

9    I do have -- because I have a lot of other things going on

10   that day, that's why I want to know that.

11         All right.  Now how many witnesses do you have on

12   the motion to suppress cell phone evidence?

13         MR. WITHERELL:  Your Honor, Officer Rillera is part

14   of that, part of that motion, as well, since he's there when

15   the cell phone is --

16         THE COURT:  Right.  Well, does the half-hour

17   include testimony --

18         MR. WITHERELL:  Yes, it all --

19         THE COURT:  -- on the cell phone?

20         MR. WITHERELL:  It all encompasses.

21         THE COURT:  All.  Okay.  All right.  So what

22   testimony do you have today on the cell phone issue?

23         MR. WITHERELL:  I actually don't believe I need to

24   present testimony because part of the defendant's motion

25   papers, she makes a _Franks_ argument.

```
 1              THE COURT:  All right.  Well, you submitted under
 2      seal the affidavit of the --
 3              MS. FLANNERY:  I couldn't find in my records that
 4      that had been done, Your Honor.  So, in an abundance of
 5      caution --
 6              THE COURT:  No --
 7              MS. FLANNERY:  -- I did bring a sealing order and a
 8      copy of it.
 9              THE COURT:  No, I have it, I have it here.  It was
10      filed April 29th, it's docketed at 2:20.  That's an
11      application for a search warrant, signed by Magistrate Judge
12      Hey -- H-e-y.
13              MS. FLANNERY:  Okay.
14              THE COURT:  And that's -- the affidavit is William
15      J. Becker, IV, FBI Special Agent.  It continues, what I have,
16      for 18 pages, including two attachments.  Well, the actual
17      affidavit is 15 pages, plus two attachments.  Do you have --
18      you have a copy of it, right?
19              MS. FLANNERY:  I do, Your Honor.
20              THE COURT:  Yeah.  Well --
21              MS. FLANNERY:  I'm glad to --
22              THE COURT:  -- it's been --
23              MS. FLANNERY:  -- hear that I did get that done.
24              THE COURT:  All right.
25              MS. FLANNERY:  I wasn't sure.
```

1          THE COURT:  Well, I don't know if it was you or the

2     Government that --

3          MR. WITHERELL:  It was -- Ms. Flannery filed the

4     motion.

5          THE COURT:  Yeah, okay.  Yeah, it was -- okay.  So

6     your position is that you don't have to offer any testimony.

7          MR. WITHERELL:  That is my position.

8          THE COURT:  But you want -- but you want to

9     introduce the Exhibit A, the affidavit and the search

10    warrant.  Is that right?

11         MR. WITHERELL:  Yes, Judge.  I would introduce the

12    warrant.  But as a portion of the -- the warrant confiscates

13    the phone sometime after Mr. Harmon's arrest at the state

14    level, after his indictment at the federal level, and is

15    signed November 20th, 2018, so sometime after the phone is

16    taken on September 11th, 2017.

17         Ms. Flannery makes a _Franks_ argument as to two

18    specific issues in the warrant.  I'm going to read from her

19    motion:

20              "The affidavit misleadingly states that the cell

21              phone was recovered during the arrest of Dennis

22              Harmon, rather than revealing the cell phone was

23              taken from him prior to his arrest and subject to.

24              The affidavit describes Abdul West as the leader of

25              a violent drug trafficking organization, then

1              falsely states that the FBI pole-cam situated on

2              the 3200 block of Sydenham Street observed Harmon

3              congregating with Abdul West outside of 23234 North

4              Sydenham Street shortly before police arrived on

5              September 11th, 2017" --

6              THE COURT:  Well, what are you reading from?

7              MR. WITHERELL:  This is defendant's motion.  I have

8       a copy --

9              THE COURT:  I have -- no, I'm -- all right.  I've

10      got it in front of me.

11             MR. WITHERELL:  "-- and that Harmon was one of the

12             males who let the area upon arrival of the police

13             officers."

