UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
                                 .
UNITED STATES OF AMERICA,        .
                                 . Case No. 2:18-CR-00249-MMB-9
              Complainant,       .
                                 . 601 Market Street
        vs.                      . Philadelphia, Pennsylvania 19106
                                 . June 24, 2019
DENNIS HARMON,                   .
                                 .
              Defendant.         .
. . . . . . . . . . . . . ..
```

TRANSCRIPT OF HEARING ON MOTIONS
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        Everett R. Witherell, Esq.
                           Timothy Mulligan Stengel, Esq.
                           Assistant U.S. Attorney
                           OFFICE OF THE U.S. ATTORNEY
                           615 Chestnut Street, Suite 1250
                           Philadelphia, Pennsylvania 19106

For the Defendant:         ANN CAMPBELL FLANNERY, ESQ.
                           1835 Market Street, Suite 2700
                           Philadelphia, Pennsylvania 19103

Audio Operator:            Electronically Recorded
                           by Janice Lutz, Deputy Clerk

Transcription Company:     Advanced Transcription
                           1600 Market Street
                           Suite 1700
                           Philadelphia, Pennsylvania 19103
                           (855)204-8184

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

<u>INDEX</u>

| <u>WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|

(RE:  MOTION TO SUPPRESS STATEMENT)

<u>FOR THE GOVERNMENT</u>

| | | | | |
|---|---|---|---|---|
| CHARLES RILLERA | 7 | 32 | 59 | |
|     By The Court | 28 | | | |


| <u>EXHIBIT</u> | <u>IDENT.</u> | <u>EVID.</u> |
|---|---|---|

(RE:  MOTION TO SUPPRESS STATEMENT)

| | | |
|---|---|---|
| Defendant's DH-72   Pole Camera Still Photos | | 32 |
| Defendant's DH-73   Clip of Pole Camera Footage | | 32 |
| Defendant's DH-74   Pole Camera Still Photo | 34 | |


| | <u>Page</u> |
|---|---|
| <u>COLLOQUY RE:  MOTION TO SEVER</u> | 66 |
| <u>COLLOQUY RE:  MOTIONS TO SUPPRESS</u> | 68 |
| <u>MOTION TO SEVER</u> | |
|     <u>Argument</u> | 70 |
|     <u>Court Decision</u> | 74 |
| <u>SCHEDULING</u> | 75 |

```
 1          (Proceedings commence at 9:09 a.m.)

 2          (Call to order of the Court)

 3              THE COURT:  Good morning.

 4              MR. WITHERELL:  Good morning, Your Honor.

 5              MS. FLANNERY:  Good morning, Your Honor.

 6              THE COURT:  Okay.  We're here for a continuation of

 7     a hearing and a motion to strike in United States v. Dennis

 8     Harmon, Criminal Action 18-249-1.  Present for the Government

 9     is Mr. Witherell and Mr. Stengel; present for the defendant,

10     Mr. Harmon, is Ms. Flannery, and Mr. Harmon is here.  All

11     right.  And we scheduled today's hearing to accommodate one

12     police officer who was not available at the prior hearing.

