# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | CRIMINAL ACTION |
|---|---|
| v. | NO. 18-249-9 |
| DENNIS HARMON | |

## MEMORANDUM RE: MOTIONS TO SUPPRESS

**Baylson, J.**                                                                                                            **August 7, 2019**

### I. Introduction

In this case involving allegations of conspiracy to traffic drugs, Defendant Dennis Harmon, whose trial has been severed from the other defendants and will begin on September 9, 2019, has moved the Court for an order suppressing certain statements he made to police and certain evidence taken from his cellphone pursuant to a federal search warrant. (ECF 214, 216). For the following reasons, these Motions to Suppress will be GRANTED IN PART and DENIED IN PART.

### II. Factual Findings

Many of the facts relevant to these Motions have been summarized in a previous Memorandum of the Court Denying Motions to Suppress Evidence Obtained From 3234 N. Sydenham Street. (See ECF 340). Counsel agreed that the record developed in relation to those previous motions should be included in the record on Harmon's Motions now before the Court. The Court therefore incorporates that previous summary here by reference, to the extent those facts are not included below.

On September 11, 2017, members of the Philadelphia Police Department arrived at 3234 N. Sydenham Street, Philadelphia, Pennsylvania, as part of an investigation stemming from a shooting that took place elsewhere that day. The police had determined that a vehicle that was connected to the shooting was registered to an Abdul West at the address. Around 6:30 P.M.,

Harmon walked out of the residence at 3234 N. Sydenham Street and walked across the street and back. (ECF 301, "6/24/19 Hearing Tr.," at 9:9–11, 10:5–7, 11:10–12). Upon returning to the property, Harmon was stopped by the police and questioned about his connection to it. (Id. at 11:10–12). Harmon told police that he resided there alone and that he was "squatting" without permission. (Id. at 11:10–23). He also told police that he had no knowledge of the vehicle connected to the earlier shooting, which was registered to a different individual at the 3234 N. Sydenham Street address. (Id. at 13:3–9). Harmon provided an identification card that listed a separate residence, and an officer then ran Harmon's identification through various police databases to verify it and check for any outstanding warrants. (Id. at 12:7–9). The officer did not return the identification card to Harmon, and other officers continued to question him. (Id. at 40:22–25, 43:6–9).

Harmon was directed to remain on the porch or front steps of the residence, where he was not handcuffed or arrested. (Id. at 13:21–14:2, 14:16–24).

At around 6:39 P.M., Amir Boyer approached the home and inquired about why the police were questioning Harmon. Boyer told police that his family used to own the property at 3234 N. Sydenham Street. He also advised Harmon that he did not have to speak with police. The police eventually told Boyer to leave. (Id. at 16:13–20, 17:4–9, 17:21–18:4).

At 7:15 P.M., the police learned that the victim of the shooting they were investigating had died. (Id. at 21:16–22:6). Believing that Harmon would have to go to the Philadelphia Homicide Division for further questioning, an officer then frisked Harmon for weapons. (Id. at 22:8–24).

A short while later, after a total of forty-five minutes on the porch of 3234 N. Sydenham Street, Harmon was transported in a marked police vehicle to the Philadelphia Homicide Division. (Id. at 26:10–15). The transporting officer took Harmon's cellphone at this time. (Id. at 24:18–

23, 26:10–27:3). He was not handcuffed or placed under arrest, and police officers testified that Harmon agreed to give a statement to the Homicide Division. (Id. at 25:18–20, 27:17–25).

Harmon arrived at the Homicide Division around 8:00 P.M. and was placed in a locked witness interview room. His cellphone was stored in a property box outside the door of the room. Detective Brian Peters entered to speak with him sometime after 11:00 P.M. (ECF 291, "6/12/19 Hearing Tr.," at 12:7–9). Detective Peters proceeded to question Harmon for twenty to thirty minutes before advising Harmon of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). (Id. at 18:1–5). Before being read Miranda warnings, Harmon allegedly told Detective Brian Peters that he had marijuana in 3234 N. Sydenham Street. (Id. at 15:4–7).

At 11:50 P.M., Detective Peters then initiated a video recording of the room and read Harmon the Miranda warnings from a card. (Id. at 17:1–5, 19:2–4; see also Gov. Ex. 2). Harmon then initialed the card and inscribed it with the time. (Id. at 17:13–18). Detective Peters continued to question Harmon, now on videotape. (Id. at 21:17–25).