14             I'm now going to read from the affidavit, Judge.

15      As to the point one, where she claims that it falsely states

16      it was arrested -- that the cell phone was recovered during

17      the arrest, and indicates somehow that that was some

18      falsehood perpetrated upon the Magistrate Judge.  I will read

19      directly from the affidavit.

20             THE COURT:  Well, this is in the nature of argument

21      because, if the -- you don't object to the affidavit becoming

22      part of the record, Ms. Flannery?

23             MS. FLANNERY:  No, Your Honor.

24             THE COURT:  All right.  So the affidavit is in

25      evidence.

1          (Search Warrant, Attachment, and Becker Affidavit

2     received in evidence)

3               MR. WITHERELL:  Okay.

4               THE COURT:  But the question I have is that -- this

5     is for Ms. Flannery.  So the Government is resting on the

6     issuance of a search warrant by the Magistrate Judge,

7     supported by the affidavit taken by Agent Becker.  Do you

8     want to introduce any testimony on this topic, Ms. Flannery?

9               MS. FLANNERY:  Well --

10              THE COURT:  Mr. Witherell takes the position that

11     he doesn't have to, that he's offering the fact that the

12     warrant was signed and the affidavit.

13              MS. FLANNERY:  May I have a moment, Your Honor?  I

14     don't know what --

15              THE COURT:  All right.  Do you want me to take a

16     ten-minute recess, so you can think about this?

17              MS. FLANNERY:  That would be helpful, Your Honor.

18              THE COURT:  All right.

19              MS. FLANNERY:  I do believe that I need some

20     testimony, but I will streamline it.

21              THE COURT:  Well, is Agent Becker here today?

22              MR. WITHERELL:  He is, Your Honor.  But I don't

23     believe you have unfettered access to cross-examine law

24     enforcement by --

25              THE COURT:  I understand.  I'm not ruling on that.

1    But I'm going to -- I am ruling on we're going to take a ten-

2    minute recess.

3                MR. WITHERELL:  Okay.

4                THE COURT:  And then everybody can reserve their

5    position, and we'll come back and see where we go.  Okay?

6                MS. FLANNERY:  Thank you.

7                THE COURT:  All right.

8                MR. WITHERELL:  Thank you.

9                THE COURT:  Thank you very much.

10          (Recess taken at 11:27 a.m.)

11          (Proceedings resume at 11:42 p.m.)

12                THE COURT:  Back on the record.

13           All right.  All right.  Ms. Flannery, what --

14    here's my feeling about it, subject to -- I'm happy to hear

15    what you think should happen.  But I think the Government has

16    satisfied its burden of going forward, as we usually do on

17    suppressing motions, by introducing the warrant and the

18    affidavit.  Okay?  And I don't think they have a burden of

19    calling any -- calling any witnesses.

20           Now Agent Becker is here, so, in theory at least,

21    you could call him as your witness and ask him questions, if

22    you wanted to.  But I think the scope of the inquiry is

23    somewhat narrow.  But what -- is that something you want to

24    do?

25                MS. FLANNERY:  I do, Your Honor.

1          THE COURT:  And can you tell me -- can you give me

2     an offer of proof, so I can rule on any objections before he

3     comes in?

4          MS. FLANNERY:  Yes, Your Honor.  The search warrant

5     affidavit and the request of Judge Hey to issue that search

6     warrant is clearly premised on the description of an

7     investigation of Abdul West and a violent drug trafficking

8     organization, Original Block Hustlers.  If you look at the

9     affidavit, it spends a great deal of time at the beginning

10    describing that organization.  It does -- it omits --

11         THE COURT:  Yeah, you're right about that.

12         MS. FLANNERY:  Yes.

13         THE COURT:  You don't have to argue that.  But then

14    it goes onto -- beginning on Page 5, it discusses Mr. Harmon.

15         MS. FLANNERY:  It does, Your Honor, and there's two

16    problems.  The description of the background investing and

17    the overarching conspiracy does not involve Mr. Harmon.  The

18    activity of the investigation, what they've observed, what

19    they've surveilled, what they've seen does not encompass Mr.