13              All right.  Mr. Witherell?

14              MR. WITHERELL:  That's correct, Your Honor.

15              THE COURT:  Are we ready to proceed?

16              MR. WITHERELL:  We are, Judge.  Just for the Court

17     to be aware, I know we're in some -- to make things as easy

18     as possible, we do have a pole camera, just so the Court is

19     aware.  I do plan on playing a series of clips; the first one

20     is approximately ten minutes long and the other two are

21     relatively short.  But I think that would be the fastest way

22     --

23              THE COURT:  Okay.

24              MR. WITHERELL:  -- for the hearing to continue.

25              THE COURT:  All right.  Fine.  Do you want to call
```

1    the witness?

2            MR. WITHERELL:  I call Officer Rillera to the

3    stand.

4            THE COURT:  All right.  Then, after this, we're

5    going to have a hearing on the motion to sever.  And then the

6    Pretrial Services, Ms. Flannery, filed a request that your

7    client have some mental health services.  Are you aware of

8    that?

9            MS. FLANNERY:  No, I'm not, Your Honor.

10            THE COURT:  All right.  Well, we'll deal with that

11    after everything else.

12            MR. WITHERELL:  Your Honor, I should have brought

13    this -- I just -- so the record is clear, we are

14    incorporating the minutes from the first hearing on the

15    search of Sydenham into this, which would make the hearing --

16            THE COURT:  Yeah.  Well, this is a continuation of

17    that hearing.

18            MR. WITHERELL:  It's actually not, Judge.  This was

19    -- this is -- that hearing was separate and apart at the last

20    motions hearing, when Detective Peters testified.  We agreed

21    and stipulated to have those portions of the hearing relevant

22    be part of this hearing.

23            THE COURT:  Okay.  Okay.  So you're saying that the

24    hearing that we had for other defendants on the North

25    Sydenham property is being incorporated into this record.

1          MR. WITHERELL:  I believe that was what we

2    stipulated to last time.

3          THE COURT:  Is that right?

4          MS. FLANNERY:  Yes, if I could clarify, Your Honor.

5    Mr. Harmon filed a motion to suppress evidence from 3234

6    Sydenham --

7          THE COURT:  Yes.

8          MS. FLANNERY:  -- joining Mr. Boyer's --

9          THE COURT:  Right.

10          MS. FLANNERY:  motion in that regard.

11          THE COURT:  Right.

12          MS. FLANNERY:  Mister -- Officer Rillera testified

13    at that hearing.

14          THE COURT:  Yes.

15          MS. FLANNERY:  This is a separate motion on Mr.

16    Harmon's motion to suppress statements.

17          THE COURT:  Right.

18          MS. FLANNERY:  So I --

19          THE COURT:  To suppress the statement, right.

20          MS. FLANNERY:  I am in accord --

21          THE COURT:  He also moved to suppress what was

22    found in North Sydenham Street, right?

23          MS. FLANNERY:  Correct.  And that's -- that was the

24    --

25          THE COURT:  That's a --

1          MS. FLANNERY:  -- first hearing --

2          THE COURT:  -- separate hearing.

3          MS. FLANNERY:  -- we had and Officer Rillera

4     testified at that.

5          THE COURT:  Right.

6          MS. FLANNERY:  So I'm in accord with the

7     Government's request that the evidence that came in, the

8     testimony from mister -- from Officer Rillera and others,

9     with respect to the suppression of 3234 Sydenham is, you

10    know, fair game in this hearing, too.

11         THE COURT:  Right.  I -- that's understood.  Thank

12    you.

13         Okay.  All right.  Swear the witness please.

14    CHARLES RILLERA, WITNESS FOR THE GOVERNMENT, SWORN

15         THE CLERK:  Thank you.  Please state your full name

16    and spell your last name for the record.

17         THE WITNESS:  Officer Charles Rillera, spelled R-i-

18    l-l-e-r-a; Philadelphia Police Department approximately six

19    years.

20         THE COURT:  All right.  Have a seat and keep your

21    voice up, please.  All right.

22         MR. WITHERELL:  Your Honor, with the Court's

23    permission --

24         THE WITNESS:  Good morning, Your Honor.

25         MR. WITHERELL:  -- can I do this from a seated

  1    position, since I'm going to --

  2                THE COURT:  Yeah.

  3                MR. WITHERELL:  -- utilize the video?

  4                THE COURT:  Go ahead.

  5                MR. WITHERELL:  Okay.

  6                THE COURT:  All right.  We're now about to play a

  7    video?

  8                MR. WITHERELL:  Portions of it.  I'm just going to

  9    orient to the Court --

 10                THE COURT:  All right.

 11                MR. WITHERELL:  -- for a second.

 12                THE COURT:  Okay.

 13                         DIRECT EXAMINATION

 14    BY MR. WITHERELL:

 15    Q    Officer Rillera, good morning.  How are you today?

 16    A    Good morning.

 17    Q    Officer Rillera, last time you testified, we were

 18    talking about your investigation into a shooting on 22nd

 19    Street that led you to a North Sydenham residence.  Do you

 20    recall that testimony?

 21    A    That is correct.

 22    Q    Okay.  I now just want to orient you to the screen in

 23    front of you.

 24                MR. WITHERELL:  And I'm playing for the record what

 25    has previously been marked as Government 1A.  The time stamp

Rillera - Direct                                        8

1    on the video is 18:32.  And we had previously stipulated,

2    Your Honor, that it's 22 minutes behind, making it

3    approximately 6:54 p.m.

4                    THE COURT:  Yes.

5    BY MR. WITHERELL:

6    Q    At this point, I think you testified last time -- and

7    just for background -- did other officers arrive at some

8    point to assist you at the North Sydenham residence?

9    A    That is correct.

10   Q    Who were those officers?

11   A    Officer Jacamelli (phonetic) and Officer Terry.

12   Q    And just for the Court's recollection, who did you

13   originally arrive at North Sydenham with?

14   A    Officer Nelson, who was my partner for that day.

15                    MR. WITHERELL:  I believe the Court has this

16   portion of the video in front of it.

17   BY MR. WITHERELL:

18   Q    Can you just orient the Court, tell where everyone is,

19   who everyone is, in relation to the North Sydenham residence?

20                    THE COURT:  All right.  Go ahead.

21   A    Yes.  We are all directly in front of the residence on

22   Sydenham.  Myself and Officer Nelson are on the side of RPC

23   3915.  My vehicle is going to be further south on the block,

24   parked at the angle.

25   Q    And who is inside 3915?

1    A    Officer Terry is the driver and Officer Jacamelli is

2    going to be the passenger.

3    Q    You previously testified that a large group had walked

4    away when you initially arrived on North Sydenham.  This has

5    happened already at this portion of the video, correct?

6    A    Yes, it did.

7    Q    I'm now going to play this portion of the video.

8         (Video recording played 9:15:00 to 9:15:04)

9    Q    Officer, I'm stopping it at 18:33 in the -- on the time

10   stamp on the video.  An individual just walk -- appeared to

11   walk out of the North Sydenham residence.  Is that correct?

12   A    That's correct.

13   Q    Do you know who that person is?

14   A    Yes.  Dennis Harmon.  He's seated to the right of

15   counsel, left of me.

16        MR. WITHERELL:  Your Honor, may the record reflect

17   that the witness identified the defendant?

18        THE COURT:  Yeah.  I actually have a stipulation,

19   Ms. Flannery, that you don't dispute that that's Mr. Harmon.

20        MS. FLANNERY:  Correct, Your Honor.

21        THE COURT:  Okay.  Go ahead.

22   BY MR. WITHERELL:

23   Q    At this point in time, on September 11th, 2017, as we

24   see in the video, at that exact point, did you know where Mr.

25   Harmon came from?

1    A     No, I did not.  Based on where I was standing, I didn't

2    catch him until he came into my peripheral vision to my

3    right.  Officer Terry inquired about where he came from, and

4    I said I wasn't sure if he came down the sidewalk or from

5    behind me or from a residence.  So we monitored where he

6    eventually walked to, which is the corner of Sydenham and

7    Hilton Street.

8              MR. WITHERELL:  I'm now going to play this for a

9    couple of minutes, Your Honor.

10         (Video recording played 9:16:06 to 9:16:57)

11   BY MR. WITHERELL:

12   Q     I've stopped it at 18:33:53.  Do you see the individual

13   on the left side of the screen?

14   A     Yes.

15   Q     Can you tell the Court who that is?

16   A     That is Mr. Harmon.

17         (Video recording played at 9:17:08 to 9:17:16)

18              THE COURT:  You played this video at the prior

19   hearing.

20              MR. WITHERELL:  I believe I did, Judge.

21              THE COURT:  Yeah.

22              MR. WITHERELL:  And looking at the transcript, I

23   believe --

24              THE COURT:  I recall.

25              MR. WITHERELL:  -- I did.

1              THE COURT:  That's okay.  Keep going.

2         (Video recording played 9:17:27 to 9:17:36)

3    BY MR. WITHERELL:

4    Q    I've stopped at 18:34:16.  Can you tell us -- withdrawn.

5         18:34:16.  Would this be your initial interaction with

6    Mr. Harmon?

7    A    Yes, that's correct.

8    Q    Could you please tell the Court what we're about to see

9    right now?  What happens between you and Mr. Harmon?

10   A    I'm engaging Mr. Harmon to ascertain what his business

11   is on Sydenham, since he's going into the residence that the

12   vehicle is registered.

13   Q    Tell us about that conversation.

14   A    I basically asked Mr. Harmon if he resided at that

15   residence, to which he confirmed.  He said that he lived

16   there.  I asked if anyone lived with him.  He said no, he

17   lived by himself.  I then asked him if he had a rental

18   agreement.  He said no, he was squatting.  He went into a

19   story about how the house was vacant, and he went in and just

20   began residing there without permission.  He provided me with

21   an identification card and that address did not come back to

22   that -- the address on the identification card did not come

23   back to the address on Sydenham.

24              MR. WITHERELL:  I'm now playing from 18:34, Your

25   Honor, 18:34:16.

1     (Video recording played 9:18:50 to 9:20:09)

2     BY MR. WITHERELL:

3     Q    I'm stopping at 18:35:35.  You seem to enter the vehicle

4     3915.  Is that correct?

5     A    That is correct.

6     Q    What was your purpose of doing that?

7     A    Basically, I'm validating that his identification card

8     is valid, and that he does not have any wants or warrants in

9     NCIC, PCIC, or BMV systems, Your Honor.

10    Q    And did you find anything -- any warrants associated

11    with the defendant?

12    A    No, I did not.

13          MR. WITHERELL:  I'm playing it again, Judge.

14    (Video recording played 9:20:41 to 9:21:08)

15    BY MR. WITHERELL:

16    Q    I'm stopping at 18:36:06.  I'm going to ask you who is

17    the officer closest to Sydenham Street -- the Sydenham

18    residence and Mr. Harmon at this time.

19    A    That's Officer Terry.

20    Q    At this point, is Mr. Harmon still on the porch?

21    A    That's correct.

22    Q    Okay.  Do you know what Officer Terry is saying to Mr.

23    Harmon at this point?

24    A    I believe he's inquiring about any correlation between

25    Mr. Harmon and that vehicle, which is parked in front of the

1    residence, which also has a registered owner that comes back

2    to the same address on Sydenham Street.

3    Q    And miss -- did you or any other officer ask him about

4    that vehicle that mister -- that the officer is pointing to

5    now and the Jeep; did you or any officer ask Mr. Harmon

6    during this colloquy about his knowledge of those two

7    vehicles?

8    A    That is correct, which he denied any association with

9    those vehicles.

10          MR. WITHERELL:   I'm continuing to play, Judge.

11       (Video recording played 9:22:02 to 9:23:48)

12   BY MR. WITHERELL:

13   Q    I'm stopping at 18:37:54.  The officer you just

14   described earlier seemed to bend down.  Do you know what he

15   was doing?

16   A    Yes, he was recovering keys to a vehicle; it was the

17   Jeep that was parked further south on the street.

18   Q    At this point, Mr. Harmon is still on the porch.  Is

19   that correct?

20   A    That is correct.

21   Q    Okay.  Did you or any other officer tell Mr. Harmon to

22   remain on that porch?

23   A    Yes, we asked him to stay on the porch until we were

24   completed conducting our investigation.

25   Q    Did you tell him what the nature of your investigation

1    was?

2    A    Not immediately, no.

3    Q    At this time and throughout your interaction with Mr.

4    Harmon, was he compliant with you and cooperative?

5    A    Yes, he was cooperative and compliant.  He gave us no

6    problems, no issues.

7         (Video recording played 9:24:33 to 9:25:02)

8    Q    I've stopped at 8:38:27 [sic].  Could you just tell the

9    Court where everybody is, what you're doing, and where Mr.

10   Harmon is?

11   A    So Mr. Harmon remains on the porch steps or on the porch

12   itself.  Officer Jacamelli is the one that's in front of the

13   Jeep.  Officer Terry is next to the Chevrolet.  And I am on

14   the phone, presently walking toward my RPC, and my partner

15   for the day is next to me, following.

16   Q    And at this time and throughout this video, Mr. Harmon

17   remains on that porch.

18   A    That's correct.

19   Q    He's not in handcuffs?

20   A    No, he's not.

21   Q    He has not been placed under arrest?

22   A    No, he hasn't.

23   Q    And at least for this portion of the video, there are no

24   police officers in his immediate presence.

25   A    That's correct.

Rillera - Direct                                    15

1                MR. WITHERELL:  I'm playing, Judge, from 18:39:38.

2                THE COURT:  Can I just ask a question?  There's --

3       it looks like there's an awning over this building.  Is that

4       correct?

5                THE WITNESS:  Yes, that's correct.

6                THE COURT:  Okay.  And is the front door right

7       there, flush with the --

8                THE WITNESS:  No, it's not, Your Honor.  There is a

9       --

10               THE COURT:  There's a --

11               THE WITNESS:  -- recessed --

12               THE COURT:  -- porch?

13               THE WITNESS:  -- porch, yes.

14               THE COURT:  And how big --

15               THE WITNESS:  Approximately --

16               THE COURT:  -- is the porch?

17               THE WITNESS:  -- six feet -- approximately six --

18      five to six feet from the front --

19               THE COURT:  Okay.

20               THE WITNESS:  -- or from the rear of the awning to

21      the front of the door, Your Honor.

22               THE COURT:  Okay.  So it's like six feet deep.

23               THE WITNESS:  Yes, correct.

24               THE COURT:  Okay.  And then there's an awning that

25      comes out over the sidewalk, right?

Rillera - Direct                               16

 1              THE WITNESS:  That is correct.

 2              THE COURT:  Okay.  Go ahead.

 3     BY MR. WITHERELL:

 4     Q    Now drawing your attention to 18:39:41, you appear to be