Harmon was held in the locked witness interview room overnight. From the time he arrived until the time he left, Harmon remained in the room for about nineteen hours. (Id. at 62:16–17). Detective Peters came and went from the room several times over that period and asked Harmon additional questions. At some point, Detective Peters brought Harmon a written summary statement, which Harmon made a change to and then signed. (Id. at 29:8–30:5). During the afternoon hours of September 12, 2017, Harmon was taken to be charged with state narcotics crimes in connection with drugs found inside the residence at 3234 N. Sydenham Street. (Id. at 31:8–15, 63:4–6). His cellphone was seized as evidence in that case. (Id. at 31:2–19).

On November 20, 2018, federal authorities obtained a search warrant to search the contents of Harmon's cellphone. The warrant was issued on the basis of an affidavit submitted by an agent

3

with the Federal Bureau of Investigation ("FBI"). The federal authorities then searched the cellphone that same day.

## III. Parties' Contentions

Harmon seeks to suppress three types of statements and also evidence seized from a search of his cellphone. The statements at issue can be categorized as follows:

1. Oral statements made outside 3234 N. Sydenham Street on September 11, 2017;

2. Unrecorded oral statements made after transportation to the Philadelphia Police Department's Homicide Division and being placed in a witness interview room prior to receiving Miranda warnings;

3. Videotaped statements and written statements made after receiving Miranda warnings.

Harmon's Motion is premised on perceived violations of his Fourth, Fifth, and Sixth Amendment rights. Specifically, Harmon contends that his interactions with the police at 3234 N. Sydenham Street and then at the Homicide Division were custodial seizures, and that he was therefore owed Miranda warnings before being questioned in those settings. Harmon notes that he was not read his Miranda warnings until after 11:30 P.M. on September 11, 2017, about five hours after he first came in contact with the police at 3234 N. Sydenham Street. Although he eventually did waive his rights under Miranda, Harmon contends that his waiver was neither knowing nor intelligent. He further contends that the police improperly re-elicited incriminating statements he previously made after he supposedly waived those Miranda rights, and that the Miranda warnings did not cure any improper seizure that proceeded them. Regarding his cellphone, Harmon contends that it was not seized pursuant to a warrant or incident to lawful arrest. He also argues that the eventual warrant to search the cellphone was void *ab initio* because the

phone was illegally seized, and because the affidavit supporting the warrant was based on false and misleading information.[1]

In response, the Government asserts that it is only seeking to admit Harmon's statements made to officers prior to being asked to stay on the porch of 3234 N. Sydenham Street and those statements recorded after Harmon waived his rights under Miranda. Those statements, the Government argues, were not obtained in violation of any constitutional right. The Government also argues that federal authorities were acting in good faith when they obtained evidence from Harmon's cellphone pursuant to a valid federal search warrant, which was only minimally based on Harmon's allegedly unlawful arrest and was significantly attenuated from that arrest.

## IV. Discussion

### A. Admissibility of Statements Made on the 3200 Block of N. Sydenham Street

The Court finds that the statements the Government is seeking to admit that were made before the police asked Harmon to travel in a police car to the Homicide Division were made voluntarily and will not be suppressed.

A serious crime had taken place nearby. A vehicle, whose owner was possibly involved in the shooting/homicide, was found to be registered at the same address where the police had begun discussions with Harmon, 3234 N. Sydenham Street. The conversations that took place between several police officers, all of whom testified credibly, and Mr. Harmon, do not raise any constitutional issues. There is no legal doctrine that prevents police officers from talking to individuals who reside in or near a home that might be the location of a person with knowledge of

---

[1] Harmon contests that the affidavit misleadingly stated that the cellphone was recovered "during" Harmon's arrest, and that the affidavit incorrectly stated that Harmon was congregating with his co-defendant, Abdul West, the supposed leader of a violent drug trafficking organization, outside 3234 N. Sydenham Street on September 11, 2017.

5

relevant facts. The fact that Harmon eventually told the police officers that he lived in that house does not in and of itself make him a suspect, particularly because the name on the vehicle registration was a name different than Harmon's. Furthermore, all of the evidence indicates that Harmon voluntarily answered the questions that the police asked and did not make any statements that were at all incriminating or would warrant any amount of suspicion. The pole camera video entered into evidence shows that Harmon left the porch for a brief period, walked across the street, and came back. These actions themselves show that Harmon was voluntarily talking to the police.