20    Harmon, and that is not explained to Judge Hey.

21         It also contains false statements about Mr. Harmon

22    being with Mr. West on September 11th, outside the house, and

23    walking off with -- in a cohort with Mr. West on September

24    11th, in an effort to tie him to Abdul West.  So I think

25    those are --

1          THE COURT:  Well, wait a minute.  Let's just -- I'm

2     looking at Page 5.  I think that's the first mention of Mr.

3     Harmon.  It says -- and we don't -- we have some testimony

4     from Officer Rillera, we don't have anything specific.  But

5     when you say it's "false," what exactly --

6          MS. FLANNERY:  "Shortly before police officers

7                arrived to secure the residence, FBI surveillance

8                observed, via pole camera, Abdul West, Dennis

9                Harmon, and others coming and going from the

10               residence."

11         That's demonstrably false.  We can see that on the

12    pole camera.

13               "Upon the arrival of police officers, all of the

14               males congregating around the residence" --

15         THE COURT:  Well, wait --

16         MS. FLANNERY:  "-- left the area" --

17         THE COURT:  Wait, what -- wait.  How do you -- how

18    -- on what basis do you say it's false that --

19         MS. FLANNERY:  We have the pole camera, Your Honor.

20    He's not going in and out of the residence.

21         THE COURT:  Well --

22         MS. FLANNERY:  He's not hanging outside with Abdul

23    West and the others.  He does --

24         THE COURT:  Mr. Witherell --

25         MR. WITHERELL:  -- not walk up.

1          THE COURT:  -- is it your view that the pole camera

2    shows Mr. Harmon?

3          MR. WITHERELL:  It absolutely does.  We've had

4    testimony to that from Rillera.  I don't think Ms. Flannery

5    is contesting that you can see Mr. Harmon leaving the area.

6    What she's contesting -- and I believe -- if I'm wrong --

7          MS. FLANNERY:  You're wrong.

8          MR. WITHERELL:  I just want to make sure I'm clear,

9    and it's unclear from the papers.  You don't believe you see

10   Mr. Harmon on the pole camera?

11         THE COURT:  Well --

12         MS. FLANNERY:  Mr. Harmon emerges from the house

13   after Abdul West and others leave.  The point is he was not

14   hanging there, outside the house, with Abdul West.  He did

15   not walk off with Abdul West.  He does not emerge and appear

16   on the pole camera until after Abdul West and the others --

17         THE COURT:  Well, it doesn't --

18         MS. FLANNERY:  -- leave.

19         THE COURT:  It says:

20         "All of the males congregating around the residence

21         left the area, including West and Harmon.  Harmon

22         then returned to the residence not long after."

23         MS. FLANNERY:  That's wrong.

24         THE COURT:  I mean, that -- what?

25         MS. FLANNERY:  That's incorrect.

1          THE COURT:  Well, we already had testimony about

2    that.  Is that right, Mr. Witherell?  We had some testimony

3    about that --

4          MR. WITHERELL:  Of course.

5          THE COURT:  -- like two weeks ago.

6          MR. WITHERELL:  I'm actually a little bit stunned

7    to hear -- it's absolutely true that the males congregating

8    left the area; that West left and that Harmon left.  I -- you

9    know, again, I don't want to speak for Ms. Flannery.  West

10   and the group go south on the video, and Harmon goes north.

11   And if the issue between -- what's she's saying is false is

12   that the agent did not put the direction of flight of these

13   two individuals.  That is not grounds to cross-examine a law

14   enforcement officer.

15         THE COURT:  Well, I agree.

16         MS. FLANNERY:  Your Honor, the two things happened

17   at different times, and we can show the video now or later.

18   I can refer Your Honor to the specific parts of the video.

19   They occurred at two different times.

20         THE COURT:  This says:

21              "Harmon was also observed via the pole camera

22              utilizing a cellular phone, which was seized by the

23              Philadelphia Police Department."

24         Now we know that the cellular phone was seized by

25   the police.  You don't contest that, do you?