 5     walking back to the porch or there is an individual wearing a

 6     red shirt that you previously, at the other hearing,

 7     identified as Amir Boyer.  Is that correct?

 8     A    That is correct.

 9     Q    I just want to play this interaction, 18:39:41.

10          (Video recording played 9:27:01 to 9:27:49)

11     Q    I've paused it at 18:40:25.  Would you tell us about

12     that interaction with Amir Boyer?

13     A    Your Honor, I don't know verbatim what was said, just

14     the general conversation was about Mr. Harmon, what the

15     investigation was, and about the house.  Mr. Boyer relayed to

16     us that his parents had owned that house, that property, at

17     one time.  I basically told him I could not give him any

18     details, it's an ongoing investigation.  After a brief

19     dialogue, not speaking about anything other than those points

20     of conversation, I asked Mr. Boyer to vacate the area.

21              THE COURT:  Okay.  He's -- Mr. Boyer is the one in

22     the red shirt.

23              THE WITNESS:  That's correct, Your Honor.

24              THE COURT:  So he was speaking -- was he speaking

25     to Mr. Harmon briefly, it looks like?

Rillera - Direct                                    17

1          THE WITNESS:  He -- he was -- he was speaking in

2     his direction, but it was more toward us.

3          THE COURT:  All right.

4          THE WITNESS:  He was inquiring what --

5          THE COURT:  All right.

6          THE WITNESS:  -- we were doing, what was our reason

7     for being there --

8          THE COURT:  Okay.

9          THE WITNESS:  -- and asking about the house.

10         THE COURT:  All right.  Thank you.

11    BY MR. WITHERELL:

12    Q    During this interaction with Boyer, what was Mr. Harmon

13    doing?

14    A    Mr. Harmon is just standing there.  He's not really

15    doing too much talking at all, throughout the whole course of

16    this investigation.

17    Q    I'll continue to play.

18         (Video recording played 9:28:59 to 9:29:13)

19    Q    I've stopped at 18:40:43.  It appears that Mr. Boyer is

20    continuing to speak.  Can you tell the Court what he said?

21    A    So, at this point now, his conversation is directed

22    toward Mr. Harmon.  He's just basically stating that he

23    doesn't have to talk to us.  And again, I don't know verbatim

24    exactly what was said, Your Honor, but he was basically just

25    telling him, you know, you don't have to say anything, things

1    to that nature, which, at that point in time, I believe

2    Officer Jacamelli is going to be like, okay, that's enough,

3    now he's being disruptive, he needs to take a walk further

4    down the street while we continue our investigation.

5    Q    What Mr. Boyer is telling Harmon, that you don't need to

6    speak to them.  Does Mr. Harmon, at any point, indicate to

7    you he doesn't want to speak to you any further?

8    A    No.

9    Q    Does he ever request a lawyer?

10   A    No.

11   Q    Is he cooperative and compliant with your questions in

12   the entire interaction you had with him on September 11th,

13   2017?

14   A    Yes, he is.

15        (Video recording played 9:30:14 to 9:30:41)

16   Q    I'm stopping this at 18:41:11.  It appears now you are

17   having another conversation with Mr. Harmon.  Is that

18   correct?

19   A    Yes.

20   Q    Okay.  I'm going to play it for approximately a minute

21   and a half.

22        (Video recording played 9:30:53 to 9:32:58)

23   Q    I paused it at 18:43:17.  You appear to be having a

24   conversation with Mr. Harmon for approximately two minutes.

25   A    Correct.

1    Q      Could you please tell the Court the nature of that

2    conversation?

3    A      It was basically the same conversation that we had

4    earlier.  I wanted him to elaborate, based on Mr. Boyer's

5    comments about his family owning the property, and to see if

6    there was any correlation with Mr. Harmon and Mr. Boyer's

7    family that previously, apparently, owned the property, which

8    he stated no, there was someone else that owned the property.

9    I asked him to go over his story again because I thought it

10   was suspicious that with all the -- the totality of all the

11   circumstances that we had so far, two vehicles, both

12   registered to that address.  He stated to me that he was the

13   only one that lived there and he was not the person that the

14   vehicles were registered to.  So I wanted to make sure my

15   investigation was complete and thorough.

16   Q      Well, let's talk about that specific, then, interaction

17   now.  So from 18:41 to approximately 18:43, you ask him about

18   what Boyer had just previously said?

19   A      That's correct.  I asked him if the person that he was

20   attempting to have a rental agreement with, which is what he

21   told me originally, was Boyer's family.

22   Q      And his response to that?

23   A      No, somebody else owns --

24   Q      Was he --

25   A      -- the property now.

1    Q    Was he able to provide a name or identity of the

2    individual he was attempting to rent from?

3    A    No, he did not give me a name.

4    Q    Did you go over his original story again?

5    A    Yes.

6    Q    Please tell the Court what he said.

7    A    His original story was he was homeless and he had broken

8    into the property through a rear door or window -- I'm not

9    sure -- and began squatting at that property.  He was then

10   confronted by homeowners, and they were in a verbal agreement

11   of some kind of rent or lease that they were still working

12   on.  He did not have any paperwork.  I asked him if he had a

13   lease agreement, he said no, that he was just squatting

14   there.

15   Q    Now you and the other officers remained at the scene for

16   some time.  Is that correct?

17   A    That's correct.

18   Q    Okay.  And not the -- now, while officers are in the

19   entire -- in the vicinity of North Sydenham until Mr. Harmon

20   is transported at approximately 7:37 p.m., you and other

21   officers are not always in front of that residence.  Is that

22   correct?

23   A    Correct.

24          MR. WITHERELL:  Okay.  I'm going to skip ahead,

25   Your Honor.

1      (Video recording played 9:35:35 to 9:36:00)

2    Q    I'm drawing your attention to about 18:54:57 on the

3    video.  Just tell the Court where everybody is and where Mr.

4    Harmon is.

5    A    Mr. Harmon remains on the porch.  Myself and Officer

6    Nelson are at the bottom of the steps of the residence.

7    Officer Terry is standing up out front of the RPC 3915.  And

8    Officer Jacamelli is seated inside of the RPC or radio patrol

9    car.

10   Q    Mr. Harmon is still on the porch.  Is that correct?

11   A    That is correct.

12   Q    Is he in handcuffs at this time?

13   A    No, he is not.

14   Q    Has he been arrested at this time?

15   A    No, he has not.

16   Q    Okay.  This is approximately 7:16 p.m.  Around this

17   time, were you made aware -- approximately around this time,

18   were you made aware about the condition of Sherman Williams,

19   who the Court is aware is the individual who was shot at 22nd

20   Street?

21   A    Yes, I was.

22   Q    What were you made aware?

23   A    I was made aware that he was pronounced.

24   Q    Okay.  When you became aware that he was pronounced, did

25   you do anything in relation to this.

1          THE COURT:  "Pronounced," pronounced dead.

2          THE WITNESS:  Yes.

3          THE COURT:  Go ahead.

4          MR. WITHERELL:  I apologize, Your Honor.

5          THE COURT:  Yes.

6          MR. WITHERELL:  Pronounced dead.

7    BY MR. WITHERELL:

8    Q    When you became aware that the victim had been

9    pronounced dead, did you do anything in relation to Mr.

10   Harmon?

11   A    Yes.  I went up on the porch and I frisked Mr. Harmon

12   for weapons to make sure he didn't have any weapons on his

13   person.

14   Q    And why did you do that?

15   A    Because before that point in time, we're investigating a

16   shooting and we're awaiting Northwest Detectives, who are

17   supposedly en route to our location, that can interview him

18   on location.  When it turns into a homicide that we're

19   investigation -- a homicide investigation, it's general

20   protocol to take that individual down to Homicide, which we

21   transport him down there, Your Honor.

22        Anytime that we transport a person of interest in a

23   police vehicle, he's going to be frisked for weapons.  We

24   don't take chances.

25          THE COURT:  What time was it when you learned that

1      Mr. Williams was dead?

2                THE WITNESS:  Approximately at this time.

3                THE COURT:  Well, the time on the screen is not

4      correct, so just --

5                THE WITNESS:  It would have been, I believe, at

6      7:15 ish.

7                THE COURT:  7:15?

8                THE WITNESS:  P.M., yes.  Yes, sir.

9                THE COURT:  Okay.  All right.  Go ahead.

10     BY MR. WITHERELL:

11     Q     Did you tell mister -- tell us about that interaction.

12     Did you just frisk Mr. Harmon or did you tell Mr. Harmon you

13     were going to frisk him.  What happened; what occurred?

14     A     I -- I explained to Mr. Harmon exactly what was going

15     on.  I told him that I needed to frisk him, that he was going

16     to have to go down and talk to homicide because they wanted

17     to speak to him.

18                THE COURT:  You told him Mr. Williams was dead.

19                THE WITNESS:  I don't recall if I told him that I

20     told him that Mr. Williams was dead, but I think it would

21     have been -- he might have inferred it himself, since I told

22     him we were investigating a shooting initially.  And then,

23     when we're going to Homicide, you know, the man was

24     pronounced.  And I'm not sure if it came over police radio.

25     He might have heard it because we were standing right on the

1    steps.  He might have heard it himself come over police

2    radio, Your Honor.

3              THE COURT:  Okay.

4              MR. WITHERELL:  I'm now going to play this portion.

5         (Video recording played 9:39:02 to 9:39:08)

6    BY MR. WITHERELL:

7    Q    I paused it at 18:55:04.  Is that you going up to that -

8    - onto the porch?

9    A    That's correct.

10   Q    Okay.  This is when you would have frisked Mr. Harmon.

11   Is that correct?

12   A    That's correct.

13        (Video recording played 9:39:21 to 9:39:40)

14   Q    You're back down at 18:55:24.  Is that correct?

15   A    That's correct.

16   Q    Did Mr. Harmon have any weapons or contraband on him?

17   A    No.  He only had a cell phone on him.

18   Q    Okay.  But -- and at this point, did you take his cell

19   phone?

20   A    No, I did not.

21   Q    Okay.  He had it with him the entire time he was on that

22   porch?

23   A    Yes.

24        (Video recording played 9:40:00 to 9:40:07)

25             MR. WITHERELL:  I'm going to move about ten minutes

1    on the video forward, approximately.

2          (Pause in proceedings)

3    BY MR. WITHERELL:

4    Q    I've stopped at 19:07:08.  At some point, are you or

5    other officers made aware that Homicide would like to speak

6    to Mr. Harmon at the Homicide Unit?

7    A    Yes.  I believe it was Officer Terry or Jacamelli.  I

8    know it wasn't Officer Nelson, and I didn't receive that

9    phone call, either.  But Officer Terry, I believe, was the

10   one that was notified that Homicide wanted Mr. Harmon taken

11   down for questioning.

12   Q    And did you alert Mr. Harmon that he -- that Homicide

13   wanted to speak to him?

14   A    Yes.

15   Q    Who told him that?

16   A    I don't recall exactly, at that time, but I know that he

17   was made aware.

18   Q    And his response when he was made aware that Homicide

19   would like to interview him about the shooting was?

20   A    He was compliant, he said okay, no problem.

21   Q    I'm now playing this video from 19:07 to 08.

22          (Video recording played 9:41:26 to 9:42:36)

23   Q    I've stopped at 19:08:19.  We saw an individual walk

24   from the porch into 3915.  Who is that?

25   A    That's the defendant, Mr. Harmon.

1   Q      Was he placed in handcuffs before being placed in that

2   car?

3   A      No, he was not.

4   Q      Was he under arrest at that point?

5   A      Not at that time, no.

6   Q      He voluntarily -- withdrawn.

7          You asked -- you or another officer told him that

8   Homicide wished to speak to him.  Is that correct?

9   A      That's correct.

10  Q      And the idea was to transport him to the homicide unit

11  at that time?

12  A      That's correct.

13  Q      You can see in the video that he enters the car with his

14  cell phone.  Is that correct?

15  A      That is correct.

16  Q      And an officer then takes that phone and places it in

17  the front seat.  Did you see that portion of the video?

18  A      Yes, that's correct.

19  Q      Who is the officer who does that?

20  A      Officer Jacamelli.

21  Q      Do you know why he did that?

22  A      Yes.  Whenever we transport someone in a -- in an RPC,

23  Your Honor, if they're a person of interest and related to

24  the case, especially going to homicide, we don't want any

25  exterior communication going out, and possible ambushes.

1    It's basically just an officer safety protocol.  And I'm just

2    assuming -- that's what I would have done -- that that's what

3    Officer Jacamelli did, as well.

4         (Participants confer)

5    Q    This is approximately -- with the twenty-two-minute

6    difference, this was approximately 7:30 p.m.  Is that

7    correct?

8    A    That's correct.

9    Q    All right.  Your initial interaction with Harmon started

10   at approximately -- withdrawn.

11        Well, let me ask it this way.  This is the end of your

12   interaction with Mr. Harmon at this time.  Is this correct?

13   A    That's correct.

14   Q    You have no further interaction with Mr. Harmon involved

15   in this case or ever in that matter.

16   A    No.

17   Q    At any time when Mr. Harmon was on the porch in your

18   entire interaction with him, did he ever ask to speak to an

19   attorney?

20   A    No.

21   Q    Did he ever say he didn't want to speak to you?

22   A    No.

23   Q    Was he ever placed in handcuffs?

24   A    No.

25   Q    Was he ever under arrest?

Rillera - Examination by the Court                    28

1    A     No.

2    Q     Tell us about his general demeanor the entire time he's

3    on that porch.

4    A     Mr. Harmon was calm, cool, and collected.  He was

5    compliant.  His story was a little bit here and there, which

6    raised red flags with me, but other than that, he gave me and

7    other officers on location no problems, Your Honor.

8    Q     Once he enters that car, am I correct in saying that, in

9    approximately ten minutes, if we watch the video, that car is

10   going to go somewhere.  Is that correct?

11   A     That's correct.

12   Q     Do you know --

13   A     He's going to be transported to Homicide.

14          MR. WITHERELL:  Your Honor, I have no further

15   questions for this witness.

16                          EXAMINATION

17   BY THE COURT:

18   Q     All right.  And you were not part of the transportation,

19   correct?

20   A     No, I was not, Your Honor.

21          THE COURT:  All right.  Ms. Flannery, about how

22   long is your cross going to be?

23          MS. FLANNERY:  I'm really bad at judging that, Your

24   Honor.  Twenty minutes to --

25          THE COURT:  All right.