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has explained that a seizure takes place when an officer applies physical force or makes a show of authority to which the suspect submits. California v. Hodari D., 499 U.S. 621, 626 (1991). A show of authority occurs when a police officer's words and actions convey to a reasonable person that he is being ordered to restrict his movements. Id. at 628. Courts are to consider the surrounding circumstances to determine whether a reasonable person would have felt free to decline the interaction with law enforcement. See United States v. Mendenhall, 446 U.S. 544, 554 (1980); Hodari D., 499 U.S. at 627–28. Such circumstances may include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554; see also United States v. Lowe, 791 F.3d 424, 431 (3d Cir. 2015).

Here, although there were four officers on scene, testimony did not reveal that they were behaving in a threatening manner or otherwise engaging in conduct that might have made Harmon feel compelled to speak with them. The police merely asked Harmon about his connection to the property at 3234 N. Sydenham Street, which he answered without objection. It is also clear that

he volunteered the information, and the Court sees no legal basis for suppressing the statements Harmon made at that time.[2] Indeed, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Florida v. Royer, 460 U.S. 491, 497–98 (1983).[3] This interaction does not warrant suppression of Harmon's initial statements.

Nor was Harmon in custody at the time he initially interacted with police. The Supreme Court has explained that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). To determine whether an interaction with law enforcement is custodial, a court must consider the surrounding circumstances of an interrogation, with "the ultimate inquiry [being]

---

[2] There was some testimony that the officers would have pursued Harmon had he attempted to walk away, but there is no evidence that this intent to detain was communicated to Harmon. An officer's "subjective intention . . . to detain the [defendant], had [he] attempted to leave, is irrelevant except insofar as that may have been conveyed to the [defendant.]" Mendenhall, 446 U.S. at 554 n.6.

[3] Although the Court concludes that Harmon spoke with the police outside 3234 N. Sydenham Street voluntarily, it is also well established that an "officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity may be afoot." Illinois v. Wardlow, 528 U.S. 119, 123–24 (2000). The police reasonably approached Harmon after it became clear to them that he was attempting to enter a property to which a vehicle connected to a shooting was registered. They were acting lawfully when they questioned him about his connection to that property, and when they took actions—such as establishing his identity—confirming or dispelling any concerns they had about persons residing at or connected to the property.

whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Id. (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Factors to take into account include:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

United States v. Willaman, 437 F.3d 354, 359–60 (3d Cir. 2006).

Each of these factors weighs in favor of finding that Harmon was not in custody when he spoke to police outside 3234 N. Sydenham Street. Although one officer testified that if Harmon had tried to leave, the officers would have stopped him, (see 6/18/19 Hearing Tr. at 37:17–24), the Court's inquiry must focus "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Stansbury, 511 U.S. at 323; see also United States v. Liam, 432 F.3d 524, 528 (3d Cir. 2006) ("[T]he officer's subjective intent is not dispositive. . . ., the test for whether an individual is in custody is an objective one."). Indeed, the evidence does not show that Harmon was *told* he could not leave.[4] The interaction took place outside on a public sidewalk, and although the street was partially blocked by parked police vehicles during some of the encounter, pedestrians could come and go, as evidenced by Boyer approaching to inquire about the police activity. The initial questioning also did not last very long, and there was no show of force or coercive tactics by the police. It is clear, based on the testimony before the Court, that Harmon voluntarily submitted to

---

[4] The fact that an officer took Harmon's identification card to confirm his identity does not, initially, indicate that the interaction was custodial. The identification card was taken during questioning and Harmon did not object or ask for it back as he continued to discuss his connection to 3234 N. Sydenham Street with the police.

this early questioning about his connection to the property. The Court sees no reason to find that Miranda warnings were required at this stage of the interaction.

The Court finds that the encounters between Harmon and the police on the 3200 block of N. Sydenham Street did not violate any of his constitutional rights and the Motion to Suppress will be denied as to this phase of any statements by Harmon before he gets into the police car.

**B.     Admissibility of Statements made at the Police Administration Building**

The Government also seeks to admit statements Harmon gave at the Police Administration Building after receiving Miranda warnings. For the following reasons, these statements must be suppressed pursuant to Dunaway v. New York, 442 U.S. 200 (1979).