1          MS. FLANNERY:  It was seized there at Sydenham, not

2     in connection with the arrest, but it was seized there at

3     Sydenham.

4          THE COURT:  Well, I don't think it matters where it

5     was seized.

6          MS. FLANNERY:  But Your Honor, I do want to -- I

7     think it is an important distinction.  Dennis Harmon does not

8     appear on the pole camera video until after West and the

9     others have exited the scene.

10          THE COURT:  Well --

11          MS. FLANNERY:  It's not a matter of one group going

12     south and --

13          THE COURT:  Well --

14          MS. FLANNERY:  -- Mr. Harmon going north.

15          THE COURT:  Well, first of all --

16          MS. FLANNERY:  It's two different times.

17          THE COURT:  -- Officer Rillera is not going to know

18     what is on the pole camera because he was at the scene.  This

19     affiant, Officer Becker, is doing this after the pole camera

20     can be observed by law enforcement officers.

21          MS. FLANNERY:  And we --

22          THE COURT:  The pole-cam -- as I understand it, the

23     pole camera was there, not as part of the -- well, I don't

24     know if the pole camera was there as part of this

25     investigation or not.

82

1          MR. WITHERELL:  No, Your Honor, not --

2          THE COURT:  But it doesn't --

3          MR. WITHERELL:  Not particular --

4          THE COURT:  It doesn't really matter.  If there was

5    a pole camera taking videos and, as we've heard, the focus of

6    the police investigation of the murder, for reasons that have

7    been testified to, turned that night to what was going on at

8    3234 North Sydenham.  So the fact that a pole camera was

9    already in existence, taking pictures there is, in my view, a

10   fact that the police can take advantage of when they want to

11   go look at the cell phone, and that's what they're doing.

12         MS. FLANNERY:  But they are misrepresenting what

13   takes place on the pole camera, Your Honor.

14         THE COURT:  Well, do you --

15         MS. FLANNERY:  That's my point.

16         THE COURT:  -- want me to look at the pole camera,

17   and I will make a findings of fact whether it shows Mr.

18   Harmon there?

19         MS. FLANNERY:  I believe Mr. Rillera will be able

20   to testify to that.

21         THE COURT:  Well, maybe, but I can, too.  I mean, I

22   -- Mr. Witherell can show how -- he can show me where the

23   Government contends Mr. Harmon is.  Can you do that?

24         MR. WITHERELL:  Absolutely, Judge.

25         THE COURT:  Do you want to --

1          MR. WITHERELL:  And I can -- and I can --

2          THE COURT:  Well, let's do that.

3          MR. WITHERELL:  And I don't think we're going to

4    have an objection to -- but let me just do that, Judge.

5          THE COURT:  I mean, I'm not in a position of saying

6    whether somebody is Mr. Harmon.  But I think the Government

7    can assess that -- they can produce testimony that Mr. Harmon

8    is shown in that pole camera.  Go ahead.  Let's see the --

9    can you go right to that portion?

10         MR. WITHERELL:  Yes, Your Honor.

11         THE COURT:  Well, let's do that.  We don't have to

12   call Agent Becker at this time.

13         MR. WITHERELL:  Hold on, Your Honor.  One second.

14         THE COURT:  Well, while we're doing that, what I

15   think you -- an attorney could show by way of testimony

16   contesting it would be that the signature is fraudulent, that

17   the agent didn't sign it, that the Magistrate never signed

18   the warrant.  I mean, that's the kind of testimony I think

19   you can introduce.  I don't think --

20         MS. FLANNERY:  I would respectfully disagree with

21   that, Your Honor.  I think Franks allows testimony as to

22   reckless misstatements in the affidavit --

23         THE COURT:  Well, you --

24         MS. FLANNERY:  -- and I think --

25         THE COURT:  -- may be right --

1          MS. FLANNERY:  -- this was --

2          THE COURT:  -- about that --

3          MS. FLANNERY:  -- a reckless statement.

4          THE COURT:  -- but we're going to -- we're going to

5     find out if this is a reckless misstatement.