```
 1              MS. FLANNERY:  -- a half hour.

 2              THE COURT:  Is the young lady who came in Ms.

 3    Baxley?

 4              MS. BAXLEY:  Yes, Your Honor.

 5              THE COURT:  Okay.  All right.  Ms. Baxley is here

 6    from Pretrial Services about -- and let me just interrupt

 7    this for a minute.  Pretrial Services filed a petition -- and

 8    I didn't realize this last time -- that they're recommending

 9    that Mr. Harmon participate in mental health services under

10    the guidance of Pretrial Services.  So Ms. Flannery, I'd like

11    you to talk to your client about that before he leaves for

12    today and whether you agree with that or not.

13              Are you going to be in your office?

14              MS. BAXLEY:  I am, Your Honor, but may I explain

15    the petition?

16              THE COURT:  Yeah.  Come forward, please.

17              MS. BAXLEY:  Okay.  How far do you want me to -- up

18    here?

19              THE COURT:  Yeah, right here.

20              MS. BAXLEY:  Okay.

21              THE COURT:  Yeah.  Yes.

22              MS. BAXLEY:  So --

23              THE COURT:  Just state your name for the record.

24              MS. BAXLEY:  Tamika Baxley with U.S. --

25              THE COURT:  Yeah.  Ms. Baxley filed a petition for
```

1    Mr. Harmon to undergo mental health services.  I'm sorry for

2    interrupting this, but I didn't want to keep her waiting.

3               Yeah, go ahead.

4               MS. BAXLEY:  Thank you, Your Honor.  So, basically,

5    Mr. Harmon was already in --

6               THE COURT:  Right.

7               MS. BAXLEY:  -- mental health and drug treatment,

8    but I noticed, when I was doing a review of his case last

9    month, that his condition did not include mental health.  So

10   it's just to cover the treatment --

11              THE COURT:  Okay.

12              MS. BAXLEY:  -- that he's already receiving.  He's

13   doing well, there were no issues.

14              THE COURT:  Okay.

15              MS. BAXLEY:  That's the --

16              THE COURT:  All right, all right.

17              MS. BAXLEY:  -- premise.

18              THE COURT:  Okay.  All right.  We'll discuss that

19   with him and his lawyer when we're done with the hearing.

20              MS. BAXLEY:  Okay.

21              THE COURT:  So thank you.  Thank you for coming up

22   --

23              MS. BAXLEY:  Okay.  You're welcome.

24              THE COURT:  -- and explaining that.

25              MS. BAXLEY:  Thank you.

1           THE COURT:  Okay.

2           MS. BAXLEY:  But he is almost done with the

3  treatment.  He'll be completed, I think, in August.

4           THE COURT:  Okay.  Thank you.

5           MS. BAXLEY:  All right?  Thanks.

6           THE COURT:  Thank you very much.

7           Okay.  Cross-examine --

8           MS. FLANNERY:  Thank you, Your Honor.

9           THE COURT:  -- Officer Rivera [sic].

10          MS. FLANNERY:  Your Honor, first of all, just as

11  housekeeping, the time period from -- on the pole camera,

12  that goes from 18:32 to 19:15, which is basically what Mr.

13  Witherell just played.

14          THE COURT:  Okay.

15          MS. FLANNERY:  We have extracted that as a clip

16  from the entirety of the pole camera --

17          THE COURT:  Okay.

18          MS. FLANNERY:  -- for the convenience of the

19  parties and the Court.

20          THE COURT:  Okay.  Thank you.

21          MS. FLANNERY:  And so I would move that in as DH-

22  73.

23          THE COURT:  Seven three?

24          MS. FLANNERY:  Yes, Your Honor.

25          THE COURT:  All right.  Thank you.

 1          (DH-73 received in evidence)

 2                  MS. FLANNERY:  And I've -- as I explained to

 3      counsel, I've extracted some still photos, most of which I

 4      think I will go through with mister -- with Officer Rillera.

 5                  THE COURT:  Okay.

 6                  MS. FLANNERY:  And I've marked those as DH-72, and

 7      I would ask --

 8                  THE COURT:  DH seven two?

 9                  MS. FLANNERY:  DH seven two, as a group exhibit of

10      still shots --

11                  THE COURT:  All right.

12                  MS. FLANNERY:  -- that come from that --

13                  THE COURT:  Okay.

14                  MS. FLANNERY:  -- segment of the pole camera.

15                  THE COURT:  Go ahead.

16                  MS. FLANNERY:  So I'd move those into evidence.

17          (DH-72 received in evidence)

18                          CROSS-EXAMINATION

19      BY MS. FLANNERY:

20      Q    Officer Rillera, by the time you -- by the time Mr.

21      Harmon came out of the house, the males that had been outside

22      when you arrived had walked away.  Is that correct?

23      A    Good morning, Counsel.  Yes, that is correct.

24      Q    And the -- Dennis Harmon was not among that group that

25      walked away, correct?

1    A    That is correct.

2    Q    Was Dennis Harmon familiar to you?

3    A    No, he was not.

4    Q    Do you know through your conversations with you -- the

5    three colleagues that you had there with you, was he familiar

6    to any of them?

7    A    Not that I'm aware of.

8    Q    We saw the clip of Mr. Harmon walking out of the house

9    and passing you and Officer Nelson.  Do you recall that?

10   A    I do.

11   Q    And Mr. Harmon did not approach you at that time, did

12   he?

13   A    No, he did not.

14   Q    He didn't initiate any conversation with you or any of

15   the other officers who were there, correct?

16   A    That's correct.

17   Q    And then, less than a minute later, he walks back

18   towards the house.  Do you remember that?

19   A    I do.

20   Q    And you're definitely noticing him at that time,

21   correct?

22   A    That is correct.

23   Q    But he did not stop and initiate any conversation with

24   you or any of the other officers, did he?

25   A    No, he did not.

1   Q    You didn't -- you stopped him as he was entering the

2   house.  Is that correct?

3   A    I stopped him when he walked up on the porch.

4             MS. FLANNERY:  Your Honor, I didn't mark this, but

5   because of the Court's questions, I will mark this DH-3 --

6   74.

7             THE COURT:  Okay.

8             MS. FLANNERY:  Would that be right?

9        (Pole Camera Still Photograph marked DH-74 for

10  identification)

11            MS. FLANNERY:  And I'll just proffer to the Court

12  and counsel that this is a later photograph of Sydenham, but

13  it's from a different angle --

14            THE COURT:  Okay.  Thank you.

15            MS. FLANNERY:  -- of the pole camera.  It might

16  help us.

17            MR. STENGEL:  And we -- at the earlier suppression

18  hearing, we introduced a series of photographs of the house,

19  which included a photograph from, I believe, the search on

20  that night of the front of the house?

21            MS. FLANNERY:  Of the front?

22            MR. STENGEL:  So it's -- I mean, it's going to --

23  there's a more accurate picture in the record already.

24            MS. FLANNERY:  Mr. Stengel is pointing out that

25  there is a picture in the record from that night, so it would

1    be more accurate.  But just to -- I don't think the porch or

2    the steps have changed.  So, if I may show this?

3              THE COURT:  Sure.

4         (Pause in proceedings)

5    BY MS. FLANNERY:

6    Q    Officer, do you see the photo in front of you?

7    A    Yes.

8    Q    Is that, structurally -- other than the absence of the

9    awning, is the -- is the house with the trash cans in front

10   of it thirty-four -- 3234 Sydenham Street?

11   A    Yes.

12   Q    So there are steps up to the house and then a short

13   porch leading to the front door.  Is that correct?

14   A    Yes.

15   Q    And where did you stop Mr. Harmon?  Where was he when

16   you stopped him?

17   A    I believe he was on the porch.

18   Q    And as you stopped him, was his back to you, entering

19   the house?

20   A    I'm assuming so.

21   Q    Now, at that point in time, you were there because the

22   Jeep, the white Jeep that someone had identified as being the

23   vehicle that the doer of the shooting drove off in was

24   registered to 3234 Sydenham Street, correct?

25   A    Correct.

1   Q     So, when you asked Mr. Harmon if he had some

2   relationship to 3234 Sydenham, you knew that was a question

3   that could elicit an answer that, in some way, could connect

4   him to the shooting.

5              MR. WITHERELL:  Objection.

6              THE COURT:  Well, over -- it's somewhat

7   argumentative, but you can answer it.  Overruled.

8              THE WITNESS:  The first question I asked him was if

9   he resided there because I did not know who the registered

10  owner was by just name.

11             MS. FLANNERY:  Okay.

12             THE WITNESS:  So, yes, my questions were directed

13  to find out if he had any correlation with the vehicle that

14  was registered to that address.

15  BY MS. FLANNERY:

16  Q     And you made a distinction later in your direct

17  testimony between the shooting and the homicide.  Do you

18  recall that?

19  A     Yes, I did.

20  Q     But a shooting is a crime, too, right?

21  A     Yes.

22  Q     And you were concerned about that shooting.

23  A     Yes.

24  Q     When he identified himself as a resident of 3234

25  Sydenham, did you give him Miranda warnings?

1   A       No, I did not.

2   Q       Did you proceed to question him?

3   A       I asked him for his identification card.

4   Q       Now, when you began to ask him for his identification

5   card and asked him other questions, there were only two ways

6   that he could move from where you stopped him, right?

7   A       Yes.

8   Q       He could go into the house or he could come forward to

9   the sidewalk and the street, correct?

10  A       That is correct.

11  Q       He wasn't free to do either, was he?

12              MR. WITHERELL:  Objection.

13              THE COURT:  Well --

14              MR. WITHERELL:  That's not the standard.

15              THE COURT:  But one at a time.

16  BY MS. FLANNERY:

17  Q       Was he free to go into the house?

18              MR. WITHERELL:  Objection.

19              THE COURT:  Overruled.

20              THE WITNESS:  No, he was not free to go into the

21  house.

22  BY MS. FLANNERY:

23  Q       Was he free to walk down to the sidewalk and the street?

24  A       No, he was not free to walk down the sidewalk.

25              MS. FLANNERY:  If we could have the still shot from

1    DH-72, the first one, which is 18:34:25.

2    BY MS. FLANNERY:

3    Q    This, I believe you testified earlier, is when you

4    stopped him and began questioning him.  Is that correct?

5    A    That is correct.

6    Q    So there are four police officers there, facing him or

7    nearby in the vicinity, correct?

8    A    That is correct.

9    Q    One African American and three who are not African

10   American, correct?

11   A    Correct.

12   Q    All of you are in uniform, correct?

13   A    Yes.

14   Q    You're all armed with visible guns, correct?

15   A    It's part of our uniform.

16   Q    And you're all armed with visible batons, correct?

17   A    That's correct.

18   Q    And at the time that you stop him and begin speaking to

19   him, there are two police cars there in the street, correct?

20   A    That is correct.

21   Q    You identified one as yours, the one that's more forward

22   in the picture, correct?

23   A    That is correct.

24   Q    And it is blocking the street at that point.  Is that

25   fair?

Rillera - Cross                                                    39

1    A     That's a --

2    Q     Is that true?

3    A     -- fair assessment, yes.

4    Q     And similarly, the car, 3915, is also blocking the

5    street, right?

6    A     Correct.

7    Q     So no one can drive up or down the street at that point,

8    right?

9    A     Not at that point, no.