As the police credibly testified, they wished to have a more lengthy interview with Harmon at the Police Administration Building at 8th and Race Streets in Philadelphia and offered to give Harmon a ride in a police car to the police building. The Court finds that this did not, in and of itself, constitute a Fourth Amendment seizure of Harmon, in that all of the evidence shows that he had no objection to going to the police building and was not handcuffed at any time while en route. The police did ask Harmon for his cell phone before he got into the police car and frisked his body to determine that he was not carrying any weapons. The Court finds that this phase of the interaction between Harmon and the police also did not raise any constitutional violations.

Although the Government has conceded that Harmon was "in custody" once he arrived in the police building and was placed in an interview room, where he was subsequently interviewed, this fact does not in any way "relate back" to what took place on the street outside 3234 N. Sydenham Street, or require finding any illegality of the police transporting Harmon to the police building to be interviewed as a witness.

The Court also notes that the facts showed that the police entered 3234 N. Sydenham Street,

9

apparently while Harmon was en route to the police headquarters. The circumstances of this entry have been discussed in the prior Memorandum and will not be repeated here. (See ECF 340). Although the Government has conceded there were no exigent circumstances to enter that building, this Court expressed some disagreement with that position. (Id. at 10 n.8).

The Government concedes, and the Court agrees, that Harmon was in a custodial position and was not free to leave when he arrived at the Homicide Division and was placed in the interview room, even though he had not been charged with any crime.

The record does show that Harmon arrived at the Homicide Division and was placed in the interview room at approximately 8:00 P.M., but the questioning of Harmon by Detective Peters did not begin until at least three hours later, sometime after 11:00 P.M. Detective Peters initially questioned Harmon for about a half hour, as a witness.[5] However, sometime between 11:30 P.M. and 11:50 P.M., according to the testimony of Detective Peters, Harmon told the detective that drugs inside of 3234 N. Sydenham Street belonged to him and that he intended to sell them. At this point, Detective Harmon quite properly understood that Harmon may have committed a crime and gave him his Miranda warnings and Harmon signed the Miranda warnings card.[6]

A number of legal issues arise out of this set of facts, starting with Harmon's arrival at the Homicide Division.

---

[5] There was testimony that Detective Peters was aware that some drugs had been found inside 3234 N. Sydenham Street before he began to question Harmon. (See ECF 283, "5/30/19 Hearing Tr., at 139:10–17). However, he did not learn about the "additional narcotics" found pursuant to the search warrant until after midnight. (See 6/12/19 Tr. at 19:2–13, 28:9–19).

[6] The Court finds that Detective Peters' reading of the Miranda warnings was proper. Although the warnings card was read with some haste, Harmon never expressed any sort of hesitation about the meaning of the warnings and never objected to further questioning. He was clearly capable of doing so, based on his careful review and revision of the summary statement Detective Peters later presented to him. There is no reason to conclude that Harmon did not employ the same scrutiny when he heard his Miranda warnings and initialed the warnings card.

The Government's contention is that, even though it concedes that Harmon was in a custodial situation, no incriminating statements were made by him until after 11:00 p.m., and the Government has no intention of using at trial any statements Harmon made at the Homicide Division prior to being read the Miranda warning. However, the Government asserts that once Harmon received Miranda warnings and waived any right to remain silent, that the Miranda warnings themselves had "cured" any constitutional violation, whether arising under the Fourth, Fifth, or Sixth Amendments, and that Harmon's Miranda waiver warrants the Court denying the motion to suppress as to Harmon's post-Miranda statements.

Where a defendant is unlawfully detained and there are no intervening events that break the connection between that detention and his confession, the statement is inadmissible even if valid Miranda warnings were given. See Dunaway, 442 U.S. at 219 (1979). The Supreme Court made clear in both Dunaway and Brown v. Illinois, 422 U.S. 590 (1975) that the proper administration of Miranda warnings will not ameliorate previous questioning or investigation made without warrant or probable cause. See Dunaway, 442 U.S. at 219; Brown, 422 U.S. at 602–03; see also United States v. Wrensford, 866 F.3d 76, 88 (3d Cir. 2017).