6          (Participants confer)

7          THE COURT:  And let's remember that Agent Becker

8     doesn't personally have to recognize Mr. Harmon; he's allowed

9     to rely on what other police officers told him as part of his

10    investigation.

11         All right.  Go ahead.

12         MR. WITHERELL:  Your Honor, to make this as easy as

13    possible, I actually think Officer Rillera testified to this

14    previously.  I think we played this portion of the video for

15    him.

16         THE COURT:  Yeah.

17         MR. WITHERELL:  I don't want to misstate if I'm

18    wrong.

19         MS. FLANNERY:  I believe that's wrong, Your Honor.

20    I don't --

21         THE COURT:  All right.  Well --

22         MS. FLANNERY:  I think Mr. Witherell --

23         THE COURT:  -- I'm --

24         MS. FLANNERY:  -- is making a good faith

25    recollection, but I think that's in error.

1          THE COURT:  All right.  I'm going to allow Mr.

2    Witherell to show what the Government believes mister --

3          MR. WITHERELL:  This was introduced as --

4          THE COURT:  -- which shows Mr. Harmon.

5          MR. WITHERELL:  This was introduced --

6          THE COURT:  All right.  This -- let's -- where you

7    are now, September 11th, 2017 at 6:32 p.m.

8          MR. WITHERELL:  Again, Your Honor, the pole camera

9    is 22 minutes slows, we had stipulated to that at the prior

10   hearing.

11         THE COURT:  Yes.  Right.  Go ahead.

12       (Video recording played at 11:52:57)

13         THE COURT:  Now stop it when you think -- when the

14   individual you think is Mr. Harmon shows up.

15         MR. WITHERELL:  Mr. Harmon has just exited the

16   residence, Your Honor.  He can be seen on the right side of

17   the screen.  What you're going to see in the next minute is

18   him walk out of the area and then return to the resident.

19         THE COURT:  Go ahead.

20       (Video recording continues)

21         MS. FLANNERY:  Your Honor, may I point out that

22   there is no Abdul West on the screen, there's no other

23   individuals on the screen.  He is not walking off with Abdul

24   West.

25       (Video recording continues)

1          MR. WITHERELL:  Mr. Harmon has now returned, Judge,

2     at 18:33:53 on the pole cam video.

3          THE COURT:  All right.  Go ahead.  I see an

4     individual there.  I can't tell whether that's Mr. Harmon or

5     not, but that's not -- that's not the test.  Go ahead.

6          MR. WITHERELL:  Your Honor, now it's going to -- I

7     proffer to the Court that he's going to now remain -- as the

8     testimony of Rillera at the last hearing, he's going to

9     remain on that stoop for some time now --

10         THE COURT:  All right.

11         MR. WITHERELL:  -- speaking to --

12         THE COURT:  That individual then goes back into the

13    house.

14         MR. WITHERELL:  He stays there.  You're going to

15    see Officer Rillera speak to him now.  This certainly was

16    testified to at the last hearing.  And he stays on that porch

17    up until the point that he's transported by law enforcement

18    after the homicide.

19         THE COURT:  All right.  The affidavit says:

20              "Harmon was also observed by a pole camera using a

21              cellular telephone."

22         MR. WITHERELL:  Correct, Your Honor.  You're going

23    to see throughout this encounter -- and he's up there for

24    quite some time.  You'll see Harmon with a cellular phone.

25    You already saw him prior, as he was walking away, Judge.  Do

1    you want me to go back to that?

2              THE COURT:  Well, he -- well --

3              MR. WITHERELL:  Additionally, Judge, what I'd like

4    to know is Ms. Harmon [sic] is arguing that this statement --

5              THE COURT:  Ms. Flannery.  Ms. Flannery.

6              MR. WITHERELL:  I'm sorry.  Ms. Flannery is arguing

7    that this statement is, not just misleading, but reckless

8    perjury, stating that Harmon -- seems to suggest that this

9    statement was intended to show that West and Harmon left

10   together, in the same direction, at the same time.  It does

11   not say that.