10   Q     And those cars remained there through the whole time

11   that you're having interaction with Mr. Harmon, correct?

12   A     Yes.

13   Q     They stay there until Mr. Harmon is in the second police

14   vehicle and is being driven to Homicide, correct?

15   A     Correct.

16   Q     And both of those cars have been there when Mr. Harmon

17   walked out of the house and across to Hilton Street, correct?

18   A     That is correct.

19   Q     And they were both there when he walked back.

20   A     Correct.

21   Q     So would you agree with me that it's reasonable to

22   assume that Mr. Harmon was aware of the two police cars

23   blocking his street?

24   A     Yes, that's a reasonable ascertation [sic].

25         (Pause in proceedings)

Rillera - Cross                                           40

1    Q     Could you clarify when you took the identification card

2    from him?

3    A     First, I asked him if he had lived there; he said yes,

4    at which point in time I asked him if he had identification

5    on him, to which he responded yes and he provided me with an

6    identification card.

7    Q     So, on your direct, you relayed further things you asked

8    him about, whether anyone lived with him and whether he had a

9    rental agreement.

10   A     Yes.

11   Q     Those questions came after you asked him for his

12   identification card?

13   A     I believe so, yes.

14   Q     Did those questions come before or after you entered

15   your vehicle and checked his identification card?

16   A     Some of the questions came directly after.  I do

17   remember specifically, when I asked him if he lived there, he

18   replied yes, to which I followed up with, does anyone else

19   live here with you.  So I know that that question happened in

20   that sequential order, to which he stated no one else lived

21   in the house but himself.

22         The further questioning would have came after the

23   identification card was provided to me and I ran his

24   identification card for wants and warrants out of NCIC, PCIC,

25   and BMV.

Rillera - Cross                                    41

1    Q     And you also noticed that it had a different address

2    than the Sydenham address, correct?

3    A     Yes.

4    Q     And at that point in time, you didn't give him his

5    Miranda warnings.

6    A     No, I did not.

7    Q     In fact, you never gave him Miranda warnings through the

8    whole evening --

9    A     That's --

10   Q     -- correct?

11   A     That's correct.  Normal procedures for Philadelphia

12   Police Officers, we don't Mirandize.

13   Q     You have someone who has identified himself as connected

14   to a residence, to which a getaway vehicle from a shooting

15   comes back, correct?

16   A     Yes.

17   Q     He's not free to either go into the house --

18              THE COURT:  Well, he's already --

19   Q     -- or down --

20              THE COURT:  He's already --

21   A     -- onto the street.

22              THE COURT:  He's already said that.

23              MS. FLANNERY:  All right.

24              THE COURT:  Next question, please.

25   BY MS. FLANNERY:

1    Q    The identification card you kept the entire time that he

2    was there, correct?

3    A    I'm not sure.  I don't recall if I gave it back to him

4    or if I might have kept it and gave it to one of the officers

5    that was transporting him.

6              MS. FLANNERY:  Could we go to 18:59:18, please?

7         (Participants confer)

8              MS. FLANNERY:  I'm going to certain points on the

9    video.  You'll have to go to our clip.  And first, let's go

10   to -- I'm sorry -- 18:48:54.

11   BY MS. FLANNERY:

12   Q    Officer Rillera, as we play this clip, would you look at

13   it and see if it appears to you that you're looking at the

14   identification card at this point.

15        (Video recording played 10:00:49 to 10:01:00)

16   A    Yes, it appears it's in my hand.

17             MS. FLANNERY:  All right.  And could we go to

18   18:50:18?

19        (Video recording played)

20   BY MS. FLANNERY:

21   Q    Officer Rillera, as we play this clip, would you tell us

22   if it appears that you're handing the card to another

23   officer, who then puts it in the car door.

24   A    That's correct.

25        (Video recording continues)

1    Q     All right.  Right there.  Officer -- is that Jacamelli?

2    A     Jacamelli, yes, ma'am.

3    Q     So that was the identification card that he put in the

4    side pocket of the door.

5    A     That's correct.

6    Q     All right.  So would you agree with me that you did not

7    give Mr. Harmon his identification card back during the

8    entire encounter?

9    A     Yes.

10          (Pause in proceedings)

11   Q     You instructed Mr. Harmon to stay on the steps to the

12   house, correct?

13   A     That's correct.

14   Q     That stoop where he's sitting is set a little back from

15   the sidewalk, correct?

16   A     Yes.

17   Q     And it's not visible from the street.  Is that correct?

18   A     From this pole-cam it's not visible, ma'am, but it is

19   visible from the street.

20   Q     If I were walking -- if someone were walking in the

21   direction from the pole camera up the sidewalk, you would

22   have to get pretty close to the house before you would see

23   the top of the steps.  Is that fair to say?

24   A     No, it's an open porch, it's not enclosed.  You could

25   see it perfectly fine from across the street.

Rillera - Cross                                              44

1    Q     From across the street.

2    A     Yeah.

3    Q     But I'm asking you whether, from down the street, where

4    the pole camera is, would you agree with me you can't see Mr.

5    Harmon from the view of the pole camera?

6                THE COURT:  When he's on the porch.

7    Q     When he's on the porch.

8                THE COURT:  Well, I'll take judicial notice.

9                MS. FLANNERY:  Okay.

10               THE COURT:  Next question.

11   BY MS. FLANNERY:

12   Q     The whole -- the entire time Mr. Harmon was there on the

13   porch, he was not allowed to go in the house, right?

14   A     That is correct.

15   Q     And he was not allowed to come down onto the sidewalk or

16   the street, correct?

17   A     That is correct.

18   Q     And you testified that there were -- there was a moment

19   we say, 18:35 -- 38:27, when you testified that there were no

20   officers immediately beside him.  Do you recall that

21   testimony?

22   A     I do.

23   Q     But let's go to that point in the tape, if we could,

24   please.

25               (Video recording played)

Rillera - Cross                                45

1    Q    And tell me if Officer Terry is not -- he is, is he not,

2    standing right beside the porch?

3    A    He is --

4    Q    It's hard to see.

5    A    He's one full house away.

6    Q    The cars are still there, correct?

7    A    Right now, he's two houses away, and right now, he's

8    three houses away.

9    Q    And then, at this point, two of you are walking toward

10   the house, including Officer Nelson, correct?

11   A    That is correct.

12   Q    And Mr. Harmon can -- is -- his sight line is such that

13   he could see you two walking toward the house, correct?

14   A    Yes, that is correct.

15   Q    And Officer Nelson then takes a position besides the

16   steps, correct?

17   A    That is correct.

18   Q    And other than switching to the other side, turning

19   around and switching to the other side of the steps, he never

20   leaves that position until Mr. Harmon leaves, does he?

21   A    I don't believe so, ma'am.

22        MS. FLANNERY:  If we could go to eight -- these are

23   the still shots, Mr. Walters.  18:41:06.

24   BY MS. FLANNERY:

25   Q    At this point in time, which is less than three minutes

Rillera - Cross                                    46

1    after the point we were looking at before, there are three

2    police officers there, facing him, at the base of the steps

3    between him and the street, correct?

4    A    That's correct.

5              MS. FLANNERY:  And if we could go to 18:42:22.  I

6    may be jumping ahead.

7    BY MS. FLANNERY:

8    Q    There are four police officers there, facing him, at the

9    base of the steps, between him and the street, correct?

10   A    That is correct, ma'am.

11             MS. FLANNERY:  Now let's go to 18:43:07, the still

12   shot.

13   BY MS. FLANNERY:

14   Q    This is right after the fifth officer arrived, correct?

15   A    Yes.

16   Q    And the new officer is in a different uniform, but he is

17   in uniform, correct?

18   A    That's correct.  Supervisors where white shirts, ma'am.

19   Q    He is armed, visibly?

20   A    Yes, he is.

21   Q    He has a gun and a baton, correct?

22   A    He should.

23   Q    So, at this point in time, five police officers are

24   facing Mr. Harmon, between him and the street, correct?

25   A    That's correct.

1  Q    And one of these officers is African American, and the

2  others are not, correct?

3  A    That's correct.

4  Q    And this is a fairly obviously question.  But this is

5  taking place in North Philadelphia, right?

6  A    That is correct.

7         MS. FLANNERY:  Let's go on to the next still shot,

8  which is 18:43:41, I believe.

9  BY MS. FLANNERY:

10  Q    You're talking to the supervisor, who has arrived,

11  correct?

12  A    That's correct.

13  Q    But two officers are still right there on the sidewalk,

14  facing Mr. Harmon, right?

15  A    Yes.

16  Q    And the third is leaning on the second car, facing Mr.

17  Harmon, correct?

18  A    That's correct.

19  Q    18:48:34.  And this is, again, Officer Nelson is still

20  standing by the stoop, correct?

21  A    Yes.

22  Q    And Officer Jacamelli is still leaning on the car,

23  facing Mr. Harmon?

24  A    Correct.

25  Q    And you are about to join Officer Jacamelli, correct?

Rillera - Cross                                    48

1    A    Yes.

2    Q    18:55:20.  Officer Nelson has walked to the other side,

3    but he's still in close proximity to Mr. Harmon, correct?

4    A    Yes.

5    Q    Turned -- he's turned toward Mr. Harmon, right?

6    A    Yes.

7    Q    And another officer, who's obscured a bit by the pole,

8    is on the sidewalk, facing Mr. Harmon, between Mr. Harmon and

9    the street, correct?

10   A    Yes.

11   Q    18:59:38.  This is three officers facing Mr. Harmon

12   again, to the left, to the right, and straight on, correct?

13   A    Yes.

14   Q    And 19:02:48.

15   A    Yes.

16   Q    Three officers are surrounding Mr. Harmon and one is in

17   the car in front of him, correct?

18              MR. WITHERELL:  Objection as to the

19   characterization.

20              THE COURT:  Overruled.

21              MR. WITHERELL:  The picture speaks for itself.

22              THE COURT:  I think he answered the question.

23              THE WITNESS:  We're not surrounding him.  We are

24   standing in front of the residence.  If we were surrounding

25   him, we would be on all sides of him, which we are not.

Rillera - Cross                                             49

1    BY MS. FLANNERY:

2    Q    Fair enough.  But behind him is the house door, correct?

3    A    That's correct.

4    Q    And you're --

5    A    And he's --

6    Q    -- not letting --

7    A    -- not allowed to enter and he's not allowed to walk

8    down the sidewalk, ma'am.

9    Q    19:06:56.  This is getting closer in time to the time

10   that he leaves to go to Homicide, correct?

11   A    Yes.

12   Q    And all four of you are standing there, two by two,

13   facing him at the base of the stairs, correct?

14   A    Yes.

15   Q    You testified that he was compliant at that point about

16   getting into the police car, correct?

17   A    Yes.

18   Q    Did you give him any choice as to whether or not he was

19   going to Homicide?

20   A    No.

21   Q    And you -- did you give him any choice about how he was