After substantial review of Dunaway, the Court finds that the confession should be suppressed. During the initial three-and-a-half hour period, Harmon was in custody, seized without probable cause, and was questioned for thirty minutes without receiving Miranda warnings. The fact that he was eventually given Miranda warnings does not cure the constitutional deprivation that took place while Harmon was waiting to be interviewed and then made his initial admission of possessing drugs at a time when he had not been warned of his Miranda rights. This interval, although not presenting as serious a situation of deprivation of rights as in many cases, is nonetheless an undisputed fact and the Court concludes the subsequent confession, even though it

11

followed Miranda warnings and the Miranda waiver, cannot be separated from the fact that while in custodial status and held for over three hours without probable cause to arrest, Harmon made an incriminating statement before getting his Miranda warnings.

The Government attempts to distinguish Dunaway on the basis that Harmon voluntarily agreed to go to the Homicide Division, and that by the time Detective Peters began to question him, the police had conducted a protective sweep of 3234 N. Sydenham Street and found drugs inside. According to the Government, this discovery, coupled with Harmon's assertion that he lived there alone, was enough to establish probable cause when Detective Peters began interviewing Harmon. But there is no dispute that the police had no warrant to arrest Harmon at that time. The Government's argument that the police nonetheless had probable cause to arrest Harmon is weakened by the Government's concession in separate briefing that the protective sweep that revealed the drugs inside 3234 N. Sydenham Street was conducted without a warrant or exigent circumstances. As this Court decided in the previous Memorandum Opinion, the discovery of drugs inside 3234 N. Sydenham Street is admissible because they would have inevitably been discovered later that evening when police officers executed a warrant that was independently supported by probable cause. But that warrant execution did not take place until after Detective Peters read Harmon his Miranda warnings. Detective Peters even testified that he was thrown off his line of questioning when Harmon initially spoke about his connection to drugs inside 3234 N. Sydenham Street, and that the probable cause to arrest Harmon arose from the execution of the search warrant later that night.

There were therefore no intervening events that broke the connection between Harmon's illegal detention and the statements the Government now seeks to admit. The fact that Harmon was eventually read the Miranda warnings "do[es] not alone sufficiently deter a Fourth

12

Amendment violation." Brown, 422 U.S. at 601. To admit his statements, even though they were made after proper Miranda warnings, "would allow law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the procedural safeguards of the Fifth." Dunaway, 442 U.S. at 219 (citation and quotation marks omitted). The Court must therefore suppress Harmon's post-Miranda statements.

C. **Admissibility of Cellphone Evidence**

The Court declines to suppress the evidence obtained through a search of Harmon's cellphone. Although the affidavit presented in support of the warrant to search Harmon's cellphone referenced a prior statement of his, as well as his arrest, it also included details obtained by law enforcement over the course of the months-long investigation. Having considered the other details contained in the affidavit, it is clear to this Court that the Magistrate Judge would have issued the warrant even absent that reference to Harmon's arrest. The warrant was thus supported by probable cause, even if the references to Harmon's arrest were improper, and the independent source doctrine permits the evidence to be admitted at trial. See United States v. Price, 558 F.3d 270, 281 (3d Cir. 2009).

Moreover, there is no evidence that the agents engaged in "deliberate, reckless, or grossly negligent conduct" when they executed the warrant. Herring v. United States, 555 U.S. 135, 144 (2009). Instead, the Court finds that they acted in good faith and reasonable reliance on the warrant, and the suppression of any evidence that resulted would be inappropriate under United States v. Leon, 468 U.S. 897, 922 (1984). See also United States v. Hodge, 246 F.3d 301, 307–08 (3d Cir. 2001) ("The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception."). It is well established that the exclusionary rule rarely applies when law enforcement conducts a search

pursuant to a warrant issued by a neutral and detached Magistrate. Hodge, 246 F.3d at 308 (citing Leon, 468 U.S. at 922–23). The Court should only call such reliance into question in four situations:

(1) The magistrate issues the warrant in reliance on a deliberately or recklessly false affidavit;
(2) The magistrate abandoned his judicial role and failed to perform his neutral and detached function;
(3) The warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or
(4) The warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Hodge, 246 F.3d at 308 (citing United States v. Williams, 3 F.3d 69, 74 n.4 (3d Cir. 1993)). There is no evidence that any of the foregoing situations took place here.

## V. Conclusion

For the foregoing reasons, the Motions to Suppress Statements and Cellphone Evidence (ECF 214, 216) filed by Defendant Dennis Harmon are GRANTED IN PART and DENIED IN PART.

An appropriate Order follows.

O:\Criminal Cases\18cr249 US v West et al\18cr249-9 Memo re Mots to Suppress Stmts & Cellphone Evid