12             THE COURT:  It does not say that.

13             MR. WITHERELL:  West leaves with the group prior to

14   this at 6:46 p.m., which can be seen on the pole cam video --

15             THE COURT:  Okay.

16             MR. WITHERELL:  -- going south or down on the

17   video.

18             THE COURT:  All right.  I'll --

19             MR. WITHERELL:  Harmon leaves and goes north and

20   returns, as stated in the affidavit.

21             Moreover, Judge, Ms. Flannery has not stated, in

22   any way in her papers, how any of this information, if it was

23   excised from the warrant, would in any way lead to a lack of

24   probable cause.

25             THE COURT:  Okay.  All right.  Well, that's for

1    argument.

2            But I'm satisfied that the affidavit, on Page 5,

3    assuming that the agent had sufficient reason to believe that

4    individual is Mr. Harmon, that it's not perjury, it's not

5    reckless, it's not a misstatement.

6            All right.  What else do you want to offer?

7            MS. FLANNERY:  Your Honor, if I could just make a

8    record on that.  The --

9            THE COURT:  I assume, Mr. Witherell, that you will

10    introduce -- and maybe Officer Rillera already testified that

11    that person was Mr. Harmon.  But if not, I assume, when we

12    reconvene on September -- on June --

13            MS. FLANNERY:  Well, we'll stipulate that the

14    individual that just walked out and walked in was Mr. Harmon,

15    Your Honor.

16            THE COURT:  Okay.  Then that's a --

17            MS. FLANNERY:  The point --

18            THE COURT:  Then that's --

19            MS. FLANNERY:  -- that I'm --

20            THE COURT:  -- a fact.

21            MS. FLANNERY:  -- I'm clearly not expressing well

22    enough to get across is that the affidavit was relying on the

23    investigation of Abdul West's drug trafficking organization;

24    therefore, tying Mr. Harmon to Abdul West was important to --

25            THE COURT:  No, I understand --

 1          MS. FLANNERY:  -- this affidavit.

 2          THE COURT:  -- your argument.

 3          MS. FLANNERY:  The --

 4          THE COURT:  And I overrule that.  That's -- I don't

 5   consider that a reason to bring Officer Becker to the witness

 6   stand.  Okay?  What's the next evidentiary -- or the next

 7   offer of proof.

 8          MS. FLANNERY:  The description of the drug

 9   trafficking organization --

10          THE COURT:  All right.

11          MS. FLANNERY:  -- describes --

12          THE COURT:  I'll overrule that.  That's not grounds

13   to have Officer Becker -- I'll deny your request to question

14   Agent Becker on that issue.

15          Anything else, any others?

16          MS. FLANNERY:  No, Your Honor.

17          THE COURT:  All right.  Do you dispute that this is

18   Agent Becker's signature?

19          MS. FLANNERY:  I do not.

20          THE COURT:  Do you dispute that he's a special

21   agent of the FBI?

22          THE COURT:  Do you dispute that Magistrate Hey

23   signed the -- personally signed the warrant?

24          MS. FLANNERY:  No, Your Honor.

25          THE COURT:  All right.  Well, then I don't see any

1    need to call Agent Becker.

2              Okay.  All right.  That's -- do you have any other

3    testimony to offer, Ms. Flannery?

4              MS. FLANNERY:  No, Your Honor.

5              THE COURT:  All right.  Now we set a briefing

6    schedule, and I forget when your opening brief is due, but I

7    think it's before June 24th.

8              MS. FLANNERY:  May I amend my last answer, Your

9    Honor?  Officer Rillera's testimony may be relevant to this

10   motion that -- so I would ask --

11             THE COURT:  Yes, I --

12             MS. FLANNERY:  -- Your Honor to --

13             THE COURT:  I agree.

14             MS. FLANNERY:  -- leave it open --

15             THE COURT:  We're going to have him --

16             MS. FLANNERY:  -- for that.

17             THE COURT:  He's going to come in on the 24th.  But

18   here's the thing.  We set a briefing schedule for the 3234

19   North Sydenham.  Okay?  I'd like Mr. Witherell to state an

20   offer of proof what you're -- what you believe you will be

21   able to establish from Officer Rillera on the 24th.  And Ms.