22   going to get to Homicide?

23   A    No.

24            MS. FLANNERY:  Is there one more picture?

25   Q    This is 19:07:41.  Officer Rillera, is this a picture of

1   Mr. Harmon walking through the four officers toward the car?

2   A    That is correct, with his phone in his hand.

3   Q    And Officer Jacamelli then leads him to the car and

4   directs him to the back seat, correct?

5   A    Yes, I believe Jacamelli opens the door for him.

6   Q    And then Officer Jacamelli takes his phone away from him

7   at that point, correct?

8   A    Yes.

9   Q    Let's turn to the point in time when Amir Boyer walks up

10   and engages you.

11          MS. FLANNERY:  Your Honor, I'd like to play this

12   clip, it's only a minute --

13          THE COURT:  Okay.

14          MS. FLANNERY:  -- or two.  18:39:36 is the start.

15          THE COURT:  That's him in the red shirt, right?

16          THE WITNESS:  That's correct, Your Honor.

17          THE COURT:  Go ahead.

18      (Video recording played)

19   BY MS. FLANNERY:

20   Q    Amir Boyer walks up and you approach him and he's

21   pointing to the steps, correct?  You turn your back -- is

22   that correct?

23   A    Well, I don't approach Amir Boyer.  Amir Boyer

24   approaches the residence.  I'm walking over there.  I believe

25   I had just gotten off the phone and I'm walking over there,

1    not for Mr. Boyer, but Mr. Boyer does -- does engage with me.

2    Q    Okay.

3    A    I --

4    Q    I'll ask you about that in just a minute.  Let's finish

5    watching the clip.

6    A    Okay.

7    Q    At that point in time, you signal for him to go with

8    your fist over your hand with your thumb pointing backwards,

9    right?

10   A    Yes, correct.

11   Q    And he's still saying things to Mr. Harmon, correct?

12   A    At this point, he is speaking with Mr. Harmon.

13   Initially, he was speaking to us.

14   Q    And you don't care for what he's saying to Mr. Harmon,

15   correct?

16            MR. WITHERELL:  Objection.

17            THE COURT:  Well, can you hear what he says to Mr.

18   Harmon?

19            THE WITNESS:  I can hear, Your Honor.  I have no

20   bias in what he's saying, besides the fact that he's being

21   disruptive.

22   BY MS. FLANNERY:

23   Q    If we could look at the clip, Officer Jacamelli now

24   chases him off --

25            MR. WITHERELL:  Objection.

Rillera - Cross                                    52

1    A      -- correct?

2              THE COURT:  Well, wait, wait.  Okay.  So Mr. Boyer

3    came up, and you heard him say something to Mr. Harmon.  Is

4    that right?

5              THE WITNESS:  No, Your Honor.  Initially, Mr. Boyer

6    comes up and his conversation is directed toward us --

7              THE COURT:  Okay.

8              THE WITNESS:  -- about the house.

9              THE COURT:  All right.

10             THE WITNESS:  He stated --

11             THE COURT:  Do you remember what he said?

12             THE WITNESS:  He stated that his parents had owned

13   that property --

14             THE COURT:  Okay.

15             THE WITNESS:  -- and he was inquiring as to why we

16   were in front of that property.  And I explained to him, if

17   your parents don't own this property anymore, why would you

18   even have concern.  We asked him to leave.  I explained to

19   him we had an active investigation going on and he couldn't

20   even be there, he needed to leave because there still might

21   have been physical evidence around.  We hadn't cordoned off

22   the area yet.  But we asked Mr. Boyer to leave.

23             THE COURT:  All right.

24             THE WITNESS:  Mr. Boyer starts to leave.  Then he

25   starts speaking to Mr. Harmon about you don't have to say

Rillera - Cross                            53

1    anything, you don't got to talk to these guys.  And that's
2    when Officer Jacamelli was like, okay, now you're being
3    disruptive.  You know, he's yelling across the street to him
4    from approximately 15 to 20 feet, however far that is.  So
5    he's raising his voice and elevating his voice.  So Officer
6    Jacamelli goes to engage him again.  And before he can go and
7    talk to him again, Mr. Boyer continues up the street,
8    northbound.
9              THE COURT:  So he left.
10             THE WITNESS:  Yes, he left.  He left the area.
11             THE COURT:  Okay.
12   BY MS. FLANNERY:
13   Q    So the advice that Mr. Boyer was giving Mr. Harmon was
14   that he didn't have to be there and he didn't need to talk to
15   you, correct?
16   A    He didn't say he don't have -- he don't have to be
17   there, he said you don't have to say anything.
18   Q    And I believe you testified, as you testified earlier,
19   he was in your view acting as a street lawyer, correct?
20   A    Yes, correct.
21   Q    At that point in time, did you tell Mr. Boyer -- Mr.
22   Harmon that he didn't have to speak to you?
23   A    No.
24   Q    Did you ever tell Mr. Harmon, through that evening, that
25   he didn't need to speak to you?

1    A    No.

2    Q    When Mr. Boyer walked up and said something about the

3    ownership of the property, did you ask Mr. Boyer where he

4    lived?

5    A    No.

6    Q    When he indicated that he knew something about the

7    ownership of the house to sit down and stay on the steps,

8    correct?

9              THE COURT:  Well, he said he didn't say anything to

10   Boyer.  Is that right?  That's your testimony?

11             THE WITNESS:  That's correct.

12   BY MS. FLANNERY:

13   Q    Mr. Boyer has information about the ownership of the

14   house, or at least past ownership of the house, correct?

15   A    Yes.

16   Q    And you don't ask him whether he lives there, right?

17   A    No.  What I asked him is, does your parents own the home

18   now, because I wanted to see -- Mr. Harmon made a statement

19   that he was in negotiations to come up with some kind of

20   rental or lease agreement, to which, if Mr. Boyer's parents

21   did own the home, then Mr. Boyer would be relevant to the

22   investigation because I would ask him if I can get in contact

23   with his parents.  When he said that they were former owners,

24   then I basically decided that he wasn't important, he wasn't

25   relevant to my investigation.  That's at -- at that point in

1    time is when I asked him to leave.

2    Q    Because your investigation at that point in time was

3    into Mr. Harmon and what he was saying, correct?

4    A    It was into Mr. Harmon and the residence and -- yes.

5    Q    Would you agree with me that the way that you treated

6    Mr. Boyer was different than the way you treated Mr. Harmon?

7    A    Yes, because one is a person of interest and the other

8    is not.

9    Q    Mr. Boyer was free to leave and Mr. Harmon was not.

10   A    That is correct.

11   Q    And one of the things you told Mr. Boyer, as he was

12   asking you questions, was that you couldn't tell him

13   anything, but that when the investigation is finished, he

14   could talk to Mr. Harmon and get all the answers --

15   A    That's correct.

16   Q    -- correct?

17        And Mr. Harmon was there within hearing distance of that

18   statement, correct?

19   A    That is correct.

20   Q    So fair to say that it was clear to Mr. Harmon that he

21   was under investigation, based on your conversation.

22             MR. WITHERELL:  Objection.

23             THE COURT:  Well, but --

24             THE WITNESS:  That's speculation.  I can't speak to

25   how he felt.

Rillera - Cross                          56

1    BY MS. FLANNERY:

2    Q    But would it -- would you agree to me that someone

3    hearing that statement in Mr. Harmon's shoes, it would be

4    reasonable to assume that that meant he was the subject of an

5    investigation.

6              MR. WITHERELL:  Objection.

7              THE COURT:  Yeah, sustained.

8         (Pause in proceedings)

9    BY MS. FLANNERY:

10   Q    Other than Amir Boyer, the only other persons who came

11   and went down the street were a woman briefly unloading

12   groceries, and toward the end, a small boy on a bike.  Is

13   that correct?

14   A    No, that's not correct.  There was another male that

15   came by and inquired.  He was a taller male, skinny, I

16   believe he was wearing white.  He inquired, and he had -- I

17   believe that was his white Lexus SUV.

18   Q    Are you -- the camera, you would agree, would be the

19   best evidence of when that individual came up.  Would you

20   agree?

21   A    Absolutely.

22   Q    And is it possible that he came up at a point in time

23   when Dennis Harmon was not there, either before or after?

24   A    I mean, it's possible.

25             MS. FLANNERY:  Your Honor, I believe I'm finished,

1    but it if I could just have a moment to look over my notes?

2            THE COURT:  Yeah, sure.

3        (Pause in proceedings)

4    BY MS. FLANNERY:

5    Q    Mr. Witherell asked you towards the end of direct

6    whether Mr. Harmon ever asked to speak to an attorney.  Do

7    you recall that testimony?

8    A    Yes.

9    Q    Did you ever tell Mr. Harmon that he had a right to

10   speak to an attorney?

11   A    No, I did not.

12   Q    And you described his demeanor as "compliant," correct?

13   A    Yes.

14   Q    You would agree that, the entire time, there were four

15   or perhaps five officers either in his immediate vicinity or

16   close to it, correct?

17   A    For the majority of the time, yes.

18   Q    Well, there was never a point in time when the cars were

19   gone, right?

20   A    Well, there was a time when officers were not in the

21   immediate vicinity, which we already went over.  Officer

22   Terry was three houses away, I was across the street.  So I

23   wouldn't say "immediate vicinity."

24   Q    Officer, I believe earlier you testified that -- and we

25   saw it on the video, that Officer Terry had walked one narrow

1   row house away, correct?

2   A     He continued on.

3             MR. WITHERELL:  Objection.

4   Q     And there was about a fifteen-second, twenty-second

5   interval before Officer Nelson took his post at the bottom of

6   the stairs, correct?

7   A     Correct.

8             (Pause in proceedings)

9   Q     But at no point in time did any of the officers, other

10  than the supervisor who came and went, leave the two- or

11  three-house vicinity of 3234 Sydenham, correct?

12  A     That is correct.

13  Q     At no point in time did the police cars leave 3234

14  Sydenham, correct?

15  A     That is correct.

16  Q     And it was only about a twenty-second interval when

17  Officer -- I believe it's Terry, walks down to the end of the

18  row of houses and back, correct?

19  A     That is correct.

20            MS. FLANNERY:  Nothing further, Your Honor.

21            THE COURT:  Okay.

22            MR. WITHERELL:  Redirect, Your Honor?

23            THE COURT:  Redirect?

24            MR. WITHERELL:  Yes.  I have a couple of questions,

25  Officer Rillera.

1          REDIRECT EXAMINATION

2     BY MR. WITHERELL:

3     Q    First, you were investigating a shooting, correct?

4     A    Initially, yes.

5     Q    When you and Officer Nelson -- let me ask it this way.

6          Ms. Flannery asked about the racial makeup of the

7     officers that arrived on Sydenham Street.  Do you remember

8     her asking those questions?

9     A    Yes.

10    Q    Prior to officers arriving to the scene of the shooting,

11    did you call over the radio and tell them, make sure we have

12    some more African American officers approach?

13    A    No.

14    Q    When backup came in response to a murder, did you go off

15    -- tell officers to go away because they were white instead

16    of black?

17    A    No.  When officers did respond, it was still a shooting,

18    and I did not.

19    Q    Let's talk about that.  There -- she went -- Ms.

20    Flannery went through a series of photographs close in time

21    of you and other officers in front of Sydenham, in the porch