22   Flannery, you can include that testimony in the brief you're

23   going to file in support of all three motions to dismiss.

24   Okay?  And your brief is due before June 24th, right?

25             MS. FLANNERY:  I --

1      THE COURT:  On the 30 --

2      MS. FLANNERY:  I understood that our brief on the

3  34 -- 30 -- 3234 Sydenham evidence is due before this.  I

4  didn't understand that that also encompassed --

5      THE COURT:  Well, now --

6      MS. FLANNERY:  -- these two motions.

7      THE COURT:  -- I am asking you if you can include

8  the -- your arguments on these two search warrants, as well,

9  or do you want a -- do you need a separate briefing schedule

10  for that?  And if so, I'll give it to you.  But it -- I'm

11  going to set the dates for that very promptly, to --

12      (Court and court personnel confer)

13      THE COURT:  I'm here, I'm looking at -- all right.

14  Thank you.

15      MS. FLANNERY:  I would prefer to have --

16      THE COURT:  Your opening -- well, no, I'm wrong.

17  Your opening brief is due June 28th.  So I would like to

18  include these two motions in that brief that's due June 28th.

19  The Government's response is July 12th and your reply brief,

20  July 19th.  Okay?  Any reason that's not reasonable?

21      MS. FLANNERY:  I believe we'll be able -- I would

22  like to have Detective Peters' transcript before the briefing

23  --

24      THE COURT:  Well, no --

25      MS. FLANNERY:  -- and that should be doable.

92

1           THE COURT:  No reason you can't have that.

2           MS. FLANNERY:  Okay.

3           THE COURT:  And if I have to -- but you're

4    privately retained, right?

5           MS. FLANNERY:  No, Your Honor; I'm CJA.

6           THE COURT:  You're court-appointed?

7           MS. FLANNERY:  Uh-huh.

8           THE COURT:  Well, get Ms. Lutz an order for one-

9    week delivery.

10          MS. FLANNERY:  Okay.  Thank you.

11          THE COURT:  And I'll sign it -- or Janice, can you

12   do that yourself for today's transcript or not?

13          THE CLERK:  Probably -- she probably would have to

14   order it.

15          THE COURT:  All right.  Well, you order -- but

16   don't I have to -- don't I have to -- if it's for CJA

17   counsel, I think I have to approve --

18          THE CLERK:  It will come -- it will come through.

19          THE COURT:  All right.  Well, put it in for --

20          MS. FLANNERY:  It's now all electronic, Your Honor.

21   I can't say I understand how it all works, but I think it

22   will come to Your Honor.

23          THE COURT:  Well, if you request for one-week

24   delivery --

25          MS. FLANNERY:  Thank you.

93

1          THE COURT:  -- just tell them the Judge will

2    approve it, and when it comes to me, I'll approve it.  Okay?

3          MS. FLANNERY:  Thank you.

4          THE COURT:  Because it's only about an hour or so

5    this morning.  All right.  But then -- but I'm not going to

6    do that for Officer Rillera because he's already testified

7    once, and you can take notes of what he said on June 24th.

8    Okay?

9          MS. FLANNERY:  Yes, Your Honor.

10         THE COURT:  All right.  All right.  So I'm going to

11   amend this briefing order to include these motions.  All

12   right?  All right.  Mr. Witherell, you have no objection to

13   that?

14         MR. WITHERELL:  I have no objection.

15         THE COURT:  All right.  Okay.  Now, Ms. Flannery,

16   any other testimony you want to introduce today on either of

17   your motions?

18         MS. FLANNERY:  No, Your --

19         THE COURT:  I already asked you about the

20   statements and you said no.  Any other testimony you want to

21   introduce on the cell phone evidence warrant?