22    area.  Do you recall that?

23    A    Yes.

24    Q    Just remind the Court, what was your purpose of being at

25    Sydenham Street?

Rillera - Redirect                                          60

1   A      The purpose of being at Sydenham is basically, Your

2   Honor, we are investigating a vehicle that fled a shooting

3   where a man was in critical condition, and the registered

4   owner came back to that address on Sydenham.  After we

5   located the vehicle, we then had Mr. Harmon, who we weren't

6   sure of initially, exited the residence that the registered

7   owner belongs to and then returns to the same residence.  So

8   now we have a person of interest.

9        We also have physical evidence, which is the keys to the

10  vehicle, which were found behind another vehicle that is

11  parked directly in front of that residence, which is also

12  owned by the same owner of the Jeep.

13  Q      When -- the entire interaction that you were having with

14  Mr. Harmon that we have played now between direct and cross.

15  At any time, had an individual been arrested for the shooting

16  of Sherman Williams?

17  A      No.

18  Q      Had the weapon that was used to murder Sherman Williams,

19  had that been found?

20  A      No.

21  Q      When there were four or five officers standing in front

22  of Sydenham Street, were any of your weapons drawn?

23  A      No.

24  Q      And that was even though you did not know where the

25  murder weapon had been at that point.

1    A      That is correct.

2    Q      Okay.  Mister -- Ms. Flannery talked a lot about whether

3    or not Mr. Harmon was free to leave.  I -- and I want to

4    clarify this.  Had the defendant, Mr. Harmon, ran inside his

5    house, he would not have been allowed to do that, correct?

6    A      No.

7    Q      And if he ran down the street, you would have stopped

8    him, correct?

9    A      Correct.

10   Q      Okay.  But let's talk about what you told Mr. Harmon.

11   Did Mr. Harmon, at any point, ask to go inside the residence?

12   A      No, he did not.

13   Q      Did he ever say to you guys, can I just go down the

14   street?

15   A      No.

16   Q      Did he ever indicate to you, in any way, shape, or form,

17   that he was uncomfortable being on that porch?

18   A      No.

19   Q      When you asked him -- tell the Court.  How did you ask

20   Mr. Harmon to stay on that porch during your investigation?

21   A      I basically stated to Mr. Harmon that we had a shooting

22   incident, and I told him that the vehicle that was seen

23   fleeing the scene is registered to the address to where he

24   said he was the only resident at.

25   Q      And Mr. Harmon's -- withdrawn.

1    And how did you tell him to please stay on the -- to

2    stay on the porch?

3    A    I told him that we are in communication with supervisors

4    and detective units, and that he was to stay on the porch

5    during that time.

6    Q    And his response when you said that was?

7    A    Okay.

8    Q    When you asked him to go to the Homicide Unit, Ms.

9    Flannery said, did you give him a choice.  I'm assuming you

10   didn't say, do you want to take your car or our vehicle.  Is

11   that correct?

12            THE COURT:  Well, that's argumentative.  Let's --

13            MR. WITHERELL:  Withdrawn.

14            THE COURT:  You can ask him what he did say.

15   BY MR. WITHERELL:

16   Q    What did you say to Mr. Harmon when you -- when -- to

17   get him to go into the vehicle?

18   A    Well, when Officer Terry indicated that Homicide wanted

19   to speak with Mr. Harmon as a person of interest, basically,

20   Mr. Harmon was told exactly that; that he -- Homicide wanted

21   to talk to him, he had to go down there and make a statement,

22   and from there, you know, I can't predict the future, I don't

23   know.  But normal protocol is he goes down there and makes a

24   statement.

25   Q    When Mr. Harmon was -- said -- was instructed that

Rillera - Redirect                                    63

1   Homicide wished to speak to him for his statement, what was

2   his response?

3   A     He was fine with it.

4   Q     What do you by that?  Tell the Court what he said.

5   A     Your Honor, verbatim, I don't know the conversation.

6   But he didn't verbally disagree or contest the transportation

7   down to Homicide to make a statement.

8   Q     And you used the word he was "compliant" during my

9   direct and the cross-examination by Ms. Flannery.  What do

10  you mean by that he was "compliant" during this interaction.

11  A     By "compliant," I mean he wasn't giving us any verbal

12  judo.  He was basically -- he was basically just not giving

13  us any problems.  Like some people like to, you know, cause

14  altercations.  And he was compliant in the sense that any

15  questions that were answered -- or asked, he answered.  He

16  provided identification without being difficult.  He went

17  into detail with his answers; it wasn't just a one-word

18  answer, yes or no.  He -- you know, when asked about the

19  residence, he said, yes, I live here, and then went into the

20  story of how he became a resident there as a -- as a

21  squatter.

22  Q     In this entire interaction that you had with Mr. Harmon,

23  did he ever indicate to you that he wants to leave his

24  position on the porch at all?

25  A     No.

 1   Q    Did he ever indicate to you he doesn't want to speak to

 2   you?

 3   A    No.

 4   Q    Does he ever request an attorney?

 5   A    No.

 6   Q    And just to be clear, you, at no point, ever read Mr.

 7   Harmon his <u>Miranda</u> warnings.

 8   A    No.  As I stated earlier, police officers in

 9   Philadelphia normally do not Mirandize; that's what a

10   detective will do.

11            MR. WITHERELL:  Okay.  One moment.  No further

12   questions, Your Honor.

13            THE COURT:  All right.  Any recross?

14            MS. FLANNERY:  No, Your Honor.

15            THE COURT:  All right.  Thank you, Officer.

16            THE WITNESS:  Thank you, Your Honor.  Thank you,

17   Counsel.

18        (Witness excused)

19            THE COURT:  Okay.  All right.  That closes the

20   factual record on the motion to suppress.  Is that correct?

21            MR. WITHERELL:  I believe so, Your Honor.  Yes.

22            THE COURT:  Right, Ms. Flannery?

23            MS. FLANNERY:  Yes, Your Honor.

24            THE COURT:  Okay.  Fine.  And we already have a

25   briefing schedule, correct?

1          MR. WITHERELL:  That's correct, Your Honor.

2          MS. FLANNERY:  We do.  I understand my briefs are

3    due Friday.

4          THE COURT:  This week?

5          MS. FLANNERY:  Yes.

6          THE COURT:  Okay.  Is that doable?

7          MS. FLANNERY:  I won't have this transcript, unless

8    we expedite it today.

9          THE COURT:  Well, are you sure you need this in its

10   entirety, or you could supplement your -- I'd like to get the

11   briefing stuck to the schedule, and I'll be glad --

12         MS. FLANNERY:  I'll do --

13         THE COURT:  I'll be glad to -- I mean, I'll sign

14   the authorization to get the transcript within a week.  Is

15   that all right?

16         MS. FLANNERY:  Thank you, Your Honor.  And I would

17   just ask leave -- I'll get a filing in on Friday.  I would

18   ask for leave to supplement --

19         THE COURT:  Yeah.

20         MS. FLANNERY:  -- and I --

21         THE COURT:  You can supplement it.

22         MS. FLANNERY:  I believe I have a reply --

23         THE COURT:  You can supplement it and -- yeah, you

24   know, you can supplement it in your reply brief.  Didn't I

25   allow for a reply brief?

1          MS. FLANNERY:  I believe we have a reply brief in

2     the schedule.

3          THE CLERK:  You do.

4          THE COURT:  Yeah, all right.  So you can supplement

5     it as to today's hearing in the reply brief, and I think --

6     and the Government can -- you can both brief what happened

7     today.  I don't think --

8          MS. FLANNERY:  That's fine, Your Honor.

9          THE COURT:  I don't think --

10          MS. FLANNERY:  Thank you.

11          THE COURT:  -- anybody will be prejudiced by that.

12     Okay?

13          MS. FLANNERY:  Thank you.

14          THE COURT:  That's what I'd like to do.  All right.

15     So I'll approve a one-week delivery of the transcript.  All

16     right.  Okay?  Okay.

17          Now let's discuss -- I'll tell you what we're going

18     to do.  I want to discuss the motion to sever briefly, and

19     then I'm going to take a short recess, and then I'll come

20     back.

21          All right.  The papers on the motion to sever

22     indicate that Mr. Harmon is only charged in Count Two with

23     possession of the drugs found at North Sydenham Street.  He

24     is not charged in conspiracy and/or any other count.  And he

25     is -- and that's the situation.

1          Now what -- Ms. Flannery may not remember this, but

2     my first major criminal case in this Court was something

3     that's called the "City Hall Tapes" case, which -- with --

4     Ronald White was the lead defendant, before he died.  And in

5     that case, there was a conspiracy charge, but there was one

6     defendant who was not charged with a conspiracy and -- but

7     was charged with like a single -- basically, a single act of

8     criminal conduct, but it was not the same as the conspiracy.

9     And there were five other defendants that were charged with

10    conspiracy.

11         And in that case, after a motion similar to this

12    one -- and the defense lawyer was Mr. DiStephano (phonetic) -

13    - I granted the motion to sever that one defendant, and we

14    had his trial before we had the other trial with the five,

15    and he was acquitted.  And my reason for severing it was,

16    basically, what it appears to be here:  That he was not --

17    that defendant, like Mr. Harmon, was not charged with a

18    conspiracy and was only charged in a single count, and that I

19    felt -- and I granted that for several reasons; primarily

20    because I thought there was substantial prejudice of an

21    individual charged in a single count, and not charged with

22    conspiracy, not charged with -- and Mr. Harmon is not charged

23    with any sale of drugs.  He's only charged with the

24    possession of what was found inside North Sydenham Street.

25    So I am prone to grant Mr. Harmon the same relief I granted

1    the defendant, whose name I can't recall, in the other case.

2    That was at least more than ten years ago.

3         Now, in doing -- before I do that, what I'd like to

4    discuss after the hearing -- after the recess, rather, is if

5    the Government would accede to the severance; or, if not, and

6    I order it, whether -- how long the Government's case would

7    take to present its evidence, and whether we could do that

8    before September 23rd, which is the date the case is now

9    scheduled to start.

10        Okay.  Ten-minute recess and then I'll come back.

11   Thank you.

12        (Recess taken at 10:33 a.m.)

13        (Proceedings resume at 10:48 a.m.)

14        THE COURT:  Okay.  All right.  Be seated, please.

15   All right.  Let's go back on the record.

16        All right.  All right.  It's -- let me have a

17   couple of comments on the record.  I have a phone call I have

18   to take at eleven o'clock in chambers, so that gives us about

19   ten minutes.

20        Just let me just say the following.  I'm not asking

21   you for your comments at this time.  Based on this testimony

22   and the testimony of the other officers, I think I understand

23   what Ms. Flannery is attempting to show, that the defendant,

24   Mr. Harmon, was in some kind of a situation in which there

25   should have been <u>Miranda</u> warnings.  So I am -- I don't have

1   any final opinion on that, but I would ask counsel to direct

2   their briefing to Third Circuit and Supreme Court cases that

3   deal with this kind of questioning of an individual who is --