22         MS. FLANNERY:  No, Your Honor.

23         THE COURT:  Okay.  All right.  So the factual

24   record is closed, except for Officer Rillera.  All right?

25         MS. FLANNERY:  With the exception, Your Honor, of I

1    may direct Your Honor to clips -- I may add clips of what we

2    have seen or played that --

3              THE COURT:  Okay.  Clips --

4              MS. FLANNERY:  It would be --

5              THE COURT:  -- from the --

6              MS. FLANNERY:  -- a subset --

7              THE COURT:  -- video?

8              MS. FLANNERY:  -- of what's already --

9              THE COURT:  And you can --

10             MS. FLANNERY:  -- in evidence.

11             THE COURT:  -- have that, sure, yes.

12             Okay.  Thank you all very much.  Court is

13   adjourned.

14             MS. FLANNERY:  Thank you, Your Honor.

15             MR. WITHERELL:  I apologize, Your Honor.  I just

16   wanted to make -- I don't know if it was actually entered

17   into evidence, but the search warrant, I believe, was.  I

18   know you stated it was.

19             THE COURT:  Yeah, I stated that the Exhibit A and

20   the search warrant and the affidavit are in evidence.

21             MR. WITHERELL:  Okay.  Just wanted to make sure,

22   Judge.

23             THE COURT:  Absolutely.

24             MR. WITHERELL:  Thank you.

25             THE COURT:  Okay.  All right.  Thank you very much.

1          (Participants confer)

2          (Off the record at 12:02 p.m.)

3          (Proceedings resume at 12:03 p.m.)

4                THE COURT:  Correct?

5                MS. FLANNERY:  Yes, Your Honor.

6                THE COURT:  All right.  And we -- and I think the

7      Government gave an answer to that.  Is that correct?

8                MR. WITHERELL:  I did.  Yes, Your Honor.

9                THE COURT:  All right.  Do you want to have oral

10     argument on that?  If so, I'd like to do it today, if you're

11     available.  We can do it this afternoon.

12               MS. FLANNERY:  Could we -- could I suggest that we

13     do it on the 24th?

14               THE COURT:  Sure.  Okay.  All right.  Okay.  All

15     right.  But I just -- I think then you ought to include that

16     in your briefing on the 28th, too.  So all your motions will

17     be subject to your briefs you'll file on June 28th.  Okay?

18               MS. FLANNERY:  Excuse me.  I believe --

19               THE COURT:  That's three --

20               MS. FLANNERY:  -- the severance motion --

21               THE COURT:  -- motions to suppress --

22               MS. FLANNERY:  -- is fully briefed.

23               THE COURT:  -- and the motion to sever.  What?

24               MS. FLANNERY:  I believe the severance motion is

25     fully briefed.  I, frankly, haven't looked at it in a long

 1    time, Your Honor --

 2                    THE COURT:  Yeah.

 3                    MS. FLANNERY:  -- so I would prefer to have time to

 4    argue it.  I don't know --

 5                    THE COURT:  Okay.  Well, I'll --

 6                    MS. FLANNERY:  -- whether I -- if I need to prepare

 7    a reply, I'll do that before --

 8                    MR. WITHERELL:  I think you did.

 9                    MS. FLANNERY:  -- the 24th.  Did I?

10                    THE COURT:  Okay.

11                    MS. FLANNERY:  Well --

12                    MR. WITHERELL:  Yeah, I think you responded and you

13    replied.

14                    THE COURT:  All right.  But we'll list that for

15    argument on the 24th, as well.

16                    MS. FLANNERY:  Thank you, Your Honor.

17                    THE COURT:  All right.  Thank you.

18          (Proceedings concluded at 12:04 p.m.)

19                              *****

1

<u>CERTIFICATION</u>

2        I certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of our

5  knowledge and ability.

6

7

8

9

10 _____   June 21, 2019

11 Coleen Rand, AAERT Cert. No. 341

12 Certified Court Transcriptionist

13 For Advanced Transcription