4   who had -- the police have reasonable grounds to believe he

5   has some information, he may have some information about a

6   shooting that turned into a homicide, and that the question

7   of whether that is custodian interrogation I think is an

8   important one.

9           And I think that there are a number of -- I'm not -

10  - I can't say, from memory, that I'm aware of either a

11  Supreme Court or Third Circuit case which has dealt with this

12  exact factual situation, but there are a number of cases that

13  deal with when the concept of custodial interrogation --

14  which is the touchstone of Miranda -- comes into play and

15  whether that comes -- and whether the scenario that has been

16  developed and the testimony of this case, including the most

17  recent witness, warrants me to find that this is custodial

18  interrogation is what I think is the primary issue.  Okay?

19          That's what I'm -- that's what I think is key here

20  because I -- as I recall, when he went down to the Roundhouse

21  and was being interviewed, at that time, he was advised of

22  his Miranda rights and --

23          MS. FLANNERY:  Not immediately, Your Honor.  He was

24  questioned for --

25          THE COURT:  You're right.  But you know -- well, we

1    have the testimony of Detective Peters.  But what I want to

2    say is I find the testimony of the witnesses to have been

3    credible.  Detective Peters, this Officer Rillera and the

4    other officers, I find their testimony to be credible.  So I

5    think, Ms. Flannery, when you deal with the facts, you --

6    you're welcome to argue otherwise, but I think they have been

7    very credible witnesses, I really do, so -- all right.  Now

8    that's that.

9              In the -- okay.  On the severance motion.  All

10   right.  I am asking you, Mr. Witherell, am I correct that Mr.

11   Harmon is charged only in the second count with possession of

12   the drugs that were found in North Sydenham Street, and he's

13   not charged with the conspiracy, correct?

14             MR. WITHERELL:  I'm going to let Mr. Stengel --

15             THE COURT:  Oh, Mr. Stengel?

16             MR. STENGEL:  Yeah, Your Honor, I'll field that.

17   And that is true.  He's charged in one count, that's Count

18   Two.

19             THE COURT:  Right.  Okay.  Now I sense a distinct

20   situation of unfairness to Mr. Harmon in that situation,

21   having to sit through what is likely to be a two- or three-

22   week trial of eight other individuals who are charged with a

23   very serious conspiracy.  What's your answer to that?

24             MR. STENGEL:  I --

25             THE COURT:  And look, I know I have discretion, I

1    know that --

2              MR. STENGEL:  Yeah.

3              THE COURT:  -- the Government's decision on how to

4    charge is entitled to some weight.  But answer my question

5    about the overall fairness of the situation.

6              MR. STENGEL:  Your Honor, I'll note that the cases

7    say that this is -- again, it's your discretion based on the

8    facts of a particular case.  I can't speak to the City Hall

9    Tapes case, I'm not familiar with those facts, but I am

10   familiar with some facts about cases we cite in our brief.

11             For example, it cited a case called Tripp

12   (phonetic) and a case called Rogers I; the first was an

13   opinion by Judge Sur (phonetic), the second opinion by Judge

14   Bartle.  And which -- those cases -- the facts of those cases

15   seemed more analogous to this case, compared to the -- I

16   think the Branken case (phonetic) from the Second Circuit the

17   defense cites, where it's 2 combined indictments, 81 counts,

18   a tax conspiracy, where it's much more complex than this.

19   Though there is a sufficient amount of evidence in this case

20   of the overall drug conspiracy, it's not overly complex.

21             Moreover, the fact that he's -- he is -- that Mr.

22   Harmon is charged in only one of the counts in many ways

23   makes that an easier argument.  You know, he is not involved

24   in all of the overt acts, safe for the one in which he's pled

25   --

1       THE COURT:  Well, if Ms. Flannery --

2       MR. STENGEL:  -- he's involved --

3       THE COURT:  -- agreed with you --

4       MR. STENGEL:  -- in this one.

5       THE COURT:  -- that this was doing him some kind of

6   favor, she wouldn't have made the motion to sever.

7       MR. STENGEL:  So -- certainly not doing him a favor

8   by the way it's charged.  I'm just commenting on the reality

9   of the indictment.

10      THE COURT:  Okay.  Let me ask another question.  If

11  I were to grant the severance, I would like to try this case

12  before the conspiracy case.  Can we try this case beginning

13  the week of September 9th or beginning the week of September

14  16?  Ms. Flannery, are you available either of those?

15      MS. FLANNERY:  Not the week of the 16th, Your

16  Honor, but the week of the 9th, I am.

17      THE COURT:  So it would be the 10th.  We'd pick a

18  jury on Thursday, the 5th.  And how long will the

19  Government's case if it was only Mr. Harmon?

20      MR. STENGEL:  We believe it would be a three-to-

21  four-day trial.

22      THE COURT:  All right.  I doubt it, but maybe.

23  Okay.  Are you available, either one of you available on the

24  week of September 10th?

25      MR. STENGEL:  The week of September 10th, Your

1    Honor --

2            MS. FLANNERY:  Is the 9th Memorial -- Labor Day?

3            THE COURT:  The 9th looks like a Sunday.

4            MS. FLANNERY:  The 10th is a Tuesday.

5            MR. STENGEL:  Yeah, the 9th is --

6            THE COURT:  Oh, yeah.  Right.  Wait, wait.

7            MR. STENGEL:  The 9th is --

8            THE COURT:  You're right, Monday is the 9th.  This

9    is a funny-looking calendar.  All right.  All right.  You're

10   right.  Okay.  It's the 9th.  We'd pick a jury on the 5th,

11   Thursday the 5th, and we'd start the case on Monday the 9th.

12           MR. STENGEL:  I am scheduled to be out of town that

13   week, Your Honor, but --

14           THE COURT:  Well, Mr. Witherell, are you free?  I

15   mean, this does not require two prosecutors.  You're welcome

16   to be here, but I'm not going to postpone it.

17           MR. WITHERELL:  No, I understand, Judge.  My fear -

18   - and I don't know if the Court will indulge my fear -- but

19   that -- the case that follows, which is September 23rd --

20           THE COURT:  Right.  Well, this is -- it would be a

21   warmup for you.

22       (Laughter)

23           MR. WITHERELL:  I -- while I appreciate that, Judge

24   --

25           MR. STENGEL:  Your Honor, we did discuss at the

1     break whether we felt we could try this case before 23rd.

2     It's our opinion, based on our schedules, that we would not

3     be able to.  And you're proposing --

4                THE COURT:  All right.  Well, I don't --

5                MR. STENGEL:  -- specific weeks.

6                THE COURT:  -- agree with that.

7                MR. STENGEL:  And you know, we can tell you what

8     our availability is then.

9                THE COURT:  All right.  I don't agree.  And I don't

10    -- I think the Government's case could be presented in a day

11    or a day or a day and a half, that's my -- I move cases

12    quickly.  I'm not -- I mean, I'm not going to --

13                MR. STENGEL:  Sure.

14                THE COURT:  -- put a deadline on you, but I don't

15    see how this case -- how your case would take more than two

16    days tops.

17                All right.  Gentlemen, that's what we're going to

18    do, and ladies.  All right.  I'm going to grant the severance

19    and we're going to have a jury trial on September 5th, and

20    the trial will start on Monday the 9th.

21                MR. WITHERELL:  Judge, just so I'm clear, you're

22    planning on picking --

23                THE COURT:  Well --

24                MR. WITHERELL:  -- a jury on the 5th, and you plan

25    on starting testimony on the 9th.

1             THE COURT:  Yes, correct.

2             MR. WITHERELL:  The 9th is not some sort of

3  holiday?  I don't know, for some reason, my calendar seems to

4  X that out.

5             THE COURT:  Is it a --

6             MR. WITHERELL:  I'm just making --

7             THE COURT:  Is it a Jewish holiday?

8             MR. WITHERELL:  I'm just trying to find out.

9        (Court and court personnel confer)

10           MS. FLANNERY:  I'm checking with Mr. Gugel

11  (phonetic).

12        (Participants confer)

13           THE COURT:  Okay.  I'm pretty sure it is not a

14  Jewish holiday or any other holiday.

15           MR. WITHERELL:  Your Honor, I --

16           THE COURT:  It's certainly not Labor Day.

17           MR. WITHERELL:  I have a holiday on my calendar,

18  that I'm somewhat embarrassed to admit I don't know what it

19  is, it's called "Ashura" or "Ashura."

20           THE COURT:  Well, if it's a holiday, then we'll

21  start the evidence on the 10th.

22           MR. WITHERELL:  Okay, Judge.

23           MS. FLANNERY:  Your Honor, I -- mister -- I don't

24  know what holiday -- religious holiday that would be.  Mr.

25  Harmon is Muslim, right?

1          THE DEFENDANT:  Yeah, I'm Muslim.

2          MS. FLANNERY:  And he's not familiar with that

3     holiday, it's not a Jewish holiday --

4          THE COURT:  All right.  Well --

5          MS. FLANNERY:  -- it's not a Christian holiday.

6          THE COURT:  I'll enter an order with the specific

7     day, and we'll have jury selection on July 5th.  And I'm

8     going to give you dates for motions in limine and things like

9     that, that will be in August, so that will be in the pretrial

10    order, as well.

11          Okay.  Thank you very much.  Court is adjourned.

12          MS. FLANNERY:  Thank you, Your Honor.

13          MR. WITHERELL:  Thank you, Judge.

14      (Participants confer)

15          MS. FLANNERY:  Oh, Your Honor, we do need to --

16          THE COURT:  Do we have something on Wednesday in

17    this case now?

18          MR. WITHERELL:  I don't know.  Excuse me.

19          THE COURT:  Wait a minute.

20          MR. STENGEL:  We have a due date on Friday for some

21    briefs, or a brief.

22          THE COURT:  Yeah, that's right.

23          MR. STENGEL:  That's all I have on my --

24          THE COURT:  Well, I would like to thank everybody

25    in this case for being so cooperative with scheduling, and I

1   appreciate that very much.

2           MS. FLANNERY:  Your Honor, before Your Honor has to

3   leave, I would like a chance to investigate further

4   Pretrial's suggestion.  Mr. Harmon is almost finished with

5   his drug program.  There's been no judicial or medical

6   finding that I'm aware of that he needs mental health

7   treatment.  He's --

8           THE COURT:  Well, you don't think he needs any?

9           MS. FLANNERY:  No, Your Honor.

10          THE COURT:  Well, would you mind --

11          MS. FLANNERY:  And he's working.

12          THE COURT:  Here, let me show you this document.

13  I'm not going to do anything about it today.  Why don't you

14  call, if you don't mind, Ms. Baxley, who was here?  Why don't

15  you take a look at --

16          MS. FLANNERY:  May I have a copy of this, Your

17  Honor?

18          THE COURT:  Yeah.

19          MS. FLANNERY:  Is that permitted?

20          THE COURT:  Janice, run a copy of that off for Ms.

21  Flannery.

22          MS. FLANNERY:  Thank you.

23          THE COURT:  And why don't you talk to her.  Okay?

24          MS. FLANNERY:  I'll check with her today.

25          THE COURT:  All right.  Thank you very much.

1            All right.  Court is adjourned.  Thank you.

2        (Proceedings concluded at 10:57 p.m.)

3                         *****

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

_____        July 2, 2019

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Advanced Transcription